**Juan C. Chavez**, OSB #136428
**Franz H. Bruggemeier**, OSB #163533
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

         Attorney for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| MARK WILSON | Case No. 6:21-cv-01606-SI |
| Plaintiffs, | |
| v. | MOTION FOR TEMPORARY RESTRAINING ORDER |
| JERRY PLANTE, and JOHN DOES 1-10. | |
| Defendants. | Oral Argument Requested |

## **MOTION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to Fed. R. Civ. P. 65(a) and (b)(1), Plaintiff's request issuance of a Temporary

Restraining Order. Plaintiff's application demonstrates that "immediate and irreparable injury,

loss, or damage will result to the movant[s]." Fed. R. Civ. P. 65(b)(1)(A). Plaintiff attempted to

remediate the issue by conferring with presumed Counsels for Defendants, Fed. R. Civ. P.

65(b)(1)(B), *see Counsel Dec.* ¶ 3, but was told under no uncertain terms that the Oregon

Department of Corrections would stick to its decision.

Plaintiff submits this motion for an order retraining Defendants from any further

retaliatory action against Plaintiff. To do that, Defendants must be enjoined to:

1) Reverse the unconstitutional disciplinary findings made against Plaintiff;

2) Release Plaintiff from the disciplinary segregation unit;

3) Place Plaintiff back into his incentive housing; and

4) Not further retaliate against Plaintiff for engaging in protected, First Amendment conduct again.

Plaintiff's Motion is supported by the following Memorandum of Law, and the Declarations of Counsel, Mark Wilson, Pam McKinney, Andrew Manning, Billy Jack Gray, Jeremy Hay, and the Supplemental Declaration of Mark Wilson. Plaintiff also requests an expedited hearing to be heard on this Motion. Plaintiff requests an oral hearing on this matter to take place no later than November 24, 2021. Plaintiff requests to be present to hear the arguments, and present testimony if allowed. Based on the foregoing, Plaintiff's Motion must be **GRANTED**.

## TABLE OF CONTENTS

**MEMORANDUM OF LAW** ......................................................................... 6

**I. INTRODUCTION** ................................................................................. 6

**II. STATEMENT OF FACTS** ................................................................... 6

    **A. An Advocate for the Rights of Prisoners** ..................................... 6

    **B. Plaintiff's Duties as an Inmate Legal Assistant at OSCI Legal Library** ............... 7

    **C. The OSCI Library Coordinator, Pam McKinney** ........................ 8

    **D. Events Giving Rise to This Lawsuit and Motion** ....................... 11

**III. STANDARDS OF LAW** ................................................................... 18

**IV. ARGUMENT** ..................................................................................... 19

    **A. Introduction** ................................................................................ 19

    **B. Likelihood of Success on the Merits** ......................................... 20

        1. Adverse Action .......................................................................... 20

        2. "Because of" Animus ................................................................. 21

        3. Protected Conduct ...................................................................... 22

        4. Chilled Speech ........................................................................... 24

        5. Legitimate Penological Goal ..................................................... 25

    **D. Irreparable Harm** ........................................................................ 27

    **E. Balance of Equities** ..................................................................... 30

    **F. The Prison Litigation Reform Act Does Not Bar Relief** ........... 30

    **V. CONCLUSION** ............................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Adams v. James*, 784 F.2d 1077 (11th Cir.1986)..................................................................... 23

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .................................... 19

Associated Press v. Otter, 682 F.3d 821 (9th Cir. 2012) .......................................................... 28

*Bell v. Wolfish*, 441 U.S. 520 (1979) ............................................................................... 22, 25

*Bounds v. Smith*, 430 F.3d 817 (1977)................................................................................. 23

*Brodheim v. Cry*, 584 F.3d 1262 (9th Cir. 2009) ............................................................... 20, 21

*Brown v. Plata*, 563 U.S. 493 (2011)................................................................................... 26

*Brown v. Valoff*, 422 F.3d 926 (9th Cir. 2004) ....................................................................... 34

*Bruce v. Ylst*, 351 F.3d 1283 (9th Cir. 2003)....................................................................... 23

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) .................................................................... 20

Elrod v. Burns, 427 U.S. 347 (1976) ................................................................................... 28

*Fletcher v. Menard Correctional Center*, 623 F.3d 1171 (7th Cir. 2010)..................................... 32

*Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012).......... 26

*Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004)..................................................................... 19

*Hines v. Gomez,* 108 F.3d 265 (9th Cir. 1997) .................................................................. 20, 27

*Hoffman v. Palagummi*, 2019 WL 582353 (E.D. Cal. 2019).................................................... 31

*In re Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007)................................................... 28

*Jackson v. District of Columbia*, 254 F.3d 262 (D.C. Cir. 2001) ............................................. 31

*Lopez v. Brewer,* 680 F.3d 1068 (9th Cir. 2012) ................................................................... 19

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)........................................................... 28, 30

*Mendocino Env'l Ctr. v. Mendocino County*, 192 F.3d 1283 (9th Cir. 1999) ............................. 24

*Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010)................................................................. 26

*Owens v. Rush*, 654 F.2d 1370 (10th Cir.1981)..................................................................... 23

*Pratt v. Rowland,* 65 F.3d 802 (9th Cir. 1995) ................................................................. 22, 25

*Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005)..................................................... 20, 23, 24

*Rizzo v. Dawson*, 778 F.2d 527 (9th Cir.1985)................................................................. 23, 26

*Shepard v. Quillen*, 840 F.3d 686 (9th Cir. 2016) ............................................................. 20, 27

*Shorter v. Baca*, 895 F.3d 1176 (9th Cir. 2018) ................................................................... 26

*Simmons v. Stokes*, 2010 WL 2165358 (D.S.C., May 26, 2010) ............................................. 31

*Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310 (9th Cir. 1989)............................................ 21

*Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979) ................................................................. 26

*Stuhlbarg Int't Sales Co. v. John D. Brush & Co.,* 240 F.3d 832 (9th Cir. 2001)....................... 18

*Stuhlbarg Int't Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 n. 7 (9th Cir. 2001)......... 18

*Thornberry v. Baughman*, 2018 WL 4039976 (E.D. Cal. 2018) ............................................... 31

*Turner v. Safley*, 482 U.S. 78 (1987) ................................................................................... 22

*Watison v. Carter*, 668 F.3d 1108 (9th Cir. 2012)....................................................... 19, 20, 25

*Whitley v. Albers*, 475 U.S. 312 (1986) ........................................................................... 25, 26

*Williams v. Bal*, 2012 WL 2065051 (E.D. Cal. 2012) ............................................................. 31

*Wilson v. Van Valkenburgh,* $\sum$ ..................................................................................... 7, 29

*Winters v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).................................................. 18

*Wolff v. Hood*, 242 F. Supp. 2d 811 (D. Or. 2002) ............................................................... 22

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ........................................................................... 27

**Statutes**

42 U.S.C. § 1997e .................................................................................................. 30, 31

42 USC §1997e ......................................................................................................... 34

**Other Authorities**

*Stacking the Deck: Futility and the Exhaustion Provision of the Prison Litigation Reform Act*,
156 U. Pa. L. Rev. 817 (Jan. 2008) ..................................................................... 30

**Regulations**

OAR 291-109-0205 .................................................................................................. 33

OAR 291-109-0210 .................................................................................................. 33

## MEMORANDUM OF LAW

## I. INTRODUCTION

Even while incarcerated, the Constitution protects Plaintiff from retaliation for performing the duties of a prison law library assistant. Defendants had no basis to punish Plaintiff for advocating for others, so they invented one. Defendants coerced and bullied a law librarian in an interview. They used the word of a notoriously unreliable informant. Defendant riffled through confidential legal documents. They wrote misconduct report based on false facts and intentional omissions. Plaintiff was then found guilty of that misconduct and given the maximum punishment in segregation. The retaliatory actions of Defendants were intended to do exactly what has occurred: today Plaintiff sits in a solitary confinement cell, chilled of his right to advocate for himself and for others.

## II. STATEMENT OF FACTS

### A. An Advocate for the Rights of Prisoners

Plaintiff has been incarcerated for over 30 years within the ODOC for a crime he committed at 18 years of age. *Compl*. at ¶ 20. During his time within the ODOC, plaintiff has become well known as Oregon's foremost advocate for prisoner's rights, working as a legal assistant in ODOC, as a writer for Prison Legal News, and as a participant in legislative matters to improve the lives of prisoners and the community. *Id*. at ¶ 21. Plaintiff has shown himself to be an honest and trustworthy person to correctional staff, other prisoners, and members of the public during his many years of incarceration. *Id*. at ¶ 22; *McKinney Decl.* at 36.

Plaintiff's advocacy for the rights of other prisoners is not well received, however, by some prison officials. Plaintiff has been targeted by ODOC staff and prisoners alike over the years due to his work as legal assistant and as a prisoner advocate. As one example, ODOC

retaliated against Plaintiff while he worked as a legal assistant at the Oregon State Penitentiary (OSP) for his assistance in a civil suit requiring ODOC to provide adequate medical treatment to prisoners. *See Wilson v. Van Valkenburgh,* USDC of Or. Case No. cv-06-1391-SU, Dkt. 1. *Id.* at ¶ 24 — Exhibit 1. ODOC tried to try to transfer Plaintiff to Eastern Oregon Correctional Institution, *Id.* at Dkt. 1 ¶¶ 115 – 118, but relented on at least one occasion. *Id.* at Dkt. 1 ¶ 117. ODOC did ultimately transfer Plaintiff to EOCI. *Id.* at Dkt. 1 ¶ 130. They rifled through his legal materials and correspondence as well. *Id.* at Dkt. 1 ¶ 118 – 129. Plaintiff sued and received a settlement that included provisions for his transfer to OSCI. *Id.* at Dkt. 6, p. 3, Exhibit 2.

## B. Plaintiff's Duties as an Inmate Legal Assistant at OSCI Legal Library

From February 2012, until earlier this year, Plaintiff was assigned as an inmate legal assistant at OSCI. *Id.* at ¶ 25. During that time, he worked under at least five library coordinators at OSCI, including, until most recently, under the supervision of library coordinator Pam McKinney (hereafter "McKinney"). *Id.*  Prior to the events giving rise to this suit, Plaintiff has never been disciplined for any violation of the polices and rules of ODOC while working as an inmate legal assistant. In fact, his only misconduct over the last 34 years occurred in August 1991 when he was disciplined for seven days for protesting prison labor wages. *Compl.* at ¶ 23; *Wilson Decl.* at ¶ 6. Prison law libraries and the duties of both ODOC staff and inmate legal assistants are loosely defined by administrative rule. ODOC rules under Chapter 291, Division 139 describe the responsibilities of library coordinators and legal assistants in the following ways. *Id*. at ¶ 13. Library coordinators are responsible for supervising facility legal libraries and providing law library services to inmates, including the activities of the assigned legal assistants. *Id.* The library coordinator may instruct inmates on how and where to access requested law library services and other resources, but may not offer advice or directly assist an inmate with

their legal issues, case or matter. *Id.* The duty to provide advice or directly assist an inmate with legal issues is the responsibility of the inmate legal assistant. *Id.* at  26.

At OSCI, Plaintiff's duties as an inmate legal assistant included but were not limited to, drafting motions, affidavits, legal memoranda, petitions, complaints, letters, appellate briefs, administrative review requests and prison grievances. *Id.* As an inmate legal assistant Plaintiff has received requests from the legal coordinator directing him to provide assistance on, including by not limited to: appeals of convictions and sentences, conditions of confinement challenges, Board of Parole issues, child support/custody/visitation issues, dissolution proceedings, wills and estates issues, defense of civil actions. *Id.* at ¶ 27. Plaintiff was allowed discretion with respect to legal matters, to do those things he deemed necessary to perform his duties properly and effectively as an inmate legal assistant. *Id.* at ¶ 28. He carried out those duties with the expectation that ODOC would not retaliate against him. *Id.* at ¶ 28.[1]

Not surprisingly, throughout the many years Plaintiff served as an inmate legal assistant, he developed working relationships with numerous attorneys, prisoner and mental health advocacy groups, court personnel and others as necessary to carry out his legal assistant duties. *Id.* at ¶ 29.

## C. The OSCI Library Coordinator, Pam McKinney

In 2017, ODOC assigned Pam McKinney, a 22-year employee of ODOC, to the OSCI Library Coordinator position. *McKinney Decl.* at ¶ 3. She was minimally trained as the Legal Coordinator by a correctional officer named Adam Pletcher. *Id.* at ¶¶ 4, 14.

---

[1] Plaintiff's duties as an inmate legal assistant constitute the unauthorized practice of the law under Oregon law. *See* ORS 9.160(1); *see also Oregon State Bar v. Sec. Escrows, Inc.,* 233 Or. 80, 89, 377 P.2d 334, 339 (1962) ("[W]e hold that the practice of law includes the drafting or selection of documents and the giving of advice in regard thereto any time an informed or trained discretion must be exercised in the selection or drafting of a document to meet the needs of the persons being served.")

After her initial training, Ms. McKinney received "minimal" training. *Id.* at ¶ 4. She received a copy of the rule regarding legal access for AICs and was told to "get it done" in the "most affordable way possible." *Id.* at ¶ 13-14. OSCI leadership also "[funneled] unique needs to [the library], like music copying." *Id.* at ¶ 15. Ms. McKinney did not agree with some programs sent to her, but she "always followed the directive of my supervisor." *Id.* She was also careful to follow policy and reported wrongdoing and safety concerns. *id.* at ¶ 17.

Sometime before the Covid-19 pandemic, ODOC implemented "a shift in the culture and practice in DOC" that normalized outside life within facilities so that "adults in custody (AICs) might better transition to normal society when/if they are released." *Id.* at ¶ 5. This new shift was known as the "Oregon Way." *Id.*

McKinney implemented various suggestions from the Oregon Way training videos and reports from staff who traveled to Norway to train on the culture shift. *id.* at ¶ 6. Ms. McKinney placed plants and inspirational posters throughout the library to create an inviting, safe atmosphere. *id.* at ¶ 7-8. Although some staff disapproved of the Oregon Way culture shift, her supervisors "appeared to love the new way of doing things." *Id.* at ¶ 12. McKinney received positive feedback regarding her adoption of the Oregon Way, including praise from her supervisor, Nathan Warren, including for once dressing up for a holiday sweater party wearing reindeer horns on her head while working her shift at the OSCI library, which ODOC administration posted on Twitter[2] on December 30, 2020, shown below:

---

[2] ORCorrections (@ORCorrections), Twitter (7:39 am Dec. 30, 2020), available at https://twitter.com/ORCorrections/status/1344307210743025665.



*Id.* at ¶ 9.

As part of McKinney's "Oregon Way" efforts, she brought in a fishbowl, hung up inspirational posters, and permitted Adults-in-Custody (AIC) put personal pictures on the library wall *Id.* at ¶¶ 7, 10. Although McKinney was eventually told to remove the fishbowl since it prompted other OSCI staff to request support animals in the workplace, her supervisor brought her a fake plastic fishbowl as a replacement. *Id.*

Like the plastic tank gift from her supervisor, McKinney brought a fake plastic phone, "(the kind that has eyes, and that can be used as a pull toy by a small child) and placed it on AIC Wilson's work desk" in "the spirit of jest." *Id.* at ¶ 11. [3] She placed the phone on plaintiff's desk as a joke "because he would get so many calls from lawyers," and she saw the gesture as an

---

[3] An accurate picture of the toy phone is shown below:



implementation of the Oregon Way. *Id.* The phone belonged to McKinney, and it was not given to Plaintiff as his own property to possess. *Id.*

During the pandemic, OSCI entered modified lockdown and the Law Library's legal case management system changed. *Id.* at ¶ 18. Many attorneys were working from home during the pandemic, so items normally sent via mail experienced significant delays. *Id.* at ¶ 19. This impacted timely filings. *Id.* at ¶¶ 18 - 19.  Thus, "the courts, parole board, and attorneys… would email me documents to give to AICs." *Id.*

McKinney had trouble reaching the Department of Administrative Services (DAS) on behalf of an AIC during the pandemic. She informed her supervisor. The supervisor spoke to McKinney and plaintiff about the situation, and he subsequently permitted McKinney to communicate with DAS via email. *Id.* at ¶ 20. McKinney did not know that this was a specific rule exception, nor did she believe this was "not okay to do." *Id.*

McKinney allowed Plaintiff to give her AIC legal documents that she would scan and send to attorneys. *Id.* at ¶ 21. She "never allowed an AIC to personally send or receive email directly, or place or receive a phone call." *Id.* at ¶ 22. McKinney facilitated attorney-client phone calls, per her job requirements. *Id.* at ¶ 23. Nothing McKinney did in her operation of the OSCI library was hidden or secret to administration. *Id.* at 13. By no means was she a pushover to AICs nor someone who would minimize the safety and security of the institution. *Id.* at ¶ 17.

**D. Events Giving Rise to This Lawsuit and Motion**

On January 21, 2021, Plaintiff was removed from his job as an inmate legal assistant and placed on work restriction by Defendant Plante. *Wilson Supp. Decl.* at ¶ 5. Defendant Plante informed Plaintiff that he was able to enter the law library to work on his own case, but that he was not permitted to help any other prisoners with their legal issues until Plante concluded his

investigation. *Id.* at ¶ 6. Defendant Plante assured Plaintiff that he would wrap up his

investigation quickly and that he had "seen what [Plaintiff had] going on." *Id*. at ¶ 8.

Days later Defendant Plante and OSCI Cpt. Hyde entered the OSCI library and

confiscated a few items, including Plaintiff's assigned flash drives which stored his legal

material and a child's toy phone that McKinney placed on Plaintiff's desk as a joke. *McKinney*

*Decl.* at ¶¶ 11; *Wilson Supp. Decl.* at ¶¶ 13-14. Shortly thereafter McKinney met with her union

representative and was told that she would be "duty stationed" (i.e., removed from her position at

OSCI) at the ODOC Dome building pending an investigation. *Id.* at ¶ 24.

On or about March 23, 2021, Defendant Plante interviewed Plaintiff and recorded the

interview on his personal cell phone. *Wilson Supp. Decl.* at ¶¶ 17-18. Defendant Plante explained

that he had received an anonymous Inmate Communication that triggered his investigation, but

that many of the allegations asserted did not involve Plaintiff. *Id* at ¶ 20. Defendant Plante stated

that the only allegation made against Plaintiff was that McKinney was "helping [him] sue

ODOC." *Id.* at ¶ 21. Defendant Plante further explained that he had searched McKinney's

incoming and outgoing emails and discovered that she had sent and received emails and

attachments for Plaintiff. *Id*. at ¶ 23. Some of those emails included:

- Emails and attachments sent by McKinney to attorney Jason E. Thompson related to a federal civil rights complaint Plaintiff drafted for two AICs alleging that ODOC/OSCI officials were deliberately indifferent to their serious medical needs. Mr. Thompson represents both AICs and is currently in settlement proceedings in the Oregon District Court.

- Emails and attachments sent by McKinney to attorney Katherine Edwards related to a federal civil rights complaint Plaintiff had drafted for an AIC alleging that ODOC/OSCI officials were deliberately indifferent to prison rape, in violation of the Eighth Amendment.

- Emails and attachments sent by McKinney to attorneys at the Oregon Justice Resource Center (OJRC) related to grievance language and information about ODOC's November 24, 2020, admission of a data breach of an estimated 2,900

former and current AIC's medical records; related to legislative efforts to obtain funding for a Correction's Ombudsman position to provide investigative oversight of ODOC; related to federal court filings in *Maney et al v. Brown et al,* which is a civil rights suit for ODOC's deliberate indifference to COVID-19 spreading among AICs; related to legislative proposals including but not limited to juvenile justice reform (Senate Bill 1008) and the reinstatement of prisoner voting rights.

*Wilson's Supp. Decl.* at ¶ 27.

On or about April 15, 2021, McKinney was summoned into a conference room with Defendant Plante and her union representative. What followed was an abusive and hostile interrogation that lasted five to six hours and resulted in McKinney's forced resignation *McKinney Decl.* at ¶ 25-36.

At the interrogation, Defendant Plante "grilled" McKinney in the presence of her union representative "from 8:00 or 9:00 in the morning until 1:00 or 2:00 in the afternoon." *Id.* at ¶ 25. McKinney felt like "[Defendant Plante] was on a mission," "browbeating" and intimidating her to "make her feel a certain way." *Id.* at ¶ 27. At various points in the interview, McKinney felt if she "didn't agree, they were going to make [her] agree," and that she could get immediately fired. *Id.* at ¶ 33. The two spoke on and off the record. *Id* at ¶ 25.

She felt that Defendant Plante "purposefully intimidat[ed her] in order to make [her] feel a certain way." *Id.* For example, Defendant Plante "would cite an example, and then a policy, and say 'you know you broke policy.'" *Id.* In response, McKinney would respond by apologizing and say that she "had no other recourse." *Id.* For example, McKinney's job tasked her with flipping through AIC legal documents prior to sending them out, although policy prevented her from reading documents. *Id.* at ¶ 23. However, Defendant Plante told her that she broke policy by emailing unread legal documents. *Id.* at ¶ 29. When she informed Defendant Plante of the policy, she stated that "he appeared not to care." *Id.* According to McKinney, ODOC policy "is rarely if ever followed exactly." *Id.* at ¶ 28. McKinney cites an IT purchase of new printers,

facilitated, and financially endorsed by OSCI, which violates its own policy regarding AIC printer contact. *Id*.

Defendant Plante also told McKinney that plaintiff had "compromised" her. *Id.* At this point in the conversation, McKinney felt "exhausted" and "pressured to say that AIC Wilson had compromised [her]." *Id.* McKinney did not feel compromised prior to that interview, nor does she currently feel "that I had mixed feelings or was confused in my supervisor role over AIC Wilson." *Id.*

McKinney stated that Plaintiff "did not push [her] or manipulate [her] to get [her] to email legal documents." *Id.* at ¶ 30. McKinney also states that Plaintiff "never behaved inappropriately throughout my time working with him... Had he done so, I would have removed him from his position as an LA and given him a disciplinary report or some other sanction." *id.* at ¶ 36.

McKinney addressed problems as she was asked to do, and she dealt with the backlog by relying on legal assistant help and emails. *Id* at ¶ 30. McKinney states that "[the supervisor] would just tell me to 'go ahead' after I asked for direction on how to solve an issue of legal access." *Id.* She does not feel "that there was any maliciousness about it," nor was there anything "special about how [McKinney] handled things in comparison to how others in DOC legal libraries handled things." *Id.* at ¶ 31 and 35. She also states that she "does not believe I received appropriate guidance and support from my supervisor," although "[McKinney's supervisors] approved of [McKinney's] decisions. *Id.*

McKinney was aware that plaintiff was involved in ODOC-related litigation, although she "tried not to know all the details about AICs legal cases." *Id.* However, McKinney "never felt [Plaintiff]... tried to take advantage of difficulties surrounding COVID." *id.* at ¶ 31. She

states that Plaintiff "was trying to get things done for other AICs." *Id.* Yet, the interview with

Defendant Plante left McKinney feeling as though she was "herded into a narrative" that plaintiff

was a "manipulator" and "devil." *Id.* McKinney believes ODOC "was pushing this narrative" out

of fear, since Plaintiff had previously won a lawsuit against ODOC. *Id.*

At some point in the conversation between McKinney and Defendant Plante, the latter

remarked: "you wouldn't have gotten a phone for [Plaintiff] if you didn't feel that you and Mark

had something going." *Id.* at ¶ 34. McKinney reiterated that the phone was a joke in the spirit of

the Oregon Way, a child's toy, "the kind that has eyes, wheels, and can be pulled as a pull toy."

*Id*. She further emphasized that the toy phone, like "the posters and holiday decorations," helped

"normalize the workplace in accordance with what [McKinney] had learned about the Oregon

way." *Id.*

McKinney asked Mr. Plante off the record "if the situation was 'retrievable' or not," and

he informed her that the decision was at the discretion of her supervisor *Id.* at ¶ 26. At one point

during the day, the union representative sent McKinney away. *Id.* After that, the representative

told McKinney that she "needed to resign or risk losing half of my retirement." *Id.* at ¶ 26. On or

about April 15, 2021, McKinney, resigned from her ODOC job.

In the end, McKinney "strongly" believes "that DOC disapproves of [Plaintiff's] lawsuits

and legal actions," and that "DOC went after [him] for that reason," and she was simply

"collateral damage." *Id.* at ¶ 35.

On August 4, 2021, nearly seven months after being removed from the legal library, and

nearly four months after interviewing McKinney, plaintiff received a misconduct report that was

signed by Defendant Plante and by ODOC staff Melissa Nofzinger that same day. *Id.* at ¶ 42.

The misconduct report alleged Plaintiff had violated four ODOC rules for his actions "in the

legal library, while in his role as a legal assistant." *Id.* at ¶ 43, Exhibit 3.[4] Those violations were: Compromising an Employee (4.15); Contraband II (1.11); Unauthorized Use of Information Systems I (1.25); and Disobedience of an Order I (4.01). *Compl.*, Dkt. 1, at ¶ 44.[5]

In the misconduct report, Defendant Plante reports that upon receiving an "anonymous" communication about McKinney, Plaintiff, and "other unauthorized things in the OSCI library," he investigated the matter. *Id.* at ¶ 45.

In the misconduct report, Defendant Plante explained that he had searched Plaintiff's assigned work area in the legal library and found a "white plastic child's toy phone" that McKinney told Plante she had purchased with her own money and gave to plaintiff without supervisor approval. *Id.* at ¶ 46. For this, Defendant Plante charged plaintiff with Contraband II (1.11) and that he engaged in an unauthorized relationship with an employee. *Id.*

In the misconduct report, Defendant Plante explained that he "reviewed hundreds of emails, from January 2020 through January 2021," that McKinney had sent and received from "individuals at an outside justice resource firm,[6] or attorneys and other professionals," all of whom were associated with Plaintiff in some manner. *Id.* at ¶ 49. "Upon [Defendant Plante's] closer review of the emails," Plante explained, he discovered that the emails contained

---

[4] Plaintiff has included Defendant Plante's Misconduct Report as an exhibit, but does not concede its veracity in all respects, as discussed *infra*.

[5] Plaintiff requests the Court to take judicial notice of the Misconduct Report pursuant to Fed. R. Evid. 201(b) for the purpose of ruling on Plaintiff's Temporary Restraining Order. *See Santa Monica Food Not Bombs v. City of Santa Monica,* 450 F3d 1022, 1025 (9th Cir. 2006) (facts contained in public records are considered appropriate subjects for judicial notice). Plaintiff only asks the Court to take notice of the existence of the record, not for the truth of the fact recited therein. *See Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F.Supp.3d 1012, 1021 (D. Or. 2015) (stating principle).

[6] With due candor with the Court, Plaintiff's Counsel works at the Oregon Justice Resource Center, and is Of Counsel in at least one of the cases referenced by Plaintiff as one he has provided assistance on, *Maney, et. al. v. Brown, et. al.*, USDC Case No. 6:20-cv-00570-SB (D. Or. 2020), concerning ODOC's conduct during the COVID-19 pandemic.

"messages and attached legal documents[.]" *Id.* Defendant Plante reported that the sending of these emails with attached legal documents saved plaintiff "at least $387.40" in copy costs— which constituted, in his view, a violation of ODOC rule "Disobedience of an Order I." *Id.*

Defendant Plante stated in his disciplinary report that he had "reviewed a number of legal calls AIC Wilson had been allowed through the legal library phones," and that "between January 2020 through January 2021, AIC Wilson had been given 146 calls to individuals at the outside justice resource firm, and he and received an additional 15 calls to five other individuals." *Id.* at ¶ 50.

With respect to rule violation "Unauthorized Use of Information Systems I," Defendant Plante alleged in the misconduct report that Plaintiff knowingly chose to disregard and violate ODOC rules by printing a single copy of AIC's legal document from his printer after assisting in the preparation of the document without charging the AIC for the copy. *Id.* at ¶ 53.

With respect to rule violation "Compromising an Employee," Defendant Plante alleged that Plaintiff "engaged in an unauthorized personal relationship" with McKenney because: (a) she gave a toy phone to plaintiff; (b) she directly assisted plaintiff with his "legal issues, case, and matters"; (c) she saved him money (at least $387.40) by sending and emailing "legal documents" to attorneys and other professionals rather than charge him through regular mail; and (d) because she "admitted to giving [plaintiff] special privileges which not all AICs were afforded." *Id.* at ¶ 54.

Defendant Plante represented in the misconduct report that he had interviewed McKinney and "she admitted that her relationships with several individuals at the outside justice resource firm became more of a personal friendship than a professional relationship." *Id.* at ¶ 55.

On August 31, 2021, Plaintiff was found guilty of three of the alleged violations—

Contraband II, Compromising an Employee, and the lesser rule of Unauthorized Use of Information Systems II—and given a sanction of 120 days in segregation, the maximum penalty. Plaintiff was found not guilty of Disobedience of an Order I. *Id.* at ¶ 59. Plaintiff and others in the OSCI DSU state that other prisoners who committed violent rule violations, including repeated assaults, received far shorter sentences. *Id.*; *Manning Dec.* at p. 5.

On September 7, 2021, Plaintiff filed a grievance, numbered OSCI_2021_09_049, against Defendant and other ODOC officials for retaliatory conduct. *Id.* at ¶ 61. On September 14, 2021, OSCI grievance coordinator rejected Plaintiff's grievance on the grounds that, "An AIC may not submit a grievance, regarding misconduct reports, investigations, lending to or arising from misconduct reports, disciplinary hearings, findings, sanctions." *Id.* at ¶ 62.[7]

### III. STANDARDS OF LAW

A plaintiff seeking a preliminary injunction or temporary restraining order must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winters v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L.Ed.2d 249 (2008), *see Stuhlbarg Int't Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 n. 7 (9th Cir. 2001), *overruled on other grounds by Winter*, 555 U.S. at 20. The Ninth Circuit, courts may apply an alternative "serious questions" test, which allows for a preliminary injunction where a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of *Winter* test are met. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir.

---

[7] Plaintiff is currently exhausting his administrative remedies with respect ODOC officials' actions during his Disciplinary Proceeings, which he asserts violated, among other things, his right to due process.

2011). This formulation applies a sliding scale approach where a stronger showing of one

element may offset a weaker showing in another element. *Id*. at 1131. To succeed under the

"serious question" test, Plaintiffs must show that they are likely to suffer irreparable injury and

that an injunction is in the public's interest. *Cottrell*, 632 F.3d at 1132. Nevertheless, the party

requesting a preliminary injunction may carry its burden of persuasion by a "clear showing" of

the four elements set forth above. *Lopez v. Brewer,* 680 F.3d 1068, 1072 (9th Cir. 2012).

## IV. ARGUMENT

### A. Introduction

"The First Amendment forbids prison officials from retaliating against prisoners for

exercising the right of free speech." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004); *see

also Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). It is important to lay bare what has

occurred to Plaintiff: Defendant Plante, in concert with the other Defendants, did not like

Plaintiff because of his activity as an inmate legal assistant, his litigation against ODOC officials,

and as the foremost prisoner advocate in Oregon. They did not like that he was a positive force

for prisoner rights. They did not like that he was effective as a legal library assistant. They did

not like that other prisoners respected him and sought his advice. They also did not like that Pam

McKinney treated Plaintiff in accordance with The Oregon Way and that she gave him access to

the courts both in his advocacy for others and himself. Their efforts were made to drive home

one central point for other incarcerated-Oregonians: Advocate for yourself and for others at your

own peril. For these reasons, Defendants conspired to deprive Plaintiff of his constitutional rights

by filing a false misconduct report against him which resulted in his placement in segregation,

where he sits today, chilled and silenced in his ability to advocate for other prisoners and

himself.[8] By taking these actions, Defendants violated Plaintiff's First Amendment right to not be retaliated against for engaging in protected conduct.

As the above-factual allegations and evidence demonstrate, Plaintiff will likely meet his ultimate burden in Court, but he cannot wait for that final judgment unless he be irreparably harmed. Plaintiff has no available administrative remedies. The relief he seeks is in the public's interest, and the balance of equities bend in his favor. This Court must **GRANT** his Motion.

**B. Likelihood of Success on the Merits**

"Likelihood of success on the merits is the most important factor." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quotations omitted). Plaintiff claims here that Defendants have retaliated against him for his protected conduct in violation of his First and Fourteenth Amendments right. When a prisoner claims retaliation, they must show that (1) "a state actor took some adverse action ... (2) because of (3) [the] prisoner's protected conduct, ... that such action (4) chilled [his] exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Shepard v. Quillen*, 840 F.3d 686, 688 (9th Cir. 2016), *citing Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005). Plaintiff will address each factor below.

1. Adverse Action

The Ninth Circuit has explained that "the mere threat of harm can be adverse action" in the retaliation context. *Brodheim v. Cry,* 584 F.3d 1262, 1270 (9th Cir. 2009) (emphasis omitted). That Court has also found that charging a prisoner for misconduct resulting in the prisoner being placed in segregation constitutes adverse action. *Watison v. Carter*, 668 F.3d 1108, 1115 (9th Cir. 2012); *see also Hines v. Gomez,* 108 F.3d 265, 267-268 (9th Cir. 1997)

---

[8] Plaintiff reserves the right to bring forth additional claim as they ripen and are administratively exhausted.

(filing false disciplinary charge in retaliation for use of grievance system).

The evidence clearly establishes that Defendant Plante filed a false misconduct report against Plaintiff in retaliation for his activities as a legal assistant, for his own personal legal activities, and as a prisoner advocate. The filing a false misconduct report which resulted in Plaintiff losing his position as a legal assistant, his ability to advocate for other inmates, to pursue his own legal actions, the loss of his privileged status, and ultimately his placement in segregation constitutes an adverse action.

2. "Because of" Motivation

To prevail on a retaliation claim, a plaintiff must show that his protected conduct was "'the substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim,* 584 F.3d at 1271 (quoting *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1314 (9th Cir. 1989)). The "but-for" motivation for Defendant Plante was to punish Plaintiff for engaging in legal assistant work. Each and every alleged rule violation in Defendant Plante's misconduct report occurred under the supervision, authorization, or direction of McKinney in her role as OSCI legal coordinator. *Compl.* at ¶ 57. Defendant Plante wanted to send a message that assisting others with their legal cases will land you in hole, like Plaintiff.

The evidence presented shows that the emails and phone calls that Defendant Plante admits to reviewing and forming the basis for Plaintiff's rule violation were, among other things, protected attorney client communications and legal materials sent and received by and through, and with permission from, McKinney. *Compl.* at ¶ 51. Defendant Plante omits from his misconduct report the fact that prisoners, including legal assistants, do not have access to telephones or email. *Id.* at ¶ 52; *Wilson Supp. Dec.* at ¶ 25. Phone calls with legal professionals are scheduled by McKenny and, when calls are received, she transfers the call to a secure phone.

*Id.* Similarly, McKinney's work emails are sent and received by her alone. *Id.* Defendant Plante

omitted that she authorized all communications. *McKinney Decl.* at ¶ 22.

Again, omitted from Defendant Plante's report is the fact that McKinney authorized and

supervised all activities. Plaintiff only acted in accordance with the long-standing practice of

OSCI legal library. Defendant Plante omitted that fact. In all the many years and under the five

different legal coordinators, Plaintiff has never been told that his actions and conduct as a legal

assistant violated ODOC rules. *Compl.* at ¶ 58. Indeed, Plaintiff has received letters of

commendation from library coordinators, including McKinney, for his work. *Id.*

Deeper scrutiny of the misconduct report and the disciplinary review process would

reveal not just further retaliatory animus but an evidentiarily-deficient finding devoid of

legitimate penological purpose, *discussed further infra* § IV.B.5: Legitimate Penological

Purpose. But the Court need only conclude from Defendant Plante's misconduct report that he

focused his ire on Plaintiff's protected conduct, *discussed next*, and that in doing so revealed his

motivation for punishing Plaintiff. Indeed, Defendant Plante's investigation began with, as was

revealed to Plaintiff by Defendant Plante, an anonymous tip claiming that McKinney "was

supposedly helping [Plaintiff] sue ODOC." *Wilson Supp. Dec.* at ¶ 23. What followed was an

intrusive inquiry into Plaintiff's protected conduct that resulted in harsh punishment.

### 3. Protected Conduct

"Prison walls do not form a barrier separating prison inmates from the protections of the

Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987); *see also Bell v. Wolfish*, 441 U.S. 520,

545 (1979). "Prisoners have a First Amendment right to be free from retaliation for participating

in 'protected speech activities'" *Wolff v. Hood*, 242 F. Supp. 2d 811, 820 (D. Or. 2002) (quoting

*Pratt v. Rowland,* 65 F.3d 802, 806 & n. 4 (9th Cir. 1995)). Assisting another prisoner in

litigation, helping educate other prisoners on legal matters, or pursing one's own legal action are all activities "protected by the first amendment." *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir.1985); *Owens v. Rush*, 654 F.2d 1370 (10th Cir.1981); *Adams v. James*, 784 F.2d 1077 (11th Cir.1986). "Of fundamental import to prisoners are their First Amendment 'right[s] to file prison grievances,' *Bruce v. Ylst,* 351 F.3d 1283, 1288 (9th Cir. 2003), and to "pursue civil rights litigation in the courts." *Rhodes v. Robinson*, 408 F.3d 559, 566 (9th Cir.2005) (quoting *Schroeder v. McDonald,* 55 F.3d 454, 461 (9th Cir. 1995)). Prisoners also maintain the constitutional right to access the courts under the First Amendment. *Bounds v. Smith,* 430 U.S. 817, 821 (1977).

Here, there can be no dispute that Plaintiff engaged in protected conduct as both inmate legal assistant and in his own legal case. Defendant Plante does not even hide in his misconduct report that he is punishing plaintiff for his protected conduct. Defendant Plante explained that he "reviewed hundreds of emails, from January 2020 through January 2021," that McKinney had sent and received from "individuals at an outside justice resource firm, or attorneys and other professionals," all of whom were associated with Plaintiff in some manner. *Compl.* at ¶ 49, Exhibit 3 at p. 1. "Upon [Defendant Plante's] closer review of the emails," Plante explained, he discovered that the emails contained "messages and attached legal documents[.]" *Id.*

Among those legal documents that were emailed by McKinney that were unlawfully reviewed by Defendant Plante:

- Documents sent on behalf of two AICs alleging deliberate indifference by ODOC to an attorney whom decided to take those two AICs' cases because of the documents sent, *Wilson Supp. Dec.* ¶ 25;

- Documents sent on behalf of an AIC alleging PREA violations to another attorney, *Id.* at ¶ 26;

- Documents regarding grievances, *Id.* at ¶ 27;

- Documents regarding a notice of medical records data breach received by AICs, *Id.*;

- Legislative proposals for, among other things, a Corrections Ombudsman to provide oversight of ODOC and reinstatement of prisoner voting rights, *Id.*; and

- Court filings in the on-going COVID-19 suit, *Maney, et. al. v. Brown, et. al.*, USDC Case No. 6:20-cv-00570-SB (D. Or. 2020), *Id.*

The remainder of the conduct cited by Defendant Plante could hardly be described as violative of any rule. Defendants' evidence purporting that there was a "personal relationship" between Plaintiff and McKinney include McKinney giving Plaintiff a toy phone for his desk in the library and serving out functions necessary to assist others in litigation. *McKinney Decl.* at ¶¶ 11; *Wilson Supp. Decl.* at ¶¶ 13-14. The other library workers would joke about the toy phone, generally leavening the atmosphere amongst workers. *Id.* This furthers Director Peters' policy goal of creating a "normalized environment and in the most humane way possible." *Compl.* at ¶ 10.

None of this conduct could justify the punishment or scrutiny Plaintiff received, but Defendant Plante did so regardless. Defendants targeted this protected conduct because they intended to chill his speech.

### 4. Chilled Speech

"Speech can be chilled even when not completely silenced." *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005). A plaintiff need not prove that "[their] speech was actually inhibited or suppressed." *Id.* at 569, *citing Mendocino Env'l Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999). A plaintiff need only demonstrate "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino County*, 192 F.3d at 1300. For a prisoner, the harm need only be "more than

minimal." *Watison*, 668 F.3d at 1114 (being placed in "administrative segregation"—i.e., solitary confinement—is "more than minimal").

Filing a false misconduct report against a prisoner, removing a prisoner from his work assignment as an inmate legal assistant, and then placing a prisoner in segregation, as here, would chill or silence the speech of a person of ordinary firmness from future First Amendment activities. Indeed, it is hard to imagine any greater action taken by prison officials than what has occurred to Plaintiff—the foremost prisoner advocate—to send a message to all prisoners: act like a lawyer, advocate for other prisoners or yourself, challenge the ODOC, and you will end up in segregation. *Wilson Supp. Dec.* ¶ 11. Let there be no doubt about it, punishing Plaintiff was meant to chill and silence both Plaintiff and all other prisoners from challenging ODOC.

And Defendant Plante succeeded. Plaintiff details how on January 21, 2021, Defendant Plante ordered him to not help other prisoners or he would face disciplinary action or loss of incentive housing and/or transfer out of OSCI. *Wilson Supp. Dec.* ¶ 9. For most of the year 2021, when other AICs would ask Plaintiff whether he could help them with their grievances, court cases, or clemency applications—some of which he had already began assisting AICs with prior to Defendant Plante's order—Plaintiff would apologetically refuse to help them. *Id.*

5. Legitimate Penological Goal

A prisoner asserting a claim for retaliation "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir. 1995).

Defendants will likely claim that they are owed extreme deference on matters involving the "safety and security" of the institution. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Whitley v. Albers*, 475 U.S. 312, 322 (1986). The Court need not concern itself with deference in this

matter. Defendant is not "automatically entitled to deference" just because they claim that this is a matter of safety and security. *Shorter v. Baca*, 895 F.3d 1176, 1183-1184 (9th Cir. 2018), *citing Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2010).

There is no legitimate penological justification for writing a false misconduct report in retaliation for a prisoner's exercise of his constitutional rights. *Rizzo v. Dawson,* 778 F.2d 527, 532 (9th Cir. 1985) (state actions that were retaliatory and were arbitrary and capricious sufficiently allege that correctional officer's action was not reasonable nor serve a legitimate correctional goal). The court "need not defer to prison officials where the plaintiff produces substantial evidence showing that the jail's policy or practice is an unnecessary, unjustified, or exaggerated response to the need for prison security." *Id.*, *citing*, *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 322–23 (2012); *Brown v. Plata*, 563 U.S. 493, 511 (2011); *Whitley v. Albers*, 475 U.S. 312, 322 (1986) (stating that deference to prison officials "does not insulate from review actions taken in bad faith and for no legitimate purpose"); *Spain v. Procunier*, 600 F.2d 189, 194 (9th Cir. 1979) ("Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary.").

As demonstrated above, Defendants have no legitimate justification for violating the Constitution to punish Plaintiff. The violations cited bear no relation to the facts of the matter. Plaintiff had engaged in proper behavior in accordance with ODOC rules. He listened to his superior, McKinney, and advocated for others, as is Constitutionally-protected. Punishing Plaintiff for this conduct is "unnecessary, unjustified, [and an] exaggerated response to the need for prison security"—especially when this conduct was sanctioned by the Director in implementing "The Oregon Way."

Defendant Plante may argue that Plaintiff's subsequent finding of guilt in his disciplinary hearing demonstrates that his Misconduct Report was not false and therefore shows a legitimate penological interest in accusing Plaintiff of rule violations. Defendant would be mistaken. The Ninth Circuit has rejected the idea that the "some evidence" standard for disciplinary hearings applies to retaliation claims like the one asserted here. *Hines*, 108 F.3d at 269 (holding that deferential "some evidence" standard afforded to disciplinary hearings does not apply to accusation that correctional officer falsely accused inmate of violating prison rule "in retaliation for prisoner's exercise of his constitutional rights.") The Ninth Circuit has also rejected using "generic justifications" from general prison rules to demonstrate a legitimate penological purpose in a First Amendment retaliation claim. *Shepard*, 840 F.3d at 691-693.

While Plaintiff would appreciate the opportunity to challenge the sufficiency of the disciplinary review process, he need not do so to succeed in this motion.[9] The Court need only review the record presented to find that Defendants had acted without a legitimate penological rationale to affect a retaliatory purpose against Plaintiff. *Hines*, 108 F.3d at 269.

**D. Irreparable Harm**

The Ninth Circuit has held that the injury resulting from a correctional officer's false changes that infringe on a prisoner's First Amendment rights "is the retaliatory accusation's chilling effect on [the prisoner's] First Amendment rights, not the additional confinement or the deprivation of" personal property. *Hines,* 108 F.3d at 269. It is also "well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v.*

---

[9] Unfortunately, federal review of prison disciplinary process is woefully inadequate in matters of due process violations. With considerable foresight, Justice Marshall, in dissent, wrote of the lack of procedural due process rights of prisoners in disciplinary cases: "In such a contest, it seems obvious to me that even the wrongfully charged inmate will invariably be the loser." *Wolff v. McDonnell*, 418 U.S. 539, 581-582 (1974). Plaintiff does not raise a due process at the present time, but reserves the right to do so.

*Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Further, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quoting *Elrod*, 427 U.S. at 373, 96 S.Ct. 2673).

Plaintiff is sitting in a solitary confinement cell as of this brief's filing. What Plaintiff faces is not merely a possibility of some future harm. *See, e.g.*, *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm.") He is currently being harmed by Defendants' unlawful actions. As his declaration details, OSCI staff strip-searched Plaintiff and placed him into an 8'x8' cell (Cell 3) in Section 1 of DSU. *Wilson Dec.* ¶ 7; *Hay Dec.* at p. 2.

This setting is typical of a cell in DSU, known as "the hole" – which "feels like being locked in a dungeon and forgotten." *Id.* at ¶ 5; *Manning Dec.* at *p.* 1. This cell contained a concrete slab bed and an open toilet approximately 6" from the head of the bed. *Id.* No natural light entered the cell, and plexiglass-covered bars prevented air circulation. *Id*.; *Hay Dec.* at p. 4 (describing how the lighting situation makes it difficult to read for longer than 15 minutes.) On September 1, 2021, OSCI staff moved Plaintiff to Cell 40 in Section 4 of DSU. *Id.* In addition to the impact of the physical confines of DSU, Plaintiff feels "increased feelings of despair, grief, fear, anxiety, loss, anger, and hopelessness" given the lack of social interaction, an inability to practice coping strategies, and the unavailability of Behavior Health Services (BHS) in DSU. *Wilson Dec.* at ¶ 28 – 29; *Hay Dec.* at p. 4; *Gray Dec.* at p. 2; *Manning Dec.* at p. 1, lns. 20-22.

The other men in OSCI's DSU report similar conditions: inhumane, unduly rigorous, cruel punishment. *See generally Decls. of Manning, Hay,* and *Gray*. DSU prevents AIC's from accessing "programs, activities or other mental stimulus," including the library. *Id.* at 26; *See*

*also Manning Dec.* at *p.* 2; *Gray Dec.* at p. 2. Medical care falls by the wayside when you are in DSU. *Gray Dec.* at p. 6; *Manning Dec.* at p. 2, lns. 29-33 ("'Kyte us when you're back in general population (GP).'"). One declarant states that OSCI's DSU is the worst one he has been placed within. *Gray Dec.* at p. 3. "Every day feels like an eternity." *Hay Dec.* at p. 7.

The OSCI DSU practice prevents Plaintiff from interacting with other AIC's or making non-legal phone calls. *Wilson Dec.* at 23. This appears to be the other main purpose for placing Plaintiff in solitary confinement, to prevent him being able to assist other AICs in litigation. In the time since this additional punishment was levied against him, Plaintiff has learned that the law library has had legal materials removed and a general chilling pall has fallen on the remaining legal support staff. Plaintiff has learned that legal workers fear having happen to them what happened to Plaintiff if they assist another AIC with their legal matter.

Having been in ODOC's custody for over 30 years, Plaintiff has seen what happens to people ODOC retaliates against. They face disciplinary segregation, loss of privileges, loss of income, an inability to receive new employment, loss of housing, and transfer to faraway prisons. Indeed, Plaintiff has been through this before, as detailed in the lawsuit *Wilson v. Van Valkenburgh, et. al.*, USDC of Or. Case No. 2:06-cv-01391-SU (D. Or. 2006), Dkt. 1, *Compl*, Exhibit 1.

Plaintiff anticipates that following his stint in OSCI's DSU, he will be transferred to a harsher prison in ODOC's system on the eastern side of the State. Plaintiff also has a disciplinary record that since 1991[10] has been unblemished. This creates further problems for Plaintiff's

---

[10] Plaintiff had engaged in a non-violent protest while at the Oregon State Penintentiary. Plaintiff joined approximately 20 co-workers in protesting wage issues that their employer, UNIBASE, refused to resolve. The protest consisted of not returning to work after lunch one afternoon. Plaintiff returned to his cell after lunch instead of going to his work assignment. He was sanctioned to spend seven days in segregation and pay a $100 fine. He was also banned from

ability to receive programming, work, and housing assignments. Most pressingly at the time of this filing, Plaintiff continues to suffer the abusive, torturous rigors of solitary confinement. The Constitution requires that Plaintiff be granted relief to prevent further irreparable harm.

**E. Balance of Equities**

The balance of equities falls overwhelmingly in favor of granting a temporary restraining order in this case.  Plaintiffs have demonstrated that their constitutional rights have been violated and that they face the high likelihood of irreparable harm.  Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).  The public has no interest in Defendants retaliating against Plaintiff for assisting other AICs in litigation.

Even if the Court finds Plaintiff deficient in one of the prongs presented here, Plaintiff's record presented in this motion demonstrates that grave Constitutional issues are at stake, and more likely than not Defendants' but-for cause for punishing Plaintiff is his protected conduct.

**F. The Prison Litigation Reform Act Does Not Bar Relief**

Plaintiff cannot grieve quickly or effectively enough to remedy the unconstitutional behavior alleged here. The Prison Litigation Reform Act requires "administrative exhaustion" to be accomplished prior to bringing suit. 42 U.S.C. § 1997e. In debating the PLRA, Congress had concerns about what they deemed "frivolous" lawsuits by prisoners on matters ranging from the availability of legal materials and staff at the prison law library[11] to the infamous, and exaggerated, case involving an inmate receiving chunky peanut butter instead of creamy peanut

---

holding a preferential prison industry job for one year, but the ban was rescinded after six months of clear conduct.

[11] Eugene Novikov, *Stacking the Deck: Futility and the Exhaustion Provision of the Prison Litigation Reform Act*, 156 U. Pa. L. Rev. 817, 817 (Jan. 2008).

butter from the canteen.[12] Congress did leave a pressure valve in the law to alleviate matters un-addressable by a grievance.

42 U.S.C. § 1997e(a) provides the following:

> "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies *as are available* are exhausted."

(Emphasis added.)

This exhaustion requirement extends to lawsuits for injunctive relief, arguably even when irreparable harm may occur. *Hoffman v. Palagummi*, 2019 WL 582353, *3 (E.D.Cal., Feb. 13, 2019) (holding refusal to process plaintiff's grievance as an emergency did not mean he could file suit before the ordinary process was completed), *report and recommendation adopted*, 2019 WL 2464599 (E.D. Cal, June 13, 2019); *Williams v. Bal*, 2012 WL 2065051, *2 (E.D. Cal., June 7, 2012) (holding there is no imminent danger exception to the exhaustion requirement). However, courts have found that inherent equitable discretion exists to grant temporary relief pending exhaustion. *See Thornberry v. Baughman*, 2018 WL 4039976, *3-4 (E.D. Cal., Aug. 22, 2018) *report and recommendation adopted*, 2018 WL 9840953 (E.D. Cal., Oct. 23, 2018); *Jackson v. District of Columbia*, 254 F.3d 262, 267–68 (D.C. Cir. 2001); *accord*, *Simmons v. Stokes*, 2010 WL 2165358, *4 (D.S.C., May 26, 2010).

Other courts have found that, even absent traditional equitable discretion, prisoners may request and be granted temporary restraining orders prior to full completion of administrative exhaustion. Here, the question becomes one of "available remedies":

> "If a prisoner has been placed in imminent danger of serious

---

[12] Notably, the inmate lost $2.50 over the misplaced order, which was and still is a considerable amount of money for a prisoner. Chief Judge Jon O. Newman, *Not All Prisoner Lawsuits Are Frivolous*, Prison Legal News (April 15, 1996) available at https://www.prisonlegalnews.org/news/1996/apr/15/not-all-prisoner-lawsuits-are-frivolous/

physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available."

*Fletcher v. Menard Correctional Center*, 623 F.3d 1171, 1173 (7th Cir. 2010).  Put another way: "If it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust." *Id.*

Grieving in ODOC requires a lengthy administrative and one fraught with peril for Oregon inmates. The timeline to grieve in ODOC is as follows:

"(1) Grievances must be *received* by the institution grievance coordinator or designee within **14 calendar days** from the date of the incident or issue being grieved, unless the AIC can satisfactorily demonstrate why the grievance could not be timely filed… (Emphasis added)

(2) A grievance response will be *sent* to the AIC within **35 calendar days from the date the grievance was accepted** by the institution grievance coordinator, unless further review is necessary to fully respond to the AIC's grievance, in which case the AIC will be notified that the department will respond within an additional 14 calendar days. (Emphasis added.)

(3) Initial appeals must be *received* by the institution grievance coordinator or designee within **14 calendar days from the date the initial grievance response** was *sent* to the AIC unless the AIC can satisfactorily demonstrate why the initial appeal could not be timely filed... (Emphasis added.)

(4) A response to the initial appeal will be sent to the AIC within **35 calendar days from the date the initial appeal was accepted**, unless further review is necessary to fully respond to the AIC's initial appeal, in which case the AIC will be notified that the department will respond within an additional 14 calendar days. (Emphasis added.)

(5) Final appeals must be *received* by the institution grievance coordinator or designee within **14 calendar days from the date the initial appeal response** was *sent* to the AIC unless the AIC can satisfactorily demonstrate why the final appeal could not be timely filed… (Emphasis added.)

(6) A response to the final appeal will be sent to the AIC within **35 calendar days from the date the final appeal was accepted**,

> unless further review is necessary to fully respond to the AIC's
> final appeal, in which case the AIC will be notified that the
> department will respond within an additional 14 calendar days."

OAR 291-109-0205 (Emphasis added).

Assuming that a grievance response does not necessitate "further review," to complete the administrative grievance system, a prisoner may not receive word of the resolution of their grievance for 147 days—likely long after Plaintiff would have served his 120 day sentence in DSU.

The grievance system in application places multiple obstacles in front of a grieving prisoner. As emphasized from the OAR text above, the dates and times a plaintiff would need to ensure that the grievance is not just filed but in the hands of the grievance coordinator within 14 days. Prisoners have reported that grievances conveniently disappear or take longer than a piece of postage mail to be received by the grievance coordinator. Then, when a prisoner receives their grievance response, a prisoner must return the grievance for appeal not 14 days from receipt, but from the date of mailing by the grievance coordinator. Functionally, this serves to provide the prisoner less and less time to submit a grievance, placing the thumb on the scale for the institution.

To date, Plaintiff has submitted grievances regarding some of the matters presented in this motion, but the primary concern raised in this motion—that a misconduct report and disciplinary hearing was conducted in retaliation for protected conduct—is not reviewable under ODOC's administrative exhaustion rule. OAR 291-109-0210(4) provides: "(4) An AIC cannot grieve the following:… (g) Misconduct reports, investigations leading to or arising from misconduct reports, or disciplinary hearings, findings, and sanctions." Plaintiff's primary claims arise out of "misconduct reports" and "disciplinary hearings."

Functionally, both in the time it would take ODOC to process an inmate's grievance, and in the responses already furnished, Plaintiffs have no "available" administrative remedy, and should be excused from the exhaustion requirement. *Brown v. Valoff*, 422 F.3d 926 (9th Cir. 2004) ("[T]he statutory language [of 42 USC §1997e] does not require exhaustion when *no* pertinent relief can be obtained through the internal process.")

## V. CONCLUSION

For the reasons stated above, Plaintiff has met his burden to request a Temporary Restraining Order. He requests the following:

1) Reversal of the unconstitutional disciplinary findings made against him;

2) Release from the disciplinary segregation unit;

3) Placement back into his incentive housing; and

4) No further retaliation against him for engaging in protected, First Amendment conduct.

Plaintiff requests an oral hearing on this matter to take place no later than November 24, 2021. Plaintiff requests to be present to hear the arguments, and present testimony if allowed.

DATED: November 22, 2021.

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Franz H. Bruggemeier, #163533

Attorneys for Plaintiff