# DECLARATION OF PAM MCKINNEY

I, Pam McKinney, hereby declare and state as follows:

1. I am a former Oregon Department of Corrections (DOC) staff. I am 18 years of age or older and am otherwise competent to make this declaration. I make this declaration on personal knowledge of the matters stated in this declaration or from sources deemed reliable.

**Background on Employment and Work Environment**

2. I started at Snake River Correction Institution (SRCI) of DOC around 1996 working in food service. Because I felt unsafe there, I ultimately moved to the west side of the state and worked at Fairview, then at the Oregon State Correctional Institution (OSCI).

3. While working as a food service coordinator at OSCI, I had health problems (knee replacement) and I was moved to the mail room. I estimate that I was in food service for about 10 years, and in the mail room for 9 before going to work in the OSCI law library around 2017 as the Library Coordinator.

4. I was trained in the law library position by a correctional officer (CO) named Adam Pletcher. Adam was leaving that position to be a release counselor.

5. I recall that sometime before Covid-19 pandemic, the DOC began to implement "the Oregon Way" - a shift in the culture and practice in DOC emphasizing "normalization" of things, so that adults in custody (AICs) might better transition to normal society when/if they are released.

Page 1 – DECLARATION OF PAM McKINNEY

6. I took cues on how to implement the Oregon Way from videos that staff had taken in Norway, and reports from the staff that had gone there.

7. For me this meant bringing in plants and posters to make a park or garden like atmosphere in the library area. I also helped AICs put up pictures that they liked on the wall, in the shape of "clocks". I also put up many inspirational sayings on the wall and I have pictures of them. Many AICs would read the sayings, and often write them down as they found them inspiring.

8. I worked hard to make the library a "safe" area to come to. As a result, AICs with Prison Rape Elimination Act (PREA) issues came to the library to speak about their problems, because it was a safe space. OSCI legal assistants' (LA) Mark Wilson and Wayne Houff assisted in facilitating these PREA AICs reports in a way that would be safe for the reporting AIC.

9. My supervisors loved my efforts to implement the Oregon Way. I received positive feedback from supervisor Nathan Warren. This included praise for participating in a staff holiday sweater party, and wearing reindeer horns on my head while working my shift in the law library, which was posted on a DOC website around the end of 2020.

10. As part of my "Oregon Way" efforts, I brought in a 2-gallon fishbowl with some fish. This was very popular with the AICs, who would come to see the fish. The "unit 3" AICs, who would rarely leave their cells due to mental health and safety issues, would even start to come to the library because of the fish. It was not at all a secret that I had the fish. After about 6 months another staff person said that she wanted her emotional support animal at work, and said that my fish tank was comparable. Because of this, I

was told that I had to remove the fish, and that as a "consolation" my supervisor brought in a fake plastic tank with some plastic fish.

11.    It was in the spirit of jest that I brought in a toy plastic phone (the kind that has eyes, and that can be used as a pull toy by a small child) and placed it on AIC Wilson's work desk. The phone was mine - it was not given to AIC Wilson as his own. I placed it on AIC Wilson's desk as a kind of a joke because he would get so many calls from lawyers. It was all in my effort to create the "Oregon Way" environment, and that it was not especially different from the fish tank that my supervisor had given me. When the phone was removed by inspectors, and called out as a specific rule violation, I was shocked, as there was nothing hidden or nefarious about it.

12.    Some staff in DOC do not like the cultural change happening in DOC, and they would say things like "Fuck the Oregon Way". My supervisors, Harlow and Warren, appeared to love the new way of doing things, and appreciated my efforts in that regard. Warren expressed wanting more college type decorations in the library, and that he even talked about putting a couch in my area - something that I resisted because it caused AICs to "hang around" too much, which complicated things.

13.    There was nothing hidden or secret about what I was doing or how I operated the OSCI library. There was very little supervision 99% of the time, and that I was left to my own devices. The directive from management was to "get it done" but that there was no direction on "how" to get it done. The main priority was to find a way to make legal access and process happen for the AICs.

Page 3 – DECLARATION OF PAM McKINNEY

14. My training on how to run the law library was minimal. My supervisors shared the rule regarding AICs having access to legal services, and told me to implement it in such a way that AICs could engage in legal access in the most affordable way possible.

15. The leadership of the institution would often funnel unique needs into my area, like the music copying. This happened with approval of my supervisor. While I did not agree with some of the things (like the music copying) that were allowed, I always followed the directive of my supervisor.

16. To explain further, when the contract ended for the AIC's electronic devices, many AIC's had thousands of dollars' worth of music and photos on the devices which would be lost if they were not copied onto a backup device. My supervisor, Warren, told me to download items from LA Houff's electronic device onto a thumb drive for Wayne, specially. Supervisors had me put AIC's David Durham's cassette music onto a purchased MP 3 player as well, specially. This was set up by the diversity coordinator because the institution didn't want cassette tapes or players in the institution anymore.

17. I was not a pushover nor someone who minimized the safety and security of the institution. Fairly recently, for example, AIC Mr. Persinger was working in the library as a scheduling coordinator. He would schedule time for the AICs to be on computers and to spend time with legal aids. After observing him acting odd one day, it raised a red flag for me. Although he was a long-term AIC, I began to observe his behavior. Ones day he received a package ostensibly via legal mail. After checking the package according to policy, I noticed that it contained CDs with paper labels on them. Through the labels I could see that the CDs were commercial pornography. I contacted the attorney who

Page 4 – DECLARATION OF PAM McKINNEY

supposedly sent the CDs, and he said that AIC Persinger was not his client, and that he had not sent anything to the prison for Mr. Persinger. All of this information was sent by me to my supervisor and AIC Persinger was disciplined.

**Operation of the OSCI Library Around the Time of Covid-19 Pandemic**

18. Once Covid hit, things became complicated for AICs managing legal cases. OSCI was on modified lock down. Things that were handled by mail were not making it in time due to delays, and this was causing significant problems in cases with court deadlines. The courts, parole board, and attorneys in the community would email me documents to give to AICs.

19. At that time things were made complicated because many attorneys were working from home rather than their offices, making mailing things complicated. Sensitive things were missing their deadlines, and things would get lost or arrive weeks late.

20. For example, once, I recall that there had been some difficulty getting legal documents for an AIC to the Department of Administrative Services (DAS). I made my supervisor aware of this, and he had spoken to me and to LA Wilson. The courts had been bombarding me because of timeline issued, and that my supervisor knew that things were being returned by mail and not making it to DAS. I talked to my supervisor about sending the documents via email as an attachment, which he had approved as a way to get the matter resolved. My supervisor never told me that this was a one-time exception to any rule, or that it was not ok to do.

21. For that reason, as well, I would allow LA Wilson to give me documents to send to attorneys because things were not arriving in time. He would give me a note explaining

Page 5 – DECLARATION OF PAM McKINNEY

what the documents were about, and I would scan the documents and email them to the attorneys. I would "fan through" the documents before scanning, as I was supposed to generally not specifically inspect legal documents without reading them.

22. I never allowed an AIC to personally send or receive email directly, or place or receive a phone call. I authorized all communication with AICs from outside persons.

23. I would set up phone calls between attorneys and clients. If an attorney called asking to set up a time to talk to a client, but the client was present or close by at the time of the call, I would sometimes just simply put the AIC on right then. I would sometimes tell the AICs, and the AIC would then go to his cellblock to make the call. There was no special treatment in this regard, and that it was simply a matter of practicality and getting things done.

**Investigation, Interrogation, and Forced Retirement**

24. One day DOC's special investigator Mr. Plante and OSCI Cpt. Hide came into my area one day, and took some things, including the toy phone. I was not aware of any problem until I was removed from the library and duty stationed.

25. I was only able to speculate on what I had done wrong and remained uncertain until I was called into a meeting in a conference room. I was "grilled" from 8:00 or 9:00 in the morning until 1:00 or 2:00 in the afternoon by Mr. Plaint with my union representative present. Mr. Plante spoke to me both on the record and off the record.

26. Off the record I asked Mr. Plante if the situation was "retrievable" or not. He told me that he could not make the determination, and that it was up to my supervisor. At one

Page 6 – DECLARATION OF PAM McKINNEY

point my union rep sent me away, and then met with me after saying that I needed to resign or risk losing half of my retirement. My union rep is the OSCI painter.

27. Mr. Plante interrogated me in a way that made me feel like he was on a mission. I felt that he was browbeating me, and trying to intimidate me with "reams of paper" and multiple binders that he would refer to whenever I answered a question. I felt that he was purposefully intimidating me in order to make me feel a certain way. Mr. Plante would cite an example, and then a policy, and say "you know you broke policy". I responded saying "I'm sorry. That's how I felt. I had no other recourse".

28. Everyone in DOC knows that policy is rarely if ever followed exactly. For example, stand-alone printers were not supposed to be allowed. When I started the library coordinator position, the AIC workers had printers assigned to them. Mr. Plante told me that DOC policy is that AICs cannot have printers assigned to them. I pointed out that the practice (as opposed to the policy) was that IT purchased the printers to be assigned to the AIC workers, and that they replaced them when they wore out. I said that notwithstanding the policy, DOC facilitated and financially endorsed this practice. Mr. Plante did not seem to care.

29. Mr. Plante told me that by emailing documents and not "reading them", I had broken policy, and that AIC Wilson had "compromised" me. I told him that staff are not supposed to read legal mail and he appeared not to care. When Mr. Plante told me that I was compromised, exhausted I felt pressured to say that AIC Wilson had compromised me. I did not feel prior to the interview that I had been compromised, and I do not feel now that I had mixed feelings or was confused in my supervisor role over AIC Wilson.

Page 7 – DECLARATION OF PAM McKINNEY

30.     AIC Wilson did not push me or manipulate me to get me to email legal documents. For example, due to complications related to COVID, documents were not getting where they needed to be in a timely manner, and I was finding a way to fix that problem and complete my duties as they had been described to me. I relied on LAs to meet those demands and use the email system as well. Other DOC institutions were dealing with these problems in a similar fashion. There were many times that my supervisor would just tell me to "go ahead" after I asked for direction on how to solve an issue of legal access. I do not feel that there was any maliciousness about it. I do not believe I received appropriate guidance and support from my supervisor.

31.     I never felt AIC Wilson or any other inmate tried to take advantage of difficulties surrounding COVID. AIC Wilson was trying to get things done for other AICs. While I tried not to know all the details about AICs legal cases, I was aware that AIC Wilson was involved in litigation related to DOC and COVID issues.

32.     While Mr. Plante was interviewing me, I felt like I was being "herded into a narrative", which was that AIC Wilson was a manipulator and "the devil". I believe that DOC was pushing this narrative because AIC Wilson had won a lawsuit against them in the past, and they were worried that he would be successful again.

33.     I felt in my interview with Mr. Plante that if I didn't agree, they were going to make me agree, and I would have "gotten canned right then". I felt that they were herding me onto their track, and they would "beat me up" until I got on their train.

34.     For example, Mr. Plante said to me (I cannot recall if it was on or off the record) that "you wouldn't have gotten a phone for Mark if you didn't feel that you and Mark had

Page 8 – DECLARATION OF PAM McKINNEY

something going". I pointed out that the phone was a "baby phone", the kind that has eyes, wheels, and can be pulled as a pull toy. I told Plante it was part of a running joke and that when a phone would ring, I and other inmate clerks would tell mark to "answer it" on the toy phone. Again, the toy phone, the posters and holiday decorations were used to normalize the workplace in accordance with what I had learned about the "Oregon way".

35. I strongly believe that DOC disapproves of AIC Wilson's lawsuits and legal actions, and that I am collateral damage. In my opinion, DOC went after AIC Wilson for that reason. There was nothing special about how I handled things in comparison to how others in DOC legal libraries handled things and all of my supervisors approved of my decisions.

36. AIC Wilson never behaved inappropriately throughout my time working with him. Had he done so, I would have removed him from his position as an LA and given him a disciplinary report or some other sanction.

**I declare under penalty of perjury and under the laws of the United States, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, memory, and belief.**

EXECUTED on this 22nd day of October,

*s/ Pam McKinney*
Pam McKinney
Declarant

Page 9 – DECLARATION OF PAM McKINNEY