ELLEN F. ROSENBLUM
Attorney General
SHANNON M. VINCENT  #054700
Senior Assistant Attorney General
KENNETH C. CROWLEY #883554
Senior Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4700
Fax: (503) 947-4791
Email:  Shannon.M.Vincent@doj.state.or.us
        Kenneth.C.Crowley@doj.state.or.us

Attorneys for Defendant Jerry Plante


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | |
|---|---|
| MARK WILSON, | Case No.  6:21-cv-01606-SI |
| Plaintiff, | MATTHEW J. LYSNE'S DECLARATION IN SUPPORT OF DEFENDANT JERRY PLANTE'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER |
| v. | |
| JERRY PLANTE, and JOHN DOES 1-10, | |
| Defendants. | |


I, Matthew J. Lysne, hereby declare:

        1.      I am an Assistant Attorney General (AAG) for the Oregon Department of Justice

(ODOJ) in the General Counsel Division.  As a part of my work responsibilities, I serve as

general counsel for the Oregon Department of Corrections (ODOC).

        2.      Attached as Exhibit 1 is a true and correct copy of a letter dated August 8, 2021,

from Juan Chavez, attorney for Plaintiff Mark Wilson, to several representatives of ODOC.  I

was not a direct recipient of that letter, which was sent to DOC representatives by email in the

Page 1 -   DECLARATION OF MATTHEW J. LYSNE

evening of August 8, 2021, however, I received forwarded copies of that letter. Attached as Exhibit 2 is a true and correct copy of one of the forwarded copies of the letter I received from ODOC. In the letter in Exhibit 1, Chavez alleged that ODOC violated Wilson's constitutional rights by initiating disciplinary proceedings against him for allegedly compromising the library coordinator at Oregon State Correctional Institution. Chavez requested, with emphasis, that ODOC "**cease this unconstitutional practice immediately and not continue any hearing of this matter until Mr. Wilson has been afforded the benefit of an independent investigation from our office.**" (Emphasis in original.)

3.      Attached as Exhibit 3 is a true and correct copy of an email I sent to Chavez on August 11, 2021, in response to his August 8 letter. In that letter, I acknowledged receiving Chavez's August 8 letter and that I would provide a response after conferring with ODOC.

4.      Attached as Exhibit 4 is a true and correct copy of an email I sent to Chavez on August 12, 2021. I sent that email partly in response to Chavez's August 8 letter, and partly in response to an additional email Chavez sent to ODOC on August 2021 at 10:23 a.m., (the latter of which is contained on the second page of Exhibit 4.) In my email to Chavez, I explained that ODOC's disciplinary proceeding remained pending, but also confirmed that ODOC "will proceed with the disciplinary proceeding concerning Mr. Wilson."

5.      After exchanging those emails, Chavez and I arranged for a telephone conference to discuss his concerns about alleged constitutional violations. Attached as Exhibit 5 is a copy of emails concerning the scheduling of that telephone conference, which occurred on or about August 17, 2021. During that telephone conference, I confirmed that ODOC intended to proceed with the disciplinary proceeding concerning Wilson, and that that disciplinary proceeding would provide Wilson due process. I understood from Chavez that Wilson may intend to proceed with litigation with claims involving due-process violations and alleged retaliation.

6.      Attached as Exhibit 6 is a true and correct copy of an email that Chavez sent to me and Shannon Vincent (an Assistant Attorney General at the Oregon Department of Justice

Page 2 -    DECLARATION OF MATTHEW J. LYSNE

who also represents ODOC) on September 29, 2021. With that email, Chavez included three attachments. In this declaration, I include a true and correct copy of each separate attachment as Exhibit 6a, Exhibit 6b, and Exhibit 6c. In the September 29 email, Chavez advised that his office, Oregon Justice Resource Center (OJRC), had filed "an administrative request to dismiss the sanctions levied against Mark Wilson (see attached) in retaliation for him performing his duties" and declared that "because Mr. Wilson is actively suffering from a deprivation of his rights, we intend to file suit against ODOC by end of day Friday [October 1, 2021] unless we can remediate this problem." Chavez included with that email, a draft copy of a civil-rights complaint against ODOC (Exhibit 6a), a copy of the Hearings Officer's Finding of Fact, Conclusion, and Order, which imposed sanctions against Wilson (Exhibit 6b), and a copy of a letter from Chavez to ODOC, dated September 29, 2021, (Exhibit 6c), in which Chavez requested "that the final disciplinary order issued against Mark J. Wilson on August 31, 2021 be vacated in the interest of justice, pursuant to OAR 291-105-0100."

7.      In reviewing the September 29 request from Chavez, Exhibit 6c, it appears that request was not a request for administrative review under Oregon Administrative Rule 291-105-0085, which is the administrative rule required to exhaust administrative remedies for disciplinary proceedings. Rather, as Exhibit 6c states, it appears that the September 29 request was an entirely separate request to vacate or withdraw a final disciplinary order under Oregon Administrative Rule 291-105-0100.

8.      On September 29, 2021, Shannon Vincent replied to Chavez's September 29 email (Exhibit 6) on ODOC's behalf. Attached as Exhibit 7 is a true and correct copy of that email. In that email, Vincent explained to Chavez that "ODOC is going to stand by its decision in Mr. Wilson's prison disciplinary case."

Page 3 -   DECLARATION OF MATTHEW J. LYSNE
SMV/jm8/Wilson 1606 PLD Lysne Declaration iso Def's response to TRO.docx

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

9.      Since Vincent's September 29 email, I had been unaware of any litigation filed on Wilson's behalf until I reviewed my email inbox on the morning of Tuesday, November 23, 2021.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on November <u>24</u>, 2021.

<u>    *s/ Matthew J. Lysne*                    </u>
MATTHEW J. LYSNE

Page 4 -    DECLARATION OF MATTHEW J. LYSNE
SMV/jm8/Wilson 1606 PLD Lysne Declaration iso Def's response to TRO.docx



August 8, 2021

To:
Jefry Van Valkenburgh, AAG Oregon Department of Justice
Colette Peters, Director, Oregon Department of Corrections
Josh Highberger, Superintendent, Oregon State Correctional Institution
Craig Prins, Office of the Inspector General, Oregon Department of Corrections
Melissa Nofzinger, Office of the Inspector General, Oregon Department of Corrections
Senator Michael Dembrow

***URGENT***

RE: Violations of Due Process and Retaliation against Mark Wilson, SID 7449142.

To Whom It May Concern:

I am writing this letter on behalf of our client, Mark J. Wilson (SID 7449142), an Adult-in-Custody currently imprisoned at the Oregon State Correctional Institution. It has come to our attention that the Oregon Department of Corrections has begun disciplinary proceedings against Mr. Wilson. Based on the allegations and the manner in which they are proceeding with prosecuting Mr. Wilson, the State of Oregon will be violating Mr. Wilson's constitutional rights if they do not cease this practice at once. **We demand that the Oregon Department of Corrections cease this unconstitutional practice immediately and not continue any hearing of this matter until Mr. Wilson has been afforded the benefit of an independent investigation from our office.** We will seek any and all available legal remedy at our disposal if ODOC does not.

Our understanding is that Mr. Wilson is being selectively targeted for discipline because of a situation arising out of the conduct of the former OSCI law librarian, Pam McKinney, who was Mr. Wilson's supervisor. That employee's conduct resulted in her resignation recently. After Mrs. McKinney's resignation, ODOC continued to investigate and ultimately removed Mr. Wilson from his work assignment despite no wrongdoing on his part. Mr. Wilson has only ever acted consistent with the job of legal assistant and under the direction supervision and control of Mrs. McKinney, a 22 year-old veteran of ODOC.

With only minimal investigation, we also have evidence of inappropriate emotional engagement by Mrs. McKinney with both Mr. Wilson and other AICs under ODOC's custody. This raises grave concerns that ODOC investigators have omitted critical information about Mrs. McKinney having compromised Mr. Wilson and other AICs. Indeed, from the information we have received, the investigators, who drafted Mr. Wilson's disciplinary report appears to place blame upon Mr. Wilson for the improper behavior of Mrs. McKinney.

It is also our understanding that Mr. Wilson is being punished for accessing the court. Whether the ODOC investigator finds Mr. Wilson's access—via email—was inconsistent with the rules,

P.O. Box 5248 Portland, Oregon 97208
T: 503-944-2270   F: 971-279-4748
http://www.ojrc.org



Mr. Wilson was given permission by Mrs. McKenney to file his court documents and speak on the OSCI legal phone for those purposes.

OAR 291-139-0160(11) provides: "Assignment and removal of inmate legal assistants by the library coordinator shall not be based upon retaliation for legitimate legal activities done in accordance with these rules." That is clearly the case here. Mr. Wilson and the people who seek his assistance have only engaged in legitimate legal activities. Additionally, the United States Constitution protects prisoners from retaliation for availing themselves to the court system and from denying them due process of law. Mr. Wilson has previously experienced similar retaliation, which resulted in a settlement in his favor. *See Wilson v. Van Valkenburg, et. al.*, Case No. 2:06-cv-01391-SU (D. Or. 2006).

As stated above, we demand that ODOC cease their unconstitutional proceeding against Mr. Wilson. If not, there will be legal consequences. Please provide our office acknowledgement of receipt of this letter at your earliest convenience, and relay news of whether or not ODOC has appropriately declined further violations of Mr. Wilson's rights. We look forward to your anticipated cooperation.

Sincerely,

Juan C. Chavez
Director, Civil Rights Project, OJRC

**Lysne Matthew J**

| | |
|---|---|
| **From:** | PRINS Craig A * DOC <Craig.A.Prins@doc.state.or.us> |
| **Sent:** | Wednesday, August 11, 2021 11:37 AM |
| **To:** | LYSNE MATTHEW J; NOFZIGER Jeremy M * DOC |
| **Subject:** | Fwd: URGENT: Letter re: Mark Wilson |
| **Attachments:** | Wilson Ltr 8.8.21.pdf |

> **\*CAUTION EXTERNAL EMAIL\*** This email originated from outside of DOJ. Treat attachments and links with caution. **\*CAUTION EXTERNAL EMAIL\***

Sent from my iPhone

Begin forwarded message:

> **From:** Juan Chavez <jchavez@ojrc.info>
> **Date:** August 9, 2021 at 9:49:04 AM PDT
> **To:** PRINS Craig A * DOC <Craig.A.Prins@doc.state.or.us>
> **Subject: FW: URGENT: Letter re: Mark Wilson**
>
> Dear Mr. Prins,
>
> I sent the attached last night to some of the addresses, but only now found your email address. Please review the letter as it is urgent.
>
> -Juan
>
> --
> Juan C. Chavez
> Tel: 503-944-2270 ext. 212
> Pronouns: he/him
>
> **Please note: During the COVID-19 emergency shutdown, we are working remotely. I can be reached on my mobile at (626) 253-9028 or through this email address.**

> **From:** Juan Chavez <jchavez@ojrc.info>
> **Date:** Sunday, August 8, 2021 at 9:09 PM
> **To:** Van Valkenburgh Jefry <jef.vanvalkenburgh@doj.state.or.us>,
> colette.s.peters@doc.state.or.us <colette.s.peters@doc.state.or.us>,
> jessica.l.freeburn@doc.state.or.us <jessica.l.freeburn@doc.state.or.us>,
> Joshua.L.Highberger@doc.state.or.us <Joshua.L.Highberger@doc.state.or.us>,
> sen.michaeldembrow@oregonlegislature.gov <sen.michaeldembrow@oregonlegislature.gov>
> **Subject:** URGENT: Letter re: Mark Wilson
>
> Dear all,

Attached, please find a letter our office has drafted on behalf of Mark Wilson, an AIC at OSCI. This is an urgent matter and demands your immediate attention, as it is our understanding that ODOC will be proceeding with a hearing against Mr. Wilson tomorrow morning, Aug. 9, 2021, at 9:00 am.

Please acknowledge receipt of this letter at your earliest convenience. Also, please forward to Craig Prins and Melissa Nofzinger at your earliest convenience.

Best,
Juan

--
Juan C. Chavez
Pronouns: he/him/his

Oregon Justice Resource Center
PO Box 5248
Portland OR  97208
Tel: 503-944-2270 ext. 212
Fax: 971-275-1839
Protonmail: chavezojrc@protonmail.com

**Please note: During the COVID-19 emergency shutdown, we are working remotely. I can be reached on my mobile at (626) 253-9028 or through this email address.**

NOTICE: This email message and any attachment(s) is/are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**Lysne Matthew J**

| | |
|---|---|
| **From:** | Lysne Matthew J |
| **Sent:** | Wednesday, August 11, 2021 11:45 AM |
| **To:** | Juan Chavez |
| **Cc:** | PETERS COLETTE S * DOC; Freeburn Jessica L; Highberger Joshua L; PRINS CRAIG A * DOC; SEN Dembrow; Vincent Shannon M; Hallman Andrew; Van Valkenburgh Jefry |
| **Subject:** | RE: URGENT: Letter re: Mark Wilson |

Good morning Mr. Chavez, thank you for your email, which was forwarded to me. I represent the Oregon Department of Corrections in this matter and would request that you communicate on this matter directly through me. I will confer with ODOC officials regarding the status of this matter and will get back to you as promptly as I can.

**Matthew J. Lysne**
Senior Assistant Attorney General
Oregon Department of Justice | General Counsel Division
1162 Court St NE | Salem, OR  97301
C: 971.707.3137 | matthew.j.lysne@doj.state.or.us

> **From:** Juan Chavez <jchavez@ojrc.info>
> **Date:** August 11, 2021 at 10:23:13 AM PDT
> **To:** Van Valkenburgh Jefry <jef.vanvalkenburgh@doj.state.or.us>,
> colette.s.peters@doc.state.or.us, jessica.l.freeburn@doc.state.or.us,
> Joshua.L.Highberger@doc.state.or.us, SEN Dembrow
> <Sen.MichaelDembrow@oregonlegislature.gov>, Craig.A.Prins@doc.state.or.us
> **Subject: Re: URGENT: Letter re: Mark Wilson**

> **\*CAUTION EXTERNAL EMAIL\* This email originated from outside of DOJ. Treat attachments and links with caution. \*CAUTION EXTERNAL EMAIL\***

> Dear all,

> It is my understanding that Mr. Wilson did have a hearing yesterday, Tuesday, sometime in the morning. This happened after he was told that his hearing would happen on Monday, and after ODOC received word that Mr. Wilson is a represented party. This is deeply troubling to our office. Additionally, Mr. Wilson attended this hearing shackled and thus unable to review his legal paperwork. The hearings officer informed him that she would not be receiving any evidence from him—testimonial or otherwise. This highlights *precisely* the harms we informed your departments about if ODOC decided to go down this reckless path of trampling Mr. Wilson's due process rights.

> We request to be put in touch with Mr. Wilson's hearings officer immediately. My contact information is below.

> Best,
> Juan Chavez

> --
> Juan C. Chavez

Tel: 503-944-2270 ext. 212
Pronouns: he/him

**Please note: During the COVID-19 emergency shutdown, we are working remotely. I can be reached on my mobile at (626) 253-9028 or through this email address.**

**From:** Juan Chavez <jchavez@ojrc.info>
**Date:** Sunday, August 8, 2021 at 9:09 PM
**To:** Van Valkenburgh Jefry <jef.vanvalkenburgh@doj.state.or.us>,
colette.s.peters@doc.state.or.us <colette.s.peters@doc.state.or.us>,
jessica.l.freeburn@doc.state.or.us <jessica.l.freeburn@doc.state.or.us>,
Joshua.L.Highberger@doc.state.or.us <Joshua.L.Highberger@doc.state.or.us>,
sen.michaeldembrow@oregonlegislature.gov <sen.michaeldembrow@oregonlegislature.gov>
**Subject:** URGENT: Letter re: Mark Wilson

Dear all,

Attached, please find a letter our office has drafted on behalf of Mark Wilson, an AIC at OSCI. This is an urgent matter and demands your immediate attention, as it is our understanding that ODOC will be proceeding with a hearing against Mr. Wilson tomorrow morning, Aug. 9, 2021, at 9:00 am.

Please acknowledge receipt of this letter at your earliest convenience. Also, please forward to Craig Prins and Melissa Nofzinger at your earliest convenience.

Best,
Juan

--
Juan C. Chavez
Pronouns: he/him/his

Oregon Justice Resource Center
PO Box 5248
Portland OR  97208
Tel: 503-944-2270 ext. 212
Fax: 971-275-1839
Protonmail: chavezojrc@protonmail.com

**Please note: During the COVID-19 emergency shutdown, we are working remotely. I can be reached on my mobile at (626) 253-9028 or through this email address.**

NOTICE: This email message and any attachment(s) is/are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

Delcaration of Lysne, Exhibit 3, Page 2 of 2

**Lysne Matthew J**

| | |
|---|---|
| **From:** | Lysne Matthew J |
| **Sent:** | Thursday, August 12, 2021 12:28 PM |
| **To:** | Juan Chavez |
| **Cc:** | PETERS COLETTE S * DOC; Freeburn Jessica L (Jessica.L.Freeburn@doc.state.or.us); Highberger Joshua L; PRINS CRAIG A * DOC; SEN Dembrow; Vincent Shannon M; Hallman Andrew; Van Valkenburgh Jefry |
| **Subject:** | RE: URGENT: Letter re: Mark Wilson |

Good afternoon Mr. Chavez, I wanted to follow up on your communications and inquiries regarding pending disciplinary proceedings concerning Mr. Mark Wilson. To begin, I wanted to either clarify or correct what may be a misunderstanding about the status of Mr. Wilson's pending disciplinary hearing. Please be aware that at this time, the hearings officer conducting Mr. Wilson's disciplinary hearing postponed the hearing to allow time to consider several requests Mr. Wilson had submitted, including a request for investigation, and a submitted list of questions for potential witnesses. I would anticipate that the hearings officer will decide those requests and that the disciplinary proceeding will proceed in accordance with those decisions. Mr. Wilson has not been denied an opportunity to review his legal paperwork or to otherwise prepare to respond to the pending disciplinary proceeding.

With that in mind, I disagree with your assertion that DOC is violating, or has violated, Mr. Wilson's due-process rights. DOC's disciplinary proceeding procedures fully satisfy the due-process requirements for disciplinary hearings in a correctional setting as set out in *Wolff v. McDonnell*, 418 US 539 (1974) and subsequent caselaw. In your email you express concern that you represent Mr. Wilson, however, please be aware that under *Wolff*, its progeny, and Department of Corrections administrative rules, an adult in custody does not have a "right to counsel" in disciplinary proceedings. The *Wolff* Court explained the underlying reason for that (with respect to due-process principles):

> The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings.

*Wolff*, 418 US at 570. DOC's administrative rules regarding assistance for disciplinary hearings are consistent with due-process principles discussed in *Wolff*.

Lastly, I wanted to respond to your allegations that the Department of Corrections is violating other constitutional rights or "retaliating" against Mr. Wilson for activities he allegedly engaged in during a legal library assistant work assignment. At this time, I am not entirely sure of the specific violations you are asserting have occurred. For example, there U.S. Supreme Court precedent establishing that adults in custody do not have a protected constitutional right to serve as a law library assistant, *Shaw v. Murphy*, 532 US 223 (2001), and there is no recognized constitutional right to violate disciplinary rules. Please note that I am expressing no opinion about whether Mr. Wilson committed any violation of DOC's rules alleged in the pending disciplinary proceeding. Determining whether any rule violations occurred (or did not occur) is a determination for the hearings officer to make, and based on the information provided during the disciplinary hearing, the evidentiary burdens required by law,

and other applicable administrative rules concerning disciplinary proceedings. In any event, I can confirm that DOC will proceed with the disciplinary proceeding concerning Mr. Wilson.

Thank you for your attention to this matter.

**Matthew J. Lysne**
Senior Assistant Attorney General
Oregon Department of Justice | General Counsel Division
1162 Court St NE | Salem, OR  97301
C: 971.707.3137 | matthew.j.lysne@doj.state.or.us

---

**From:** Lysne Matthew J
**Sent:** Wednesday, August 11, 2021 11:45 AM
**To:** Juan Chavez <jchavez@ojrc.info>
**Cc:** PETERS COLETTE S * DOC <Colette.S.Peters@state.or.us>; Freeburn Jessica L <Jessica.L.Freeburn@doc.state.or.us>; Highberger Joshua L <Joshua.L.Highberger@doc.state.or.us>; PRINS CRAIG A * DOC <Craig.A.Prins@state.or.us>; SEN Dembrow <Sen.MichaelDembrow@oregonlegislature.gov>; Vincent Shannon M <shannon.m.vincent@doj.state.or.us>; Hallman Andrew <andrew.hallman@doj.state.or.us>; Van Valkenburgh Jefry <jef.vanvalkenburgh@doj.state.or.us>
**Subject:** RE: URGENT: Letter re: Mark Wilson

Good morning Mr. Chavez, thank you for your email, which was forwarded to me. I represent the Oregon Department of Corrections in this matter and would request that you communicate on this matter directly through me. I will confer with ODOC officials regarding the status of this matter and will get back to you as promptly as I can.

**Matthew J. Lysne**
Senior Assistant Attorney General
Oregon Department of Justice | General Counsel Division
1162 Court St NE | Salem, OR  97301
C: 971.707.3137 | matthew.j.lysne@doj.state.or.us

> **From:** Juan Chavez <jchavez@ojrc.info>
> **Date:** August 11, 2021 at 10:23:13 AM PDT
> **To:** Van Valkenburgh Jefry <jef.vanvalkenburgh@doj.state.or.us>, colette.s.peters@doc.state.or.us, jessica.l.freeburn@doc.state.or.us, Joshua.L.Highberger@doc.state.or.us, SEN Dembrow <Sen.MichaelDembrow@oregonlegislature.gov>, Craig.A.Prins@doc.state.or.us
> **Subject: Re: URGENT: Letter re: Mark Wilson**

> **\*CAUTION EXTERNAL EMAIL\* This email originated from outside of DOJ. Treat attachments and links with caution. \*CAUTION EXTERNAL EMAIL\***

> Dear all,

> It is my understanding that Mr. Wilson did have a hearing yesterday, Tuesday, sometime in the morning. This happened after he was told that his hearing would happen on Monday, and after ODOC received word that Mr. Wilson is a represented party. This is deeply troubling to our office. Additionally, Mr. Wilson attended this hearing shackled and thus unable to review his legal paperwork. The hearings officer informed him that she would not be receiving any evidence from him—testimonial or otherwise.

This highlights *precisely* the harms we informed your departments about if ODOC decided to go down this reckless path of trampling Mr. Wilson's due process rights.

We request to be put in touch with Mr. Wilson's hearings officer immediately. My contact information is below.

Best,
Juan Chavez

--
Juan C. Chavez
Tel: 503-944-2270 ext. 212
Pronouns: he/him

**Please note: During the COVID-19 emergency shutdown, we are working remotely. I can be reached on my mobile at (626) 253-9028 or through this email address.**

---

**From:** Juan Chavez <jchavez@ojrc.info>
**Date:** Sunday, August 8, 2021 at 9:09 PM
**To:** Van Valkenburgh Jefry <jef.vanvalkenburgh@doj.state.or.us>,
colette.s.peters@doc.state.or.us <colette.s.peters@doc.state.or.us>,
jessica.l.freeburn@doc.state.or.us <jessica.l.freeburn@doc.state.or.us>,
Joshua.L.Highberger@doc.state.or.us <Joshua.L.Highberger@doc.state.or.us>,
sen.michaeldembrow@oregonlegislature.gov <sen.michaeldembrow@oregonlegislature.gov>
**Subject:** URGENT: Letter re: Mark Wilson

Dear all,

Attached, please find a letter our office has drafted on behalf of Mark Wilson, an AIC at OSCI. This is an urgent matter and demands your immediate attention, as it is our understanding that ODOC will be proceeding with a hearing against Mr. Wilson tomorrow morning, Aug. 9, 2021, at 9:00 am.

Please acknowledge receipt of this letter at your earliest convenience. Also, please forward to Craig Prins and Melissa Nofzinger at your earliest convenience.

Best,
Juan

--
Juan C. Chavez
Pronouns: he/him/his

Oregon Justice Resource Center
PO Box 5248
Portland OR  97208
Tel: 503-944-2270 ext. 212
Fax: 971-275-1839
Protonmail: chavezojrc@protonmail.com

**Please note: During the COVID-19 emergency shutdown, we are working remotely. I can be reached on my mobile at (626) 253-9028 or through this email address.**

NOTICE: This email message and any attachment(s) is/are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

4

**Lysne Matthew J**

---

**From:**           Lysne Matthew J
**Sent:**           Tuesday, August 17, 2021 8:34 AM
**To:**             Juan Chavez
**Subject:**        RE: URGENT: Letter re: Mark Wilson


Good morning Juan, I understand client emergencies, not a problem. I'll be available 10-11 this morning.

**Matthew J. Lysne**
**Senior Assistant Attorney General**
**Oregon Department of Justice | General Counsel Division**
1162 Court St NE | Salem, OR  97301
C: 971.707.3137 | matthew.j.lysne@doj.state.or.us

---

**From:** Juan Chavez <jchavez@ojrc.info>
**Sent:** Tuesday, August 17, 2021 8:10 AM
**To:** Lysne Matthew J <matthew.j.lysne@doj.state.or.us>
**Subject:** Re: URGENT: Letter re: Mark Wilson

**\*CAUTION EXTERNAL EMAIL\* This email originated from outside of DOJ. Treat attachments and links with caution. \*CAUTION EXTERNAL EMAIL\***

Hi Matt,

Sorry I missed your call yesterday. I had a client emergency. I'll have time between 10:00 to 11:00, then 1:00 to 2:30.

-Juan

--
Juan C. Chavez
Tel: 503-944-2270 ext. 212
Pronouns: he/him

**Please note: During the COVID-19 emergency shutdown, we are working remotely. I can be reached on my mobile at (626) 253-9028 or through this email address.**

---

**From:** Lysne Matthew J <matthew.j.lysne@doj.state.or.us>
**Date:** Thursday, August 12, 2021 at 12:28 PM
**To:** Juan Chavez <jchavez@ojrc.info>
**Cc:** PETERS COLETTE S * DOC <Colette.S.PETERS@state.or.us>, Freeburn Jessica L (Jessica.L.Freeburn@doc.state.or.us) <Jessica.L.Freeburn@doc.state.or.us>, Highberger Joshua L <Joshua.L.Highberger@doc.state.or.us>, PRINS CRAIG A * DOC <Craig.A.PRINS@state.or.us>, SEN Dembrow <Sen.MichaelDembrow@oregonlegislature.gov>, Vincent Shannon M <shannon.m.vincent@doj.state.or.us>, Hallman Andrew <andrew.hallman@doj.state.or.us>, Van Valkenburgh Jefry

<jef.vanvalkenburgh@doj.state.or.us>
**Subject:** RE: URGENT: Letter re: Mark Wilson

Good afternoon Mr. Chavez, I wanted to follow up on your communications and inquiries regarding pending disciplinary proceedings concerning Mr. Mark Wilson. To begin, I wanted to either clarify or correct what may be a misunderstanding about the status of Mr. Wilson's pending disciplinary hearing. Please be aware that at this time, the hearings officer conducting Mr. Wilson's disciplinary hearing postponed the hearing to allow time to consider several requests Mr. Wilson had submitted, including a request for investigation, and a submitted list of questions for potential witnesses. I would anticipate that the hearings officer will decide those requests and that the disciplinary proceeding will proceed in accordance with those decisions. Mr. Wilson has not been denied an opportunity to review his legal paperwork or to otherwise prepare to respond to the pending disciplinary proceeding.

With that in mind, I disagree with your assertion that DOC is violating, or has violated, Mr. Wilson's due-process rights. DOC's disciplinary proceeding procedures fully satisfy the due-process requirements for disciplinary hearings in a correctional setting as set out in *Wolff v. McDonnell*, 418 US 539 (1974) and subsequent caselaw. In your email you express concern that you represent Mr. Wilson, however, please be aware that under *Wolff*, its progeny, and Department of Corrections administrative rules, an adult in custody does not have a "right to counsel" in disciplinary proceedings. The *Wolff* Court explained the underlying reason for that (with respect to due-process principles):

> The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings.

*Wolff*, 418 US at 570. DOC's administrative rules regarding assistance for disciplinary hearings are consistent with due-process principles discussed in *Wolff*.

Lastly, I wanted to respond to your allegations that the Department of Corrections is violating other constitutional rights or "retaliating" against Mr. Wilson for activities he allegedly engaged in during a legal library assistant work assignment. At this time, I am not entirely sure of the specific violations you are asserting have occurred. For example, there U.S. Supreme Court precedent establishing that adults in custody do not have a protected constitutional right to serve as a law library assistant, *Shaw v. Murphy*, 532 US 223 (2001), and there is no recognized constitutional right to violate disciplinary rules. Please note that I am expressing no opinion about whether Mr. Wilson committed any violation of DOC's rules alleged in the pending disciplinary proceeding. Determining whether any rule violations occurred (or did not occur) is a determination for the hearings officer to make, and based on the information provided during the disciplinary hearing, the evidentiary burdens required by law, and other applicable administrative rules concerning disciplinary proceedings. In any event, I can confirm that DOC will proceed with the disciplinary proceeding concerning Mr. Wilson.

Thank you for your attention to this matter.

**Matthew J. Lysne**
Senior Assistant Attorney General
Oregon Department of Justice | General Counsel Division
1162 Court St NE | Salem, OR 97301

C: 971.707.3137 | matthew.j.lysne@doj.state.or.us

---

**From:** Lysne Matthew J
**Sent:** Wednesday, August 11, 2021 11:45 AM
**To:** Juan Chavez <jchavez@ojrc.info>
**Cc:** PETERS COLETTE S * DOC <Colette.S.Peters@state.or.us>; Freeburn Jessica L <Jessica.L.Freeburn@doc.state.or.us>; Highberger Joshua L <Joshua.L.Highberger@doc.state.or.us>; PRINS CRAIG A * DOC <Craig.A.Prins@state.or.us>; SEN Dembrow <Sen.MichaelDembrow@oregonlegislature.gov>; Vincent Shannon M <shannon.m.vincent@doj.state.or.us>; Hallman Andrew <andrew.hallman@doj.state.or.us>; Van Valkenburgh Jefry <jef.vanvalkenburgh@doj.state.or.us>
**Subject:** RE: URGENT: Letter re: Mark Wilson

Good morning Mr. Chavez, thank you for your email, which was forwarded to me. I represent the Oregon Department of Corrections in this matter and would request that you communicate on this matter directly through me. I will confer with ODOC officials regarding the status of this matter and will get back to you as promptly as I can.

**Matthew J. Lysne**
Senior Assistant Attorney General
Oregon Department of Justice | General Counsel Division
1162 Court St NE | Salem, OR  97301
C: 971.707.3137 | matthew.j.lysne@doj.state.or.us

> **From:** Juan Chavez <jchavez@ojrc.info>
> **Date:** August 11, 2021 at 10:23:13 AM PDT
> **To:** Van Valkenburgh Jefry <jef.vanvalkenburgh@doj.state.or.us>, colette.s.peters@doc.state.or.us, jessica.l.freeburn@doc.state.or.us, Joshua.L.Highberger@doc.state.or.us, SEN Dembrow <Sen.MichaelDembrow@oregonlegislature.gov>, Craig.A.Prins@doc.state.or.us
> **Subject: Re: URGENT: Letter re: Mark Wilson**

> *CAUTION EXTERNAL EMAIL* This email originated from outside of DOJ. Treat attachments and links with caution. *CAUTION EXTERNAL EMAIL*

> Dear all,

> It is my understanding that Mr. Wilson did have a hearing yesterday, Tuesday, sometime in the morning. This happened after he was told that his hearing would happen on Monday, and after ODOC received word that Mr. Wilson is a represented party. This is deeply troubling to our office. Additionally, Mr. Wilson attended this hearing shackled and thus unable to review his legal paperwork. The hearings officer informed him that she would not be receiving any evidence from him—testimonial or otherwise. This highlights *precisely* the harms we informed your departments about if ODOC decided to go down this reckless path of trampling Mr. Wilson's due process rights.

> We request to be put in touch with Mr. Wilson's hearings officer immediately. My contact information is below.

> Best,
> Juan Chavez

> --
> Juan C. Chavez

Tel: 503-944-2270 ext. 212
Pronouns: he/him

**Please note: During the COVID-19 emergency shutdown, we are working remotely. I can be reached on my mobile at (626) 253-9028 or through this email address.**

---

**From:** Juan Chavez <jchavez@ojrc.info>
**Date:** Sunday, August 8, 2021 at 9:09 PM
**To:** Van Valkenburgh Jefry <jef.vanvalkenburgh@doj.state.or.us>,
colette.s.peters@doc.state.or.us <colette.s.peters@doc.state.or.us>,
jessica.l.freeburn@doc.state.or.us <jessica.l.freeburn@doc.state.or.us>,
Joshua.L.Highberger@doc.state.or.us <Joshua.L.Highberger@doc.state.or.us>,
sen.michaeldembrow@oregonlegislature.gov <sen.michaeldembrow@oregonlegislature.gov>
**Subject:** URGENT: Letter re: Mark Wilson

Dear all,

Attached, please find a letter our office has drafted on behalf of Mark Wilson, an AIC at OSCI. This is an urgent matter and demands your immediate attention, as it is our understanding that ODOC will be proceeding with a hearing against Mr. Wilson tomorrow morning, Aug. 9, 2021, at 9:00 am.

Please acknowledge receipt of this letter at your earliest convenience. Also, please forward to Craig Prins and Melissa Nofzinger at your earliest convenience.

Best,
Juan

--
Juan C. Chavez
Pronouns: he/him/his

Oregon Justice Resource Center
PO Box 5248
Portland OR  97208
Tel: 503-944-2270 ext. 212
Fax: 971-275-1839
Protonmail: chavezojrc@protonmail.com

**Please note: During the COVID-19 emergency shutdown, we are working remotely. I can be reached on my mobile at (626) 253-9028 or through this email address.**

NOTICE: This email message and any attachment(s) is/are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

*****CONFIDENTIALITY NOTICE*****

This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure under

applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this e-mail in error, please advise me immediately by reply e-mail, keep the contents confidential, and immediately delete the message and any attachments from your system.

***********************************

Delcaration of Lysne, Exhibit 5, Page 5 of 5

**Lysne Matthew J**

| | |
|---|---|
| **From:** | Juan Chavez <jchavez@ojrc.info> |
| **Sent:** | Wednesday, September 29, 2021 2:17 PM |
| **To:** | Lysne Matthew J; Vincent Shannon M |
| **Cc:** | Franz Bruggemeier; Walter Fonseca; Ben  Haile; Jonny Gersten |
| **Subject:** | Mark Wilson |
| **Attachments:** | DRAFT Wilson Complaint 9.29.21.pdf; Final Send- Mark WIlson #7449142[33].pdf; Mark Wilson 7449142 Request to Vacate Discipline Order[64].pdf |

**\*CAUTION EXTERNAL EMAIL\* This email originated from outside of DOJ. Treat attachments and links with caution. \*CAUTION EXTERNAL EMAIL\***

Hi Matt and Shannon,

Our office filed an administrative request to dismiss the sanctions levied against Mark Wilson (see attached) in retaliation for him performing his duties. Our hope is that ODOC recognizes this and reverses course. However, because Mr. Wilson is actively suffering from a deprivation of his rights, we intend to file suit against ODOC by end of day Friday unless we can remediate this problem. Attached, please find a draft Complaint we intend to file by EOD Friday, October 1, 2021. We do reserve the right to amend this Complaint up to the time of filing and within FRCP 15, but this document reflects the core of our allegations.

Our hope is to avoid litigating this issue at all, as we think that the problem is both obvious and remediable. I can make time to chat later this afternoon, but more likely I'll be more available tomorrow morning or on Friday.

Hope you two are doing well, and we look forward to fixing this issue.

Best,
Juan

--
Juan C. Chavez
Pronouns: he/him/his

Oregon Justice Resource Center
PO Box 5248
Portland OR  97208
Tel: 503-944-2270 ext. 212
Fax: 971-275-1839
Protonmail: chavezojrc@protonmail.com

NOTICE: This email message and any attachment(s) is/are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

1

**INTRODUCTION**

1.      This is a civil rights action brought by plaintiff, Mark J. Wilson, a state prisoner pursuant

to 42 U.S.C. § 1983. Plaintiff alleges that defendants have retaliated against plaintiff for his

protected conduct as an inmate legal assistant, prison advocate, and for his efforts to access the

courts in his own case. Plaintiff seeks damages for actions by defendants which violate his

protected constitutional rights pursuant to the First and Fourteenth Amendments to the

Constitution. Plaintiff seeks declaratory and injunctive relief, compensatory and punitive

damages and reasonable costs and attorney's fees, pursuant to 42 U.S.C. § 1988.

**JURISDICTION AND VENUE**

2.       This court has jurisdiction over plaintiff's claims for violation of federal constitutional

rights, pursuant to 28 U.S.C. §§ 1331(a) and 1343 because the cause of action arises under 42

U.S.C. § 1983.

3.      Venue is properly before this District of Oregon pursuant to 28 U.S.C. § 1391(b) where

all of the events giving rise to these claims occurred in this judicial district and because

defendants are subject to personal jurisdiction in the District Court of Oregon.

**PARTIES**

4.      Plaintiff MARK J. WILSON is, and was at all times relevant, a prisoner of the Oregon

Department of Corrections (ODOC). At all relevant times, he was and is currently confined

within the Oregon State Correctional Institution (OSCI) in Salem, Marion County Oregon. At all

relevant times, plaintiff was employed at OSCI as an inmate legal assistant, as defined by OAR

291-139-0130(2) and ORS 291-139-0160.

Page  1 – COMPLAINT

5.      Defendant JERRY K. PLANTE is, and was at all times relevant, an employee of the ODOC, assigned as an inspector in the Special Investigation Unit (SIU). He has been personally involved in the violations alleged herein. He is sued in his official and individual capacities.

6.      Defendant JOHN and JANE DOES 1-20 are and were at all times relevant, employees of the ODOC whose identifies are currently unknown to plaintiff. All Doe defendants have been personally involved in the violations alleged herein. Plaintiff will amend this complaint to formally name all DOE defendants once their identifies are revealed to plaintiff in discovery. All Doe defendants are sued in their official and individual capacities.

7.      All defendants have acted, and continue to act, at all times relevant under color of state law.

## FACTUAL ALLEGATIONS

Relevant Polices, Practices, and Rules of the ODOC

8.      The "Oregon Way" is a philosophical approach to corrections created by the ODOC based on best practices in security and the belief that humanizing and normalizing the prison environment is beneficial for employees and prisoners. This innovative approach to incarceration stems from an investigation and immersion in the Norwegian correction system. The Norwegian system is driven by the idea that incarcerated people are "human beings in prisons."

9.      ODOC Director Collette Peters, who developed and promotes the "Oregon Way," explained that Oregon prisons should be places where punishment is the absence of freedom and community, but where "everything else models life on the outside to every degree possible" and prisoners are treated with dignity.

10.    ODOC Director Peters has stated the "Oregon Way" policy in testimony before the

Oregon Legislature, stating that "we now know that in order to protect society, help our Adults in

Custody (AICs) take personal responsibility, be accountable for their actions, and engage in

reformation we must treat them in a normalized environment and in the most humane way

possible."

11.    The adoption of the "Oregon Way" and ODOC Director Peters' public statements create

a reasonable expectation by ODOC employees, prisoners, and the public that prisoners in ODOC

custody will be treated "in a normalized environment and in the most humane way possible."

12.    Prison officials have a constitutional obligation to provide prisoners with law libraries or

adequate assistance from persons trained in the law to assist in the preparation and filing of

meaningful legal papers. ODOC has fulfilled that duty by providing both law libraries and legal

assistance to prisoners at the Oregon State Correctional Institution (OSCI).

13.    ODOC rules under Chapter 291, Division 139 describe the responsibilities of library

coordinators and legal assistants in the following ways. Library coordinators are responsible for

supervising facility legal libraries and the provision of law library services to inmates, including

the activities of the assigned legal assistants. The library coordinator may instruct inmates on

how and where to access requested law library services and other resources, but may not offer

advice or directly assist an inmate with their legal issues, case or matter.

14.    OAR 291-139-0160(11) prohibits the library coordinator from assigning or removing an

inmate legal assistant based on retaliation for legitimate legal activities done in accordance with

ODOC rules.

Page  3 – COMPLAINT

15.    Based on OAR 291-139-0160(11), inmate legal assistants have a reasonable expectation that they will not be retaliated against by any ODOC employee for their authorized legal activities.

16.    Inmate legal assistants are authorized and expected in ODOC to do legal activities that would otherwise constitute the unauthorized practice of law under Oregon law.

17.    Prisoners must obey ODOC employees or be in violation of ODOC rules.

18.    ODOC employees are permitted to make day-to-day decisions and authorize prisoner activity within the scope of the employee's duties, including deciding whether a prisoner's action is a violation of ODOC rules.

19.    Prisoners have a reasonable expectation to not be punished for violating ODOC rules when their actions have been authorized by an ODOC employee.

Plaintiff, His Position as Legal Assistant at OSCI, and the Library Coordinator

20.    Plaintiff has been incarcerated for over 30 years within the ODOC for a crime he committed at 18 years of age.

21.    During his time within the ODOC, plaintiff is well known as an advocate for prisoner's rights, working in as a legal assistant in ODOC, contributing as a writer for Prison Legal News, and participating in legislative matters.

22.    Plaintiff has shown himself to be an honest and trustworthy person to both correctional staff, other prisoners, and members of the public during his many years of incarceration.

23.    Rule violation for 1991 violation authorized protest at wages for pay,

24.    Plaintiff has been targeted by ODOC staff and prisoners alike over the years due to his work as legal assistant and as a prisoner advocate. For example, ODOC has previously retaliated

against plaintiff for his assistance in a civil suit requiring ODOC to provide adequate medical treatment to prisoners. *See Wilson v. Van Valkenburgh,* cv-06-1391-SU.

25.    From February 2012, until earlier this year, plaintiff was assigned as an inmate legal assistant at OSCI. During that time, he worked under at least five library coordinators at OSCI, including, until most recently, under the supervision of library coordinator Pam McKinney (hereafter "McKinney").

26.    Plaintiff's duties as an inmate legal assistant included but were not limited to, drafting motions, affidavits, legal memoranda, petitions, complaints, letters, appellate briefs, administrative review requests and prison grievances.

27.    As an inmate legal assistant plaintiff has received requests that legal coordinators direct him to provide assistance on, including by not limited to: appeals of convictions and sentences, conditions of confinement challenges, Board of Parole issues, child support/custody/visitation issues, dissolution proceedings, wills and estates issues, defense of civil actions.

28.    Throughout his entire time as an inmate legal assistant, he was allowed discretion with respect to legal matters, to do those things he deemed necessary to properly and effectively perform his duties as an inmate legal assistant.

29.    Throughout the many years plaintiff served as an inmate legal assistant he developed working relationships with numerous attorneys, prisoner and mental health advocacy groups, court personnel and others as necessary to carry out his legal assistant duties.

30.    Until on or about April 15, 2021, McKinney had worked for over 22 years as a veteran employee with the ODOC. She had been through countless hours of training during her career.

31.    McKinney authorized plaintiff and other legal assistants to print documents and provide other services without charging prisoners for the initial printing costs.

32.    McKinney authorized and facilitated legal assistants, including plaintiff, and prisoners to have emails and phone calls sent and received to outside individuals.

33.    McKinney oversaw the operation of the law library during the catastrophic events of the Covid-19 pandemic and wildfires in Oregon last year, in which prisoners were evacuated from OSCI under threat of fire and OSCI was on numerous modified lockdowns.

34.    At all relevant times, McKinney authorized plaintiff to assist other OSCI prisoners and present his own legal issues with (a) lawsuits related to Covid-19, including *Maney v. Brown,* 6:20-cv00570-SB, (b) clemency applications; (c) legal matters related to an ODOC's employee losing protected information that was taken home on a work computer; (d) legislative matters, (e) and the development of a mentorship program at OSCI with the support of ODOC administrative employees.

35.    McKinney's conduct and relationship with all prisoners at OSCI is consistent with the "Oregon Way," that is, by humanizing and normalizing the prison environment and treating prisoners with dignity and by modeling life on the outside "to every degree possible."

36.    Plaintiff has always maintained a professional and respectful working relationship with ODOC employees, including McKinney, which is also consistent with the Oregon Way.

37.    As example of the environment McKinney created at OSCI law library, ODOC posted on Twitter (ODOC Twitter) on December 30, 2020, pictures of McKinney at work within the OSCI library as shown below:



Events Giving Rise to § 1983 Suit

38.    On January 21, 2021, plaintiff was removed from his job as inmate legal assistant and

placed on work restriction by defendant Plante, an investigator for the ODOC's Special

Investigative Unit (SIU).

39.    On January 21, 2021, defendant Plante met with plaintiff and ordered him to cease

assisting other inmates with their legal affairs.

40.    On or about January 21, 2021, McKenney was removed from her supervision over the

OSCI library and stationed at a desk in another ODOC facility.

41.    On or about April 15, 2021, McKenney, following what she described as a four-hour

grilling by ODOC employees that was "brutal," resigned from her ODOC job because she was

forced to "[e]ither resign or lose the [retirement] money match."

42.     On August 4, 2021, plaintiff received a misconduct report that was signed by defendant

Plante and by ODOC staff Melissa Nofziger that same day.

43.     A true and genuine copy of the August 4, 2021, misconduct report is attached hereto as

plaintiff's Exhibit 1.

44.     The misconduct report alleged plaintiff had violated four ODOC rules: Compromising an

Employee (4.15); Contraband II (1.11); Unauthorized Use of Information Systems I (1.25); and

Disobedience of an Order I (4.01).

45.     In the misconduct report, defendant Plante explained that upon receiving an

"anonymous" communication about McKinney, plaintiff, and "other unauthorized things in the

OSIC library," he conducted an investigation.

46.     In the misconduct report, defendant Plante explained that he had searched plaintiff's

assigned work area in the legal library and found a "white plastic child's toy phone" that

McKinney told Plante she had purchased with her own money and gave to plaintiff without

supervisor approval. For this, Defendant Plante charged plaintiff with Contraband II (1.11) and

that he engaged in an unauthorized relationship with an employee.

47.     An accurate image of the toy phone is show below:



Delcaration of Lysne, Exhibit 6a, Page 8 of 14

48.     McKinney placed the child's toy phone on plaintiff's work desk as a joke, not as a gift, which defendant Plante knew but intentionally omitted from his disciplinary report.

49.     In the misconduct report, defendant Plante explained that he "reviewed hundreds of emails, from January 2020 through January 2021," that McKinney had sent and received from "individuals at an outside justice resource firm, or attorneys and other professionals," all of whom were associated with plaintiff in some manner. "Upon [defendant Plante's] closer review of the emails," Plante explained, he discovered that the emails contained "messages and attached legal documents[.]" Defendant Plante reported that the sending of these emails with attached legal documents saved plaintiff "at least $387.40" in copy costs – which constituted, in his view, a violation of ODOC rule "Disobedience of an Order I.

50.     Defendant Plante stated in his disciplinary report that he had "reviewed a number of legal calls AIC Wilson had been allowed through the legal library phones," and that "between January 2020 through January 2021, AIC Wilson had been given 146 calls to individuals at the outside justice resource firm, and he and received an additional 15 calls to five other individuals."

51.     The emails and phone calls that defendant Plante admits to reviewing and forming the basis for plaintiff's rule violation were, among other things, protected attorney client communications and legal materials sent and received by and through, and with permission from, McKinney.

52.     Defendant Plante omits from his misconduct report the fact that prisoners, including legal assistants, do not have access to telephones or email. Phone calls with legal professionals are scheduled by McKenny and, when calls are received, she transfers the call to a secure phone. Similarly, McKenney's work emails are sent and received by her alone.

53.     With respect to rule violation "Unauthorized Use of Information Systems I," defendant Plante alleged in the misconduct report that plaintiff knowingly chose to disregard and violate ODOC rules by printing a single copy of AIC's legal document from his printer after assisting in the preparation of the document without charging the AIC for the copy.

54.     With respect to rule violation "Compromising an Employee," defendant Plante alleged that plaintiff "engaged in an unauthorized personal relationship" with McKenney because: (a) she gave a toy phone to plaintiff; (b) she directly assisted plaintiff with his "legal issues, case, and matters"; (c) she saved him money (at least $387.40) by sending and emailing "legal documents" to attorneys and other professionals rather than charge him through regular mail; and (d) because she "admitted to giving [plaintiff] special privileges which not all AICs were afforded."

55.     Defendant Plante represented in the misconduct report that he had interviewed McKinney and "she admitted that her relationships with several individuals at the outside justice resource firm became more of a personal friendship than a professional relationship."

56.     Defendant Plante stated in the misconduct report that plaintiff's "actions were conducted in the legal library, while he was in his role as a legal assistant."

57.     Each and every alleged rule violation in defendant Plante's misconduct report occurred under the supervision, authorization, or direction of McKinney in her role as OSCI legal coordinator.

58.     In all the many years and under the five different legal coordinators, plaintiff has never been told that his actions and conduct as a legal assistant violated ODOC rules. Indeed, plaintiff has received letters of commendation from library coordinators, including McKinney, for his work.

59.    On August 31, 2021, plaintiff was found guilty of three of the alleged violations - Contraband II, Compromising an Employee, and Unauthorized Use of Information Systems II - and given a sanction of 120 days in segregation, the maximum penalty. Plaintiff was found not guilty of the two other rule violations.

60.    Subsequent to plaintiff's termination from position as legal assistant, ODOC removed hundreds of law books and research materials that were used by the legal assistants and inmates at OSCI over the last two decades.

61.    On September 7, 2021, plaintiff filed a grievance, numbered OSCI_2021_09_049, against defendant and other ODOC officials for retaliatory conduct.

62.    On September 14, 2021, OSCI grievance coordinator rejected plaintiff's grievance on the grounds that "An AIC may not submit a grievance, regarding misconduct reports, investigations, lending to or arising from misconduct reports, disciplinary hearings, findings, sanctions."

63.    Plaintiff is currently in segregation, suffering an atypical and significant hardship from the ordinary experience of prison life.

## FIRST CLAIM FOR RELIEF

### (First and Fourteenth Amendment – Retaliation)

64.    Plaintiff realleges paragraphs __ through __.

65.    From January 2021 to the present, defendants personally engaged in and continue to engage in retaliatory actions against plaintiff in violation of his First and Fourteenth Amendment rights.

66.    Defendant Plante has taken adverse actions against plaintiff, including by not limited to: (1) reading plaintiff's confidential legal material; (2) restricting, removing and punishing him for

his work as a legal assistant and for his prisoner advocacy (3) placing him on work restriction

from January 2021 until August 10, 2021; and (6) charging plaintiff with rule violations.

67.    The adverse acts of defendant Plante, alleged in the previous paragraphs, were

intentionally taken because of plaintiff's work as a legal assistant helping other prisoners on legal

matters, his accessing the court, communication with legal professionals and his counsel by

email and telephone, and his association and communication with the legal and legislative

community as a prison advocate – all of which are protected conduct involving litigation,

advocacy, and political speech.

68.    Defendant Plante's adverse actions have had a chilling effect on plaintiff's exercise of his

First Amendment rights.

69.    Defendant Plante charged plaintiff for rule violations for conduct authorized, facilitated,

or done by McKinney in her role as OSCI legal coordinator.

70.    Defendant Plante charged plaintiff but not other legal assistants and prisoner's at OSCI,

even though he knew those individuals were granted similar privileges by McKinney and took

similar actions.

71.     Defendant Plante punished plaintiff because McKinney was friendly and helpful in

carrying out her job as OSCI legal coordinator, and specifically for providing plaintiff access to

the courts.

72.    Defendant Plante's adverse actions are inconsistent with the Oregon Way in that he has

punished plaintiff because McKinney normalized the prison environment and treated plaintiff

and other prisoners humanely.

73.    Defendant Plante used the investigative and misconduct system as subterfuge to obscure

his intention to retaliate against plaintiff for his protected conduct.

Page  12 – COMPLAINT

74.    Defendant Plante's actions against plaintiff do not reasonably advance a legitimate correctional goal nor were defendant's actions narrowly tailored enough to achieve such goals, to the extent they exist.

## RELIEF SOUGHT

75.    WEREFORE Plaintiff prays for judgment as follows:

A.  Issue a Declaratory Judgment stating that Defendant Plante retaliated against plaintiff in violation of the First and Fourteenth Amendments to the United States Constitution.

B.  Issue and Injunction ordering defendants and their agents to immediately:

1.  Cease engaging in any and all ongoing acts of retaliation against plaintiff;

2.  Cease engaging in any and all ongoing chilling of plaintiff's First and Fourteenth Amendment rights for the exercise of his protected conduct.

3.  Credit plaintiff's inmate trust account with the difference in the monetary award he would have earned as an Inmate Legal Assistant and the amount of monetary awards he actually received for each month from January 2021 to the present.

4.  Order plaintiff's assignment to the OSCI law library as a legal assistant.

5.  Assign plaintiff to incentive housing, where he was housed prior to January 20, 2021, in OSCI.

C.  Award compensatory damages against defendant.

D.  Award punitive damages against defendant for an amount to be determined at trial.

E.  Award reasonable costs and attorney fees.

F.  Grant such other relief as this court deems just and equitable.

Dated this ___ day of _____, 2021.

Respectfully submitted,

_____

Page  14 – COMPLAINT



**Oregon**

Kate Brown, Governor

**Oregon Department of Corrections**
Office of the Inspector General
2575 Center Street NE
Salem, OR 97301-4667
Voice: 503-945-9043
Fax: 503-373-7092

September 23, 2021



Bobbin Singh
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
bsingh@ojrc.info

Dear Bobbin Singh:

In accordance with ORS 192.324(2), this acknowledges our receipt of your September 22, 2021, request for the following records:

- We are requesting the Final Order for the DR for Mark Wilson, which was just issued. This is a time sensitive issue and we would like for it to be emailed to this email address as soon as possible.

We understand there have been email communications between your office and the Oregon State Correctional Institution for records regarding Mr. Wilson. We interpret your email dated September 22, 2021, as narrowing the records request to the Final Order issued to Mr. Wilson dated September 15, 2021. With the enclosure of the above requested records we consider your request completed. If you wish to obtain further records, you will need to submit a new records request with what specific records you are seeking, and a fee estimate will be provided to you.

Sincerely,

*Shelley Clayton*

Shelley Clayton
Legal Information Officer

cc:    File

01/24/2018



Oregon Department of Corrections
# Disciplinary Hearing
Finding of Fact, Conclusion, and Order

| | | | |
|---|---|---|---|
| **Offender Name:** | Wilson, Mark James | **Case #:** | 2103 OSCI 0056 OSCI 35 |
| **SID:** | 7449142 | **Date(s) of Hearing:** | 08/10/2021, 08/31/2021, 08/09/2021 |

**Rules Charged**                                                **Plea**

| | | | |
|---|---|---|---|
| 4.15 | - | Compromising an Employee | Deny |
| 1.25 | - | Unauthorized Use Info System I | Deny |
| 4.01 | - | Disobedience of an Order I | Deny |
| 1.11 | - | Contraband II | Deny |

## Procedural Points

On August 10, 2021 the Hearings Officer granted the AIC's request for witness(es). The case was reconvened on August 31, 2021 and concluded.

Adult in Custody (AIC) received a copy of the Misconduct Report, Notice of Hearing, Notice of Rights in a Hearing and Rules of Prohibited Conduct. The AIC acknowledged understanding the Misconduct Report and Rights in a Hearing.

The Hearings Officer considered the Confidential Information provided and found it to be believable.

AIC's request for witness(es) was denied because the proffered testimony would not constitute a defense to the charges nor substantially mitigate the rule violations.

All relevant documentary evidence was considered by the Hearings Officer.

An audio recording of the incident was available and considered by the Hearings Officer.

## Finding of Fact

On December 4, 2020, an anonymous Adult in Custody (AIC) communication was received by the staff at the Oregon State Correctional Institution (OSCI) and reported to the Special Investigations Unit (SIU). The communication contained numerous allegations pertaining to Library Coordinator Pam McKinney, AIC Wilson, Mark (7449142) and unauthorized activities occurring in the library at OSCI. Inspector III Plante initiated an investigation due to the information provided.

Inspector III Plante reports conducting a search of AIC Wilson's assigned work area in the legal library on January 19, 2021. During the search Inspector III Plante found a white plastic child's toy phone. Inspector III Plante reports during an interview with Ms. McKinney, she admitted to buying the plastic child's toy phone with her own money and giving the plastic child's toy phone to AIC Wilson without Ms. McKinney's supervisor's approval.

Inspector III Plante reports reviewing Ms. McKinney's emails between January 2020 and January 2021. Inspector III Plante found hundreds of emails, both incoming and outgoing, associated with AIC Wilson in some manner that were with individuals at an outside justice resource firm, attorneys, other professionals, and other individuals. Inspector III Plante reports upon closer review of the emails discovering Ms. McKinney was sending and receiving hundreds of pages of attached documents that were sent from or to be given to AIC Wilson. Inspector III Plante reports by Ms. McKinney sending these documents for AIC Wilson this saved AIC Wilson a significant amount of money along with bypassing the Mailroom.

---

**Confidentiality Notice:** This document contains information belonging to the Department of Corrections. This information may be confidential, restricted, and/or legally privileged, and is intended for appropriate and approved use under existing department rules, regulations, confidentiality and security agreements. If you have received this document in error, please notify DOC immediately, keep the contents confidential, and promptly destroy the information and/or delete the document information from your computer system.

Oregon Department of Corrections
## Disciplinary Hearing
Finding of Fact, Conclusion, and Order

| | | | |
|---|---|---|---|
| **Offender Name:** | Wilson, Mark James | **Case #:** | 2103 OSCI 0056 OSCI 35 |
| **SID:** | 7449142 | **Date(s) of Hearing:** | 08/10/2021, 08/31/2021, 08/09/2021 |

**Finding of Fact**

Inspector III Plante interviewed AIC Wilson. During the interview AIC Wilson admitted to receiving photographs and a video of an former AIC that was placed on a thumb drive by Ms. McKinney, which Ms. McKinney had received by email from the former AIC. AIC Wilson sent an email message to the former AIC through Ms. McKinney, which was an obituary. Also, in the interview AIC Wilson admitted to receiving two black thumb drives from Ms. McKinney that he was storing all of his legal work on. AIC Wilson stated he was planning on taking the two black thumb drives home with him when he was going to leave the institution as they were given to him by Ms. McKinney. AIC Wilson admitted to having personal photos, music and videos stored on the thumb drives AIC Wilson was to use for work as a Legal Assistant. At one point in the interview AIC Wilson stated, "McKinney's biggest sin is being overly helpful, right. I mean seriously, I mean she, she's helpful with stuff, and so, uh, it makes it easy to say hey, can we let Katie know this, and she says, yeah, fine, no problem, you know. So, you know, it speeds the process up. It's more convenient."

Confidential information was provided for the hearing.

An audio recording was provided for the hearing.

Emails were provided for the hearing.

At the hearing, AIC Wilson requested numerous staff, AICs and members of the community be called as witnesses. Most of these witnesses were denied as the proffered testimony would not constitute a defense to the charges nor substantially mitigate the rule violations. At the hearing, AIC Wilson was asked about the photographs and video of the former AIC on the thumb drive, to which AIC Wilson admitted Ms. McKinney gave to AIC Wilson and placed on the thumb drive. AIC Wilson admitted Ms. McKinney sent messages and documents through email for AIC Wilson. When asked if AIC Wilson had ever asked any other boss or staff other than Ms. McKinney to send messages or documents for AIC Wilson, AIC Wilson stated he had not. AIC Wilson also stated no other staff, other than Ms. McKinney, had ever sent messages or documents through email for AIC Wilson. When asked about the plastic child's toy phone, AIC Wilson became agitated and stated the plastic child's toy phone was a joke from Ms. McKinney.

There is a preponderance of evidence AIC Wilson engaged in a personal relationship with Ms. McKinney by accepting items that were not authorized such as a plastic child's toy phone, photographs from a former AIC, a video of a former AIC, two thumb drives, and having Ms. McKinney send and receive numerous emails on AIC Wilson's behalf.

There is a preponderance of the evidence AIC Wilson exceeded the conditions of usage of a state owned computer that are granted by the Director, functional unit manager or designee by viewing photographs of a former AIC and video of a former AIC on the state owned computer for personal use and using that computer to share the photographs and video with other AICs.

---

Produced by FOSSR On: 09/03/2021 09:37:30 AM                              Page 2 of 5

**Confidentiality Notice:** This document contains information belonging to the Department of Corrections. This information may be confidential, restricted, and/or legally privileged, and is intended for appropriate and approved use under existing department rules, regulations, confidentiality and security agreements. If you have received this document in error, please notify DOC immediately, keep the contents confidential, and promptly destroy the information and/or delete the document information from your computer system.

Oregon Department of Corrections
# Disciplinary Hearing
Finding of Fact, Conclusion, and Order

| | | | |
|---|---|---|---|
| **Offender Name:** | Wilson, Mark James | **Case #:** | 2103 OSCI 0056 OSCI 35 |
| **SID:** | 7449142 | **Date(s) of Hearing:** | 08/10/2021, 08/31/2021, 08/09/2021 |

## Finding of Fact

There is preponderance of the evidence AIC Wilson was in possession of contraband that was not authorized that created a threat to the safety, security or orderly operations of the facility as AIC Wilson was in possession of an unauthorized plastic child's toy phone in AIC Wilson's work area, photographs of a former AIC on AIC Wilson's thumb drive that is to be utilized for work as the Legal Assistant, a video of a former AIC on AIC Wilson's thumb drive that is to be utilized for work as the Legal Assistant, music on the thumb drive that is to be utilized for work as the Legal Assistant.

## Ultimate Findings of Fact and Conclusions

AIC knowingly engaged an employee, public safety officer, non-employee service provider, or any person involved in DOC programs or activities in a personal relationship or business transaction, excluding AICs or visitors approved under DOC visiting rules, thereby, violating Rule 4.15, Compromising an Employee.

AIC possessed contraband that created a threat to the safety, security, or orderly operation of the facility, thereby, violating Rule 1.11.01. The contraband includes tobacco or smoking paraphernalia, unauthorized medication, items of barter, checks, money under $10, or unauthorized sexually explicit material.

On Rule 1.25, Unauthorized Use of Information Systems I, the Hearings Officer is substituting the lesser included minor rule violation of Rule 1.26, Unauthorized Use of Information Systems II.

AIC made copies, viewed video, or listened to audio files for personal use, by operating or using any information system equipment (including terminals, personal computers, tablet computers, minicomputers, work stations, controllers, printers, copiers, fax machines, or phones) that exceeded the conditions of use or access granted by the Director, functional unit manager, or designee, thereby, violating Rule 1.26.02, Unauthorized Use of Information Systems II.

Rule 4.01, Disobedience of an Order I, is dismissed. Corrective action using less formalized procedures would have been more appropriate.

## Preliminary Order

AIC has had 0 major rule violation(s) in the past two years. Rule 4.15, Compromising an Employee, is on Level 1 of the Major Violation Grid.

---

**Confidentiality Notice:** This document contains information belonging to the Department of Corrections. This information may be confidential, restricted, and/or legally privileged, and is intended for appropriate and approved use under existing department rules, regulations, confidentiality and security agreements. If you have received this document in error, please notify DOC immediately, keep the contents confidential, and promptly destroy the information and/or delete the document information from your computer system.

Oregon Department of Corrections
## Disciplinary Hearing
Finding of Fact, Conclusion, and Order

| | | | |
|---|---|---|---|
| **Offender Name:** | Wilson, Mark James | **Case #:** | 2103 OSCI 0056 OSCI 35 |
| **SID:** | 7449142 | **Date(s) of Hearing:** | 08/10/2021, 08/31/2021, 08/09/2021 |

| **Rule** | **Charge** |
|---|---|
| Compromising an Employee | Violation |

| Sanctions | Begin Date | End Date | Days | Amount | Suspended Thru | Notes |
|---|---|---|---|---|---|---|
| Disciplinary Segregation | 8/31/2021 | 12/28/2021 | 120 | | | |
| suspended sanctions | | | | | 12/28/2021 | Suspend $100 Fine pending no major rule violations. |
| suspended sanctions | | | | | 12/28/2021 | Suspend 28 days Loss of Privileges pending no major rule violations. |
| Confiscate Contraband | | | 0 | | | Toy phone, thumb drives, video, photographs. |

| **Rule** | **Charge** |
|---|---|
| Unauthorized Use Info Systm II | Violation |

| Sanctions | Begin Date | End Date | Days | Amount | Suspended Thru | Notes |
|---|---|---|---|---|---|---|
| Merged per OAR 291-105-0066(8) | | | 0 | | | |

| **Rule** | **Charge** |
|---|---|
| Disobedience of an Order I | Dismissed/Less Formalized Proc |

---

**Confidentiality Notice:** This document contains information belonging to the Department of Corrections. This information may be confidential, restricted, and/or legally privileged, and is intended for appropriate and approved use under existing department rules, regulations, confidentiality and security agreements. If you have received this document in error, please notify DOC immediately, keep the contents confidential, and promptly destroy the information and/or delete the document information from your computer system.

Oregon Department of Corrections
# Disciplinary Hearing
Finding of Fact, Conclusion, and Order

| Offender Name: | Wilson, Mark James | Case #: | 2103 OSCI 0056 OSCI 35 |
|---|---|---|---|
| SID: | 7449142 | Dates(s) of Hearing: | 08/10/2021, 08/31/2021, 08/09/2021 |

| Rule | Charge |
|---|---|
| Contraband II | Violation |

| Sanctions | Begin Date | End Date | Days | Amount | Suspended Thru | Notes |
|---|---|---|---|---|---|---|
| Merged per OAR 291-105-0066(8) | | | 0 | | | |

RECEIVED

SEP 1 0 2021

Superintendent's Office
Oregon State Correctional Institution

| Hearing Officer: | Foss, Ronnie L | Date: | 08/31/2021 |
|---|---|---|---|
| Functional Unit Manager: | | Date: | 9/15/21 |
| Final Order: | ☒ Approved   ☐ Order Hearing Reopened | | ☐ Amended per below |

---

Produced by FOSSR On: 09/03/2021 09:37:30 AM                    Page 5 of 5

Confidentiality Notice: This document contains information belonging to the Department of Corrections. This information may be confidential, restricted, and/or legally privileged, and is intended for appropriate and approved use under existing department rules, regulations, confidentiality and security agreements. If you have received this document in error, please notify DOC immediately, keep the contents confidential, and promptly destroy the information and/or delete the document information from your computer system.

Delcaration of Lysne, Exhibit 6b, Page 6 of 6



*SENT VIA EMAIL TO: rob.j.persson@doc.state.or.us; craig.a.prins@doc.state.or.us*

September 29, 2021

Rob Persson, Assistant Director of Operations
Craig Prins, Inspector General
Oregon Department of Corrections
2575 Center St. NE
Salem 97301-4667

Re:    Mark J. Wilson, SID 7449142
       Request to Vacate Final Disciplinary Order per OAR 291-105-0100

Dear Assistant Director Rob Persson and Inspector General Craig Prins,

We are writing to request that the final disciplinary order issued against Mark J. Wilson on August 31, 2021 be vacated in the interest of justice, pursuant to OAR 291-105-0100. There will unlikely be a more fitting use of this regulation than in this case. Each decision made against Mr. Wilson throughout this disciplinary process constitutes a grave injustice: the allegations in the misconduct report dated March 23, 2021; the findings of violations for Unauthorized Use of Information Systems II, Contraband II and Compromising an Employee; and the inhumane sanction of 120 days in disciplinary segregation, the maximum penalty available. In vacating Mr. Wilson's final disciplinary order, we request the restoration of Mr. Wilson's status at OSCI prior to the disciplinary investigation in January 2021, including his housing in the incentive unit at OSCI, and position as a legal assistant in the OSCI library.

Mr. Wilson has an incredibly robust record of countless remarkable contributions to his community which demonstrate his honest, strong, and compassionate character. This exceptional record, speaking volumes about who Mark is as a person, stands in stark contrast to the scant and spurious information with which ODOC unsuccessfully attempts to create a basis for the charges and guilty findings against Mr. Wilson in the disciplinary order issued on August 31, 2021.

**<u>Summary of investigation of allegations made against Mr. Wilson by confidential informant.</u>**

On December 4, 2020, Oregon State Correctional Institution (OSCI) staff received a report from a confidential informant, an adult in custody with a reputation for submitting false reports about other AICs. The report contained allegations pertaining to Mr. Wilson and Library Coordinator Pam McKinney, and "other unauthorized things in the OSCI library." On or about January 19, 2021, Mr. Wilson was ordered to cease assisting other AICs with their legal affairs, removed from his job as a legal assistant, and placed on work restriction. Mr. Wilson continued to live in general population on the incentive unit and continued to be paid as a legal assistant,

PO Box 5248, Portland, Oregon 97208
T: 503-944-2270
F: 971-279-4748
www.ojrc.info

while ODOC's Special Investigation Unit (SIU) investigated the allegations made by the confidential informant. On or about January 21, 2021, Ms. McKinney was removed from the OSCI library and stationed at a desk in another facility. On March 23, 2021, ODOC initiated a misconduct report against Mr. Wilson. On April 15, 2021, Ms. McKinney, following what she described as a "brutal" four- to six-hour interrogation by ODOC employees, resigned from ODOC because she was forced to "[e]ither resign or lose the [retirement] money match." On August 4, 2021, Mr. Wilson received a misconduct report with the following charges: 4.15 Compromising an Employee (Major); 1.11 Contraband II (Major); 1.25 Unauthorized Use of Information System 1 (Major); and 4.01 Disobedience of an Order I (Major). A copy of the misconduct report is enclosed. On August 10, 2021, Mr. Wilson had his first disciplinary hearing, during which he sat shackled in a cage and was unable to access and read the materials he had prepared to defend himself.  On August 31, 2021, he was found guilty of Contraband II and Compromising an Employee, sentenced to the maximum penalty of 120 days in disciplinary segregation, also known as solitary confinement, and immediately taken to the Disciplinary Segregation Unit.

The record of this matter, further discussed below, reveals that Mr. Wilson is being unjustly and cruelly punished for carrying out his prescribed duties as a legal assistant, and is being wrongfully held accountable for the independent actions and decisions of his supervisor, Library Coordinator Pam McKinney. Mr. Wilson's duties as a legal assistant are provided for in ODOC regulations and were overseen and authorized by Ms. McKinney, a veteran of ODOC for over 20 years before her resignation.

### Summary of the robust record evidencing Mr. Wilson's strong moral character and profoundly meaningful service to others.

Mr. Wilson has been incarcerated since 1987 and has spent over 30 years in the custody of the Oregon Department of Corrections (ODOC) for a crime he committed at age 18. It is well-documented that Mr. Wilson is truly an exceptional human being, a person of immense compassion and wisdom, and has lived many lives' worth of profoundly meaningful service to others. Throughout his incarceration, he has met, assisted, and positively influenced the lives of countless people, not only being a support to fellow AICs, but also to many individuals in the outside community. He has been a hospice worker, serving others in their darkest hours and touching the depths of humanity in a way few ever will. He has created education groups and programs within the prison that have positively shifted the trajectory of many, many incarcerated individuals, which has a far-reaching impact on the families of AICs, on the prison environment, and on the general community. He has served tirelessly as a legal assistant for decades, giving hope and a voice to incarcerated individuals who would otherwise be invisible and buried by the system. This only scratches the surface of Mr. Wilson's service to others. Enclosed is a summary of Mr. Wilson's contributions to his prison community and the broader community.

Those who encounter Mr. Wilson quickly recognize how special he is. He has the ongoing support of so many: legislators, educators, spiritual leaders, victim support specialists,

attorneys, mental health providers, incarcerated and formerly incarcerated people, and his greatest and most devoted supporters, his mother, father, aunt, and grandmother.

Mr. Wilson has always done this good work within the parameters of what is authorized by ODOC. Since entering prison in 1988, until this recent discipline action, Mr. Wilson had only incurred a single, low-level rule violation, for being in an unauthorized area on August 22, 1991. Twenty-nine years ago, Mr. Wilson joined approximately 20 co-workers in protesting wage issues that their employer, UNIBASE, refused to resolve. The protest consisted of not returning to work after lunch one afternoon. Mr. Wilson returned to his cell after lunch instead of going to his work assignment. He was sanctioned to spend seven days in segregation and pay a $100 fine. He was also banned from holding a preferential prison industry job for one year, but the ban was rescinded after six months of clear conduct.

Mr. Wilson's positive discipline record and his remarkable contributions are a reflection of his character and his deeply held personal values. Dr. Rex Newton, who was an ODOC mental health therapist for over 35 years, wrote in a 2019 letter to the Oregon Board of Parole, "The maturity and personal growth with which [Mr. Wilson] has gone about serving his prison community is exemplary and a model for all whether living in prison or the free community . . . I truly admire who he has become." Dr. Newton further expresses that Mr. Wilson genuinely possesses "a positive moral compass demonstrated over time, commitment to the service of others, continual education and a faith based belief in the goodness of humanity."

**Mr. Wilson's decades-long misconduct-free history as a legal assistant and summary of the longstanding procedures within the OSCI library.**

Mr. Wilson has worked as a legal assistant since 1989, beginning at OSCI. In June 1990, he was transferred to Oregon State Penitentiary (OSP). He worked as a legal assistant at OSP from November 1991 until September 2004, when ODOC retaliated against him for his assistance in a civil lawsuit by transferring him to Eastern Oregon Correctional Institution (EOCI). The lawsuit resulted in a court order requiring ODOC to provide adequate medical care to prisoners with Hepatitis C. At EOCI, Mr. Wilson was not allowed to work as a legal assistant. Michelle Burrows, the attorney who filed the Hepatitis C case, filed a retaliation lawsuit on Mr. Wilson's behalf, and as a result, Mr. Wilson was transferred back to OSCI in January 2008.

From July 2012 until earlier this year, Mr. Wilson worked as a legal assistant at OSCI. During these nine years, Mr. Wilson worked under the supervision of at least five library coordinators. He was hired as a legal clerk in February 2012 by Library Coordinator Greg Hunter, who remained his supervisor when Mr. Wilson became a legal assistant a few months later. It was under the supervision of Mr. Hunter that Mr. Wilson learned the protocols and procedures for legal assistants in the OSCI library. As former OSCI legal assistants and library coordinators would attest, library coordinators rely on the honesty, professionalism, and skills of the legal assistants to carry out the work, recognizing that legal assistants have privileges not afforded to other AICs. Mr. Wilson could not have remained in the position of legal assistant for

so many years, through multiple library coordinators, if he did not conduct himself appropriately and only as authorized.

Under ODOC regulations, library coordinators are "responsible for supervising facility legal libraries and the provision of law library services to inmates," and for prioritizing and assigning activities to the legal assistants. Library coordinators "may instruct inmates on how and where to access requested law library services and other resources, but may not offer advice or directly assist an inmate with their legal issues, case or matter." OAR 291-139-0150. Legal assistants "are assigned to work in the facility law library by the library coordinator to help guide and assist other inmates in legal research and document preparation on a prioritized basis as assigned by the library coordinator." OAR 291-139-0160.

In accordance with these rules, Mr. Wilson received assignments from the library coordinators to assist AICs on matters including but not limited to: appeals of convictions and sentences, conditions of confinement challenges, Board of Parole issues, child custody and visitation matters, dissolution proceedings, wills and estates, and other civil actions. Throughout his nine years as a legal assistant at OSCI, Mr. Wilson was authorized by library coordinators to conduct research, prepare documents, and develop working relationships with attorneys, prisoner and mental health advocacy groups, court staff, Board of Parole personnel, and other professionals. These privileges allowed Mr. Wilson to effectively conduct his duties assisting the AICs who were assigned to him.

Mr. Wilson could only carry out this work with the knowledge of, approval by, and assistance of the library coordinators. Legal assistants have no access to the internet, no email accounts, and no phone access other than what is available to all AICs, which are phones on their living units or legal calls scheduled by the library coordinator. If Mr. Wilson or other legal assistants needed to contact people outside of the institution by phone, the library coordinator would schedule a legal call. If Mr. Wilson or other legal assistants needed to contact people outside of the institution by email, the library coordinator would send and receive emails through the library coordinator's ODOC email account and then print out the message and attachments or put them on work thumb drives for the legal assistant and AIC. If Mr. Wilson or other legal assistants needed to access information from the internet, they would make a request to the library coordinator who would then print out the requested information.

At OSCI, it was standard procedure, as authorized by library coordinators, to print the first copy of any document that a legal assistant was working on for an AIC from the legal assistant's standalone printer without charging the AIC. AICs paid for any subsequent copies of documents.

Also as authorized by the OSCI library coordinator, AICs who are working on legal matters can store their legal materials on a thumb drive and take them home when they leave the institution. Legal assistants are also authorized to use thumb drives to store work that they are doing for AICs assigned to them. Again, legal assistants do not have access to the internet. So, any information that is stored on the thumb drive from the internet is done by the library coordinator.

Consistent with Mr. Wilson's behavior for the past thirty years in ODOC custody, Mr. Wilson always carried out his duties as an OSCI legal assistant in accordance with ODOC rules and as authorized by his supervisor.

**The misconduct report and final order do not include any unauthorized conduct by Mr. Wilson to substantiate the charges brought against him or the findings of violations.**

The allegations contained in the misconduct report, dated March 23, 2021 and submitted on August 4, 2021,[1] and the findings of violations in the final order, dated August 31, 2021, are entirely unsupported by substantiating evidence. Instead, the misconduct report and final order clearly reveal that Mr. Wilson was charged and found in violation of the rules for (1) assisting AICs completely within the proper bounds of his position as a legal assistant and as authorized by Library Coordinator Pam McKinney and four previous library coordinators; and for (2) actions and decisions made by Ms. McKinney, of her own volition, which were encouraged and condoned by the ODOC director and administration.

Mr. Wilson was charged with: Disobedience of an Order I (4.15), Unauthorized Use of Information Systems I (1.25), Contraband II (1.11), and Compromising an Employee (4.15). He was found in violation of: Unauthorized Use of Information Systems II (1.26), Contraband II (1.11), and Compromising an Employee (4.15).

The evidence offered for each charge and violation is addressed in detail below. Some repetition of the facts is provided in order to make clear that each individual allegation lacks any basis in fact to justify the actions taken against Mr. Wilson.

Disobedience of an Order I (4.15)

Mr. Wilson should never have been charged with Disobedience of an Order I, which was ultimately dismissed. The charge was based on protocols and procedures that had long been authorized by library coordinators at OSCI. In the misconduct report, the investigator explains that the charge was based on Mr. Wilson disregarding and violating OAR 291-139 (Legal Affairs), OAR 291-131 (Mail), and OAR 291-86 (AIC Access to Automation). The investigator concludes that those OARs were violated because the investigator reviewed "hundreds of emails, from January 2020 to January 2021, between Ms. McKinney and individuals in the community. These emails were both incoming and outgoing. Most of these emails were with individuals at an outside justice resource firm, or [with] attorneys and other professional[s]. All of the individuals are associated with AIC Wilson in some manner." It has been a longstanding procedure in OSCI for library coordinators to help legal assistants communicate, through email and scheduled legal calls, with attorneys, prisoner and mental health advocacy groups, court staff, Board of Parole personnel, and others to effectively assist assigned AICs with their legal matters. The

---

[1] Misconduct reports are commonly dated on the date the report is started rather than date completed and submitted.

investigator further asserts that "Ms. McKinney's actions of sending and receiving emails, containing messages, and attached legal documents saved AIC Wilson at least $387.40." Again, it is a longstanding practice for OSCI library coordinators to send and receive emails and print emails and attachments for AICs. Furthermore, all the activities described in the misconduct report were actions taken by Ms. McKinney.

Unauthorized Use of Information Systems II (1.26)

Similarly, the charge of Unauthorized Use of Information Systems I should never have been brought against Mr. Wilson. The finding of Mr. Wilson to be in violation of the lesser included rule, Unauthorized Use of Information Systems II, is likewise baseless. The final order states that Mr. Wilson is in violation of Unauthorized Use of Information Systems II because he "made copies, viewed video or listened to audio files for personal use . . . that exceeded the conditions of use or access granted by the Director, functional unit manager, or designee." However, all conduct described was either authorized by Ms. McKinney or done by Ms. McKinney, of her own volition, for AICs.

While the final order does not otherwise refer to Mr. Wilson making copies, the misconduct report states that the charge of Unauthorized Use of Information System I was based on Mr. Wilson printing a copy of work for AICs' legal affairs from the standalone printer at the legal assistant work area without charging the AICs. As explained above, this was a procedure authorized by library coordinator Ms. McKinney, as well as the previous four library coordinators.

The referenced audio files and video were files downloaded and put on thumb drives by Ms. McKinney of her own accord. Mr. Wilson did not request any of these materials. Ms. McKinney downloaded music and put the files on thumb drives so that AICs who worked in the library, such as the legal assistants and law clerks, could listen to music while they worked. The AICs could only assume that Ms. McKinney had authorization to do so, and that she did this to create a more productive, pleasant, and "normal" work environment. In fact, Ms. McKinney was regularly instructed to create a "normal" and humane environment for AICs by the ODOC director and administration, as further explained below.

Similarly, Ms. McKinney downloaded a video onto Mr. Wilson's work thumb drive, not at his request, but of her own volition. Ms. McKinney exchanged emails with a former AIC's partner about new children in their lives, Ms. McKinney's grandchild and the former AIC's child. None of the emails were addressed to Mr. Wilson or made any mention of Mr. Wilson. Knowing that Mr. Wilson and other AICs at OSCI knew this former AIC, Ms. McKinney downloaded the video and a few photos of the child and asked Mr. Wilson to show them to other AICs who came into the library. Again, Mr. Wilson could only assume that Ms. McKinney was authorized to do this. This action was consistent with the "normal" and pro-social community environment that Ms. McKinney, a 22-year ODOC employee, created in the library. The library environment Ms. McKinney created, which AICs were accustomed to, is further explained in a later section.

Finally, the suggestion that any of this occurred for Mr. Wilson's "personal use" is without evidence. The conclusion that Mr. Wilson is in violation of Unauthorized Use of Information Systems II is baseless and should be vacated in the interest of justice.

Contraband II (1.11)

The finding of Mr. Wilson to be in violation of Contraband II is entirely unfounded. The alleged violation is based on actions and decisions made by Ms. McKinney of her own volition, which were encouraged and condoned by the ODOC director and administration.

The final order states,

> There is a preponderance of evidence AIC Wilson was in possession of contraband that was not authorized that created a threat to the safety, security, or orderly operations of the facility as AIC Wilson was in possession of an unauthorized plastic child's toy phone in AIC Wilson's work area, photographs of a former AIC on AIC Wilson's thumb drive that is to be utilized for work as the Legal Assistant, a video of a former AIC on AIC Wilson's thumb drive that is to be utilized for work as the Legal Assistant, music on the thumb drive that is to be utilized for work as the Legal Assistant.

An AIC commits a Contraband II violation when an "AIC *possesses* contraband, including that listed in Contraband I and Contraband III, that *creates a threat to safety, security or orderly operation of a facility*, including but not limited to: [ ] Tobacco or smoking paraphernalia, unauthorized medication, items of barter, checks, money under $10, or unauthorized explicit material; or [ ] Items that were obtained by threats of or actual theft, forgery, or coercion." OAR 291-105-0015(1)(e) (emphasis added). The discipline rules define "possession" as "To have physical possession of or otherwise exercise dominion or control over property." OAR 291-105-0010(34).

*Plastic child's toy phone*

The misconduct report and final order explain that the investigator searched Mr. Wilson's work area in the library and found a "white plastic child's toy phone," which Ms. McKinney said she purchased with her own money and gave to Mr. Wilson without supervisor approval, constituting a Contraband II violation. Here is an accurate image of the child's toy phone referred to in the reports:

Page 8



The investigator omitted from the misconduct report that Ms. McKinney placed this toy phone on Mr. Wilson's work area desk as a joke, not as a gift. Mr. Wilson did not request this item and he did not exercise control of this toy in any way that could constitute a violation of Contraband II. This toy was placed in the library by Ms. McKinney of her own accord, and it remained in the library.

No explanation is given as to how the presence of the toy in the library created "a threat to the safe, secure, and orderly operation of the facility," a required element of a contraband violation, other than to allege that Mr. Wilson engaged in an "unauthorized relationship with an employee," which is baseless, as explained below. In fact, within the community-like environment Ms. McKinney sought to create in the library, the existence of the toy phone could hardly be deemed irregular or inappropriate. The toy was just one of many playful items that Ms. McKinney brought in and placed throughout the library. For example, as recent as August 2021, in the OSCI library there is a clock that Ms. McKinney made from personal pictures and a plastic container with fake fish, meant to resemble an aquarium. Ms. McKinney also often decorated the library with festive items for various holidays, like Halloween and Christmas – including bringing in reindeer antlers for AICs to wear.

Ms. McKinney, like many ODOC staff, received regular emails from ODOC administration encouraging staff to interact with AICs according to the "Oregon Way" – the ODOC philosophy that AICs are to be treated "in a normalized environment and in the most humane way possible."[2] ODOC Director Colette Peters has consistently stated publicly the

---

[2] Written Testimony, House Judiciary Committee, HB 3146, (March 20, 2019) (statement of the Oregon Department of Correction Director Colette Peters), *available at* https://olis.oregonlegislature.gov/liz/2019R1/Downloads/CommitteeMeetingDocument/175702; *see also e.g*.,

importance of ODOC doing what it can to "make the institutions feel more like communities"[3] so that AICs will return to the community as "good neighbors."[4] To illustrate the environment Ms. McKinney created in the OSCI library – in accordance with the Oregon Way – below is a photo of Ms. McKinney in the OSCI library. ODOC posted this photo on Twitter (ODOC Twitter) on December 30, 2020, among a few other photos of the decorated OSCI library that ODOC posted on Twitter that holiday season.



*Music, photographs, and video files on Mr. Wilson's work thumb drive*

As explained previously, Ms. McKinney downloaded music and put it on thumb drives so that AICs with jobs in the library could listen to music while they worked, a decision that AICs considered unremarkable and consistent with how Ms. McKinney ran the library. Also as explained previously, Ms. McKinney exchanged emails with a former AIC's partner to share

---

Oregon Department of Corrections, 2021-23 Agency Budget Request, at 316, *available at* https://www.oregon.gov/doc/Documents/2021-23-agency-request-budget.pdf ("The Oregon Way is a philosophical approach to corrections based on security best practices and the belief that normalizing and humanizing the prison environment is beneficial for employees and incarcerated individuals. This innovative approach to incarceration stems from an exploration of and immersion in the Norwegian correctional system. The objectives and outcomes of this program support ODOC's focus on segregation reduction and reform, and the primary goal of keeping both staff and AICs safe. Normalizing an individual's environment and experience while incarcerated is believed to help in successful re-entry and ultimately reduce recidivism. Shifting the focus from punitive to a rehabilitative mindset is the foundation of normalization. Creating humane conditions and transition opportunities prepare AICs for a successful incarceration and re-entering society."); Oregon Department of Correction, *The Oregon Way*, https://www.oregon.gov/doc/about/Pages/oregon-way.aspx (accessed Sept. 20, 2021).
[3] *See* Suzanne Stevens, *Inside the Oregon State Penitentiary and efforts to make it a model of prison reform*, Portland Business Journal (Aug. 1, 2019), https://www.bizjournals.com/portland/news/2019/08/01/inside-the-oregon-state-penitentiary-and-efforts.html.
[4] *See, e.g., Id.*

photos of Ms. McKinney's new grandchild, and photos and a video of the former AIC's child. Ms. McKinney downloaded the video and photos on Mr. Wilson's work thumb drive, not at his request or the request of anyone, but of her own volition. Knowing that Mr. Wilson and other AICs knew this former AIC, Ms. McKinney downloaded the video and photos and asked Mr. Wilson to show them to other AICs who came into the library.

Like the presence of the child's toy phone in the library, these uses of the thumb drive provide no basis for a finding of a Contraband II violation. First, as previously explained, AICs, including Mr. Wilson, would not have any reason to suspect that Ms. McKinney was not authorized to take these actions. Her actions were consistent with the positive environment that she consistently created in the library with the encouragement of ODOC leadership. Mr. Wilson should in no way be held accountable for the actions and decisions of his supervisor, an ODOC employee who had worked for the department for more than 20 years.

Second, Mr. Wilson did not "possess" the thumb drive in any way that could constitute a violation of the Contraband II rule. The thumb drive was kept in the library, under the control and dominion of the library coordinator. Mr. Wilson only used the thumb drive as authorized by the library coordinator while he worked as a legal assistant in the library. Finally, no explanation is offered as to how, through use of the thumb drive, Mr. Wilson "creat[ed] a threat to safety, security or orderly operation of a facility," necessary for a finding of a Contraband II violation. Given the circumstances, even the suggestion that safety, security, or order was threatened is absurd.

Compromising an Employee

An AIC commits the violation of Compromising an Employee when an "AIC knowingly engages an employee . . . in a personal relationship[.]" OAR 291-105-0015(4)(h). The final order states,

> There is a preponderance of evidence AIC Wilson engaged in a personal relationship with Ms. McKinney by accepting items not authorized such as a plastic child's toy phone, photographs from a former AIC, a video of a former AIC, two thumb drives, and having Ms. McKinney send and receive numerous emails on AIC Wilson's behalf.

The plastic toy phone has already been explained above and provides no evidence of Mr. Wilson doing anything whatsoever to "engage" Ms. McKinney in a personal relationship. Consistent with the "normal" community environment that she created in the library, per the culture encouraged by ODOC administrators, Ms. McKinney put the toy phone in Mr. Wilson's work area as a joke – not at the request of Mr. Wilson.

The photos and video of the former AIC's child, as explained above, were placed on Mr. Wilson work thumb drive by Ms. McKinney of her own volition, and she asked Mr. Wilson to

show the files to other AICs who knew the former AIC. These circumstances provide no basis to conclude that Mr. Wilson engaged Ms. McKinney in a personal relationship.

In regard to the numerous emails sent by Ms. McKinney, as has been explained, it was a longstanding practice by library coordinators in OSCI to help legal assistants communicate, through email and scheduled legal calls, with attorneys, prisoner and mental health advocacy groups, court staff, and Board of Parole personnel, and others to effectively assist assigned AICs with their legal matters. Mr. Wilson is known to be a very dedicated and proficient legal assistant. Any emails that Ms. McKinney sent and received on behalf of Mr. Wilson were all pursuant to his work as a legal assistant; or to his work in helping to create pro-social programs in the prison as known about and authorized by ODOC administration, some of whom were cc'd on the emails.

The final order refers to an obituary that Ms. McKinney sent by email, on Mr. Wilson's behalf, to a former AIC. While not entirely clear, this email appears to be proffered as evidence of the Compromising an Employee violation. Yet, like all the other emails that Ms. McKinney sent and received on Mr. Wilson's behalf, this email was connected to Mr. Wilson's work as a legal assistant. The obituary reported the death of a close family member of a criminal defense attorney who represents AICs at OSCI. Mr. Wilson had a professional relationship with the defense attorney pertaining to his job duties as a legal assistant, assisting AICs at OSCI with criminal case-related matters. The former AIC who received the obituary is a contract legal assistant who has worked with the defense attorney on cases of AICs at OSCI, including matters that Mr. Wilson also worked on. Given this ongoing work relationship, Mr. Wilson believed it was appropriate that the former AIC be timely made aware of the death, an unexpected and tragic occurrence. As explained earlier, for legal assistants to effectively carry out their duties, they develop ongoing working relationships and engage in regular communication with legal professionals in the wider community. Library coordinators routinely help legal assistants communicate by sending emails and scheduling legal phone calls. The fact that Ms. McKinney facilitated this particular email is consistent with this longstanding practice. There is simply no basis from which to conclude that Mr. Wilson's actions – asking Ms. McKinney to send an email to inform a legal assistant in the community about important news related to an attorney representing an AIC in OSCI – constitutes Mr. Wilson engaging in a personal relationship with Ms. McKinney.

The final order further attempts to support the Compromising an Employee violation by referring to "two thumb drives." The final order states, "AIC Wilson admitted to receiving two black thumb drives from Ms. McKinney that he was storing all of his legal work on. AIC Wilson stated he was planning on taking the two black thumb drives home with him when he was going to leave the institution." Again, it is common practice at OSCI for AICs to save their legal materials on a thumb drive and then take those thumb drives with them when they leave the institution. Mr. Wilson's legal materials would exceed the available storage on a single thumb drive. So, Ms. McKinney gave him two thumb drives. Again, this fact is not evidence of Compromising an Employee.

Although the following allegations from the misconduct report related to the Compromising an Employee charge do not appear in the final order, we address them here because they gratuitously suggest wrongdoing by Mr. Wilson without providing any plausible basis in fact.

In the misconduct report, the investigator states that Ms. McKinney "admitted to directly assisting AIC Wilson with his legal issues, case, matters" and "admitted to giving AIC Wilson special privileges which not all AICs were afforded." The investigator provides no examples or description of Ms. McKinney's assistance or "special privileges" other than again describing the emails, printing of emails, and attachments, and scheduled legal calls, which are all longstanding practices in the OSCI library that were authorized by numerous library coordinators. Legal assistants, like Mr. Wilson, do have "special privileges" not afforded to other AICs that allow them to carry out their authorized work duties.

Finally, the investigator uses statements made by Ms. McKinney that are unrelated to Mr. Wilson as evidence of Compromising an Employee. First, he says that Ms. McKinney "admitted that her relationships with several individuals at the outside justice resource firm became more of a personal friendship than a professional relationship." This is a boundary issue personal to Ms. McKinney and independent of Mr. Wilson.

The investigator also states that when he asked, "'Have you been compromised as an employee?' She said, 'Yes.'" No further explanation is given about this statement other than the investigator acknowledging that Ms. McKinney is a "22-year veteran employee with the DOC," who has been through "countless hours of training." There is no connection made to Mr. Wilson. Again, this question of and answer from Ms. McKinney occurred in an hours-long interrogation, which she described as "brutal" and "intimidating" and resulted in her feeling forced to resign. Ms. McKinney did not feel "compromised" as an employee prior to the interrogation.

The record is void of any description of actions or statements by Mr. Wilson that would indicate that he "knowingly engage[d] an employee . . . in a personal relationship." There is simply no basis for a finding of a Compromising an Employee violation.

**None of the violations and charges described above are supported by any unauthorized conduct by Mr. Wilson. The findings of fact in the record refer to conduct by Mr. Wilson that was completely within the bounds of his position as a legal assistant, as well as actions taken independently by Ms. McKinney that were encouraged and condoned by the ODOC director and administration. The findings of guilty for violations of Unauthorized Use of Information Systems II, Contraband II and Compromising an Employee are baseless. Therefore, the interest of justice requires that the final disciplinary order issued against Mark J. Wilson on August 31, 2021 be vacated.**

**<u>The sanction ordered for Mr. Wilson is inhumane, contrary to law and regulations governing ODOC, and further compounds the injustice experienced by Mr. Wilson.</u>**

The injustice that Mr. Wilson has suffered is further compounded by the extreme sanction of 120 days in disciplinary segregation, also known as solitary confinement, and loss of privileges, including his housing on OSCI's incentive housing unit and his position as a legal assistant in the OSCI library. Experts would consider ODOC's use of disciplinary segregation inhumane and out of line with the overwhelming amount of data and research documenting the severe adverse effects of solitary confinement for any length of time on all human beings. Sanctioning Mr. Wilson to any time in disciplinary segregation is immensely inappropriate, contrary to state law and regulations, and profoundly unjust.

### The cruel and inhumane nature of ODOC's use of disciplinary segregation.

The United Nations Standard Minimum Rules for the Treatment of Prisoners, also known as the Nelson Mandela Rules,[5] define solitary confinement as "confinement of prisoners for 22 hours or more a day, without meaningful human contact[6]," and "prolonged solitary confinement" as a "time period in excess of 15 consecutive days."[7] The National Commission on Correctional Health Care (NCCHC) defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals."[8] The NCCHC has adopted the following position on the use of solitary confinement:

> Solitary confinement as an administrative method of maintaining security should be used only as an exceptional measure when other, less restrictive options are not available, and then for the shortest time possible. Solitary confinement should never exceed 15 days. In those rare cases where longer isolation is required to protect the safety of staff and/or other inmates, more humane conditions of confinement need to be utilized.[9]

ODOC's disciplinary segregation is solitary confinement. Experts would consider its use to be inhumane and, specifically in the case of Mr. Wilson, a misuse of power – serving no safety and security purpose, it is nothing more than extreme and unwarranted cruelty.

AICs have described OSCI's Disciplinary Segregation Unity (DSU) as follows. During the first 24 hours, an AIC is placed in a cell in Section 1 of DSU. These cells are monitored by surveillance cameras, have no light and no table. There is a cement slab to sleep on, a toilet, a sink, and plexiglass over the bars. After the first 24 hours, the AIC is moved to a cell in a different section of DSU. The approximately 9'x11' cells each have a bed, toilet, and sink, and are described as "really dirty" and "filthy." There is a light in the cell, but no access to natural

---

[5] G.A. Res. 70/175, United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules) (Dec. 17, 2015).
[6] *Id.* at 17.
[7] *Id.*
[8] National Commission on Correctional Health Care, *Solitary Confinement (Isolation)*, https://www.ncchc.org/solitary-confinement (accessed Sept. 20, 2021).
[9] *Id.*

light. Across the unit from the cell is a frosted window to the outside where a person can see whether it is night or day, but cannot see anything else outside. The cells themselves do not have air ventilation. There is an air duct that is turned on at night in the general area. AICs spend more than 23 hours a day in these cells. They are allowed to leave their cells for 40 minutes a day to move about in a cage within the unit that has a pull-up bar but is otherwise empty. This cage, like the cells, has no natural light or natural air. After the first 30 days, AICs may be allowed to go outside for a maximum of 40 minutes per day.

AICs in DSU are allowed to shower only three times a week in "filthy" showers. They receive a soda bottle-sized cap of soap and have ten minutes to shower. There are no other hygiene products. AICs who wish to shave must use the "community" electric razor during shower times. They are only allowed to change their clothing and underwear at shower times.

During the first 30 days of segregation, AICs have no access to canteen, meaning they cannot buy any hygiene products or other necessities. To brush their teeth, they are given two small envelopes of baking soda, which is meant to last the first 30 days. AICs are only given two envelopes to send out mail. Because their only real means of communicating with anyone on the outside depends on those two envelopes, AICs must be very thoughtful about how to use them. Phone calls other than legal calls are limited to "verified emergency situations (death, serious illness, or injury to an immediate family member, etc.)." OAR 291-011-0060(15).

All AICs are placed in restraints when escorted by staff. This can include the use of a "leash," which is hung on the unit in view when not in use.

The Vera Institute of Justice, which assessed the ODOC's use of disciplinary segregation in 2015, stated that AICs in ODOC's DSU live in "conditions marked by isolation, idleness and sensory deprivation" for 23 hours a day, on average.[10] At OSCI's DSU, there are no programs, "no ability to engage in productive activities" and AICs "rarely have meaningful contact with other people during their time in DSU."[11] People report that in this desperate and idle environment, time stands still.

The inhumane and degrading nature of DSU is impossible to imagine and to understand for anyone who has never spent time there. It is also difficult for AICs who have experienced DSU to adequately describe the severe environment. In their attempts to do so, people have expressed the following. Imagine the most beastly state that a person could be in. That is the state of many AICs in DSU. Everything smells. Your body never feels clean. You feel grimy all day long, all the time. It is not because of the restriction of three showers a week. It is because the grime of the environment gets into your skin, into you. All day long, people are screaming and yelling out of desperation, anger, and states of insanity. People are harming themselves and

---

[10] Alison Hastings et al., Vera Institute of Justice, *The Safe Alternatives to Segregation Initiative: Findings and Recommendations for the Oregon Department of Corrections* at 26, available at https://www.vera.org/downloads/publications/safe-alternatives-segregation-initiative-findings-recommendations-odoc.pdf.
[11] *Id.*

harming others out of frustration, anger, and to feel any sense of autonomy or control of their lives. It is common for people to clog toilets so that the units flood, to throw objects, including feces, out of their cells and at corrections officers and other AICs. One person recounted knowing of AICs who would eat their own feces, smearing it in their teeth, when corrections officers came by. Adding insult to injury, behavioral health specialists do not regularly visit AICs in OSCI's DSU.

This is the environment that Mr. Wilson, who poses no risk to the safety and security of the prison, has been ordered to endure for 120 days.

Solitary confinement is a severe sanction that "a massive body"[12] of scientific research confirms is physiologically and psychologically harmful to all people, not only vulnerable populations, with significant and long-lasting impacts occurring after just a few days of segregation.[13] The National Commission on Correctional Health Care (NCCHC), which opposes solitary confinement longer than 15 days, explains in its position statement:

> The inherent restriction in meaningful social interaction and environmental stimulation and the lack of control adversely impact the health and welfare of all who are held in solitary confinement. While there is a school of thought that suggests that solitary confinement in facilities that meet basic standards of humane care has relatively little adverse effect on most individuals' mental or physical health, this is not the view of most international organizations. The World Health Organization (WHO), United Nations, and other international bodies have recognized that solitary confinement is harmful to health.
>
> . . . Even those without a prior history of mental illness may experience a deterioration in mental health, experiencing anxiety, depression, anger, diminished impulse control, paranoia, visual and auditory hallucinations, cognitive disturbances, obsessive thoughts, paranoia, hypersensitivity to stimuli, posttraumautic stress disorder, self-harm, suicide, and/or psychosis. Some of these effects may persist after release from solitary confinement.
>
> Moreover, the very nature of prolonged social isolation is antithetical to the goals of rehabilitation and social integration.

In addition to the psychological impact of solitary confinement summarized in the NCCHC's position statement, solitary confinement has physical impacts. These include, "gastrointestinal and genitourinary problems, diaphoresis, insomnia, deterioration of

---

[12] Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature* 441, 475 Crime & Justice Vol. 34, No. 1 (2006), available at https://www.jstor.org/stable/10.1086/500626?seq=1#metadata_info_tab_contents.
[13] *See e.g.*, *Id.* at 12; Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement* (Jan. 1, 2003), available at https://journals.sagepub.com/doi/abs/10.1177/0011128702239239; Lauren Brinkley-Rubinstein et al., *Association of Restrictive Housing During Incarceration With Mortality After Release*, JAMA (October 4, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.

eyesight, profound fatigue, heart palpitations, migraines, back and joint pain, weight loss, diarrhea, and aggravation of preexisting medical problems."[14]

Humans are naturally social beings, and it is the "social pain," the environmental and social isolation, of solitary confinement that can be the most torturous and damaging.[15] Researchers define "social pain" as "the feelings of hurt and distress that come from negative social experiences such as social deprivation, exclusion, rejection, or loss."[16] Even after **a few days** in solitary confinement, researchers observe people "descend into a mental torpor or 'fog,' in which alertness, attention, and concentration all become impaired. . . . [T]he individual becomes increasingly incapable of processing external stimuli . . . Over time the very absence of stimulation causes whatever stimulation is available to become noxious and irritating."[17] "This lethargic condition has been described by researchers in connection with a complete breakdown or disintegration of the identity of the isolated individual. This can be described as a simultaneous attack of several symptoms that effectively erase the personality of the isolated individual: they experience problems talking and understanding others, hallucinate (hear and see things), have constant headaches, are troubled by anxiety, lose control (cry, become lethargic, have fits of rage, etc.), and reach a condition that resembles (or is) psychosis."[18] Expert Craig Haney describes a reaction of "isolation panic," which sets in quickly. "The longer they're in it, and especially if they're not sure when they're going to get out, a range of negative psychological reactions begin to mount."[19]

To be clear, solitary confinement harms all individuals, not only those considered vulnerable, such as those with preexisting mental illness. "Isolation can be psychologically harmful to any prisoner, with the nature and severity of the impact depending on the individual, the duration, and particular conditions (e.g., access to natural light, books, or radio)."[20]

Also, any amount of time in solitary confinement increases a person's risk of premature death.[21] A 2019 study of 229,274 people released from incarceration in North

---

[14] Hastings et al., *supra* note 10 at 7; *See also, e.g.*, Lars Moller et al., eds., *Health in Prisons: A WHO Guide to the Essentials in Prison Health* (Copenhagen: World Health Organization, 2007) at 36.

[15] *See e.g.*, Tiana Herring, Prison Pol'y Init., *The research is clear: Solitary confinement causes long-lasting harm* (Dec. 8, 2020), available at https://www.prisonpolicy.org/blog/2020/12/08/solitary_symposium/

[16] *Id.*

[17] Stuart Grassian, Psychiatric Effects of Solitary Confinement 325, 331 Wash. U. J. Law & Pol'y, Vol. 22 (2006), *available at* https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1362&context=law_journal_law_policy.

[18] Scharff Smith, *supra* note 12, at 492-493.

[19] Ramin Skibba, *Solitary Confinement Screws up The Brains of Prisoners*, Newsweek (Apr. 18, 2017), https://www.newsweek.com/2017/04/28/solitary-confinement-prisoners-behave-badly-screws-brains-585541.html.

[20] Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics* at 104 (citing H. Reyes, *The worst scars are in the mind: psychological torture.* Int. Rev. Red Cross 89:591-617 (2007) and M. Basoglu et al., *Torture vs. other cruel, inhuman and degrading treatment: is the distinction real or apparent?* Arch. Gen. Psych. 64:277-85 (2007)).

[21] Lauren Brinkley-Rubinstein et al., *Association of Restrictive Housing During Incarceration With Mortality After Release,* JAMA (October 4, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.

Carolina from 2000 to 2015 concluded, "Compared with individuals who were incarcerated and not placed in restrictive housing [also known as solitary confinement], individuals who spent any time in restrictive housing were 24% more likely to die in the first year after release, especially from suicide (78% more likely) and homicide (54% more likely); they were also 127% more likely to die of an opioid overdose in the first 2 weeks after release."[22] Social pain can cause ongoing suffering for people because of "humans' ability to relive social pain months or even years later."[23]

The "massive body" of research documenting the severe adverse impacts of solitary confinement have led many state policy makers and corrections departments to drastically reduce and limit the use of solitary confinement. States who have reformed their laws and policies have considered the standard set by the "Nelson Mandela Rules," a resolution unanimously adopted by the United Nations General Assembly in 2015. The Nelson Mandela Rules prohibit indefinite solitary confinement; considers "prolonged solitary confinement" as a time period more than 15 consecutive days; and prescribes that solitary confinement be used "only in exceptional cases as a last resort, for as short a time as possible."[24]

Several states have a maximum sanction of disciplinary segregation that is far below what is authorized in Oregon. Further, a few states have led the way in ascribing to the guidelines set forth in the "Nelson Mandela Rules." Colorado[25], Idaho[26], and New York[27] have all limited solitary confinement as a discipline sanction to a maximum of 15 consecutive days. New York's legislation, passed in 2021 and to take effect on March 31, 2022, limits *all forms* of solitary confinement to a maximum of 15 days.[28] Similarly, in 2019, New Jersey enacted a reform limiting solitary confinement of all incarcerated persons to no more than 20 consecutive days, and no more than 30 days in a 60-day period.[29]

Rick Raemish, Executive Director of the Colorado Department of Corrections, wrote the following in a blog post of the American Civil Liberties Union in December 2018 after Colorado became the first state in the country to limit solitary confinement to a maximum of 15 consecutive days in 2017,

---

[22] *Id.*

[23] Herring, *supra* note 15.

[24] G.A. Res. 70/175, *supra* note 5, at 17.

[25] Colo. Dep't of Corrections, Reg. No. 150-01, Code of Penal Discipline, Attachment A (Nov. 1, 2019), available at https://cdoc.colorado.gov/about/department-policies.

[26] Idaho Dep't of Corrections, Control No. 318.02.01.001, Standard Operating Procedure, Disciplinary Procedures for Inmates at 31 (Oct. 5, 2018), *available at* http://forms.idoc.idaho.gov/WebLink/0/edoc/281212/Disciplinary%20Procedures%20for%20Inmates.pdf.

[27] S.B. 2836, 2021 Leg., 244th Sess. (N.Y. 2021), *available at* https://www.nysenate.gov/legislation/bills/2021/s2836.

[28] Notably, any confinement to a cell for more than 17 hours is considered solitary confinement under the New York law, lower than the 22 hours in the Mandela Rule. *See id.*

[29] N.J. A314, 218th Leg., Reg. Sess. (N.J. 2019); Isolated Confinement Restriction Act, Pub. L. 2019, Ch. 60, available at https://www.njleg.state.nj.us/2018/Bills/AL19/160_.PDF.

In Colorado, long-term solitary confinement used to be a tool that was regularly used in corrections. The problem is that it was not corrective at all. It was indiscriminate punishment that too often amounted to torture and did not make anyone safer.

The practice was pervasive because it was considered reasonable and effective. It was neither. In practice, long-term isolation punished people in a way that not only lacked humanity but sense. And when a program lacks both sense and humanity, the results are as clear as they are disastrous: dehumanization and harm.

We have ended the use of long-term solitary confinement in our state and limited its use to 15 days at a time. This limitation follows the international human rights standards from the United Nations' Nelson Mandela Rules, which state that keeping someone in solitary confinement for over 15 days is torture.

. . .

We made this policy change because we are committed to public safety. The research has shown that housing someone in a cell the size of a parking space for 22 or more hours per day for extended periods of time damages them both mentally and physically. Since most people who go to prison – 97 percent – return to their community, that means we were releasing people back into their communities in worse shape than when they arrived. That's why long-term restrictive housing needs to end, not only for the health and well-being of incarcerated people – but for the communities to which they will return.[30]

The Vera Institute of Justice assessed ODOC's use of disciplinary segregation in 2015 and reported that "ODOC's maximum DSU sanction of 120 days with a possible upward deviation of 60 days (for a total of 180 days) is long compared to other jurisdictions."[31] The report further found that "DSU is frequently used as a sanction for non-violent rule violations" and that "[a]dults in custody experience a number of collateral consequences from a sanction to DSU. . . includ[ing] incentive-level reduction, program failures and/or loss of eligibility for certain programs, loss of employment, loss of housing, and loss of recreation yard time."[32] These collateral consequences can cause AICs to experience feelings of "despair" and hopelessness, leading them to "question whether they should strive to accomplish anything in prison when their accomplishments can so easily be stripped away."[33] This impact on AICs' morale and loss of privileges, programs, and work opportunities can diminish their ability to succeed after their re-entry.

---

[30] Rick Raemisch, ACLU, *Why I Ended the Horror of Long-Term Solitary in Colorado's Prisons*, (Dec. 15, 2018) https://www.aclu.org/blog/prisoners-rights/solitary-confinement/why-i-ended-horror-long-term-solitary-colorados-prisons.
[31] Alison Hastings et al., s*upra* note 10, at 25.
[32] Alison Hastings et al., s*upra* note 10, at 23..
[33] *Id*.

The ODOC's use of disciplinary segregation is inhumane and is nowhere near to living up to the philosophy of the Oregon Way: to treat AICs "in the most humane way possible."[34]

The sanction ordered for Mr. Wilson of 120 days in DSU and loss of privileges, in addition to being inhumane, is beyond the bounds of the laws and regulations governing ODOC. ORS 421.105(1) provides,

> The superintendent may enforce obedience to the rules for the government of the adults in custody in the institution under the supervision of the superintendent by *appropriate* punishment but neither the superintendent nor any other prison official or employee may strike or inflict physical violence except in self-defense, or inflict any cruel or unusual punishment.

(Emphasis added).

This sanction is woefully inappropriate and is therefore contrary to this state law and to regulations governing ODOC's disciplinary process.

First, Mr. Wilson should never have been put in formal proceedings that could result in such a severe sanction. The rules regarding the "Procedures for Handling Misconduct by AICs" state,

> Employees shall be expected to use less formal procedures if the act or acts of misconduct do not constitute an immediate and continued threat to life, health, facility security, employee authority, or serious property damage or destruction, and in a manner that promotes and embraces the Oregon Accountability Model. Less formal corrective action may include: a reprimand, a warning, counseling, a conduct order, or as otherwise authorized by the functional unit manager, Officer-in-Charge, or designee.

OAR 291-105-0021(1).

The record is void of any indication that the alleged actions of Mr. Wilson constituted "an immediate and continued threat to life, health, facility security, employee authority, or serious property damage or destruction." At worst, the record suggests that Mr. Wilson had a child's toy phone in his work area in the library. All other allegations made were of longstanding authorized conduct within the OSCI library: email communications by the library coordinator with attorneys, outside organizations, and court and Board of Parole personnel; the printing of documents under the supervision of the library coordinator; the scheduling of legal calls by the library coordinator; and the use of thumb drives to store legal materials. The absence of any threat or harm explains why Mr. Wilson remained in general population, living on the incentive

---

[34] Testimony of Colette Peters, *supra* note 2; *see also, e.g.*, Oregon Department of Corrections, 2021-23 Agency Budget Request, at 316, *available at* https://www.oregon.gov/doc/Documents/2021-23-agency-request-budget.pdf

unit, throughout the seven-month investigation. Concerns of misconduct by Mr. Wilson should have been handled using "less formal" proceedings and a sanction of solitary confinement should never have been available.

Second, Mr. Wilson should never have been sanctioned to *any time* in disciplinary segregation. The ODOC rules provide:

> Placement on Disciplinary Segregation Status: An AIC charged with committing a rule violation may be placed on disciplinary segregation status pending resolution of the charge through a formal hearing. This action will be taken when the functional unit manager or designee or the Officer-in-Charge determines that the **alleged rule violation or violations are of such seriousness that the security of a facility is at risk and requires immediate removal of the AIC from the general population, or determines that the AIC is a threat to the community,** or determines that the AIC is likely to escape or abscond.

OAR 291-105-0021(3) (emphasis added).

Again, the record is void of any indication that Mr. Wilson's actions placed the security of OSCI at risk or threatened the community, requiring his immediate removal from general population. Any suggestion that the child's toy phone (pictured above) confiscated from the library by investigators posed a security risk or threat to the community is absurd. Any suggestion that Ms. McKinney downloading materials for AICs, in furtherance of a more humane and "normal" work environment, is an indication that Mr. Wilson poses a security risk to the community is likewise absurd. Furthermore, the only discernable results of the alleged violations consisted of: Ms. McKinney sending and receiving emails and printing out emails and attachments for Mr. Wilson related to legal matters, as is done for all AICs who seek legal help from the OSCI legal assistants; Ms. McKinney sending and receiving emails and printing out email attachments for Mr. Wilson related to his work to create pro-social programs in the prison as authorized by the ODOC administration; and Ms. McKinney scheduling legal calls for Mr. Wilson, as is done for all AICs by the library coordinator. It is impossible to reasonably conclude that these results rise to the level of removing Mr. Wilson from general population and placing him in solitary confinement. Again, while the seven-month investigation was pending, Mr. Wilson remained in general population, living on the incentive unit, with no issues.

ODOC also failed to comply with its rule that sanctions ordered for rule violations are to be "individualized" to the circumstances and the incarcerated person. The rule states, "adults in custody found in violation of the rules of prohibited conduct are issued individualized sanctions based upon the totality of circumstances (including . . . the adult in custody's behavior, strengths, and needs . . . ." OAR 291-105-0005(3)(c). In this case, a gratuitously punitive sanction was imposed despite the absence of any harm or threat, and without consideration of Mr. Wilson's exemplary record during his incarceration. Mr. Wilson not only has been misconduct-free for 30 years, he has been a model for all AICs in his commitment to serving others in his community, demonstrating that he is a compassionate individual of strong moral character. Under these circumstances, a sanction of even one day in solitary confinement is inconceivable.

Sanctioning Mr. Wilson to any time in solitary confinement is completely inappropriate, unjustified, and a clear injustice. Sanctioning Mr. Wilson to 120 days of solitary confinement, the maximum available sanction for a violation, is unconscionable – serving no purpose other than grotesque punishment for punishment's sake.

> *"Even though I have interviewed the Dalai Lama, Maya Angelou and other prominent and inspiring figures, one of the most profound experiences for me personally has been to interview Mark [Wilson] and other spiritually-oriented men at OSCI. I believe Mark's story of transformation demonstrates the positive change, redemption and personal insights that we are all capable of...."*
>
> –Khashyar Darvich, Producer-Director, Wakan Films, who filmed and interviewed Mark Wilson over a ten-year period for a documentary film about men who commit crimes as youth and have experienced transformation through a decades-long process of accepting and facing their crimes and dedicating themselves to a personal and spiritual practice of yoga and meditation.

## Conclusion

At every stage, this disciplinary proceeding has inflicted a series of harms upon Mr. Wilson that are wholly unwarranted and unjust, culminating in the grievous 120-day sanction of solitary confinement that he is now serving. ODOC removed Mr. Wilson from a longstanding, well-earned work assignment and launched an investigation based on information from a dubious source, a confidential informant reputed to have fabricated allegations against other AICs. At his hearing, Mr. Wilson was shackled and prevented from accessing the written materials he had prepared to defend himself. Then, ODOC issued guilty findings against Mr. Wilson without providing any factual basis to support them. Finally, despite lacking any evidence that Mr. Wilson represents a security threat, ODOC imposed the maximum possible sanction of 120 days in solitary confinement, showing a complete disregard for Mr. Wilson's exceptional record of ethical and pro-social behavior over the last 30 years. In doing so, ODOC failed to follow state law and agency rules designed to protect AICs from inappropriate punishments, and defied its pledge to treat AICs humanely through "the Oregon Way."

In the interest of justice, we request that the final disciplinary order issued against Mark J. Wilson on August 31, 2021 be vacated pursuant to OAR 291-105-0100, and that Mr. Wilson's

status as OSCI be restored to its previous status, including his housing in the incentive unit in
OSCI and his position as a legal assistant in the OSCI library.

Sincerely,

*Julia Yoshimoto*

Julia Yoshimoto
Attorney

 /s/ *Juan Chavez*

Juan Chavez
Attorney

Encl:    Summary of Mark Wilson's Record in ODOC

cc:    Colette Peters, Director, Oregon Department of Corrections
       Michael Dembrow, Oregon State Senator
       Mark Wilson

**Summary of Mark Wilson's Record in ODOC**
1988 to Present

Treatment and Self-Improvement Programs

Completed hundreds of hours of counseling in more than 100 programs, from 1988 to the present, including:

| | |
|---|---|
| 1988 Nov – 2010 Oct | Mental health treatment/counseling, 152+ months |
| 1989 Mar – 1992 Oct | Substance abuse treatment, 42 months |
| 1992 – 1993 | Anger management counseling 12 months |
| 1995 Feb – 2004 Sept | Victim Awareness & Empathy Development Group, 108 months |
| 2008 Mar – 2013 | Insight Development Group, 60 months |
| 2008 – present | Empathy Development & Victim Awareness Group, 108+ months |
| 2010 Jun – 2014 Apr | Violent Offender Group, 48 months |
| 2012 Jan – 2012 Apr | Presence Process Addiction Recovery Class, 3 months |
| 2015 Oct – present | Impaired Driver Impact Panels, 16+ months |

Activities in Service to Others

Extensive commitment to serving others including but not limited to:

| | |
|---|---|
| 1988 – present | Legal assistant for other prisoners |
| 1994 – 1998 | Volunteer visiting room photographer |
| 1995 Feb – 2004 Sept | Co-founder and co-facilitator of a victim awareness and empathy development group |
| 1995 May – 2004 Sept | Facilitator for crime prevention group of at-risk youth |
| 1999 Feb – 2004 Sept | Hospice volunteer for 23 terminally ill prisoners |
| 2000 | Co-creator of a 90-day pilot victim awareness and empathy development group for Josephine County Parole and Probation |
| 2000 | Creator and facilitator of three-day forgiveness seminar |
| 2000 – 2002 | Co-facilitator of victim awareness panels |

Summary of Mark Wilson's Record in ODOC  1

| | |
|---|---|
| 2003 – 2009 | Member of the Western Prison Project (nka Partnership for Safety and Justice) Prisoner Advisory Committee and Legal Advisory Committee |
| 2005 Jul – 2008 Jan | GED/ABE Tutor |
| 2008 Mar – 2013 | Co-founder and co-facilitator of Insight Development Group |
| 2008 – present | Co-creator and co-facilitator of an empathy development and awareness group |
| 2014 – present | Assist with University of Oregon's Prison Education Program to advance and promote the program's credit and non-credit classes and workshops in OSCI and ODOC |
| 2015 Feb – present | Co-founder of weekly Buddhist study group |
| 2015 Aug – present | Volunteer yoga and mindfulness instructor for prisoners with developmental disabilities and severe mental illness |
| 2015 Oct – present | Co-creator and co-facilitator of impaired driver impact panels |
| 2016 Jun – 2016 Sept | Volunteer gardener in the OSCI garden |
| 2018 Sept – present | Co-coordinated stakeholder and community outreach meetings with the Oregon Justice Resource Center; hosted over 40 state leaders, on multiple days, at OSCI to educate them on the experiences of juvenile lifers |
| 2018 Sept – present | Special Advisor to the Oregon Justice Resource Center |
| 2019 Jun | Wrote *A Guide to Preparing for Your Murder Review Hearing* published by the Oregon Justice Resource Center and distributed by ODOC to prisons state-wide |
| 2019 – present | Co-creator and co-coordinator with the Oregon Justice Resource Center of the Peer Support Program, a peer support mentorship program for OYA youth transferring to ODOC custody |
| 2019 Jun – present | Member of the Oregon State Legislature's Prison Education Workgroup, led by Senator Michael Dembrow |

Summary of Mark Wilson's Record in ODOC  2

<u>Charitable Giving</u>

Commitment to charitable giving and coordinating fundraising efforts, which have raised more than $11,000 for crime victims, children, and others in need, including:

| | |
|---|---|
| 1993 – 2004 Sept | Participated in six annual charitable races and donations for Make-A-Wish Foundation |
| 2004 Jun | $2,030 for burial expenses for former prisoner |
| 2004 Sept & 2009 Oct | $1,372 for The Dougy Center for Grieving Children, Portland |
| 2007 Aug – 2009 Dec | $400, personal contribution, for the Sexual Assault Victims' Emergency Medical Response (SAVE) Fund administered by the Oregon Department of Justice Crime Victims' Assistance Section |
| 2008 – present | Participation in annual walkathon and donations for Gales Creek Children's Diabetes Camp, American Foundation for Suicide Prevention, Angel Tree |
| 2009 Apr – 2009 Oct | $7,505.13 for counseling from three children who witnessed their father murder their mother on March 16, 2009 |
| 2017 Oct | Participated in American Red Cross Eagle Creek Fire Relief Fund, total funds raised: $1,000 |

<u>Education and Vocational Training</u>

Commitment to continuously furthering his education by participating in opportunities including:

- Vocational Training

| | |
|---|---|
| 1989 Mar – 1989 Jul | Print Shop Operations, Vocational Training Program |
| 1999 Apr – 1999 Feb | End of Life Hospice Care Training, 36 hours |
| 1999 Feb – 2004 Sept | Monthly In Service Hospice Training |
| 2000 Mar | Basic Meditation Training, 30 hours |
| 2001 Feb | Advanced Family Mediation Training, 12 hours |
| 2005 Jun | TELT – GED/ABE Education Tutor Training |
| 2010 Nov – 2011 Apr | Business Technology, Computer Aided Design (AutoCAD)certification program |

Summary of Mark Wilson's Record in ODOC  3

| | |
|---|---|
| 2015 Mar | Protecting Human Research Participants web-based training course from the National Institute of Health |
| 2015 Aug – 2016 Mar | Certified Yoga Instructor Training, 200 hours |

- Higher Education

| | |
|---|---|
| 1988 | Completed half credit of high school and earned high school diploma |
| 1988 Fall | Began taking college-level course through Chemeketa Community College |
| 1995 Mar 17 | Associates of Arts Degree, Chemeketa Community College, 3.52 GPA |
| 2002–2003 | Completed three law classes offered by Ohio University |
| 2017 Winter | Teaching Assistant, University of Oregon class Autobiography as Political Agency II |
| 2017 Spring | Teaching Assistant, University of Oregon class Prison Narratives and Social Change |
| 2018 Winter | Teaching Assistant, University of Oregon class Autobiography as Political Agency |
| 2019 Jun 6 | Bachelor of Arts Degree, Majoring in General Social Sciences with a focus on Crime, Law and Society, University of Oregon, GPA 4.08 |
| 2020 Winter | Teaching Assistant, University of Oregon class Autobiography as Political Agency; earned master's-level credit |

## Institutional Employment History

Held nine jobs during over thirty years of incarceration, including:

| | |
|---|---|
| Corridor Orderly | 1988 Jul – 1988 Sept |
| Legal Assistant | 1989 Oct – 1990 Jun; 1991 Nov – 2004 Sept; 2012 Jul – 2021 Jan. Mark Wilson has worked as a legal assistant throughout most of his incarceration. He finds this position the most rewarding because it is challenging and allows him to be of service to others in very meaningful ways. |

Summary of Mark Wilson's Record in ODOC  4

| | |
|---|---|
| Legal Clerk | 1989 Aug – Dec 1989; 2012 Feb – 2012 Jul |
| UNIBASE Telephone Operator/Data Entry | 1990 Aug – 1991 Sept |
| Clothing Room Worker | 2004 Oct – 2005 Jun |
| Education Clerk | 2005 Jun – 2006 Jan |
| GED/ABE Education Tutor | 2005 Jul – 2008 Jan |
| Engineering Support Unit GIS Technician | 2008 Feb – 2010 Apr |
| Print Shop – Pre-press Assembly | 2011 Apr – 2012 Jan |

<u>Publications</u>

Published a vast number of articles over the past 30+ years of incarceration, educating the public on criminal justice news and the experiences of incarcerated people.

*Catholic Sentinel*, Portland, OR

| | |
|---|---|
| Catholic Community Flourishes in Salem Prison | 1989 Apr 28 |
| Hoping the Padre Serves a Stiff Sentence | 1989 May 26 |
| Prisons Need Long-Term Planning | 1989 Jul 7 |
| Parable Brings Out the Rich Man in All of Us | 1989 Oct 6 |
| Murder is Murder No Matter Who Commits It | 1991 Feb 1 |
| Inmate Has Fond Memories; Best Wishes to Prison Chaplain | 1999 Nov 5 |

*The Printer's Northwest Trader*, Portland, OR

| | |
|---|---|
| Rehabilitation Training, You Can Help | 1989 Aug 8 |

*Legal Assistant Today*, Costa Mesa, CA

| | |
|---|---|
| Not Always Frivolous (Part 1) | 1996 Jan/Feb |
| Civil on the Side (Part 2) | 1996 Mar/Apr |

*Prison Legal News*, Lake Worth, FL

| | |
|---|---|
| ★ Regular Contributing Writer | 1998 – Present |

For a list of articles, visit www.prisonlegalnews.org and search for "Mark Wilson"

Summary of Mark Wilson's Record in ODOC  5

| | |
|---|---|
| *The Oregon Defense Attorney*, OCDLA, Eugene, OR | |
| Post-Conviction Relief: The Last Hope | 2002 Mar |
| | |
| *Hope Magazine*, Brooklin, ME | |
| Finding the Heart | 2002 Nov/Dec |
| | |
| *The Mindfulness Bell* (Issue No. 32) | |
| Practicing the Mindfulness Trainings in Prison | 2002/2003 Winter |
| | |
| *Criminal Legal News*, Lake Worth, FL | |
| ★ Regular Contributing Writer<br>For a list of articles, visit www.criminallegalnews.org and search for "Mark Wilson" | 2018 Dec – Present |
| | |
| *The Appeal*, https://theappeal.org | 2020 Sep 14 |
| Far From Beyond Saving, Prison Youth Deserve Every Opportunity for Meaningful Rehabilitation | |

## Additional Evidence of Rehabilitation

Highest possible incentive level and eligible for incentive/honor housing and other privileges since 1993.

Discipline Record: Prior to the Final Order at issue here, in August 2021, Mark has only incurred a single, low-level prison rule violation for being in an unauthorized area on August 22, 1991.

No drug or alcohol use since 1990, 30 years ago.

No participation or affiliation with prison security threat groups or gangs.

No acts of violence, criminal or abusive behavior against any other person during his 32 years of incarceration.

Summary of Mark Wilson's Record in ODOC  6

**Lysne Matthew J**

| | |
|---|---|
| **From:** | Vincent Shannon M |
| **Sent:** | Wednesday, September 29, 2021 3:05 PM |
| **To:** | Juan Chavez |
| **Cc:** | Lysne Matthew J |
| **Subject:** | RE: Mark Wilson |

Hi, Juan.

Thank you for your email, and thank you for sharing a copy of the draft complaint that you intend to file on Mr. Wilson's behalf.

ODOC is going to stand by its decision in Mr. Wilson's prison disciplinary case. I will handle this lawsuit for the defendant(s), and I look forward to working with you on it. You may send any request for waiver of service to me by email, and I will be happy to take care of the necessary paperwork to get the ball rolling on the waiver front.

If you would like to chat, I can make time tomorrow or Friday. But I won't have any authority to change anything related to Mr. Wilson's underlying disciplinary case at this time.

Thank you again, Juan.
Shannon

**Shannon Vincent**
Oregon Department of Justice
503.947.4700

**From:** Juan Chavez <jchavez@ojrc.info>
**Sent:** Wednesday, September 29, 2021 2:17 PM
**To:** Lysne Matthew J <matthew.j.lysne@doj.state.or.us>; Vincent Shannon M <shannon.m.vincent@doj.state.or.us>
**Cc:** Franz Bruggemeier <fbruggemeier@ojrc.info>; Walter Fonseca <wfonseca@ojrc.info>; Ben Haile <bhaile@ojrc.info>; Jonny Gersten <jgersten@ojrc.info>
**Subject:** Mark Wilson

*CAUTION EXTERNAL EMAIL* This email originated from outside of DOJ. Treat attachments and links with caution. *CAUTION EXTERNAL EMAIL*

Hi Matt and Shannon,

Our office filed an administrative request to dismiss the sanctions levied against Mark Wilson (see attached) in retaliation for him performing his duties. Our hope is that ODOC recognizes this and reverses course. However, because Mr. Wilson is actively suffering from a deprivation of his rights, we intend to file suit against ODOC by end of day Friday unless we can remediate this problem. Attached, please find a draft Complaint we intend to file by EOD Friday, October 1, 2021. We do reserve the right to amend this Complaint up to the time of filing and within FRCP 15, but this document reflects the core of our allegations.

Our hope is to avoid litigating this issue at all, as we think that the problem is both obvious and remediable. I can make time to chat later this afternoon, but more likely I'll be more available tomorrow morning or on Friday.

Hope you two are doing well, and we look forward to fixing this issue.

1

Best,
Juan

--
Juan C. Chavez
Pronouns: he/him/his

Oregon Justice Resource Center
PO Box 5248
Portland OR  97208
Tel: 503-944-2270 ext. 212
Fax: 971-275-1839
Protonmail: chavezojrc@protonmail.com


NOTICE: This email message and any attachment(s) is/are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

## CERTIFICATE OF SERVICE

I certify that on November  29 , 2021, I served the foregoing MATTHEW J. LYSNE'S

DECLARATION IN SUPPORT OF DEFENDANT JERRY PLANTE'S RESPONSE IN

OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

upon the parties hereto by the method indicated below, and addressed to the following:

Juan C. Chavez                                    ___ HAND DELIVERY
Franz H. Bruggemeier                         ___ MAIL DELIVERY
Oregon Justice Resource Center           ___ OVERNIGHT MAIL
PO Box 5248                                        ___ TELECOPY (FAX)
Portland, OR 97208                              _X_ E-MAIL
        *Attorneys for Plaintiff*                   _X_ E-SERVE


                                          *s/ Shannon M. Vincent*
                                          SHANNON M. VINCENT #054700
                                          Senior Assistant Attorney General
                                          KENNETH C. CROWLEY #883554
                                          Senior Assistant Attorney General
                                          Trial Attorney
                                          Tel (503) 947-4700
                                          Fax (503) 947-4791
                                          Shannon.M.Vincent@doj.state.or.us
                                          Kenneth.C.Crowley@doj.state.or.us
                                          Of Attorneys for Defendant

Page 1 -   CERTIFICATE OF SERVICE
        SMV/jm8/151894191.docx