ELLEN F. ROSENBLUM
Attorney General
SHANNON M. VINCENT  #054700
Senior Assistant Attorney General
KENNETH C. CROWLEY #883554
Senior Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4700
Fax: (503) 947-4791
Email:  Shannon.M.Vincent@doj.state.or.us
          Kenneth.C.Crowley@doj.state.or.us

Attorneys for Defendant Jerry Plante

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MARK WILSON,<br><br>             Plaintiff,<br><br>     v.<br><br>JERRY PLANTE, and JOHN DOES 1-10,<br><br>             Defendants. | Case No.  6:21-cv-01606-SI<br><br>JEREMY NOFZIGER'S DECLARATION IN SUPPORT OF DEFENDANT JERRY PLANTE'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER |

I, Jeremy Nofziger, hereby declare:

1.      The Oregon Department of Corrections (ODOC) employs me as an Assistant Inspector General in the Office of Inspector General.

2.      I make this declaration from personal knowledge and in reliance on the attached records, which are regularly maintained in the ordinary course of ODOC's business.

3.      I make this declaration in support of *Defendant Jerry Plante's Response in Opposition to Plaintiff's Motion for Temporary Restraining Order*.

Page 1 -   DECLARATION OF JEREMY NOFZIGER
          SMV/jm8/Wilson 1606 PLD Nofziger Declaration iso Def's response to TRO.docx

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

4.      On August 9, 2021, Hearings Officer Ronnie Foss opened a prison disciplinary hearing in Disciplinary Case No. 2013 OSCI 0056, which arose out of the misconduct report that Inspector Jerry Plante issued to AIC Mark Wilson.  A true and correct copy of the Finding of Fact, Conclusion, and Order is attached to this declaration as Exhibit 1.

5.      On August 10, 2021, Hearings Officer Foss granted Mr. Wilson's request for witnesses in the case.  See Ex. 1, p. 1.

6.      The case was reconvened on August 31, 2021, and concluded.  See Ex. 1, p. 1.

7.      A true and correct copy of the disciplinary rules applicable to Mr. Wilson's disciplinary case is attached to this declaration as Exhibit 2.

8.      Hearings Officer Foss sanctioned Mr. Wilson for three rule violations: (1) Rule 4.15, Compromising an Employee (a Level 1 on the Major Violation Grid); (2) Rule 1.11, Contraband II (a Level IV on the Major Violation Grid); and (3) Rule 1.26, Unauthorized Use of Information Systems II (a Level IV on the Major Violation Grid).

9.      Because Mr. Wilson was sanctioned for a Level 1 rule violation on the Major Violation Grid, he could have petitioned the Inspector General for administrative review.

10.     Under OAR 291-105-0085, disciplinary actions for Level I rule violations are subject to review by the Inspector General.  See Ex. 2, p. 27.

11.     OAR 291-105-0085(3) provides: "Petitions for administrative review must be filed by the AIC and received by the Inspector General within 60 calendar days after the preliminary order becomes the Final Order under OAR 291-105-0031.  Filing a petition for administrative review shall not stay the imposition of a sanction."  See Ex. 2, p. 27.

12.     An AIC seeking administrative review "shall request an administrative review by completing the Department approved Petition for Administrative Review form and submitting it to the Inspector General."  OAR 291-105-0085(4).  The petition must state the date of the hearing, the rule meeting the criteria for review, and sufficient information to show either (a) why there was not substantial compliance with OAR 291-105, (b) that the finding was not based

Page 2 -   DECLARATION OF JEREMY NOFZIGER
SMV/jm8/Wilson 1606 PLD Nofziger Declaration iso Def's response to TRO.docx

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

upon a preponderance of the evidence, or (c) that the sanctions imposed were not in accordance with provisions set forth in OAR 291-105.  *Id.*

13.     Here, Mr. Wilson was entitled to seek administrative review for Case No. 2103 OSCI 0056 because he was sanctioned for a Level I rule violation.

14.     Mr. Wilson never submitted a petition for administrative review.

15.     On September 29, 2021, Mr. Wilson's counsel submitted a request that Mr. Wilson's disciplinary order "be vacated in the interest of justice, pursuant to OAR 291-105-0100."  A true and correct copy of the request is attached to this declaration as Exhibit 3.

16.     Inspector General Craig Prins's October 28, 2021, response to Mr. Wilson's request under OAR 291-105-0100 is attached to this declaration as Exhibit 4.

17.     OAR 291-105-0100 is a separate provision that supplements OAR 291-105-0085's administrative review process.  It does not replace the administrative review process.

18.     Mr. Wilson did not exhaust all levels of administrative review available to him before filing this lawsuit on November 4, 2021.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on November <u>23</u>, 2021.


          <u>*s/ Jeremy Nofziger*</u>
          JEREMY NOFZIGER

Page 3 -    DECLARATION OF JEREMY NOFZIGER

Oregon Department of Corrections
# Disciplinary Hearing
## Finding of Fact, Conclusion, and Order

| | | | |
|---|---|---|---|
| **Offender Name:** | Wilson, Mark James | **Case #:** | 2103 OSCI 0056 OSCI 35 |
| **SID:** | 7449142 | **Date(s) of Hearing:** | 08/10/2021, 08/31/2021, 08/09/2021 |

**Rules Charged**                                  **Plea**

| | | | |
|---|---|---|---|
| 4.15 | - | Compromising an Employee | Deny |
| 1.25 | - | Unauthorized Use Info System I | Deny |
| 4.01 | - | Disobedience of an Order I | Deny |
| 1.11 | - | Contraband II | Deny |

## Procedural Points

On August 10, 2021 the Hearings Officer granted the AIC's request for witness(es). The case was reconvened on August 31, 2021 and concluded.

Adult in Custody (AIC) received a copy of the Misconduct Report, Notice of Hearing, Notice of Rights in a Hearing and Rules of Prohibited Conduct. The AIC acknowledged understanding the Misconduct Report and Rights in a Hearing.

The Hearings Officer considered the Confidential Information provided and found it to be believable.

AIC's request for witness(es) was denied because the proffered testimony would not constitute a defense to the charges nor substantially mitigate the rule violations.

All relevant documentary evidence was considered by the Hearings Officer.

An audio recording of the incident was available and considered by the Hearings Officer.

## Finding of Fact

On December 4, 2020, an anonymous Adult in Custody (AIC) communication was received by the staff at the Oregon State Correctional Institution (OSCI) and reported to the Special Investigations Unit (SIU). The communication contained numerous allegations pertaining to Library Coordinator Pam McKinney, AIC Wilson, Mark (7449142) and unauthorized activities occurring in the library at OSCI. Inspector III Plante initiated an investigation due to the information provided.

Inspector III Plante reports conducting a search of AIC Wilson's assigned work area in the legal library on January 19, 2021. During the search Inspector III Plante found a white plastic child's toy phone. Inspector III Plante reports during an interview with Ms. McKinney, she admitted to buying the plastic child's toy phone with her own money and giving the plastic child's toy phone to AIC Wilson without Ms. McKinney's supervisor's approval.

Inspector III Plante reports reviewing Ms. McKinney's emails between January 2020 and January 2021. Inspector III Plante found hundreds of emails, both incoming and outgoing, associated with AIC Wilson in some manner that were with individuals at an outside justice resource firm, attorneys, other professionals, and other individuals. Inspector III Plante reports upon closer review of the emails discovering Ms. McKinney was sending and receiving hundreds of pages of attached documents that were sent from or to be given to AIC Wilson. Inspector III Plante reports by Ms. McKinney sending these documents for AIC Wilson this saved AIC Wilson a significant amount of money along with bypassing the Mailroom.

---

Produced by FOSSR On: 09/03/2021 09:37:30 AM                               Page 1 of 5

**Confidentiality Notice:** This document contains information belonging to the Department of Corrections. This information may be confidential, restricted, and/or legally privileged, and is intended for appropriate and approved use under existing department rules, regulations, confidentiality and security agreements. If you have received this document in error, please notify DOC immediately, keep the contents confidential, and promptly destroy the information and/or delete the document information from your computer system.

Oregon Department of Corrections
# Disciplinary Hearing
Finding of Fact, Conclusion, and Order

| | | | |
|---|---|---|---|
| **Offender Name:** | Wilson, Mark James | **Case #:** | 2103 OSCI 0056 OSCI 35 |
| **SID:** | 7449142 | **Date(s) of Hearing:** | 08/10/2021, 08/31/2021, 08/09/2021 |

### Finding of Fact

Inspector III Plante interviewed AIC Wilson. During the interview AIC Wilson admitted to receiving photographs and a video of an former AIC that was placed on a thumb drive by Ms. McKinney, which Ms. McKinney had received by email from the former AIC. AIC Wilson sent an email message to the former AIC through Ms. McKinney, which was an obituary. Also, in the interview AIC Wilson admitted to receiving two black thumb drives from Ms. McKinney that he was storing all of his legal work on. AIC Wilson stated he was planning on taking the two black thumb drives home with him when he was going to leave the institution as they were given to him by Ms. McKinney. AIC Wilson admitted to having personal photos, music and videos stored on the thumb drives AIC Wilson was to use for work as a Legal Assistant. At one point in the interview AIC Wilson stated, "McKinney's biggest sin is being overly helpful, right. I mean seriously, I mean she, she's helpful with stuff, and so, uh, it makes it easy to say hey, can we let Katie know this, and she says, yeah, fine, no problem, you know. So, you know, it speeds the process up. It's more convenient."

Confidential information was provided for the hearing.

An audio recording was provided for the hearing.

Emails were provided for the hearing.

At the hearing, AIC Wilson requested numerous staff, AICs and members of the community be called as witnesses. Most of these witnesses were denied as the proffered testimony would not constitute a defense to the charges nor substantially mitigate the rule violations. At the hearing, AIC Wilson was asked about the photographs and video of the former AIC on the thumb drive, to which AIC Wilson admitted Ms. McKinney gave to AIC Wilson and placed on the thumb drive. AIC Wilson admitted Ms. McKinney sent messages and documents through email for AIC Wilson. When asked if AIC Wilson had ever asked any other boss or staff other than Ms. McKinney to send messages or documents for AIC Wilson, AIC Wilson stated he had not. AIC Wilson also stated no other staff, other than Ms. McKinney, had ever sent messages or documents through email for AIC Wilson. When asked about the plastic child's toy phone, AIC Wilson became agitated and stated the plastic child's toy phone was a joke from Ms. McKinney.

There is a preponderance of evidence AIC Wilson engaged in a personal relationship with Ms. McKinney by accepting items that were not authorized such as a plastic child's toy phone, photographs from a former AIC, a video of a former AIC, two thumb drives, and having Ms. McKinney send and receive numerous emails on AIC Wilson's behalf.

There is a preponderance of the evidence AIC Wilson exceeded the conditions of usage of a state owned computer that are granted by the Director, functional unit manager or designee by viewing photographs of a former AIC and video of a former AIC on the state owned computer for personal use and using that computer to share the photographs and video with other AICs.

---

Produced by FOSSR On: 09/03/2021 09:37:30 AM                                   Page 2 of 5

**Confidentiality Notice: This document contains Information belonging to the Department of Corrections. This information may be confidential, restricted, and/or legally privileged, and is intended for appropriate and approved use under existing department rules, regulations, confidentiality and security agreements. If you have received this document in error, please notify DOC immediately, keep the contents confidential, and promptly destroy the Information and/or delete the document information from your computer system.**

Oregon Department of Corrections
# Disciplinary Hearing
Finding of Fact, Conclusion, and Order

| | | | |
|---|---|---|---|
| **Offender Name:** | Wilson, Mark James | **Case #:** | 2103 OSCI 0056 OSCI 35 |
| **SID:** | 7449142 | **Date(s) of Hearing:** | 08/10/2021, 08/31/2021, 08/09/2021 |

## Finding of Fact

There is preponderance of the evidence AIC Wilson was in possession of contraband that was not authorized that created a threat to the safety, security or orderly operations of the facility as AIC Wilson was in possession of an unauthorized plastic child's toy phone in AIC Wilson's work area, photographs of a former AIC on AIC Wilson's thumb drive that is to be utilized for work as the Legal Assistant, a video of a former AIC on AIC Wilson's thumb drive that is to be utilized for work as the Legal Assistant, music on the thumb drive that is to be utilized for work as the Legal Assistant.

## Ultimate Findings of Fact and Conclusions

AIC knowingly engaged an employee, public safety officer, non-employee service provider, or any person involved in DOC programs or activities in a personal relationship or business transaction, excluding AICs or visitors approved under DOC visiting rules, thereby, violating Rule 4.15, Compromising an Employee.

AIC possessed contraband that created a threat to the safety, security, or orderly operation of the facility, thereby, violating Rule 1.11.01. The contraband includes tobacco or smoking paraphernalia, unauthorized medication, items of barter, checks, money under $10, or unauthorized sexually explicit material.

On Rule 1.25, Unauthorized Use of Information Systems I, the Hearings Officer is substituting the lesser included minor rule violation of Rule 1.26, Unauthorized Use of Information Systems II.

AIC made copies, viewed video, or listened to audio files for personal use, by operating or using any information system equipment (including terminals, personal computers, tablet computers, minicomputers, work stations, controllers, printers, copiers, fax machines, or phones) that exceeded the conditions of use or access granted by the Director, functional unit manager, or designee, thereby, violating Rule 1.26.02, Unauthorized Use of Information Systems II.

Rule 4.01, Disobedience of an Order I, is dismissed. Corrective action using less formalized procedures would have been more appropriate.

## Preliminary Order

AIC has had 0 major rule violation(s) in the past two years. Rule 4.15, Compromising an Employee, is on Level 1 of the Major Violation Grid.

---

Produced by FOSSR On: 09/03/2021 09:37:30 AM                                    Page 3 of 5

**Confidentiality Notice:** This document contains information belonging to the Department of Corrections. This information may be confidential, restricted, and/or legally privileged, and is intended for appropriate and approved use under existing department rules, regulations, confidentiality and security agreements. If you have received this document in error, please notify DOC immediately, keep the contents confidential, and promptly destroy the information and/or delete this document information from your computer system.

Oregon Department of Corrections

# Disciplinary Hearing

Finding of Fact, Conclusion, and Order

| | | | |
|---|---|---|---|
| **Offender Name:** | Wilson, Mark James | **Case #:** | 2103 OSCI 0056 OSCI 35 |
| **SID:** | 7449142 | **Date(s) of Hearing:** | 08/10/2021, 08/31/2021, 08/09/2021 |

| Rule | Charge |
|---|---|
| Compromising an Employee | Violation |

| Sanctions | Begin Date | End Date | Days | Amount | Suspended Thru | Notes |
|---|---|---|---|---|---|---|
| Disciplinary Segregation | 8/31/2021 | 12/28/2021 | 120 | | | |
| suspended sanctions | | | | | 12/28/2021 | Suspend $100 Fine pending no major rule violations. |
| suspended sanctions | | | | | 12/28/2021 | Suspend 28 days Loss of Privileges pending no major rule violations. |
| Confiscate Contraband | | | 0 | | | Toy phone, thumb drives, video, photographs. |

| Rule | Charge |
|---|---|
| Unauthorized Use Info Systm II | Violation |

| Sanctions | Begin Date | End Date | Days | Amount | Suspended Thru | Notes |
|---|---|---|---|---|---|---|
| Merged per OAR 291-105-0066(8) | | | 0 | | | |

| Rule | Charge |
|---|---|
| Disobedience of an Order I | Dismissed/Less Formalized Proc |

---

**Confidentiality Notice:** This document contains information belonging to the Department of Corrections. This information may be confidential, restricted, and/or legally privileged, and is intended for appropriate and approved use under existing department rules, regulations, confidentiality and security agreements. If you have received this document in error, please notify DOC immediately, keep the contents confidential, and promptly destroy the information and/or delete the document information from your computer system.

Oregon Department of Corrections
# Disciplinary Hearing
## Finding of Fact, Conclusion, and Order

| Offender Name: | Wilson, Mark James | Case #: | 2103 OSCI 0056 OSCI 35 |
| SID: | 7449142 | Date(s) of Hearing: | 08/10/2021, 08/31/2021, 08/09/2021 |

**Rule**
Contraband II

**Charge**
Violation

| Sanctions | Begin Date | End Date | Days | Amount | Suspended Thru | Notes |
|---|---|---|---|---|---|---|
| Merged per OAR 291-105-0066(8) | | | 0 | | | |

RECEIVED

SEP 10 2021

Superintendent's Office
Oregon State Correctional Institution

| | | | |
|---|---|---|---|
| Hearing Officer: | Foss, Ronnie L | Date: | 08/31/2021 |
| Functional Unit Manager: | | Date: | 9/15/21 |
| Final Order: | ☑ Approved    ☐ Order Hearing Reopened | | ☐ Amended per below |

---

Confidentiality Notice: This document contains information belonging to the Department of Corrections. This information may be confidential, restricted, and/or legally privileged, and is intended for appropriate and approved use under existing department rules, regulations, confidentiality and security agreements. If you have received this document in error, please notify DOC immediately, keep the contents confidential, and promptly destroy the information and/or delete the document information from your computer system.

Oregon Secretary of State Administrative Rules

Home      Business      Voting      Elections      State Archives      Audits

# Department of Corrections

## Chapter 291

Division 105

PROHIBITED CONDUCT AND PROCESSING DISCIPLINARY ACTIONS

### 291-105-0005

**Authority, Purpose and Policy**

(1) Authority: The authority for this rule is granted to the Director of the Department of Corrections in accordance with ORS 179.040, 421.068, 421.180, 423.020, 423.030, and 423.075.

(2) Purpose: The purpose of this rule is to define the rules of conduct governing adults in custody and outline the procedures to be followed in processing disciplinary action(s).

(3) Policy:

(a) It is the policy of the Department of Corrections to hold adults in custody accountable for misconduct while incarcerated, and to promote and reinforce pro-social behavior by adults in custody, through a system of disciplinary rules and procedures that embrace the Oregon Accountability Model and Correctional Case Management.

(b) Adults in custody under Department of Corrections supervision shall be disciplined for violation of specified rules of prohibited conduct in accordance with the procedures set forth in these rules. The primary objectives of these rules are:

(A) To provide for the safe, secure, efficient, and orderly management of Department of Corrections facilities, the safety and security of Department employees, the public, adults in custody, and property of the Department of Corrections;

(B) To establish norms of acceptable conduct and consistent and fair procedures for the processing of misconduct reports for adults in custody

(C) To allow a range of appropriate disciplinary sanctions for violation of the rules of prohibited conduct for adults in custody; and

(D) To encourage positive behavioral change.

(c) To promote these objectives, adults in custody found in violation of the rules of prohibited conduct are issued individualized sanctions based upon the totality of the circumstances (including input from stakeholders, and the adult in custody's behavior, strengths, and needs, subject to modification upon order of the Hearings Officer and functional unit manager or designee.

(d) The Department intends that the authorization in OAR 291-105-0100 to withdraw an order and direct the disciplinary hearing to be reopened applies retroactively to disciplinary orders issued on, before, or after these rules.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 11-2011(Temp), f. & cert. ef. 6-10-11 thru 12-7-11
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 29-1986, f. & ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, ef. 4-15-86
CD 30-1985, f. & ef. 8-16-85

Declaration of Nofziger, Exhibit 2, Page 1 of 30

CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79
CD 7-1979, f. & ef. 3-14-79

### 291-105-0010
**Definitions**

(1) Adjudicator: The assigned employee within the facility responsible for the disposition of all informal hearings and minor misconduct reports that are to be adjudicated without a formal hearing.

(2) Adult in Custody (AIC): A person incarcerated or detained in a correctional facility who is accused of, convicted of or sentenced for a violation of criminal law or for the violation of the terms and conditions of pretrial release, probation, parole, post-prison supervision, or a diversion program. For the purposes of these rules, AIC includes individuals who are in the legal custody of the Department of Corrections but are temporarily outside of the physical custody of the Department of Corrections for reasons that include, but are not limited to, transport, court proceeding, medical appointments, work assignment, programs, or interstate compact. AIC also includes those who have been released onto Short-Term Transitional Leave, Non-Prison leave, or emergency leave.

(3) Attempt: Conduct that constitutes a substantial step towards the commission of a rule violation.

(4) Calendar Day: All weekdays, weekends, and holidays.

(5) Conduct Order: An Oregon Department of Corrections form that allows for various interventions to affect positive behavioral change, and without the need for a disciplinary hearing, in accordance with OAR 291-105-0021(1). Restriction of an AIC's privileges through a conduct order can be for no more than 72 hours.

(6) Conspiracy: An agreement between an AIC and one or more persons to engage in, cause, or conceal a rule violation.

(7) Contraband: Any article or thing that an AIC is prohibited by statute, rule, or order from obtaining or possessing, that the AIC is not specifically authorized to obtain or possess, or that the AIC alters without authorization.

(8) Controlled Substance: A drug or its precursor as listed in ORS 475.005 through 475.999.

(9) Dangerous or Deadly Weapon: Any instrument, article, or substance specifically designed for or readily capable of causing death or serious physical injury.

(10) Deadly Force: Physical force that, under the circumstances in which it is used, is readily capable of causing death or serious physical injury.

(11) Department of Corrections Facility: Any institution, facility, or employee office, including the grounds, operated by the Department of Corrections.

(12) Distribution: The transfer of contraband from one person to another. This term includes smuggling or the deliberate destruction of evidence.

(13) Drugs: Any controlled substance as listed in ORS 475.005 through 475.999.

(14) Electronic Communication Device: A device designed to be used for or is readily capable of being used for making or receiving wireless communication transmissions.

(15) Employee: Any person who is employed full time, part time, or under temporary employment by the Department of Corrections or Oregon Corrections Enterprises.

(16) Escape Device: Any item designed for, physically altered for, or readily capable of being used to facilitate an escape from a secure housing unit, a facility, or from custody.

(17) Facility: Any institution, facility, or employee office, including the grounds, that an AIC under the supervision of the Department of Corrections is assigned.

(18) Fine: A monetary sanction imposed in accordance with these rules (OAR 291-105.) AIC fines shall be deposited as established under ORS 421.068 as confiscated funds.

(19) Functional Unit: Any organizational component within the Department of Corrections responsible for the delivery of services or coordination of programs.

(20) Functional Unit Manager: Any person within the Department of Corrections who reports to either the Director, Deputy Director, an assistant director, or an administrator, and who has responsibility for the delivery of program services or coordination of program operations. In a correctional setting the functional unit manager is the superintendent.

(21) Good Cause: Adequate or substantial grounds or reason to take (or not take) an action prescribed by law. What constitutes good cause is usually determined on a case-by-case basis and is thus relative.

(22) Hearings Officer: A DOC employee assigned to review and adjudicate misconduct reports through a formal hearing.

(23) Intoxicant: Any substance, including but not limited to, unauthorized medication, alcoholic beverages, and inhalants, which causes a disturbance of mental or physical capacity resulting from the introduction of the substance in the body.

(24) Lesser Included Violation: Any violation which is a lesser degree of the charged violation (for example, AIC Assault III is a lesser included violation of AIC Assault II.)

(25) Local Jail: Any city or county lock-up or local correctional facility.

(26) Money: Cash, money orders, personal checks, warrants, certified checks, and other remittances.

(27) Non-Employee Service Provider (NSP): An individual who provides services or programs to the Department or to AICs, but not as a paid employee of the Department. Examples of non-employee service providers include contractors, volunteers, mentors, criminal justice partners, and government agency partners.

(28) Non-Prison Leave: A period of leave preceding an established release date granted to AICs successfully completing the institution phase of an Alternative Incarceration Program. Non-Prison Leave is designed to provide AICs with transitional opportunities that promote successful reintegration into the community and is granted in accordance with ORS 137.751, ORS 421.508, ORS 421.510 and the Department's rule on Alternative Incarceration Programs (OAR 291-062).

(29) Officer-in-Charge: That person designated by the functional unit manager to supervise the facility and make operational decisions in accordance with policy, rule, or procedure during periods when the functional unit manager is not readily available.

(30) Order: Any direction given to an AIC that directs or forbids the doing of some act over which the AIC has control. An order may be written, verbal, or gestured communication (including all Department of Corrections rules; functional unit rules, and procedures; all federal, state, and local laws; conditions of leave; and court-ordered terms and conditions).

(31) Oregon Corrections Enterprises (OCE): A semi-independent state agency established under ORS 421.344 that is a non-Department of Corrections agency or division. For purposes of this rule only, Oregon Corrections Enterprises shall not be considered an external organization.

(32) Physical Force: The use of hands, other parts of the body, objects, instruments, chemical devices, electronic devices, firearms, or other physical methods used to restrain, subdue, control, or intimidate another person, or to compel another person to act in a particular way or to stop acting in a particular way.

(33) Physical Injury: Impairment of physical condition or substantial pain. An impairment of physical condition can include, but is not limited to, an abrasion, scrape, scratch, bruise, contusion, or swelling.

(34) Possession: To have physical possession of or otherwise exercise dominion or control over property.

(35) Public Safety Officer: Corrections officers, emergency medical dispatchers, emergency medical technicians, firefighters, parole and probation officers, police officers, certified reserve officers, reserve officers, telecommunicators, and regulatory specialists.

(36) Restitution: A monetary amount ordered in accordance with these rules (OAR 291-105). Restitution funds will be credited to the institution or program suffering fiduciary loss or cost from the AIC misconduct, and shall be the actual cost incurred.

(37) Security Device: Any fixture, device, or tool, the purpose of which is to assist with safety or security.

(38) Security Threat Activity: AIC behavior that poses a significant threat to the safe and secure operation of a facility.

(39) Security Threat Group (STG): Any group of two or more individuals who:

(a) Have a common name, identifying symbol, or characteristic, which serves to distinguish themselves from others; and

(b) Have members, affiliates, or associates who individually or collectively engage, or have engaged, in a pattern of illicit activity or acts of misconduct that violate Department of Corrections rules; and

(c) Have the potential to act in concert to present a threat, or potential threat, to employees, non-employee service providers, public, visitors, AICs, or the secure and orderly operation of the institution.

(40) Serious Physical Injury: Injury that creates a substantial risk of death, causes protracted disfigurement, impairment of health, loss or impairment of any bodily organ function, or death.

Oregon Secretary of State Administrative Rules

(41) Sexual Activity: Sexual contact includes, but is not limited to: contact between the penis and the vulva or the penis and the anus, including penetration, however slight; contact between the mouth and the penis, vulva, or anus; penetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument; any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of another person or of oneself, excluding contact incidental to a physical altercation; and any other intentional touching to include kissing and fondling.

(42) Sexual Harassment: Unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature directed toward another, including, but not limited to, demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

(43) Short-Term Transitional Leave: A period of leave preceding an established release date granted in accordance with ORS 421.168 and the Department's rule on Short-Term Transitional Leave and Emergency Leaves (OAR 291-063) to AICs for transitional opportunities that promote successful reintegration into the community.

(44) Working Day: Monday through Friday, excluding Saturday, Sunday, or legal holidays.

(45) Working File: Those documents maintained in a Department of Corrections facility, Community Corrections office, or functional unit for administrative, operational, or case management purposes.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030, 423.075 & 475.005
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 14-2018, amend filed 06/07/2018, effective 06/07/2018
DOC 2-2018, temporary amend filed 04/03/2018, effective 04/03/2018 through 09/29/2018
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 16-2000, f. & cert. ef. 6-19-00
DOC 28-1999(Temp), f. & cert. ef. 12-22-99 thru 6-19-00
DOC 3-1999, f. 2-25-99, cert. ef. 3-1-99
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 38-1987, f. & ef. 10-2-87
CD 29-1986, f. & ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, ef. 4-15-86
CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79
CD 7-1979, f. & ef. 3-14-79

### 291-105-0013

**AIC Access to the Rules of Prohibited Conduct**

During the admission and orientation process, AICs will be provided with the Rules of Misconduct (291-105-0015) and Rights in Formal and Informal Hearings (291-105-0056). Spanish-speaking AICs will receive copies in Spanish; other AICs with a language barrier will receive assistance from an individual who speaks their language. AICs with a visual, speech, or hearing disability shall be provided with assistance appropriate to the degree of their disability. In addition, OAR 291-105 will be available for review in the legal library and general library of each facility. Copies also may be obtained in accordance with the Department's rules on Release of Public Records (OAR 291-037), or from the library coordinator upon request at the AIC's expense in accordance with the Department's rules on Legal Affairs (OAR 291-139).

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02

Oregon Secretary of State Administrative Rules

CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 29-1986, f. & ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, ef. 4-15-86

### 291-105-0015
**Rules of Misconduct**

(1) Violations Involving Property

(a) 1.01 Arson: An AIC commits arson when that AIC starts an unauthorized fire or causes an explosion.

(b) 1.05 Property I: An AIC commits Property I when that AIC, except as authorized by an employee, destroys, abuses, alters, damages, defaces, misuses, tampers with, or wastes materials or property, or fails to properly protect or produce issued property in a timely manner; and:

(A) 1.05.01 The State-owned or employee-owned property involved exceeds $100 in value; or

(B) 1.05.02 The misconduct involves the functioning of a security device; or

(C) 1.05.03 The misconduct involves a threat to the safety, security, or orderly operation of a facility; or

(D) 1.05.04 The misconduct includes possession of an unauthorized or altered blade, such as a razor blade or pencil sharpener.

(c) 1.06 Property II (minor violation): An AIC commits Property II when that AIC, except as authorized by an employee, destroys, alters, abuses, damages, defaces, misuses, tampers with, or wastes materials or property, or fails to properly protect or produce issued property in a timely manner.

(d) 1.10 Contraband I: An AIC commits Contraband I when that AIC:

(A) 1.10.01 Possesses any intoxicant or is intoxicated; or

(B) 1.10.02 Possesses any drug paraphernalia; or

(C) 1.10.03 Has gone through any authorized screening process such as urinalysis, breathalyzer, oral swabs, etc. and has been found to have any controlled substance or intoxicant in urine, blood, or other body parts; or

(D) 1.10.04 Fails to provide or refuses to submit an acceptable sample for testing or submits an unacceptable sample for testing; or

(E) 1.10.05 Alters, substitutes, contaminates, or destroys a urine sample; or

(F) 1.10.06 Possesses money in the amount of $10 or more (this excludes trust account funds); or

(G) 1.10.07 Possesses illegitimately obtained property or trust account funds valuing $100 or more.

(e) 1.11 Contraband II: An AIC commits Contraband II when that AIC possesses contraband, including that listed in Contraband I and Contraband III, that creates a threat to the safety, security, or orderly operation of a facility, including but not limited to:

(A) 1.11.01 Tobacco or smoking paraphernalia, unauthorized medication, items of barter, checks, money under $10, or unauthorized sexually explicit material; or

(B) 1.11.02 Items that were obtained by threats of or actual theft, forgery, or coercion.

(f) 1.12 Contraband III (minor violation): An AIC commits Contraband III when that AIC possesses contraband, including that listed in Contraband I and Contraband II, or un-cancelled stamps, expired self-medication, legal material belonging to another AIC, or property in excess of that authorized.

(g) 1.15 Drug Possession: An AIC commits Drug Possession when that AIC possesses a controlled substance.

(h) 1.20 Possession of Body Modification Paraphernalia: An AIC commits Possession of Body Modification Paraphernalia when that AIC possesses items capable of being used in body modification, including but not limited to, motors, needles, and ink.

(i) 1.25 Unauthorized Use of Information Systems I: An AIC commits Unauthorized Use of Information Systems I when that AIC operates or uses any information system equipment (including terminals, personal computers, tablet

Oregon Secretary of State Administrative Rules

computers, minicomputers, work stations, controllers, printers, copiers, fax machines, or phones) if the usage exceeds the conditions of use or access granted by the Director, functional unit manager, or designee in the following manner:

(A) 1.25.01 To send, receive, or read messages or e-mails, access the Internet, or access any employee-only programs or computer systems; or

(B) 1.25.02 To conduct illegitimate business activity; or

(C) 1.25.03 To do unauthorized legal work.

(j) 1.26 Unauthorized Use of Information Systems II: An AIC commits Unauthorized Use of Information Systems II when that AIC operates or uses any information system equipment (including terminals, personal computers, tablet computers, minicomputers, work stations, controllers, printers, copiers, fax machines, or phones) if the usage exceeds the conditions of use or access granted by the Director, functional unit manager, or designee in the following manner:

(A) 1.26.01 To prepare a letter or other unauthorized document; or

(B) 1.26.02 To make copies, view video, or listen to audio files for personal use; or

(C) 1.26.03 To use the phone, Video Interactive Phone system, or any incentive level electronic device in excess of, or outside, the parameters permitted under the Department's rules.

(2) Violations Against Persons

(a) 2.01 Staff Assault I: An AIC commits Staff Assault I when that AIC:

(A) 2.01.01 Causes physical injury to or commits a physical attack on an employee, public safety officer, or non-employee service provider; or

(B) 2.01.02 Causes bodily fluids (human or animal) to come in contact with an employee, public safety officer, or non-employee service provider; or

(C) 2.01.03 Commits a physical attack on an employee, visitor, public safety officer, or non-employee service provider and uses a dangerous or deadly weapon; or

(D) 2.01.04 Harms or endangers the well-being of an animal in the care and custody of DOC or used to conduct DOC affairs; or

(E) 2.01.05 Refuses to stop any assaultive behavior after being ordered to do so, which necessitates an employee to use physical force to stop the behavior and which results in employee injury.

(b) 2.02 Staff Assault II: An AIC commits Staff Assault II when that AIC commits a physical attack on an employee, public safety officer, non-employee service provider, or animal in the care and custody of DOC.

(c) 2.03 Assault of a Member of the Public: An AIC commits Assault of a Member of the Public when that AIC commits a physical attack, endangers the well-being of, or causes bodily fluids (human or animal) to come in contact with any person or animal who is not an employee, a non-employee service provider, AIC in the care and custody of DOC, or an animal in the care and custody of DOC.

(d) 2.05 AIC Assault I: An AIC commits AIC Assault I when that AIC:

(A) 2.05.01 Causes serious physical injury to another AIC or causes injury to another AIC that requires transporting the AIC to an outside agency for medical care; or

(B) 2.05.02 Causes physical injury to another AIC and uses a dangerous or deadly weapon; or

(C) 2.05.03 Commits a unilateral attack in a location or under circumstances that create a threat to the safety, security, or orderly operation of a facility; or

(D) 2.05.04 Refuses to stop assaultive behavior after being ordered to do so which necessitates an employee to use physical force to stop the assaultive behavior; or

(E) 2.05.05 Causes bodily fluids (human or animal) to come in contact with another AIC.

(e) 2.06 AIC Assault II: An AIC commits AIC Assault II when that AIC:

(A) 2.06.01 Commits a unilateral attack or is involved in a mutual fight that causes physical injury to another AIC; or

(B) 2.06.02 Is involved in a mutual fight in a location or under circumstances that create a threat to the safety, security, or orderly operation of a facility.

(f) 2.07 AIC Assault III: An AIC commits AIC Assault III when that AIC commits a unilateral attack or is involved in a mutual fight with another AIC.

(g) 2.10 Disrespect I: An AIC commits Disrespect I when that AIC directs hostile, sexual, abusive, or threatening language or gestures (verbal or written) toward or about another person that involves racial, religious, or sexual harassment or a physical threat to the other person.

(h) 2.11 Disrespect II: An AIC commits Disrespect II when that AIC directs hostile, sexual, abusive, or threatening language or gestures (verbal or written) toward or about another person, in a manner or circumstances that create a threat to the safety, security, or orderly operation of a facility.

(i) 2.12 Disrespect III (minor violation): An AIC commits Disrespect III when that AIC directs hostile, sexual, abusive, or threatening language or gestures (verbal or written) toward or about another person.

(j) 2.15 Extortion I: An AIC commits Extortion I when that AIC compels or induces any person, who is not an AIC, to act or refrain from acting, by threats, force, or intimidation.

(k) 2.16 Extortion II: An AIC commits Extortion II when that AIC:

(A) 2.16.01 Compels or induces another AIC to act or refrain from acting by threats, force, or intimidation; or

(B) 2.16.02 Compels or induces an employee to act, to refrain from acting, or to refrain from performing a job duty through use of demands.

(l) 2.20 Sexual Assault/Abuse: An AIC commits Sexual Assault/Abuse when that AIC engages in sexual activity and the victim does not consent, is unable to consent or refuse consent, or is coerced into such activity by expressed or implied threats of violence.

(m) 2.25 Sexual Harassment: An AIC commits Sexual Harassment when that AIC:

(A) 2.25.01 Makes repeated and unwelcomed sexual advances or requests for sexual favors, or

(B) 2.25.02 Makes repeated and unwelcomed verbal comments, gestures, or actions of a derogatory or offensive sexual nature, directed toward or about another, including demeaning references to gender; or

(C) 2.25.03 Makes repeated and unwelcomed sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

(n) 2.30 Non-Assaultive Sexual Activity: An AIC commits Non-Assaultive Sexual Activity when that AIC solicits or engages in sexual activity and the sexual activity is conducted without violence, threat of violence, coercion, or use of a weapon.

(o) 2.40 Hostage Taking: An AIC commits Hostage Taking when that AIC seizes, holds, or otherwise significantly deprives the liberty of another person.

(p) 2.45 Body Modification: An AIC commits body modification when that AIC alters or allows any person to be altered by tattooing, piercing, puncturing, scarring, etc., including modifying or perpetuating any previous modification.

(3) Violations Involving Fraud or Deception

(a) 3.01 False Information to Employees I: An AIC commits False Information to Employees I when that AIC presents or causes the presentation of false or misleading information to an employee or non-employee service provider that creates a threat to the safety, security, or orderly operation of a facility. False or misleading information shall include gestures, verbal, or written communications.

(b) 3.02 False Information to Employees II (minor violation): An AIC commits False Information to Employees II when that AIC presents or causes the presentation of false and misleading information to an employee or non-employee service provider. False or misleading information includes gestures, verbal, or written communications.

(c) 3.05 Forgery: An AIC commits Forgery when that AIC falsely makes, completes, alters, or presents a written instrument.

(d) 3.10 Gambling: An AIC commits Gambling when that AIC wagers anything of value in games of chance, possesses paraphernalia associated with gambling, or possesses the proceeds of gambling activity.

(e) 3.15 Fraud: An AIC commits fraud when that AIC deceives another person or business in order to obtain money, property, or something of value.

(4) Violations Against the Orderly Operation of the Department or a Facility:

(a) 4.01 Disobedience of an Order I: An AIC commits Disobedience of an Order I when that AIC overtly refuses to promptly or in a timely manner comply with a valid order, which creates a threat to the safety, security, or orderly operation of a facility.

(b) 4.02 Disobedience of an Order II: An AIC commits Disobedience of an Order II when that AIC fails to comply with a valid order, which creates a threat to the safety, security, or orderly operation of a facility.

Declaration of Nofziger, Exhibit 2, Page 7 of 30

(c) 4.03 Disobedience of an Order III (minor violation): An AIC commits Disobedience of an Order III when that AIC fails to comply with a valid order.

(d) 4.04 Leave Violation: An AIC commits a Leave Violation when that AIC:

(A) 4.04.01 Refuses or fails to follow a valid order or condition of Short-Term Transitional Leave.

(B) 4.04.02 Refuses or fails to follow a valid order or condition of Non-Prison Leave.

(e) 4.05 Disturbance: An AIC commits a Disturbance when that AIC advocates, incites, creates, engages in, maintains, or promotes a situation characterized by unruly, noisy, or violent conduct, or unauthorized group activity, which disrupts the orderly administration of or poses a direct threat to the security of a facility, facility programs, or the safety of an employee or another person.

(f) 4.10 Distribution I: An AIC commits Distribution I when that AIC:

(A) 4.10.01 Distributes or receives any controlled substance, intoxicant, drug paraphernalia, or money in the amount of $10 or more (not including funds maintained by DOC in an AIC trust account); or

(B) 4.10.02 Possesses any controlled substance, intoxicant, drug paraphernalia, or money in the amount of $10 or more (not including funds maintained by DOC in an AIC trust account), which have been packaged for distribution.

(g) 4.11 Distribution II: An AIC commits Distribution II when that AIC:

(A) 4.11.01 Distributes or receives contraband that creates a threat to the safety, security, and orderly operation of a facility; or

(B) 4.11.02 Possesses contraband that has been packaged for distribution and that creates a threat to the safety, security, and orderly operation of a facility; or

(C) 4.11.03 Knowingly destroys evidence to interfere with an employee's ability to identify the contraband.

(h) 4.15 Compromising an Employee: An AIC commits Compromising an Employee when that AIC knowingly engages an employee, public safety officer, non-employee service provider, or any person involved in DOC programs or activities in a personal relationship or business transaction, excluding AICs or visitors approved under DOC visiting rules.

(i) 4.20 Escape I: An AIC commits Escape I when that AIC departs without authorization from:

(A) 4.20.01 Within the security perimeter of a facility; or

(B) 4.20.02 The immediate control of an employee or public safety officer while in secure physical custody and outside a secure facility perimeter; or

(C) 4.20.03 The immediate control of a secure cell or secure housing unit.

(j) 4.21 Escape II: An AIC commits Escape II when that AIC departs without authorization from:

(A) 4.21.01 The grounds of a facility without a secure perimeter; or

(B) 4.21.02 The direct supervision of personnel authorized to supervise AICs while outside a facility secure perimeter; or

(C) 4.21.03 Short-Term Transitional Leave or Non-Prison Leave and a warrant or an order for arrest and return of the AIC has been issued.

(k) 4.25 Possession of an Escape Device: An AIC commits Possession of an Escape Device when that AIC possesses any item specifically designed for, physically altered for, or readily capable of being used to facilitate an escape from a facility or from custody.

(l) 4.30 Possession of a Weapon: An AIC commits Possession of a Weapon when that AIC possesses an instrument, article, or substance specifically designed for, physically altered for, or readily capable of causing death or serious physical injury to a person or animal.

(m) 4.33 Possession of an Electronic Device: An AIC commits Possession of an Electronic Device when that AIC possesses an unauthorized electronic communication device.

(n) 4.35 Racketeering: An AIC commits Racketeering when that AIC engages in illicit activity that is carried out for the purpose of personal or financial gain through unlawful acts.

(o) 4.40 Unauthorized Area I: An AIC commits Unauthorized Area I when that AIC fails to be present in any location designated by assignment, programmed activity, call out, or employee or non-employee service provider directive (or is in any location not designated by assignment, programmed activity, call out, or employee or non-employee service provider directive) that creates a threat to the safety, security, or orderly operation of a facility.

Declaration of Nofziger, Exhibit 2, Page 8 of 30

(p) 4.41 Unauthorized Area II (minor violation): An AIC commits Unauthorized Area II when that AIC fails to be present in any location designated by assignment, programmed activity, call out, or employee or non-employee service provider directive (or is in any location not designated by assignment, programmed activity, call out, or employee or non-employee service provider directive).

(q) 4.45 Unauthorized Organization I: An AIC commits Unauthorized Organization I when that AIC is part of a group of two or more persons (whether formal or informal), who collectively, or in concert, create or actively promote, recruit, participate in, or is involved in security threat activity.

(r) 4.46 Unauthorized Organization II: An AIC commits Unauthorized Organization II when that AIC:

(A) 4.46.01 Supports, displays, or endorses through verbal, visual, or written acts or communication any club, association, or organization that is a security threat group; or

(B) 4.46.02 Engages in a petition drive without specific authorization from the functional unit manager.

[ED. NOTE: To view attachments referenced in rule text, click here to view rule.]

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 9-2009, f. 6-24-09, cert. ef. 7-1-09
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 16-2000, f. & cert. ef. 6-19-00
DOC 28-1999(Temp), f. & cert. ef. 12-22-99 thru 6-19-00
DOC 3-1999, f. 2-25-99, cert. ef. 3-1-99
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-14-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 38-1987, f. & ef. 10-2-87
CD 29-1986, f. & ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, ef. 4-15-86
CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80, Renumbered from 291-040-0050
CD 19-1979(Temp), f. & ef. 10-19-79, Renumbered from 291-040-0050
CD 7-1979, f. & ef. 3-14-79
CD 36, f. 11-5-76, ef. 11-15-76
CD 34(Temp), f. & ef. 7-19-76
CD 33, f. 6-16-76, ef. 7-1-76
CD 12(Temp), f. & ef. 10-20-72 thru 2-16-73
CD 11(Temp), f. & ef. 10-20-72 thru 2-16-73
CD 8(Temp), f. & ef. 10-20-72 thru 2-16-73


**291-105-0021**
**Procedures for Handling Misconduct by AICs**

(1) Corrective Action: Employees shall be expected to use less formal procedures if the act or acts of misconduct do not constitute an immediate and continued threat to life, health, facility security, employee authority, or serious property damage or destruction, and in a manner that promotes and embraces the Oregon Accountability Model. Less formal corrective action may include: a reprimand, a warning, counseling, a conduct order, or as otherwise authorized by the functional unit manager, Officer-in-Charge, or designee.

(a) Employees issuing a conduct order shall promptly complete the conduct order and forward it to the Officer-in-Charge or designee for review.

(b) The Officer-in-Charge or designee shall review and approve, cancel, or modify the conduct order as soon as practicable or within four hours of it being issued. If the Officer-in-Charge or designee determines that the incident warrants a misconduct report rather than a conduct order, the Officer-in-Charge or designee will ensure the conduct order is cancelled and a misconduct report submitted. If the Officer-in-Charge or designee determines a conduct order is necessary to immediately address safety and security concerns, and a misconduct report is warranted, the misconduct report shall reflect the reason(s) for issuing both a conduct order and a misconduct report.

Declaration of Nofziger, Exhibit 2, Page 9 of 30

Oregon Secretary of State Administrative Rules

(c) The AIC shall be notified a conduct order is being issued as soon as practicable. A copy of the conduct order shall be delivered to the AIC as soon as practicable or within four hours of it being approved, cancelled, or modified.

(2) Misconduct Reports:

(a) When the behavior justifies submission of a misconduct report, the employee shall legibly print, sign, and file a misconduct report with an immediate supervisor or the Officer-in-Charge, no later than 24 hours after sufficient evidence or information is gathered, discovered, or observed to support a rule violation. Determination of the sufficiency of evidence shall be a matter of judgment for the employee submitting the report and the immediate supervisor reviewing the report. The misconduct report will reflect the reason(s) for delay of submission if submitted after the 24-hour period.

(b) The reviewing supervisor will ensure the report is accurate, appropriate, and supported by sufficient information. If not supported or appropriate, the reviewing supervisor will refer the report back to the author for additional investigation or for less formal action. The report will have a printed, legible name and signature of the author and reviewing supervisor. The reviewing supervisor or designee shall be responsible for providing the AIC with a legible copy of the misconduct report, Rules of Misconduct (291-105-0015), and the notice of hearing and rights within 24 hours of the filing of the report, unless the AIC is unavailable to be served. If the report is not served to the AIC within 24 hours, the reviewing supervisor or designee shall notify the Hearings Unit of the reason for delay, which will be made part of the record.

(c) The AIC will be allowed 24 hours, after being served the misconduct report, before a hearing is conducted to prepare a defense unless the AIC waives this right.

(d) The misconduct report shall be submitted to the Hearings Unit on an approved Department of Corrections form and shall be as specific and comprehensive as possible. Upon receipt of the misconduct report, the Hearings Unit shall note the date received on the form.

(A) The misconduct report shall include a description of any unusual relevant AIC behavior and information regarding how the employee became aware of the behavior. The report shall identify all discovered information related to the incident (including video, memos, etc.). The misconduct report must contain sufficient and complete facts to support the alleged rule violation(s), including a description of what the restitution is for and the amount of restitution to be ordered, if applicable. The misconduct report must contain sufficient information to allow the AIC to prepare a defense.

(B) Attempt or Conspiracy: If an AIC attempts to commit or enters into a conspiracy to commit an act of prohibited conduct, it shall be considered the same as if the AIC had completed or accomplished the prohibited act.

(e) The misconduct report must specifically allege all the rule violations the AIC is alleged to have violated and demonstrate conduct constituting an attempt or conspiracy.

(f) Reports from all employee and non-employee service provider witnesses shall also be submitted.

(g) When the alleged misconduct occurs while the AIC is in the temporary physical custody of a jurisdiction other than the Department of Corrections, employees from that jurisdiction may provide a written description of the misconduct to the Officer-in-Charge:

(A) On review of such written information, the Officer-in-Charge at the facility receiving the AIC back into the physical custody of the Department may determine that the described action violates a rule or rules of prohibited conduct and direct that an employee submit a conduct order, misconduct report, or both.

(B) The written description provided by the temporary custody jurisdiction shall accompany the misconduct report. A misconduct report shall not be submitted absent a written description of the allegation from the temporary physical custody jurisdiction.

(C) If it is determined that the other jurisdiction maintained the AIC in a similarly restrictive status, the AIC shall receive credit for the number of days held in segregation type status by the other jurisdiction.

(3) Placement on Disciplinary Segregation Status: An AIC charged with committing a rule violation may be placed on disciplinary segregation status pending resolution of the charge through a formal hearing. This action will be taken when the functional unit manager or designee or the Officer-in-Charge determines that the alleged rule violation or violations are of such seriousness that the security of a facility is at risk and requires immediate removal of the AIC from the general population, or determines that the AIC is a threat to the community, or determines that the AIC is likely to escape or abscond.

(a) If disciplinary segregation status is ordered, the Officer-in-Charge must document specifying the reason(s) why immediate disciplinary segregation of the AIC was deemed necessary.

(b) A completed copy of the Department of Corrections misconduct report will be forwarded to the functional unit manager or designee who will review the AIC's pre-hearing disciplinary segregation placement within 72 hours of the AIC's placement on disciplinary segregation status. If approved, the functional unit manager or designee will initial the report. If the AIC is temporarily confined in a local jail while on Short-Term Transitional Leave, Non-Prison Leave, or

Declaration of Nofziger, Exhibit 2, Page 10 of 30

Emergency Leave, the functional unit manager or designee will be notified for review of the AIC's status, within 72 hours of the AIC's confinement or as soon as practicable after the AIC's confinement.

(4) Scheduling a Hearing:

(a) An AIC charged with a rule violation through a misconduct report shall be scheduled for a hearing as soon as practicable.

(b) If the AIC is transferred to another facility before the hearing is complete, the misconduct report shall be forwarded to the other facility for processing.

(5) Initiating a Hearing: A hearing will be considered initiated when the misconduct report has been received by the Hearings Unit, numbered, and scheduled.

(a) A hearing shall be initiated and conducted within ten calendar days if the AIC is placed on disciplinary segregation status pending a formal hearing. For significant delays, the reasons for the delay shall be made part of the hearing record.

(b) All other hearings shall be initiated and conducted as soon as practicable. For significant delays, reasons for longer timeframes shall be made part of the hearing record.

(c) When an AIC charged with violating any level I rule, Escape II, Short-Term Transitional Leave, or Non-Prison Leave is released from custody prior to a hearing being held, a hearing will be initiated as soon as practicable upon return to DOC custody.

(d) The hearing may be postponed or continued for a reasonable period for good cause as provided in OAR 291-105-0064. The reason(s) for the postponement or continuance shall be made part of the record.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 16-2000, f. & cert. ef. 6-19-00
DOC 28-1999(Temp), f. & cert. ef. 12-22-99 thru 6-19-00
DOC 3-1999, f. 2-25-99, cert. ef. 3-1-99
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 38-1987, f. & ef. 10-2-87
CD 29-1986, f. & ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, ef. 4-15-86
CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79

### 291-105-0026
**Hearings Officers Responsibilities**

(1) Unless waived by the AIC, a formal hearing shall be conducted by the Hearings Officer on all misconduct reports charging a major rule violation(s), and included minor violation(s), and on all misconduct reports charging a minor rule violation(s) for which an AIC requests a formal hearing. Requests for a formal hearing for a misconduct report charging a minor rule violation(s) should be submitted to the adjudicator in writing in advance of the informal hearing or made verbally prior to the start of the informal hearing at the latest.

(2) Prior to the formal hearing, the Hearings Officer shall review the misconduct report alleging major rule violation(s). If there is no prima facie case for a major rule violation, the Hearings Officer may dismiss the major violation(s) and refer the minor violations back to the adjudicator for an informal hearing. The Hearings Officer may substitute minor violations as lesser-included violations.

(3) The Hearings Officer shall not have been a witness to the event or alleged conduct that gives rise to the misconduct report or have participated in the case as a charging or investigating officer.

Declaration of Nofziger, Exhibit 2, Page 11 of 30

Oregon Secretary of State Administrative Rules

(4) The Hearings Officer will conduct the hearing and shall decide, based upon the evidence, whether the AIC has violated the rule(s) as charged in the misconduct report. The Hearings Officer may not add or change the violation(s) in the misconduct report. The Hearings Officer may find for a lesser-included violation or refer for less formal disciplinary action.

(5) The Hearings Officer may dismiss any alleged rule violation at any stage of the proceedings, with or without prejudice, stating in writing the reason for the dismissal. Any alleged rule violation dismissed without prejudice or due to insufficient evidence may be resubmitted in another misconduct report utilizing the same process as provided in OAR 291-105-0021(2).

(6) The Hearings Officer or other employees as requested by the Hearings Officer shall report disciplinary actions which involve security's threat activity to the facility's Officer-in-Charge or security threat manager and a Suspected Security Threat Intelligence Report (SSTIR) shall be completed.

(7) Behavioral Health Services will be notified when an AIC receives a misconduct report or is placed in disciplinary segregation if that AIC has a mental health concern or intellectual disability that makes the AIC eligible to receive services (coded as MH2, MH3, DD2, or DD3) or if that AIC has engaged in self-harm activity or a suicide attempt.

(a) Behavioral Health Services will then determine whether an evaluation shall be submitted to the Hearings Unit in the institution housing the AIC.

(b) If an evaluation is to be provided, Behavioral Health Services will submit the evaluation to the Hearings Unit within two working days of receiving notification or submit a postponement request to complete the evaluation. Behavioral Health Services will include the timeline for submission of the postponed evaluation.

(c) The Hearings Officer will postpone the hearing, as requested, to ensure that such an evaluation is considered in the case at issue.

(d) The evaluation shall address the following questions:

(A) Did this AIC's actions constitute an act of self-harm?

(B) Does this AIC have a Serious Mental Illness? and

(C) Does the AIC have significant functional impairments?

(8) If an evaluation is not provided by Behavioral Health Services prior to the AIC's hearing, the Hearings Officer may request an evaluation be completed on the AIC prior to disposition of the hearing.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 16-2000, f. & cert. ef. 6-19-00
DOC 3-1999, f. 2-25-99, cert. ef. 3-1-99
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 29-1987, f. & ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, ef. 4-15-86
CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79


**291-105-0028**
**Conduct of Formal Hearings**

(1) Unless waived by the AIC, a formal hearing shall be conducted by the Hearings Officer on all misconduct reports charging any major rule violation (and any included minor violation), on all misconduct reports charging a minor rule violation(s) for which an AIC requests a formal hearing, and on all misconduct reports referred by the adjudicator for a formal hearing in accordance with OAR 291-105-0041(6).

(2) The findings must be on the merits. Technical and clerical errors in the writing or processing of the misconduct report should not be grounds for dismissal, unless there is substantial prejudice to the AIC.

(3) Standard of Proof: Rule violation(s) shall be found upon proof by a preponderance of the evidence. The term "preponderance of the evidence" means the greater weight of evidence, not necessarily established by the amount of evidence or number of witnesses, but by that evidence that has the most convincing force.

(4) The Hearings Officer shall consider such evidence as would be considered by a reasonable person in the conduct of their serious affairs.

(5) Once the formal hearing has begun, if the Hearings Officer determines that the violations are not supported by the facts as written in the misconduct report, the Hearings Officer may substitute a lesser included violation or refer back to the author for less formalized discipline.

(6) At the hearing, the AIC will be allowed to exercise rights as allowed in OAR 291-105-0056.

(7) The Hearings Officer may pose questions during the hearing.

(8) An investigation shall be conducted in a formal hearing upon the AIC's request if the information sought, when viewed in a light most favorable to the AIC, and with all reasonable inferences drawn in the favor of the AIC, would constitute a defense to the charge or substantially mitigate the violation. The information sought must be within the ability of the facility to procure. If a request for investigation is denied, the reason(s) for denial shall be made a part of the record.

(9) Testimony of Witnesses:

(a) The Hearings Officer shall direct the scheduling and taking of testimony of witnesses at the hearing. Witnesses may include AICs, employees, or other persons. Testimony may be taken in person, by telephone, or by written report or statement.

(b) The AIC may request that the Hearings Officer schedule witnesses to present testimony at the hearing. The request should be submitted to the Hearings Officer in writing in advance of the hearing and include a list of all persons the AIC requests be called to testify, and the questions sought to be posed to each person. Requests for witnesses must minimally be made to the Hearings Officer at the time of the hearing. The AIC must provide sufficient evidence for the Hearings Officer to conclude that the results of the testimony provided by witnesses will either constitute a defense to the alleged violation(s) or substantially lessen the severity of the violation(s). The Hearings Officer shall arrange for the taking of testimony from such witnesses as properly requested by the AIC, subject to the exclusions and restrictions provided in these rules. Requests for witnesses made or received after a hearing is decided will not be considered.

(c) The AIC shall not directly pose questions to any witness.

(d) The Hearings Officer may limit testimony when it is cumulative or irrelevant.

(e) The Hearings Officer may exclude a specific witness upon finding that the witness' testimony, together with all reasonable inferences to be drawn from that testimony, would not constitute a defense to the charge, would not substantially mitigate the violation, or would not assist the Hearings Officer in the resolution of the disciplinary action. The Hearings Officer may exclude a specific witness upon finding that the appearance of the witness at the hearing would present an immediate undue risk to the safe, secure, or orderly operation of the facility, specifically including the safety and security of employees and AICs. If a witness is excluded, the reason(s) shall be made a part of the record.

(f) The Hearings Officer may call witnesses to testify as deemed necessary.

(g) Persons requested as witnesses, other than employees, may refuse to testify.

(h) All questions that may assist in eliciting evidence that would constitute a defense to the alleged rule violation(s) or substantially mitigate the violation(s) shall be posed. The reason for not posing a question will be made part of the record.

(i) Confidential Informants:

(A) When confidential informant testimony is submitted to the Hearings Officer, the identity of the informant and the verbatim statement of the informant shall be submitted to the Hearings Officer in writing using an approved Department of Corrections form but shall remain confidential in accordance with OAR 291-105-0036(3).

(B) Information must be submitted supporting the informant is a person who can be believed or that the information provided is believable in order for the Hearings Officer to rely on the testimony of the confidential informant.

(10) Documents and Physical Evidence:

(a) An AIC participating in a formal disciplinary hearing may present documents and physical evidence during the hearing, subject to the exclusions and restrictions provided in these rules. Any evidence submitted by the AIC will be added to the record and will not be returned or photocopied for the AIC by the Hearings Officer. In instances where the

Declaration of Nofziger, Exhibit 2, Page 13 of 30

Oregon Secretary of State Administrative Rules

AIC does not have the ability to procure the evidence (for example, obtaining surveillance video footage), the Hearings Officer may assist.

(b) Any person who is knowledgeable of any rule violation charged in the misconduct report(s) may submit documents and physical evidence in advance of or during the hearing.

(c) The Hearings Officer may exclude documents and physical evidence upon finding that such evidence would not assist the Hearings Officer in the resolution of the disciplinary action or that such evidence would present an undue risk to the safe, secure, or orderly operation of a facility, specifically including the safety and security of employees and AICs. The reason(s) for exclusion shall be made a part of the record.

(d) The Hearings Officer shall classify documents and physical evidence as confidential upon finding that disclosure would present an undue risk to the safe, secure, or orderly operation of any facility, specifically including the safety and security of employees and AICs, or that disclosure would interfere with an ongoing official investigation. The reason(s) for classifying documents and physical evidence as confidential shall be made a part of the record. Documents and physical evidence classified as confidential by the Hearings Officer shall not be shown or otherwise provided to the AIC.

(e) The Hearings Officer may show to the AIC or read into the record any evidence submitted. However, the Hearings Officer will not provide copies of the evidence to the AIC. AICs may request and obtain copies of nonexempt records in accordance with the Department's rule on Release of Public Records (OAR 291-037).

(11) The Hearings Officer shall determine whether any rule violations occurred.

(a) The Hearings Officer may postpone the rendering of a decision for a reasonable period of time, not to exceed seven working days, for the purpose of reviewing the evidence to determine if there is a violation(s). The decision will be based solely upon information obtained in the hearings process, including employee reports, the statements of the AIC charged, and evidence derived from witnesses and documents.

(b) Attempt and Conspiracy: An AIC who attempts or conspires to commit a rule violation shall be found in violation of the rule and shall be subject to appropriate sanctions on the same basis as if the AIC had committed the rule violation.

(12) At the formal hearing the Hearings Officer shall decide:

(a) No Violation: The Hearings Officer may find that the AIC did not commit the violation(s) charged, in which case the AIC may be restored to similar status and privileges as before being charged, as allowed by other rules, policies, etc.

(b) Violation: The Hearings Officer may find that the AIC committed the violation(s) charged, in which case, the Hearings Officer will so inform the AIC.

(c) Dismissal: The Hearings Officer may dismiss the alleged rule violation(s) if:

(A) There is insufficient evidence to support the alleged violation(s); or

(B) Corrective action using less formalized procedures would be more appropriate. The Hearings Officer may refer back to the author for less formalized discipline; or

(C) The AIC is released from custody.

(d) Violation Not Responsible: An AIC is deemed not to be responsible for their actions.

(e) Violation of Leave: When conduct constitutes a violation of the AIC's condition(s) of Short-Term Transitional Leave or Non-Prison Leave, the Hearings Officer may also recommend retraction of earned time, statutory good time, or extra good time credits in accordance with the rule on Prison Term Modification (OAR 291-097).

(13) If no violation is found or all of the alleged rule violation(s) are dismissed on the misconduct report(s), the report(s) shall not be placed in the AIC's institution file but may be retained for statistical or litigation purposes in the Hearings records.

(14) Upon the finding of violation(s) by the Hearings Officer, the Hearings Officer:

(a) Shall determine the location of the violation(s) on the major or minor grids (Exhibits 1 and 2).

(b) Shall determine the AIC's prior misconduct history as recorded on the Disciplinary Misconduct System. Evidence of the AIC's prior misconduct history shall be placed in the record either orally or in writing.

(d) Shall impose appropriate sanctions in accordance with the major or minor grids (Exhibits 1 and 2).

(e) Determine if a deviation (upward or downward) is appropriate. The Hearings Officer shall document in writing the substantial reasons for the deviation in accordance with OAR 291-105-0072.

(f) Determine if consecutive sanctions are appropriate for separate rule violations arising from a single misconduct report. The Hearings Officer must document in writing the substantial reasons for consecutive sanctions, in accordance with OAR 291-105-0066(4)(b).

(15) The Hearings Officer may also consider imposing the additional sanctions that are available. (OAR 291-105-0069).

(16) The Hearings Officer may suspend imposition of any or all of the imposed disciplinary sanctions, informing the AIC of expected conduct to avoid imposition and the length of time for which the sanction will be suspended.

(17) The Hearings Officer may impose any or all sanctions previously suspended after finding that the AIC has failed to comply with the conditions of the suspension.

(18) At the conclusion if the hearing, the AIC shall be informed of the rule violations the Hearings Officer found the AIC committed and any sanctions imposed.

(19) A verbatim record of the hearing shall be made. A written record will be made of the decision and the supporting reasons.

[ED. NOTE: To view attachments referenced in rule text, click here to view rule.]

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 19-2001(Temp), f. & cert. ef. 12-3-01 thru 6-1-02
DOC 16-2000, f. & cert. ef. 6-19-00
DOC 28-1999(Temp), f. & cert. ef. 12-22-99 thru 6-19-00
DOC 3-1999, f. 2-25-99, cert. ef. 3-1-99
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 38-1987, f. & cert. ef. 10-2-87
CD 29-1986, f. cert. ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, cert. ef. 4-15-86
CD 30-1985, f. & cert. ef. 8-16-85
CD 8-1985(Temp), f. & cert. ef. 6-19-85
CD 25-1982, f. & cert. ef. 11-19-82
Formerly Exhibit 2 to OAR 291-105-026


**291-105-0031**
**Processing of the Formal Record**

(1) Within ten working days following the conclusion of the hearing, the Hearings Officer shall prepare and deliver to the functional unit manager or designee a preliminary order containing the Hearings Officer's finding of fact and conclusions of law and recommendations for review.

(2) The Hearings Officer may issue an amended order for restitution purposes. In all such instances, the Hearings Officer shall convene or reconvene a hearing with the AIC regarding the restitution issue(s), in accordance with the provision of OAR 291-105-0028 and 291-105-0056. In such cases the AIC shall be provided a Notice of Hearing in accordance with OAR 291-105-0056(3), a brief written description of what the restitution is for, and the amount of restitution to be ordered.

(3) Upon receipt of the preliminary order, the functional unit manager or designee shall note the date received on the order. Within five working days after receipt of the preliminary order, the functional unit manager or designee shall do one of the following:

(a) Approve and sign the preliminary order without amendment, upon which the preliminary order becomes the Final Order; or

(b) Issue an amended order dismissing the misconduct report(s) or changing the disciplinary sanction(s) (or their imposition) in the preliminary order, for one or more of the reasons specified in OAR 291-105-0031(5), upon which the amended order becomes the Final Order; or

(c) Order the Hearings Officer to reopen the hearing to receive and consider additional evidence not submitted in the original hearing, and to issue an amended preliminary order after consideration of the additional evidence.

Oregon Secretary of State Administrative Rules

(4) If the functional unit manager or designee fails to act on the preliminary order within seven working days following its receipt, the preliminary order shall become the Final Order.

(5) Grounds for Issuance of Amended Orders: The functional unit manager or designee may issue an amended order for one or more of the following reasons:

(a) The evidence in the record is insufficient to support the violation(s) found, in which case the functional unit manager or designee may find a violation of a lesser included violation or order the dismissal of the misconduct report(s);

(b) The sanction(s) imposed by the Hearings Officer was not within the range of sanction(s) in the correct box on the grid, in which case the functional unit manager or designee may impose appropriate sanction(s) from the correct grid box;

(c) The deviation ordered by the Hearings Officer was not supported by written substantial reasons, in which case the functional unit manager or designee may impose the appropriate sanctions without the deviation or order the deviation upon written substantial reasons found by the functional unit manager or designee;

(d) The deviation ordered by the Hearings Officer included a segregation sanction in excess of 50%, in which case the functional unit manager or designee shall impose a sanction that does not exceed 50%;

(e) The consecutive segregation sanctions imposed by the Hearings Officer for multiple rule violations from the same misconduct report were not supported by written reasons, in which case the functional unit manager or designee may impose the segregation sanctions served concurrently or order the segregation sanctions served consecutively upon written reasons;

(f) To order a deviation not ordered by the Hearings Officer upon written substantial reasons found by the functional unit manager or designee;

(g) To impose mandatory consecutive sanction(s) not imposed by the Hearings Officer for multiple rule violations from two or more misconduct reports;

(h) To impose consecutive sanctions not imposed by the Hearings Officer for multiple rule violations from the same misconduct report, upon written reasons;

(i) To suspend imposition of any or all sanction(s) imposed by the Hearings Officer, informing the AIC of expected conduct to avoid imposition of the sanction(s);

(j) To impose any or all sanctions ordered suspended by the Hearings Officer. The reasons for imposing the previously suspended sanctions shall be explained in writing in the order.

(k) To amend sanction(s) imposed or to impose sanction(s) not imposed by the Hearings Officer, within the range of sanctions listed in the appropriate grid box and OAR 291-105-0066(2), OAR 291-105-0069 or OAR 291-105-0071.

(6) Within seven working days after the Final Order is signed by the functional unit manager or designee or after a preliminary order becomes the Final Order under OAR 291-105-0031(3) and (4), a copy of the Final Order shall be sent to the AIC.

(7) Clerical errors on the written Finding of Fact, Conclusion, and Order may be rectified by correcting that document to accurately reflect the results of the hearing, without actually reconvening the hearing. The AIC shall be notified in writing of such corrections.

(8) The record of the hearing and all supporting documents shall be maintained in the Hearings Unit's records as per retention schedules. A copy of the misconduct report(s) and the Final Order (Findings of Fact, Conclusions, and Order) shall be permanently retained in the AIC's institution file, except in those instances where all major charges have been reduced to minor violations or dismissed by the Hearings Officer.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 3-1999, f. 2-25-99, cert. ef. 3-1-99
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 29-1986, f. & ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, ef. 4-15-86

CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79

## 291-105-0036
**Preparation of the Formal Record**

(1) The record of the formal hearing shall include:

(a) The misconduct report(s);

(b) The Notice of Hearing/Rights;

(c) Supporting material;

(d) The Final Order (Findings of Fact, Conclusions, and Order) issued by the Hearings Officer and the functional unit manager or designee.

(2) A recording of the hearing shall not be a part of the record; however, it shall be prepared and provided to the Inspector General, Attorney General, or their designees or to the court, upon request. A copy of the recording of the hearing shall not be provided directly to the AIC by the Hearings Office.

(3) Information received that is determined to be confidential shall be clearly labeled "confidential" and shall not be shared with or provided to AICs.

(a) Confidential information may be summarized for the AIC at the time of the hearing, without releasing the confidential information verbatim or the name of a confidential informant.

(b) Confidential information may be shared with the functional unit manager or designee. Confidential information may also be shared with Department employees, the Attorney General, or the courts with approval of the Inspector General or the Assistant Inspector General(s). Employee requests for confidential information shall be approved by the functional unit manager prior to being forwarded to the Inspector General or the Assistant Inspector General(s).

(c) Such confidential information shall be archived in a secure area as determined by the Inspector General or Assistant Inspector General(s).

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 421.185, 421.190, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, cert. ef. 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 11-1988, f. & cert. ef. 8-19-88
CD 38-1987, f. & cert. ef. 10-2-87
CD 32-1987(Temp), f. & cert. ef. 8-5-87
CD 29-1986, f. & cert. cert. ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, cert. ef. 4-15-86
CD 30-1985, f. & cert. ef. 8-16-85
CD 25-1982, f. & cert. ef. 11-19-82
CD 13-1980, f. & cert. ef. 4-15-80
CD 19-1979(Temp), f. & cert. ef. 10-19-79

## 291-105-0041
**Adjudicator Responsibilities**

(1) An adjudicator shall be appointed by the functional unit manager in each Department of Corrections facility.

(2) The adjudicator will receive all minor misconduct reports, once they have been entered into the disciplinary system and assigned a case number. The adjudicator shall conduct an informal hearing on minor misconduct reports in accordance with OAR 291-105-0046.

(3) The adjudicator shall not have been a witness of or participated in the event in any manner.

Oregon Secretary of State Administrative Rules

(4) The adjudicator shall conduct the informal hearing and decide whether the AIC has violated the rule(s) as charged. The adjudicator may not add or change the violations in the misconduct report.

(5) The adjudicator may dismiss the misconduct report(s) at any stage of the proceedings, with or without prejudice, stating in writing the reason for the dismissal. A new misconduct report may be resubmitted utilizing the same process as provided in OAR 291-105-0021(2) if dismissed without prejudice or dismissed for insufficient evidence.

(6) The adjudicator may decline to conduct an informal hearing and refer the case to the Hearings Officer for a formal hearing when the AIC's mental competency is an issue.

(7) Requests for a formal hearing for a misconduct report charging a minor rule violation(s) should be submitted to the adjudicator in writing in advance of the informal hearing or made verbally prior to the start of the informal hearing at the latest.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 16-2000, f. & cert. ef. 6-19-00
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 29-1986, f. & ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, ef. 4-15-86
CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79

### 291-105-0046
**Conduct of the Informal Hearings**

(1) An informal hearing shall be conducted by the adjudicator on all misconduct report(s) that do not charge a major violation(s), unless the AIC requests a formal hearing in writing on the Notice of Hearing/Rights form or verbally prior to the start of the informal hearing.

(2) Findings by the adjudicator must be on the merits. Technical and clerical errors in the writing or processing of the misconduct report shall not be grounds for dismissal.

(3) The adjudicator shall consider such evidence as would be considered by a reasonable person in the conduct of their serious affairs.

(4) Standard of Proof: Rule violation(s) shall be found upon proof by a preponderance of the evidence. The term preponderance of the evidence means the greater weight of evidence, not necessarily established by the amount of evidence or number of witnesses, but by that evidence that has the most convincing force.

(5) The AIC shall be given the opportunity to provide testimony, to submit evidence, or to waive the right to participate in the hearing as set forth in OAR 291-105-0056. AICs shall not be permitted to call witnesses in an informal hearing.

(6) Assistance by an employee, AIC, or other person approved by the adjudicator will be utilized in cases where it is found that assistance is necessary based upon language barriers or capacity of the AIC.

(7) The adjudicator may pose questions during the hearing.

(8) Documents and Physical Evidence:

(a) An AIC participating in an informal disciplinary hearing may present documents and physical evidence during the hearing, subject to the exclusions and restrictions provided in these rules.

(b) Any person who is knowledgeable of the rule violation(s) charged in the misconduct report(s) may submit documents and physical evidence in advance of or during the hearing.

(c) The adjudicator may exclude documents and physical evidence upon finding that such evidence would not assist in the resolution of the disciplinary action or that such evidence would present an undue risk to the safe, secure, or orderly operation of a facility, specifically including the safety and security of employees and AICs. The reason(s) for exclusion shall be made a part of the record.

(d) The adjudicator may classify documents and physical evidence as confidential (and not disclose such evidence to the AIC) upon finding that disclosure would present an undue risk to the safe, secure, or orderly operation of a facility, specifically including the safety and security of employees and AICs or that disclosure would interfere with an ongoing official investigation or criminal prosecution. The reason(s) for classifying documents and physical evidence as confidential shall be made a part of the record.

(9) At the informal hearing the adjudicator shall decide:

(a) No Violation: The adjudicator may find that the AIC did not commit the violation charged, in which case the AIC may be restored to the same status and privileges as before being charged as allowed by other rules, policies, etc.

(b) Violation: The adjudicator may find that the AIC did commit the violation charged, in which case, the adjudicator will so inform the AIC.

(c) Dismissal: The adjudicator may dismiss the alleged rule violation(s) without entering a finding if:

(A) There is insufficient evidence to support the alleged violation(s); or

(B) Corrective action using less formalized procedures would be more appropriate; or

(C) The AIC is released from custody.

(10) At the conclusion of the hearing the AIC shall be informed of the finding and any sanctions imposed.

(11) If the AIC is found in violation, the record of the decision shall be retained in the Hearings Unit records as per retention schedules.

(12) Upon finding that a violation occurred as charged, the adjudicator shall impose sanctions within the appropriate range of the minor disciplinary grid (Exhibit 2).

(13) The adjudicator may also consider imposing the additional sanctions that are available per OAR 291-105-0071.

(14) The adjudicator may suspend imposition of any or all of the ordered disciplinary sanctions, informing the AIC of expected future conduct to avoid imposition and the length of time for which the sanction will be suspended.

(15) The adjudicator may impose any or all sanctions previously suspended after finding that the rule violation in question was also a violation of the conditions of the suspension.

(16) The adjudicator may give a verbal warning and reprimand in lieu of sanctions on the minor grid, informing the AIC of expected future conduct.

(17) No verbatim recording of the hearing shall be made.

[ED. NOTE: To view attachments referenced in rule text, click here to view rule.]

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 421.185, 421.190, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 16-2000, f. & cert. ef. 6-19-00
DOC 28-1999(Temp), f. & cert. ef. 12-22-99 thru 6-19-00
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 30-1985, f. & ef. 8-16-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79


**291-105-0056**
**AIC Rights in Formal and Informal Hearings**

Oregon Secretary of State Administrative Rules

(1) Hearing: The AIC shall be entitled to a hearing whenever a misconduct report has been filed. An AIC receiving a minor misconduct report shall not receive a formal hearing, unless specifically requested.

(2) Waiver of Hearing:

(a) The AIC may waive the right to a hearing. Waiver of the right must be made in writing, verbally, or through behavior and must be documented on the record. An AIC's refusal to attend the hearing will constitute a waiver.

(b) If the AIC waives the right to a hearing, the case will be reviewed on its merits by the Hearings Officer or adjudicator in accordance with the procedures outlined in these rules.

(3) Notice of Hearing:

(a) The AIC shall be given written notice of the hearing no less than 24 hours prior to the hearing, unless the AIC consents to holding the hearing sooner.

(b) The notice shall include a statement of the AIC's rights with respect to the hearing.

(4) Representation:

(a) In all cases, the AIC shall be entitled to:

(A) Provide a defense through written or oral testimony.

(B) Be present at all evidentiary stages of the hearing process, except when the Hearings Officer or adjudicator finds that to have the charged AIC present would constitute an immediate threat to facility security or the AIC's behavior during the hearing warrants exclusion. The reason(s) for the finding shall be part of the record.

(C) AICs shall be excluded during the testimony of any witness whose testimony must be given in confidence. The reasons for the AIC's absence or exclusion shall be made part of the record.

(b) Assistance by an employee, AIC, or other person approved by the Hearings Officer or adjudicator will be ordered in cases where it is found that assistance is necessary based upon language barriers or capacity to prepare a defense, to understand the charge, or surrounding facts, and rights available to the AIC.

(5) AICs shall be allowed to submit evidence, except when the Hearings Officer or adjudicator finds that to have the evidence present would constitute an immediate threat to a facility or not assist in the resolution of the hearing, as provided in OAR 291-105-0028 or OAR 291-105-0046.


**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** 421.180, 423.020, 423.030, 423.075, ORS 179.040 & 421.068
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 16-2000, f. & cert. ef. 6-19-00
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79


### 291-105-0058

**Investigations in Formal and Informal Hearings**

(1) The Hearings Officer or adjudicator may order an investigation.

(2) The investigator shall not have been a witness to the event or have participated in the case as a charging officer.

(3) The Hearings Officer or adjudicator shall disclose the results of the investigation to the AIC unless disclosure of the investigative results would constitute a threat to the safety, security, or orderly operation of a facility. The reason(s) for nondisclosure shall be made a part of the record. The Hearings Officer or adjudicator shall not provide the AIC with copies of supplemental documents that comprise the case against the AIC.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.180, 423.020, 423.030 & 423.075
**History:**

DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 38-1987, f. & cert. ef. 10-2-87
CD 30-1985, f. & cert. ef. 8-16-85
CD 8-1985(Temp), f. & cert. ef. 6-19-85
CD 25-1982, f. & cert. ef. 11-19-82
CD 13-1980, f. & cert. ef. 4-15-80
CD 19-1979(Temp), f. & cert. ef. 10-19-79


**291-105-0064**

**Postponements and Continuances of Hearings**

(1) A hearing may be postponed or continued by the Hearings Officer or the adjudicator for a reasonable period of time for good cause.

(2) "Good cause" includes, but is not limited to:

(a) Preparation of defense; or

(b) Illness or unavailability of the AIC charged; or

(c) Gathering of additional evidence (for example, calling of witnesses, gathering of witness statements, investigation, acquisition of physical evidence); or

(d) Avoiding interference with an ongoing police investigation or pending prosecution; or

(e) Determination of appropriate sanctions.

(3) The reason for the postponement in a formal hearing shall be made part of the record.

(4) If an AIC has been placed on disciplinary segregation status pending a hearing and a continuance or postponement is ordered on the motion of the Hearings Officer, the Hearings Officer shall consider retention of the AIC on disciplinary segregation status and:

(a) Determine that the AIC no longer presents a threat to security and recommend to the functional unit manager or designee of the facility where the AIC is on disciplinary segregation status, that the AIC be released from disciplinary segregation status pending conclusion of the hearing; or

(b) Determine that the rule violation(s) alleged is so serious that, if proven, the AIC would present an immediate and continuing threat to the safety, security, or orderly operation of the facility. The Hearings Officer will recommend to the functional unit manager or designee of the facility where the AIC is on disciplinary segregation status that the AIC be retained on disciplinary segregation status. The written approval of the functional unit manager or designee of the facility where the AIC is on disciplinary segregation status shall be made a part of the record. The AIC may be retained on disciplinary segregation status for a period no longer than allowed for the alleged rule violation(s). In no case shall an AIC be retained on disciplinary segregation status for a period in excess of 180 consecutive days.

(5) If an AIC has been placed on disciplinary segregation status pending a hearing and a continuance or postponement is requested by the AIC, the Hearings Officer shall not consider retention of the AIC on disciplinary segregation status; the AIC will be retained on disciplinary segregation status. The AIC will be retained on disciplinary segregation status for a period no longer than allowed for the alleged rule violation(s). The AIC may not be retained on disciplinary segregation status under this provision for more than 180 days.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 38-1987, f. & ef. 10-2-87
CD 29-1986, f. & ef. 8-20-86
CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82

CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79

### 291-105-0066

**Principles of Application of Disciplinary Sanctions**

(1) A single act of misconduct may violate more than one misconduct rule.

(2) Loss of Privilege: If the AIC's misconduct involves the abuse or misuse of a specific privilege (for example: recreation yard, canteen, etc.), the Hearings Officer or adjudicator may order a loss of that specific privilege and may increase the loss of that specific privilege sanction up to twice the amount listed in the appropriate grid box.

(3) If an AIC receives a conduct order and a misconduct report that results in a recommended loss of privileges sanction, the AIC will receive credit for the length of the conduct order toward the loss of privilege sanction.

(4) If an AIC is placed in disciplinary segregation pending a misconduct report and the formal hearing results in a recommended disciplinary segregation sanction, the AIC will receive credit for the length of time in disciplinary segregation awaiting the hearing toward the recommended disciplinary segregation sanction.

(5) For rule violations arising from separate misconduct reports, disciplinary segregation sanctions shall be served consecutively, up to 180 days.

(6) For rule violations arising from the same misconduct report:

(a) Concurrent disciplinary segregation sanctions may be imposed by the Hearings Officer or functional unit manager or designee, up to 180 days. The AIC shall be ordered to only serve the sanction for the most serious violation in the misconduct report.

(b) Consecutive sanctions may be imposed by the Hearings Officer or functional unit manager or designee. The reasons for consecutive sanctions shall be supported by written substantial reasons outlining the factor(s) supporting the consecutive sanctions. No aspect of the misconduct that serves as a necessary element of misconduct may be used as an aggravating factor if that factor is also used to impose discipline.

(7) The Department's rule on Prohibited Rules of Conduct and Processing Disciplinary Actions for Adults in Custody contains two disciplinary grids. One grid governs disciplinary action for major violations (Exhibit 1). The other grid governs disciplinary action for minor violations (Exhibit 2).

(8) Each of the disciplinary grids shall outline the available sanctions within each box, which includes fines, disciplinary segregation time, and the loss of privileges.

(9) There are additional sanctions available to the Hearings Officers and adjudicators for major violation(s) and minor violations (OAR 291-105-0069 and 291-105-0071). These sanctions shall be applied in proportion to the violation, the AIC's prior misconduct, and institutional behavior.

(10) Merged and Consecutive Sanctions: In the case of multiple rule violations, a Hearings Officer or adjudicator shall impose any sanctions for only the single most severe or most applicable rule violation found as a sanction in a single misconduct report, except as specifically allowed by OAR 291-105-0066(5)(b). The applicable sanction(s) for the remaining rule violations shall be deemed to have merged with the sanction(s) imposed for the single rule violation, unless consecutive sanctions are imposed as authorized in OAR 291-105-0066(5)(b).

(11) The Hearings Officer may consider input regarding appropriate sanction(s) from stakeholders involved with the AIC (for example, Behavioral Health Services, housing unit employees, counselor(s), Security Threat Management, etc.).

(12) Limitations on the Length of Confinement in Disciplinary Segregation for Rule Violations:

(a) No AIC shall be confined in disciplinary segregation for more than 180 consecutive days. On the 180th consecutive day of confinement in disciplinary segregation, an AIC shall be reassigned and ordered to other housing. Once reassigned and ordered to other housing, the AIC shall be subject to additional confinement in disciplinary segregation (up to a maximum of another 180 days) as a sanction for a new rule violation(s).

(b) Once an AIC has received the maximum sanction of 180 consecutive days, the Hearings Officer is not required to impose any additional disciplinary segregation sanction. The Hearings Officer is also not required to order additional loss of privileges sanctions to an AIC who has already received the maximum 180 days disciplinary segregation sanction, if the Hearings Officer determines that the sanction would not be meaningful to the AIC. Such action shall be made a part of the written record of the hearing.

(c) New violations committed while assigned to disciplinary segregation: If an AIC is ordered to serve an additional disciplinary segregation sanction for committing a new rule violation(s) while assigned to disciplinary segregation, the additional disciplinary segregation sanction may be served consecutively or concurrent, to any prior disciplinary segregation sanction(s), up to a maximum of 180 days.

(d) New violations committed while assigned to Intensive Management Unit (IMU) Status or Behavioral Health Unit (BHU) Status: An AIC who commits a new rule violation(s) while assigned to IMU status or to the BHU under OAR 291-048-0280, shall not be ordered to serve a disciplinary segregation sanction for the violation(s). The AIC shall be subject to the range of additional sanctions described in OAR 291-105-0069 & OAR 291-105-0071, including but not limited to fines and loss of privileges.

(13) When an AIC has been assigned to disciplinary segregation as part of a disciplinary sanction that is considered a Level I or Level II violation and the AIC is temporarily transferred to the custody of a jurisdiction other than the Department or is released from prison, the AIC shall not be given credit for time served in disciplinary segregation while out of Department custody unless it is determined that the other jurisdiction maintained the AIC in a similarly restrictive status, in such cases the AIC shall be credited with the number of days held in disciplinary segregation type status.

(a) If the AIC is returned to the Department's custody within three years, the case will be reviewed by the functional unit manager or designee of the institution where the behavior occurred. The review will consider the number of days already served of the disciplinary segregation sanction and will determine if the remaining disciplinary segregation sanction or any portion of it will be served.

(b) If the AIC is returned to the Department's custody after three years, the remaining disciplinary segregation sanction will be considered served.

(14) In those instances where the functional unit manager or designee under the authority of OAR 291-011-0030(3), determines it is appropriate, the AIC may be released from disciplinary segregation.

(a) At that point, the current disciplinary segregation sanction will be deemed to have been completed and the remaining disciplinary segregation sanction will not be served as loss of privileges while the AIC resides in the general population.

(b) Any loss of privileges sanction ordered to be served upon the AIC's release from disciplinary segregation, shall begin at the time the AIC is actually released from disciplinary segregation.

(c) Notification of an early release from disciplinary segregation will be provided to appropriate sections for necessary action, including the Hearings Unit, where the early release will be entered into the disciplinary system.

(15) AICs who commit a rule violation may be subject to classification review in accordance with the Department of Corrections rule on Classification (OAR 291-104).

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 421.185, 421.190, 423.020, 423.030 & 423.075
**History:**
DOC 13-2021, temporary amend filed 10/13/2021, effective 10/13/2021 through 04/10/2022
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 4-2018, amend filed 05/04/2018, effective 05/04/2018
DOC 1-2018, temporary amend filed 01/24/2018, effective 01/24/2018 through 07/22/2018
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 3-1999, f. 2-25-99, cert. ef. 3-1-99
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 29-1986, f. & ef. 8-20-86
CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79

**291-105-0069**
**Additional Sanctions for Major Violations**

The additional sanctions available to the Hearings Officer for major violations include, but are not limited to:

(1) Restitution: AICs shall be responsible for making full restitution for any damage or loss of property. In addition, AICs shall be financially responsible for all costs associated with or resulting from the violation. These shall include the costs of any drug urinalysis testing and other costs incurred by the Department of Corrections as a result of the AIC's actions. There is no limit on the amount of restitution which can be imposed. There must always be a factual basis in the record

Oregon Secretary of State Administrative Rules

to support the restitution amount. The Hearings Officer may recommend a freeze on the AIC's trust account for the sum of the restitution as per OAR 291-158.

(2) Confiscation of property or contraband: If the property or contraband confiscated is in the AIC's trust account, the Hearings Officer may recommend a freeze on the AIC's trust account for the sum of the contraband, or the balance of the AIC's account, whichever is lower as per OAR 291-158.

(3) Reduction to Basic Visiting Status (non-contact): For any major violation, basic visiting status may be imposed up to a maximum of 180 days for any one violation. Any AIC found in violation of Distribution I or Possession of an Electronic Device, including attempt or conspiracy, within the past two years may be restricted to basic visits for each violation as follows:

(a) First violation: up to 1 year (365 days)

(b) Second violation: up to 2 years (730 days)

(c) Third or more violation(s): up to 4 years (1,460 days)

(A) Basic visiting sanctions shall be served upon return to general population housing.

(B) Basic visiting sanctions shall be served consecutively up to 7 years (2,555 days). No AIC shall serve more than 7 years (2,555 days) of consecutive basic visiting sanctions at any one time.

(C) Once a basic visiting sanction starts, it runs to conclusion regardless of the AIC's housing or custody status.

(4) Extra Work Detail: For a major violation, the limit on extra work detail is a maximum of 80 hours, to be completed within 30 days after the Final Order has been signed.

(5) Recommendation for no Favorable Future Consideration of Parole Release Date.

(6) Recommendation for an extension of parole release date in accordance with the rule on Prison Term Modification (OAR 291-097).

(7) Recommendation for reduction in earned time, statutory good time, or extra good time credits in accordance with the rule on Prison Term Modification (OAR 291-097).

(8) Other sanctions as deemed appropriate by the Hearings Officer and approved by the functional unit manager or designee.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 421.185, 421.190, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 3-1999, f. 2-25-99, cert. ef. 3-1-99
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 38-1987, f. & ef. 10-2-87
CD 29-1986, f. & ef. 8-20-86
CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79

## 291-105-0071

### Additional Sanctions for Minor Violations

The additional sanctions available to the Hearings Officer or adjudicator for minor violations include, but are not limited to:

(1) Restitution: AICs shall be responsible for making full restitution for any damage or loss of property. In addition, AICs shall be financially responsible for all costs with or resulting from the misconduct. There is no limit on the amount of restitution which can be ordered. There must always be a documented factual basis in the record to support the restitution amount.

(2) Confiscation of property or contraband.

(3) Reduction to basic visiting status (non-contact): For a minor violation, basic visiting status may be imposed up to a maximum of 28 days for any one violation.

(4) Extra work detail: For a minor violation, the limit on extra work detail is a maximum of 40 hours, to be completed within 30 days after the hearing.

(5) Other sanctions as deemed appropriate by the Hearings Officer or adjudicator and approved by the functional unit manager or designee.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 6-1993, f. 3-10-93, cert. ef. 4-1-93
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
Reverted to CD 25-1982, f. & ef. 11-19-82
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79

**291-105-0072**
**Deviation Sanctions for Major Violations**

(1) Once the level of discipline has been determined, according to the disciplinary grid, the Hearings Officer or functional unit manager or designee may deviate, either upward or downward on major violations in formal hearings. This deviation, under no circumstances, may exceed 50% of the segregation sanction in the appropriate box on the grid. All deviated sanctions shall be supported by written "substantial reasons" outlining the mitigating or aggravating factors which support the deviation. All deviations shall be subject to review by the functional unit manager or designee.

(2) There may be only one deviation ordered for each sanction imposed. The Hearings Officer and functional unit manager or designee may not both order a separate deviation for one sanction.

(3) Deviations may only be ordered for major violations.

(4) Substantial reasons will be separated into mitigating and aggravating factors.

(5) The following list of mitigating and aggravating factors may be considered when determining substantial reasons for a deviation. Other factors not listed may also constitute substantial reasons for mitigation or aggravation.

(a) Mitigating factors:

(A) The AIC acted under duress or compulsion (not sufficient as a complete defense).

(B) The AIC's mental capacity was diminished (excluding diminished capacity due to voluntary drug or alcohol abuse).

(C) The misconduct was principally accomplished by another and the AIC exhibited extreme caution or concern for the victim.

(D) The victim (if any) was an aggressor or participant in the behavior associated with the misconduct.

(E) The AIC played a minor or passive role in the misconduct.

(F) The AIC cooperated with the Department with respect to the current misconduct or any other misconduct by the AIC or other AICs.

(G) The degree of harm or loss attributed to the current misconduct was significantly less than typical for such misconduct.

(b) Aggravating factors:

(A) Threat of or actual violence toward a witness or victim.

(B) Persistent involvement in similar misconduct or repetitive assaults.

(C) Use of a weapon in the commission of the misconduct.

(D) Deliberate cruelty to victim.

(E) The AIC knew, or had reason to know, of the victim's particular vulnerability, such as, the age, disability, or ill health of victim, which increased the harm or threat of harm caused by the misconduct.

(F) The misconduct involved multiple victims or incidents.

(G) The misconduct was part of an organized operation.

(H) The misconduct resulted in a permanent injury to the victim.

(I) The degree of harm or loss attributed to the current violation was significantly greater than typical for such misconduct.

(J) The misconduct was motivated entirely, or in part, by the race, sex, color, religion, ethnicity, or national origin of the victim.

(K) The timing and location of the misconduct directly threatened the safety, security, or orderly operation of the facility significantly more than typical for such misconduct.

(c) No aspect of the misconduct that serves as a necessary element of misconduct may be used as an aggravating factor if that aspect is also used to impose discipline.

**Statutory/Other Authority:** ORS 179.040, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 9-1995, f. 5-23-95, cert. ef. 6-1-95
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92


### 291-105-0081

**Adjustments to Final Orders**

(1) Adjustments to Final Orders shall be initiated by an employee and documented using the Adjustment to Final Order form. Adjustments to Final Orders must pertain to a specific disciplinary case.

(2) In recommending adjustments to Final Orders, the designated institution committee will consider each individual AIC's particular circumstances and significant positive behavior change. Recommendations will be made by the designated institution committee to the functional unit manager or designee to make adjustments to the Final Orders regarding fines, basic visiting, earned time, statutory good time, or extra good time credits.

(a) Generally, the AIC should have served/completed at least 50% of the sanction imposed and demonstrated a significant positive behavior change before an adjustment to that sanction would be considered. If the recommendation for the adjustment would be more than 50%, the recommendation to the functional unit manager or designee shall include factors that justify more than a 50% adjustment.

(b) Generally, a restoration of earned time, statutory good time, or extra good time credits should not cause an AIC's release date to move within 60 days of the date of adjustment. If the restoration of earned time, statutory good time, or extra good time credits should cause an AIC's release date to move within 60 days of the date of adjustment, the recommendation for restoration must also go through the Department's Release Services Manager, who must also approve the restoration of retracted time.

(3) The functional unit manager or designee will approve, deny, or amend the recommendations of the designated institution committee.

(4) Copies of the approved Adjustment to Final Order will be provided to appropriate sections for necessary action, including the Hearings section, where the amendment will be entered into the disciplinary system.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 4-2018, amend filed 05/04/2018, effective 05/04/2018
DOC 1-2018, temporary amend filed 01/24/2018, effective 01/24/2018 through 07/22/2018
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05

### 291-105-0085
### Administrative Review

(1) An AIC may direct concerns or issues regarding a hearing to the functional unit manager or designee as soon as possible after the conclusion of the hearing. Upon receipt of the Preliminary Order, the functional unit manager or designee will: approve the order, amend the order, dismiss the order, or reopen to consider new evidence not submitted in the original hearing.

(2) Disciplinary actions subject to review by the Inspector General or designee are:

(a) Level I or Level II rule violations; or

(b) Recommendations for extension of the AIC's parole release date, retraction of earned time, statutory good time, or extra good time credits; or

(c) Deviations from the disciplinary segregation sanction listed on the grid; or

(d) Any case deemed appropriate by the Inspector General or designee.

(3) Petitions for administrative review must be filed by the AIC and received by the Inspector General within 60 calendar days after the preliminary order becomes the Final Order under OAR 291-105-0031. Filing a petition for administrative review shall not stay the imposition of a sanction.

(4) An AIC shall request an administrative review by completing the Department approved Petition for Administrative Review form and submitting it to the Inspector General. Petition for Administrative Review forms shall minimally state the following:

(a) The date the hearing was completed and the case number (for example, 1503 EOCI 0001 EOCI 01).

(b) The rule violation(s) which the AIC was found in violation or sanction(s) which meets the review criteria listed in (2) above.

(c) Sufficient information to show why there was not substantial compliance with the OAR 291-105, that the finding was not based upon a preponderance of the evidence, or that the sanction(s) imposed was not in accordance with provisions set forth in OAR 291-105.

(d) An AIC who attempts to file for an administrative review by use of any written communication other than the approved Petition for Administrative Review form shall have the communication returned with instructions that the AIC resubmit the request on the proper form. The AIC will have 14 days from the date the communication is returned or 60 calendar days after the Final Order is signed, whichever is longer, to make the request on the approved form.

(e) Duplicate petitions for the same case will not be considered or responded to.

(f) A separate Petition for Administrative Review must be filed for each case number for which an administrative review is requested.

(5) Upon receipt of the Petition for Administrative Review, the Inspector General or designee shall review the case to determine:

(a) Was there substantial compliance with OAR 291-105?

(b) Was the finding based upon a preponderance of evidence? and

(c) Was the sanction imposed in accordance with the provisions set forth in OAR 291-105?

(6) If the Inspector General or designee determines there was substantial compliance with OAR 291-105, the finding was based on a preponderance of evidence, and the sanction(s) imposed were in accordance with the provisions set forth in OAR 291-105, the AIC will be informed. The Inspector General or designee may order the case reopened to address technical and clerical errors that do not substantially prejudice the AIC.

(7) If the Inspector General or designee determines there was not substantial compliance with OAR 291-105, the finding was not based on a preponderance of the evidence, or the sanction(s) imposed were not in accordance with provisions set forth in OAR 291-105, the case shall be reopened to address non-compliance. The order may be dismissed or vacated, in whole or in part, by the Inspector General or designee.

(8) Upon receipt of the order to reopen a case, the Hearings Officer shall reopen and complete the case and notify the Inspector General or designee of completion within 10 business days. If completing the case takes longer than 10 business days, the reason for delay shall be made part of the record.

(9) Upon completing the case, the Hearings Officer shall prepare and issue an updated preliminary order containing the Hearings Officer's finding of fact and conclusion(s) of law per OAR 291-105-0031.

Oregon Secretary of State Administrative Rules

(10) The Inspector General or designee shall provide the AIC with a written response to the Petition for Administrative Review within 60 days from the date it is received. Documentation submitted to the Inspector General shall not be returned to the AIC. Requests for updates during the 60-day period will not receive a response.

(11) Petitions that are outside the criteria listed in OAR 291-105-0085 shall be returned.

(12) Cases that are not eligible for review by the Inspector General or designee are subject to review by the functional unit manager or designee, if requested by the AIC. If the functional unit manager or designee determines the case was not incompliance with OAR 291-105, the Inspector General or designee will be contacted to request the case be reopened.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 14-2008, f. & cert. ef. 6-2-08
Renumbered from 291-105-0073, DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 6-2002, f. 4-30-02, cert. ef. 5-1-02
DOC 3-1999, f. 2-25-99, cert. ef. 3-1-99
CD 16-1996, f. 11-13-96, cert. ef. 11-15-96
CD 8-1992, f. 3-27-92, cert. ef. 4-15-92
CD 5-1989, f. & cert. ef. 4-21-89
CD 38-1987, f. & ef. 10-2-87
CD 32-1987(Temp), f. & ef. 8-5-87
CD 29-1986, f. & ef. 8-20-86
CD 6-1986(Temp), f. 3-14-86, ef. 4-15-86
CD 30-1985, f. & ef. 8-16-85
CD 8-1985(Temp), f. & ef. 6-19-85
CD 25-1982, f. & ef. 11-19-82
CD 13-1980, f. & ef. 4-15-80
CD 19-1979(Temp), f. & ef. 10-19-79


**291-105-0100**
**Vacating or Withdrawing the Final Order in the Interest of Justice**

The Inspector General, Assistant Director for Operations, or their designees may, in the interest of justice, vacate all or part of a final disciplinary order or withdraw the order and direct that a disciplinary hearing be reopened for consideration of new evidence.

**Statutory/Other Authority:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**Statutes/Other Implemented:** ORS 179.040, 421.068, 421.180, 423.020, 423.030 & 423.075
**History:**
DOC 25-2020, amend filed 12/14/2020, effective 12/15/2020
DOC 24-2011, f. 12-2-11, cert. ef. 12-7-11
DOC 11-2011(Temp), f. & cert. ef. 6-10-11 thru 12-7-11
DOC 14-2008, f. & cert. ef. 6-2-08
DOC 9-2005, f. 7-22-05, cert. ef. 7-24-05
DOC 3-1999, f. 2-25-99, cert. ef. 3-1-99

**Oregon State Archives** • 800 Summer Street NE • Salem, OR 97310
Phone: 503-373-0701 • Fax: 503-378-4118 • reference.archives@oregon.gov

Declaration of Nofziger, Exhibit 2, Page 28 of 30

**Exhibit 1**
**MAJOR VIOLATION GRID**

| | # | Rule | |
|---|---|---|---|
| I | 2.05<br>1.01<br>2.03<br>4.15<br>4.05<br>4.10<br>1.15<br>4.20<br>2.15<br>2.40<br>4.33<br>4.25<br>4.30<br>4.35<br>2.20<br>2.01<br>4.45 | AIC Assault I<br>Arson<br>Assault of the Member of the Public<br>Compromising an Employee<br>Disturbance<br>Distribution I<br>Drug Possession<br>Escape I<br>Extortion I<br>Hostage Taking<br>Possession of an Electronic Device<br>Possession of an Escape Device<br>Possession of a Weapon<br>Racketeering<br>Sexual Assault/Abuse<br>Staff Assault I<br>Unauthorized Organization I | DSU: 120 days max<br>LOP: 28 days max<br>Fine: $200 max |
| II | 2.06<br>1.10<br>4.11<br>4.21<br>2.16<br>4.04<br>2.25<br>2.02 | AIC Assault II<br>Contraband I<br>Distribution II<br>Escape II<br>Extortion II<br>Leave Violation<br>Sexual Harassment<br>Staff Assault II | DSU: 60 days max<br>LOP: 28 days max<br>Fine: $100 max |
| III | 2.07<br>4.01<br>2.10<br>2.30<br>1.05<br>4.40<br>4.46<br>1.25 | AIC Assault III<br>Disobedience of an Order I<br>Disrespect I<br>Non-Assaultive Sexual Activity<br>Property I<br>Unauthorized Area I<br>Unauthorized Organization II<br>Unauthorized Use of Info Systems I | DSU: 28 days max<br>LOP: 28 days max<br>Fine: $75 max |
| IV | 2.45<br>1.11<br>4.02<br>2.11<br>3.01<br>3.05<br>3.15<br>3.10<br>1.20<br>1.26 | Body Modification<br>Contraband II<br>Disobedience of an Order II<br>Disrespect II<br>False Information to Employees I<br>Forgery<br>Fraud<br>Gambling<br>Possession of Body Modification Par.<br>Unauthorized Use of Info Systems II | DSU: 14 days max<br>LOP: 14 days max<br>Fine: $50 max |

291-105 Exhibit 1: Dec 2020
Declaration of Nofziger, Exhibit 2, Page 29 of 30

**Exhibit 2**
**MINOR VIOLATION GRID**

| | # | Rule | |
|---|---|---|---|
| V | 4.03<br>2.12<br>1.06 | Disobedience III<br>Disrespect III<br>Property II | LOP:10 days max<br>Fine: $25 max |
| VI | 1.12<br>3.02<br>4.41 | Contraband III<br>False Information to Employees II<br>Unauthorized Area II | LOP: 7 days max<br>Fine: $15 max |

291-105 Exhibit 2: Dec 2020

Declaration of Nofziger, Exhibit 2, Page 30 of 30



*SENT VIA EMAIL TO: rob.j.persson@doc.state.or.us; craig.a.prins@doc.state.or.us*

September 29, 2021

Rob Persson, Assistant Director of Operations
Craig Prins, Inspector General
Oregon Department of Corrections
2575 Center St. NE
Salem 97301-4667

Re:    Mark J. Wilson, SID 7449142
         Request to Vacate Final Disciplinary Order per OAR 291-105-0100

Dear Assistant Director Rob Persson and Inspector General Craig Prins,

We are writing to request that the final disciplinary order issued against Mark J. Wilson on August 31, 2021 be vacated in the interest of justice, pursuant to OAR 291-105-0100. There will unlikely be a more fitting use of this regulation than in this case. Each decision made against Mr. Wilson throughout this disciplinary process constitutes a grave injustice: the allegations in the misconduct report dated March 23, 2021; the findings of violations for Unauthorized Use of Information Systems II, Contraband II and Compromising an Employee; and the inhumane sanction of 120 days in disciplinary segregation, the maximum penalty available. In vacating Mr. Wilson's final disciplinary order, we request the restoration of Mr. Wilson's status at OSCI prior to the disciplinary investigation in January 2021, including his housing in the incentive unit at OSCI, and position as a legal assistant in the OSCI library.

Mr. Wilson has an incredibly robust record of countless remarkable contributions to his community which demonstrate his honest, strong, and compassionate character. This exceptional record, speaking volumes about who Mark is as a person, stands in stark contrast to the scant and spurious information with which ODOC unsuccessfully attempts to create a basis for the charges and guilty findings against Mr. Wilson in the disciplinary order issued on August 31, 2021.

**Summary of investigation of allegations made against Mr. Wilson by confidential informant.**

On December 4, 2020, Oregon State Correctional Institution (OSCI) staff received a report from a confidential informant, an adult in custody with a reputation for submitting false reports about other AICs. The report contained allegations pertaining to Mr. Wilson and Library Coordinator Pam McKinney, and "other unauthorized things in the OSCI library." On or about January 19, 2021, Mr. Wilson was ordered to cease assisting other AICs with their legal affairs, removed from his job as a legal assistant, and placed on work restriction. Mr. Wilson continued to live in general population on the incentive unit and continued to be paid as a legal assistant,

PO Box 5248, Portland, Oregon 97208
T: 503-944-2270
F: 971-279-4748
www.ojrc.info

while ODOC's Special Investigation Unit (SIU) investigated the allegations made by the confidential informant. On or about January 21, 2021, Ms. McKinney was removed from the OSCI library and stationed at a desk in another facility. On March 23, 2021, ODOC initiated a misconduct report against Mr. Wilson. On April 15, 2021, Ms. McKinney, following what she described as a "brutal" four- to six-hour interrogation by ODOC employees, resigned from ODOC because she was forced to "[e]ither resign or lose the [retirement] money match." On August 4, 2021, Mr. Wilson received a misconduct report with the following charges: 4.15 Compromising an Employee (Major); 1.11 Contraband II (Major); 1.25 Unauthorized Use of Information System 1 (Major); and 4.01 Disobedience of an Order I (Major). A copy of the misconduct report is enclosed. On August 10, 2021, Mr. Wilson had his first disciplinary hearing, during which he sat shackled in a cage and was unable to access and read the materials he had prepared to defend himself.  On August 31, 2021, he was found guilty of Contraband II and Compromising an Employee, sentenced to the maximum penalty of 120 days in disciplinary segregation, also known as solitary confinement, and immediately taken to the Disciplinary Segregation Unit.

The record of this matter, further discussed below, reveals that Mr. Wilson is being unjustly and cruelly punished for carrying out his prescribed duties as a legal assistant, and is being wrongfully held accountable for the independent actions and decisions of his supervisor, Library Coordinator Pam McKinney. Mr. Wilson's duties as a legal assistant are provided for in ODOC regulations and were overseen and authorized by Ms. McKinney, a veteran of ODOC for over 20 years before her resignation.

### **Summary of the robust record evidencing Mr. Wilson's strong moral character and profoundly meaningful service to others.**

Mr. Wilson has been incarcerated since 1987 and has spent over 30 years in the custody of the Oregon Department of Corrections (ODOC) for a crime he committed at age 18. It is well-documented that Mr. Wilson is truly an exceptional human being, a person of immense compassion and wisdom, and has lived many lives' worth of profoundly meaningful service to others. Throughout his incarceration, he has met, assisted, and positively influenced the lives of countless people, not only being a support to fellow AICs, but also to many individuals in the outside community. He has been a hospice worker, serving others in their darkest hours and touching the depths of humanity in a way few ever will. He has created education groups and programs within the prison that have positively shifted the trajectory of many, many incarcerated individuals, which has a far-reaching impact on the families of AICs, on the prison environment, and on the general community. He has served tirelessly as a legal assistant for decades, giving hope and a voice to incarcerated individuals who would otherwise be invisible and buried by the system. This only scratches the surface of Mr. Wilson's service to others. Enclosed is a summary of Mr. Wilson's contributions to his prison community and the broader community.

Those who encounter Mr. Wilson quickly recognize how special he is. He has the ongoing support of so many: legislators, educators, spiritual leaders, victim support specialists,

attorneys, mental health providers, incarcerated and formerly incarcerated people, and his greatest and most devoted supporters, his mother, father, aunt, and grandmother.

Mr. Wilson has always done this good work within the parameters of what is authorized by ODOC. Since entering prison in 1988, until this recent discipline action, Mr. Wilson had only incurred a single, low-level rule violation, for being in an unauthorized area on August 22, 1991. Twenty-nine years ago, Mr. Wilson joined approximately 20 co-workers in protesting wage issues that their employer, UNIBASE, refused to resolve. The protest consisted of not returning to work after lunch one afternoon. Mr. Wilson returned to his cell after lunch instead of going to his work assignment. He was sanctioned to spend seven days in segregation and pay a $100 fine. He was also banned from holding a preferential prison industry job for one year, but the ban was rescinded after six months of clear conduct.

Mr. Wilson's positive discipline record and his remarkable contributions are a reflection of his character and his deeply held personal values. Dr. Rex Newton, who was an ODOC mental health therapist for over 35 years, wrote in a 2019 letter to the Oregon Board of Parole, "The maturity and personal growth with which [Mr. Wilson] has gone about serving his prison community is exemplary and a model for all whether living in prison or the free community . . . I truly admire who he has become." Dr. Newton further expresses that Mr. Wilson genuinely possesses "a positive moral compass demonstrated over time, commitment to the service of others, continual education and a faith based belief in the goodness of humanity."

**Mr. Wilson's decades-long misconduct-free history as a legal assistant and summary of the longstanding procedures within the OSCI library.**

Mr. Wilson has worked as a legal assistant since 1989, beginning at OSCI. In June 1990, he was transferred to Oregon State Penitentiary (OSP). He worked as a legal assistant at OSP from November 1991 until September 2004, when ODOC retaliated against him for his assistance in a civil lawsuit by transferring him to Eastern Oregon Correctional Institution (EOCI). The lawsuit resulted in a court order requiring ODOC to provide adequate medical care to prisoners with Hepatitis C. At EOCI, Mr. Wilson was not allowed to work as a legal assistant. Michelle Burrows, the attorney who filed the Hepatitis C case, filed a retaliation lawsuit on Mr. Wilson's behalf, and as a result, Mr. Wilson was transferred back to OSCI in January 2008.

From July 2012 until earlier this year, Mr. Wilson worked as a legal assistant at OSCI. During these nine years, Mr. Wilson worked under the supervision of at least five library coordinators. He was hired as a legal clerk in February 2012 by Library Coordinator Greg Hunter, who remained his supervisor when Mr. Wilson became a legal assistant a few months later. It was under the supervision of Mr. Hunter that Mr. Wilson learned the protocols and procedures for legal assistants in the OSCI library. As former OSCI legal assistants and library coordinators would attest, library coordinators rely on the honesty, professionalism, and skills of the legal assistants to carry out the work, recognizing that legal assistants have privileges not afforded to other AICs. Mr. Wilson could not have remained in the position of legal assistant for

so many years, through multiple library coordinators, if he did not conduct himself appropriately and only as authorized.

Under ODOC regulations, library coordinators are "responsible for supervising facility legal libraries and the provision of law library services to inmates," and for prioritizing and assigning activities to the legal assistants. Library coordinators "may instruct inmates on how and where to access requested law library services and other resources, but may not offer advice or directly assist an inmate with their legal issues, case or matter." OAR 291-139-0150. Legal assistants "are assigned to work in the facility law library by the library coordinator to help guide and assist other inmates in legal research and document preparation on a prioritized basis as assigned by the library coordinator." OAR 291-139-0160.

In accordance with these rules, Mr. Wilson received assignments from the library coordinators to assist AICs on matters including but not limited to: appeals of convictions and sentences, conditions of confinement challenges, Board of Parole issues, child custody and visitation matters, dissolution proceedings, wills and estates, and other civil actions. Throughout his nine years as a legal assistant at OSCI, Mr. Wilson was authorized by library coordinators to conduct research, prepare documents, and develop working relationships with attorneys, prisoner and mental health advocacy groups, court staff, Board of Parole personnel, and other professionals. These privileges allowed Mr. Wilson to effectively conduct his duties assisting the AICs who were assigned to him.

Mr. Wilson could only carry out this work with the knowledge of, approval by, and assistance of the library coordinators. Legal assistants have no access to the internet, no email accounts, and no phone access other than what is available to all AICs, which are phones on their living units or legal calls scheduled by the library coordinator. If Mr. Wilson or other legal assistants needed to contact people outside of the institution by phone, the library coordinator would schedule a legal call. If Mr. Wilson or other legal assistants needed to contact people outside of the institution by email, the library coordinator would send and receive emails through the library coordinator's ODOC email account and then print out the message and attachments or put them on work thumb drives for the legal assistant and AIC. If Mr. Wilson or other legal assistants needed to access information from the internet, they would make a request to the library coordinator who would then print out the requested information.

At OSCI, it was standard procedure, as authorized by library coordinators, to print the first copy of any document that a legal assistant was working on for an AIC from the legal assistant's standalone printer without charging the AIC. AICs paid for any subsequent copies of documents.

Also as authorized by the OSCI library coordinator, AICs who are working on legal matters can store their legal materials on a thumb drive and take them home when they leave the institution. Legal assistants are also authorized to use thumb drives to store work that they are doing for AICs assigned to them. Again, legal assistants do not have access to the internet. So, any information that is stored on the thumb drive from the internet is done by the library coordinator.

Consistent with Mr. Wilson's behavior for the past thirty years in ODOC custody, Mr. Wilson always carried out his duties as an OSCI legal assistant in accordance with ODOC rules and as authorized by his supervisor.

**The misconduct report and final order do not include any unauthorized conduct by Mr. Wilson to substantiate the charges brought against him or the findings of violations.**

The allegations contained in the misconduct report, dated March 23, 2021 and submitted on August 4, 2021,[1] and the findings of violations in the final order, dated August 31, 2021, are entirely unsupported by substantiating evidence. Instead, the misconduct report and final order clearly reveal that Mr. Wilson was charged and found in violation of the rules for (1) assisting AICs completely within the proper bounds of his position as a legal assistant and as authorized by Library Coordinator Pam McKinney and four previous library coordinators; and for (2) actions and decisions made by Ms. McKinney, of her own volition, which were encouraged and condoned by the ODOC director and administration.

Mr. Wilson was charged with: Disobedience of an Order I (4.15), Unauthorized Use of Information Systems I (1.25), Contraband II (1.11), and Compromising an Employee (4.15). He was found in violation of: Unauthorized Use of Information Systems II (1.26), Contraband II (1.11), and Compromising an Employee (4.15).

The evidence offered for each charge and violation is addressed in detail below. Some repetition of the facts is provided in order to make clear that each individual allegation lacks any basis in fact to justify the actions taken against Mr. Wilson.

Disobedience of an Order I (4.15)

Mr. Wilson should never have been charged with Disobedience of an Order I, which was ultimately dismissed. The charge was based on protocols and procedures that had long been authorized by library coordinators at OSCI. In the misconduct report, the investigator explains that the charge was based on Mr. Wilson disregarding and violating OAR 291-139 (Legal Affairs), OAR 291-131 (Mail), and OAR 291-86 (AIC Access to Automation). The investigator concludes that those OARs were violated because the investigator reviewed "hundreds of emails, from January 2020 to January 2021, between Ms. McKinney and individuals in the community. These emails were both incoming and outgoing. Most of these emails were with individuals at an outside justice resource firm, or [with] attorneys and other professional[s]. All of the individuals are associated with AIC Wilson in some manner." It has been a longstanding procedure in OSCI for library coordinators to help legal assistants communicate, through email and scheduled legal calls, with attorneys, prisoner and mental health advocacy groups, court staff, Board of Parole personnel, and others to effectively assist assigned AICs with their legal matters. The

---

[1] Misconduct reports are commonly dated on the date the report is started rather than date completed and submitted.

investigator further asserts that "Ms. McKinney's actions of sending and receiving emails, containing messages, and attached legal documents saved AIC Wilson at least $387.40." Again, it is a longstanding practice for OSCI library coordinators to send and receive emails and print emails and attachments for AICs. Furthermore, all the activities described in the misconduct report were actions taken by Ms. McKinney.

Unauthorized Use of Information Systems II (1.26)

Similarly, the charge of Unauthorized Use of Information Systems I should never have been brought against Mr. Wilson. The finding of Mr. Wilson to be in violation of the lesser included rule, Unauthorized Use of Information Systems II, is likewise baseless. The final order states that Mr. Wilson is in violation of Unauthorized Use of Information Systems II because he "made copies, viewed video or listened to audio files for personal use . . . that exceeded the conditions of use or access granted by the Director, functional unit manager, or designee." However, all conduct described was either authorized by Ms. McKinney or done by Ms. McKinney, of her own volition, for AICs.

While the final order does not otherwise refer to Mr. Wilson making copies, the misconduct report states that the charge of Unauthorized Use of Information System I was based on Mr. Wilson printing a copy of work for AICs' legal affairs from the standalone printer at the legal assistant work area without charging the AICs. As explained above, this was a procedure authorized by library coordinator Ms. McKinney, as well as the previous four library coordinators.

The referenced audio files and video were files downloaded and put on thumb drives by Ms. McKinney of her own accord. Mr. Wilson did not request any of these materials. Ms. McKinney downloaded music and put the files on thumb drives so that AICs who worked in the library, such as the legal assistants and law clerks, could listen to music while they worked. The AICs could only assume that Ms. McKinney had authorization to do so, and that she did this to create a more productive, pleasant, and "normal" work environment. In fact, Ms. McKinney was regularly instructed to create a "normal" and humane environment for AICs by the ODOC director and administration, as further explained below.

Similarly, Ms. McKinney downloaded a video onto Mr. Wilson's work thumb drive, not at his request, but of her own volition. Ms. McKinney exchanged emails with a former AIC's partner about new children in their lives, Ms. McKinney's grandchild and the former AIC's child. None of the emails were addressed to Mr. Wilson or made any mention of Mr. Wilson. Knowing that Mr. Wilson and other AICs at OSCI knew this former AIC, Ms. McKinney downloaded the video and a few photos of the child and asked Mr. Wilson to show them to other AICs who came into the library. Again, Mr. Wilson could only assume that Ms. McKinney was authorized to do this. This action was consistent with the "normal" and pro-social community environment that Ms. McKinney, a 22-year ODOC employee, created in the library. The library environment Ms. McKinney created, which AICs were accustomed to, is further explained in a later section.

Finally, the suggestion that any of this occurred for Mr. Wilson's "personal use" is without evidence. The conclusion that Mr. Wilson is in violation of Unauthorized Use of Information Systems II is baseless and should be vacated in the interest of justice.

Contraband II (1.11)

The finding of Mr. Wilson to be in violation of Contraband II is entirely unfounded. The alleged violation is based on actions and decisions made by Ms. McKinney of her own volition, which were encouraged and condoned by the ODOC director and administration.

The final order states,

> There is a preponderance of evidence AIC Wilson was in possession of contraband that was not authorized that created a threat to the safety, security, or orderly operations of the facility as AIC Wilson was in possession of an unauthorized plastic child's toy phone in AIC Wilson's work area, photographs of a former AIC on AIC Wilson's thumb drive that is to be utilized for work as the Legal Assistant, a video of a former AIC on AIC Wilson's thumb drive that is to be utilized for work as the Legal Assistant, music on the thumb drive that is to be utilized for work as the Legal Assistant.

An AIC commits a Contraband II violation when an "AIC *possesses* contraband, including that listed in Contraband I and Contraband III, that *creates a threat to safety, security or orderly operation of a facility*, including but not limited to: [ ] Tobacco or smoking paraphernalia, unauthorized medication, items of barter, checks, money under $10, or unauthorized explicit material; or [ ] Items that were obtained by threats of or actual theft, forgery, or coercion." OAR 291-105-0015(1)(e) (emphasis added). The discipline rules define "possession" as "To have physical possession of or otherwise exercise dominion or control over property." OAR 291-105-0010(34).

*Plastic child's toy phone*

The misconduct report and final order explain that the investigator searched Mr. Wilson's work area in the library and found a "white plastic child's toy phone," which Ms. McKinney said she purchased with her own money and gave to Mr. Wilson without supervisor approval, constituting a Contraband II violation. Here is an accurate image of the child's toy phone referred to in the reports:



The investigator omitted from the misconduct report that Ms. McKinney placed this toy phone on Mr. Wilson's work area desk as a joke, not as a gift. Mr. Wilson did not request this item and he did not exercise control of this toy in any way that could constitute a violation of Contraband II. This toy was placed in the library by Ms. McKinney of her own accord, and it remained in the library.

No explanation is given as to how the presence of the toy in the library created "a threat to the safe, secure, and orderly operation of the facility," a required element of a contraband violation, other than to allege that Mr. Wilson engaged in an "unauthorized relationship with an employee," which is baseless, as explained below. In fact, within the community-like environment Ms. McKinney sought to create in the library, the existence of the toy phone could hardly be deemed irregular or inappropriate. The toy was just one of many playful items that Ms. McKinney brought in and placed throughout the library. For example, as recent as August 2021, in the OSCI library there is a clock that Ms. McKinney made from personal pictures and a plastic container with fake fish, meant to resemble an aquarium. Ms. McKinney also often decorated the library with festive items for various holidays, like Halloween and Christmas – including bringing in reindeer antlers for AICs to wear.

Ms. McKinney, like many ODOC staff, received regular emails from ODOC administration encouraging staff to interact with AICs according to the "Oregon Way" – the ODOC philosophy that AICs are to be treated "in a normalized environment and in the most humane way possible."[2] ODOC Director Colette Peters has consistently stated publicly the

---

[2] Written Testimony, House Judiciary Committee, HB 3146, (March 20, 2019) (statement of the Oregon Department of Correction Director Colette Peters), *available at* https://olis.oregonlegislature.gov/liz/2019R1/Downloads/CommitteeMeetingDocument/175702; *see also e.g.*,

Page 9

importance of ODOC doing what it can to "make the institutions feel more like communities"[3] so that AICs will return to the community as "good neighbors."[4] To illustrate the environment Ms. McKinney created in the OSCI library – in accordance with the Oregon Way – below is a photo of Ms. McKinney in the OSCI library. ODOC posted this photo on Twitter (ODOC Twitter) on December 30, 2020, among a few other photos of the decorated OSCI library that ODOC posted on Twitter that holiday season.



*Music, photographs, and video files on Mr. Wilson's work thumb drive*

As explained previously, Ms. McKinney downloaded music and put it on thumb drives so that AICs with jobs in the library could listen to music while they worked, a decision that AICs considered unremarkable and consistent with how Ms. McKinney ran the library. Also as explained previously, Ms. McKinney exchanged emails with a former AIC's partner to share

Oregon Department of Corrections, 2021-23 Agency Budget Request, at 316, *available at* https://www.oregon.gov/doc/Documents/2021-23-agency-request-budget.pdf ("The Oregon Way is a philosophical approach to corrections based on security best practices and the belief that normalizing and humanizing the prison environment is beneficial for employees and incarcerated individuals. This innovative approach to incarceration stems from an exploration of and immersion in the Norwegian correctional system. The objectives and outcomes of this program support ODOC's focus on segregation reduction and reform, and the primary goal of keeping both staff and AICs safe. Normalizing an individual's environment and experience while incarcerated is believed to help in successful re-entry and ultimately reduce recidivism. Shifting the focus from punitive to a rehabilitative mindset is the foundation of normalization. Creating humane conditions and transition opportunities prepare AICs for a successful incarceration and re-entering society."); Oregon Department of Correction, *The Oregon Way*, https://www.oregon.gov/doc/about/Pages/oregon-way.aspx (accessed Sept. 20, 2021).
[3] *See* Suzanne Stevens, *Inside the Oregon State Penitentiary and efforts to make it a model of prison reform*, Portland Business Journal (Aug. 1, 2019), https://www.bizjournals.com/portland/news/2019/08/01/inside-the-oregon-state-penitentiary-and-efforts.html.
[4] *See, e.g.*, *Id.*

photos of Ms. McKinney's new grandchild, and photos and a video of the former AIC's child. Ms. McKinney downloaded the video and photos on Mr. Wilson's work thumb drive, not at his request or the request of anyone, but of her own volition. Knowing that Mr. Wilson and other AICs knew this former AIC, Ms. McKinney downloaded the video and photos and asked Mr. Wilson to show them to other AICs who came into the library.

Like the presence of the child's toy phone in the library, these uses of the thumb drive provide no basis for a finding of a Contraband II violation. First, as previously explained, AICs, including Mr. Wilson, would not have any reason to suspect that Ms. McKinney was not authorized to take these actions. Her actions were consistent with the positive environment that she consistently created in the library with the encouragement of ODOC leadership. Mr. Wilson should in no way be held accountable for the actions and decisions of his supervisor, an ODOC employee who had worked for the department for more than 20 years.

Second, Mr. Wilson did not "possess" the thumb drive in any way that could constitute a violation of the Contraband II rule. The thumb drive was kept in the library, under the control and dominion of the library coordinator. Mr. Wilson only used the thumb drive as authorized by the library coordinator while he worked as a legal assistant in the library. Finally, no explanation is offered as to how, through use of the thumb drive, Mr. Wilson "creat[ed] a threat to safety, security or orderly operation of a facility," necessary for a finding of a Contraband II violation. Given the circumstances, even the suggestion that safety, security, or order was threatened is absurd.

Compromising an Employee

An AIC commits the violation of Compromising an Employee when an "AIC knowingly engages an employee . . . in a personal relationship[.]" OAR 291-105-0015(4)(h). The final order states,

> There is a preponderance of evidence AIC Wilson engaged in a personal relationship with Ms. McKinney by accepting items not authorized such as a plastic child's toy phone, photographs from a former AIC, a video of a former AIC, two thumb drives, and having Ms. McKinney send and receive numerous emails on AIC Wilson's behalf.

The plastic toy phone has already been explained above and provides no evidence of Mr. Wilson doing anything whatsoever to "engage" Ms. McKinney in a personal relationship. Consistent with the "normal" community environment that she created in the library, per the culture encouraged by ODOC administrators, Ms. McKinney put the toy phone in Mr. Wilson's work area as a joke – not at the request of Mr. Wilson.

The photos and video of the former AIC's child, as explained above, were placed on Mr. Wilson work thumb drive by Ms. McKinney of her own volition, and she asked Mr. Wilson to

show the files to other AICs who knew the former AIC. These circumstances provide no basis to conclude that Mr. Wilson engaged Ms. McKinney in a personal relationship.

In regard to the numerous emails sent by Ms. McKinney, as has been explained, it was a longstanding practice by library coordinators in OSCI to help legal assistants communicate, through email and scheduled legal calls, with attorneys, prisoner and mental health advocacy groups, court staff, and Board of Parole personnel, and others to effectively assist assigned AICs with their legal matters. Mr. Wilson is known to be a very dedicated and proficient legal assistant. Any emails that Ms. McKinney sent and received on behalf of Mr. Wilson were all pursuant to his work as a legal assistant; or to his work in helping to create pro-social programs in the prison as known about and authorized by ODOC administration, some of whom were cc'd on the emails.

The final order refers to an obituary that Ms. McKinney sent by email, on Mr. Wilson's behalf, to a former AIC. While not entirely clear, this email appears to be proffered as evidence of the Compromising an Employee violation. Yet, like all the other emails that Ms. McKinney sent and received on Mr. Wilson's behalf, this email was connected to Mr. Wilson's work as a legal assistant. The obituary reported the death of a close family member of a criminal defense attorney who represents AICs at OSCI. Mr. Wilson had a professional relationship with the defense attorney pertaining to his job duties as a legal assistant, assisting AICs at OSCI with criminal case-related matters. The former AIC who received the obituary is a contract legal assistant who has worked with the defense attorney on cases of AICs at OSCI, including matters that Mr. Wilson also worked on. Given this ongoing work relationship, Mr. Wilson believed it was appropriate that the former AIC be timely made aware of the death, an unexpected and tragic occurrence. As explained earlier, for legal assistants to effectively carry out their duties, they develop ongoing working relationships and engage in regular communication with legal professionals in the wider community. Library coordinators routinely help legal assistants communicate by sending emails and scheduling legal phone calls. The fact that Ms. McKinney facilitated this particular email is consistent with this longstanding practice. There is simply no basis from which to conclude that Mr. Wilson's actions – asking Ms. McKinney to send an email to inform a legal assistant in the community about important news related to an attorney representing an AIC in OSCI – constitutes Mr. Wilson engaging in a personal relationship with Ms. McKinney.

The final order further attempts to support the Compromising an Employee violation by referring to "two thumb drives." The final order states, "AIC Wilson admitted to receiving two black thumb drives from Ms. McKinney that he was storing all of his legal work on. AIC Wilson stated he was planning on taking the two black thumb drives home with him when he was going to leave the institution." Again, it is common practice at OSCI for AICs to save their legal materials on a thumb drive and then take those thumb drives with them when they leave the institution. Mr. Wilson's legal materials would exceed the available storage on a single thumb drive. So, Ms. McKinney gave him two thumb drives. Again, this fact is not evidence of Compromising an Employee.

Although the following allegations from the misconduct report related to the Compromising an Employee charge do not appear in the final order, we address them here because they gratuitously suggest wrongdoing by Mr. Wilson without providing any plausible basis in fact.

In the misconduct report, the investigator states that Ms. McKinney "admitted to directly assisting AIC Wilson with his legal issues, case, matters" and "admitted to giving AIC Wilson special privileges which not all AICs were afforded." The investigator provides no examples or description of Ms. McKinney's assistance or "special privileges" other than again describing the emails, printing of emails, and attachments, and scheduled legal calls, which are all longstanding practices in the OSCI library that were authorized by numerous library coordinators. Legal assistants, like Mr. Wilson, do have "special privileges" not afforded to other AICs that allow them to carry out their authorized work duties.

Finally, the investigator uses statements made by Ms. McKinney that are unrelated to Mr. Wilson as evidence of Compromising an Employee. First, he says that Ms. McKinney "admitted that her relationships with several individuals at the outside justice resource firm became more of a personal friendship than a professional relationship." This is a boundary issue personal to Ms. McKinney and independent of Mr. Wilson.

The investigator also states that when he asked, "'Have you been compromised as an employee?' She said, 'Yes.'" No further explanation is given about this statement other than the investigator acknowledging that Ms. McKinney is a "22-year veteran employee with the DOC," who has been through "countless hours of training." There is no connection made to Mr. Wilson. Again, this question of and answer from Ms. McKinney occurred in an hours-long interrogation, which she described as "brutal" and "intimidating" and resulted in her feeling forced to resign. Ms. McKinney did not feel "compromised" as an employee prior to the interrogation.

The record is void of any description of actions or statements by Mr. Wilson that would indicate that he "knowingly engage[d] an employee . . . in a personal relationship." There is simply no basis for a finding of a Compromising an Employee violation.

**None of the violations and charges described above are supported by any unauthorized conduct by Mr. Wilson. The findings of fact in the record refer to conduct by Mr. Wilson that was completely within the bounds of his position as a legal assistant, as well as actions taken independently by Ms. McKinney that were encouraged and condoned by the ODOC director and administration. The findings of guilty for violations of Unauthorized Use of Information Systems II, Contraband II and Compromising an Employee are baseless. Therefore, the interest of justice requires that the final disciplinary order issued against Mark J. Wilson on August 31, 2021 be vacated.**

**<u>The sanction ordered for Mr. Wilson is inhumane, contrary to law and regulations governing ODOC, and further compounds the injustice experienced by Mr. Wilson.</u>**

The injustice that Mr. Wilson has suffered is further compounded by the extreme sanction of 120 days in disciplinary segregation, also known as solitary confinement, and loss of privileges, including his housing on OSCI's incentive housing unit and his position as a legal assistant in the OSCI library. Experts would consider ODOC's use of disciplinary segregation inhumane and out of line with the overwhelming amount of data and research documenting the severe adverse effects of solitary confinement for any length of time on all human beings. Sanctioning Mr. Wilson to any time in disciplinary segregation is immensely inappropriate, contrary to state law and regulations, and profoundly unjust.

## The cruel and inhumane nature of ODOC's use of disciplinary segregation.

The United Nations Standard Minimum Rules for the Treatment of Prisoners, also known as the Nelson Mandela Rules,[5] define solitary confinement as "confinement of prisoners for 22 hours or more a day, without meaningful human contact[6]," and "prolonged solitary confinement" as a "time period in excess of 15 consecutive days."[7] The National Commission on Correctional Health Care (NCCHC) defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals."[8] The NCCHC has adopted the following position on the use of solitary confinement:

> Solitary confinement as an administrative method of maintaining security should be used only as an exceptional measure when other, less restrictive options are not available, and then for the shortest time possible. Solitary confinement should never exceed 15 days. In those rare cases where longer isolation is required to protect the safety of staff and/or other inmates, more humane conditions of confinement need to be utilized.[9]

ODOC's disciplinary segregation is solitary confinement. Experts would consider its use to be inhumane and, specifically in the case of Mr. Wilson, a misuse of power – serving no safety and security purpose, it is nothing more than extreme and unwarranted cruelty.

AICs have described OSCI's Disciplinary Segregation Unity (DSU) as follows. During the first 24 hours, an AIC is placed in a cell in Section 1 of DSU. These cells are monitored by surveillance cameras, have no light and no table. There is a cement slab to sleep on, a toilet, a sink, and plexiglass over the bars. After the first 24 hours, the AIC is moved to a cell in a different section of DSU. The approximately 9'x11' cells each have a bed, toilet, and sink, and are described as "really dirty" and "filthy." There is a light in the cell, but no access to natural

---

[5] G.A. Res. 70/175, United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules) (Dec. 17, 2015).
[6] *Id.* at 17.
[7] *Id.*
[8] National Commission on Correctional Health Care, *Solitary Confinement (Isolation)*, https://www.ncchc.org/solitary-confinement (accessed Sept. 20, 2021).
[9] *Id.*

light. Across the unit from the cell is a frosted window to the outside where a person can see whether it is night or day, but cannot see anything else outside. The cells themselves do not have air ventilation. There is an air duct that is turned on at night in the general area. AICs spend more than 23 hours a day in these cells. They are allowed to leave their cells for 40 minutes a day to move about in a cage within the unit that has a pull-up bar but is otherwise empty. This cage, like the cells, has no natural light or natural air. After the first 30 days, AICs may be allowed to go outside for a maximum of 40 minutes per day.

AICs in DSU are allowed to shower only three times a week in "filthy" showers. They receive a soda bottle-sized cap of soap and have ten minutes to shower. There are no other hygiene products. AICs who wish to shave must use the "community" electric razor during shower times. They are only allowed to change their clothing and underwear at shower times.

During the first 30 days of segregation, AICs have no access to canteen, meaning they cannot buy any hygiene products or other necessities. To brush their teeth, they are given two small envelopes of baking soda, which is meant to last the first 30 days. AICs are only given two envelopes to send out mail. Because their only real means of communicating with anyone on the outside depends on those two envelopes, AICs must be very thoughtful about how to use them. Phone calls other than legal calls are limited to "verified emergency situations (death, serious illness, or injury to an immediate family member, etc.)." OAR 291-011-0060(15).

All AICs are placed in restraints when escorted by staff. This can include the use of a "leash," which is hung on the unit in view when not in use.

The Vera Institute of Justice, which assessed the ODOC's use of disciplinary segregation in 2015, stated that AICs in ODOC's DSU live in "conditions marked by isolation, idleness and sensory deprivation" for 23 hours a day, on average.[10] At OSCI's DSU, there are no programs, "no ability to engage in productive activities" and AICs "rarely have meaningful contact with other people during their time in DSU."[11] People report that in this desperate and idle environment, time stands still.

The inhumane and degrading nature of DSU is impossible to imagine and to understand for anyone who has never spent time there. It is also difficult for AICs who have experienced DSU to adequately describe the severe environment. In their attempts to do so, people have expressed the following. Imagine the most beastly state that a person could be in. That is the state of many AICs in DSU. Everything smells. Your body never feels clean. You feel grimy all day long, all the time. It is not because of the restriction of three showers a week. It is because the grime of the environment gets into your skin, into you. All day long, people are screaming and yelling out of desperation, anger, and states of insanity. People are harming themselves and

---

[10] Alison Hastings et al., Vera Institute of Justice, *The Safe Alternatives to Segregation Initiative: Findings and Recommendations for the Oregon Department of Corrections* at 26, available at https://www.vera.org/downloads/publications/safe-alternatives-segregation-initiative-findings-recommendations-odoc.pdf.
[11] *Id.*

harming others out of frustration, anger, and to feel any sense of autonomy or control of their lives. It is common for people to clog toilets so that the units flood, to throw objects, including feces, out of their cells and at corrections officers and other AICs. One person recounted knowing of AICs who would eat their own feces, smearing it in their teeth, when corrections officers came by. Adding insult to injury, behavioral health specialists do not regularly visit AICs in OSCI's DSU.

This is the environment that Mr. Wilson, who poses no risk to the safety and security of the prison, has been ordered to endure for 120 days.

Solitary confinement is a severe sanction that "a massive body"[12] of scientific research confirms is physiologically and psychologically harmful to all people, not only vulnerable populations, with significant and long-lasting impacts occurring after just a few days of segregation.[13] The National Commission on Correctional Health Care (NCCHC), which opposes solitary confinement longer than 15 days, explains in its position statement:

> The inherent restriction in meaningful social interaction and environmental stimulation and the lack of control adversely impact the health and welfare of all who are held in solitary confinement. While there is a school of thought that suggests that solitary confinement in facilities that meet basic standards of humane care has relatively little adverse effect on most individuals' mental or physical health, this is not the view of most international organizations. The World Health Organization (WHO), United Nations, and other international bodies have recognized that solitary confinement is harmful to health.

> . . . Even those without a prior history of mental illness may experience a deterioration in mental health, experiencing anxiety, depression, anger, diminished impulse control, paranoia, visual and auditory hallucinations, cognitive disturbances, obsessive thoughts, paranoia, hypersensitivity to stimuli, posttraumautic stress disorder, self-harm, suicide, and/or psychosis. Some of these effects may persist after release from solitary confinement.

> Moreover, the very nature of prolonged social isolation is antithetical to the goals of rehabilitation and social integration.

In addition to the psychological impact of solitary confinement summarized in the NCCHC's position statement, solitary confinement has physical impacts. These include, "gastrointestinal and genitourinary problems, diaphoresis, insomnia, deterioration of

---

[12] Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature* 441, 475 Crime & Justice Vol. 34, No. 1 (2006), available at https://www.jstor.org/stable/10.1086/500626?seq=1#metadata_info_tab_contents.
[13] *See e.g.*, *Id.* at 12; Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement* (Jan. 1, 2003), available at https://journals.sagepub.com/doi/abs/10.1177/0011128702239239; Lauren Brinkley-Rubinstein et al., *Association of Restrictive Housing During Incarceration With Mortality After Release,* JAMA (October 4, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.

eyesight, profound fatigue, heart palpitations, migraines, back and joint pain, weight loss, diarrhea, and aggravation of preexisting medical problems."[14]

Humans are naturally social beings, and it is the "social pain," the environmental and social isolation, of solitary confinement that can be the most torturous and damaging.[15] Researchers define "social pain" as "the feelings of hurt and distress that come from negative social experiences such as social deprivation, exclusion, rejection, or loss."[16] Even after **a few days** in solitary confinement, researchers observe people "descend into a mental torpor or 'fog,' in which alertness, attention, and concentration all become impaired. . . . [T]he individual becomes increasingly incapable of processing external stimuli . . . Over time the very absence of stimulation causes whatever stimulation is available to become noxious and irritating."[17] "This lethargic condition has been described by researchers in connection with a complete breakdown or disintegration of the identity of the isolated individual. This can be described as a simultaneous attack of several symptoms that effectively erase the personality of the isolated individual: they experience problems talking and understanding others, hallucinate (hear and see things), have constant headaches, are troubled by anxiety, lose control (cry, become lethargic, have fits of rage, etc.), and reach a condition that resembles (or is) psychosis."[18] Expert Craig Haney describes a reaction of "isolation panic," which sets in quickly. "The longer they're in it, and especially if they're not sure when they're going to get out, a range of negative psychological reactions begin to mount."[19]

To be clear, solitary confinement harms all individuals, not only those considered vulnerable, such as those with preexisting mental illness. "Isolation can be psychologically harmful to any prisoner, with the nature and severity of the impact depending on the individual, the duration, and particular conditions (e.g., access to natural light, books, or radio)."[20]

Also, any amount of time in solitary confinement increases a person's risk of premature death.[21] A 2019 study of 229,274 people released from incarceration in North

---

[14] Hastings et al., *supra* note 10 at 7; *See also, e.g.*, Lars Moller et al., eds., *Health in Prisons: A WHO Guide to the Essentials in Prison Health* (Copenhagen: World Health Organization, 2007) at 36.

[15] *See e.g.*, Tiana Herring, Prison Pol'y Init., *The research is clear: Solitary confinement causes long-lasting harm* (Dec. 8, 2020), available at https://www.prisonpolicy.org/blog/2020/12/08/solitary_symposium/

[16] *Id.*

[17] Stuart Grassian, Psychiatric Effects of Solitary Confinement 325, 331 Wash. U. J. Law & Pol'y, Vol. 22 (2006), *available at* https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1362&context=law_journal_law_policy.

[18] Scharff Smith, *supra* note 12, at 492-493.

[19] Ramin Skibba, *Solitary Confinement Screws up The Brains of Prisoners*, Newsweek (Apr. 18, 2017), https://www.newsweek.com/2017/04/28/solitary-confinement-prisoners-behave-badly-screws-brains-585541.html.

[20] Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics* at 104 (citing H. Reyes, *The worst scars are in the mind: psychological torture.* Int. Rev. Red Cross 89:591-617 (2007) and M. Basoglu et al., *Torture vs. other cruel, inhuman and degrading treatment: is the distinction real or apparent?* Arch. Gen. Psych. 64:277-85 (2007)).

[21] Lauren Brinkley-Rubinstein et al., *Association of Restrictive Housing During Incarceration With Mortality After Release,* JAMA (October 4, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.

Carolina from 2000 to 2015 concluded, "Compared with individuals who were incarcerated and not placed in restrictive housing [also known as solitary confinement], individuals who spent any time in restrictive housing were 24% more likely to die in the first year after release, especially from suicide (78% more likely) and homicide (54% more likely); they were also 127% more likely to die of an opioid overdose in the first 2 weeks after release."[22] Social pain can cause ongoing suffering for people because of "humans' ability to relive social pain months or even years later."[23]

The "massive body" of research documenting the severe adverse impacts of solitary confinement have led many state policy makers and corrections departments to drastically reduce and limit the use of solitary confinement. States who have reformed their laws and policies have considered the standard set by the "Nelson Mandela Rules," a resolution unanimously adopted by the United Nations General Assembly in 2015. The Nelson Mandela Rules prohibit indefinite solitary confinement; considers "prolonged solitary confinement" as a time period more than 15 consecutive days; and prescribes that solitary confinement be used "only in exceptional cases as a last resort, for as short a time as possible."[24]

Several states have a maximum sanction of disciplinary segregation that is far below what is authorized in Oregon. Further, a few states have led the way in ascribing to the guidelines set forth in the "Nelson Mandela Rules." Colorado[25], Idaho[26], and New York[27] have all limited solitary confinement as a discipline sanction to a maximum of 15 consecutive days. New York's legislation, passed in 2021 and to take effect on March 31, 2022, limits *all forms* of solitary confinement to a maximum of 15 days.[28] Similarly, in 2019, New Jersey enacted a reform limiting solitary confinement of all incarcerated persons to no more than 20 consecutive days, and no more than 30 days in a 60-day period.[29]

Rick Raemish, Executive Director of the Colorado Department of Corrections, wrote the following in a blog post of the American Civil Liberties Union in December 2018 after Colorado became the first state in the country to limit solitary confinement to a maximum of 15 consecutive days in 2017,

---

[22] *Id.*

[23] Herring, *supra* note 15.

[24] G.A. Res. 70/175, *supra* note 5, at 17.

[25] Colo. Dep't of Corrections, Reg. No. 150-01, Code of Penal Discipline, Attachment A (Nov. 1, 2019), available at https://cdoc.colorado.gov/about/department-policies.

[26] Idaho Dep't of Corrections, Control No. 318.02.01.001, Standard Operating Procedure, Disciplinary Procedures for Inmates at 31 (Oct. 5, 2018), *available at* http://forms.idoc.idaho.gov/WebLink/0/edoc/281212/Disciplinary%20Procedures%20for%20Inmates.pdf.

[27] S.B. 2836, 2021 Leg., 244th Sess. (N.Y. 2021), *available at* https://www.nysenate.gov/legislation/bills/2021/s2836.

[28] Notably, any confinement to a cell for more than 17 hours is considered solitary confinement under the New York law, lower than the 22 hours in the Mandela Rule. *See id.*

[29] N.J. A314, 218th Leg., Reg. Sess. (N.J. 2019); Isolated Confinement Restriction Act, Pub. L. 2019, Ch. 60, available at https://www.njleg.state.nj.us/2018/Bills/AL19/160_.PDF.

In Colorado, long-term solitary confinement used to be a tool that was regularly used in corrections. The problem is that it was not corrective at all. It was indiscriminate punishment that too often amounted to torture and did not make anyone safer.

The practice was pervasive because it was considered reasonable and effective. It was neither. In practice, long-term isolation punished people in a way that not only lacked humanity but sense. And when a program lacks both sense and humanity, the results are as clear as they are disastrous: dehumanization and harm.

We have ended the use of long-term solitary confinement in our state and limited its use to 15 days at a time. This limitation follows the international human rights standards from the United Nations' Nelson Mandela Rules, which state that keeping someone in solitary confinement for over 15 days is torture.

. . .

We made this policy change because we are committed to public safety. The research has shown that housing someone in a cell the size of a parking space for 22 or more hours per day for extended periods of time damages them both mentally and physically. Since most people who go to prison – 97 percent – return to their community, that means we were releasing people back into their communities in worse shape than when they arrived. That's why long-term restrictive housing needs to end, not only for the health and well-being of incarcerated people – but for the communities to which they will return.[30]

The Vera Institute of Justice assessed ODOC's use of disciplinary segregation in 2015 and reported that "ODOC's maximum DSU sanction of 120 days with a possible upward deviation of 60 days (for a total of 180 days) is long compared to other jurisdictions."[31] The report further found that "DSU is frequently used as a sanction for non-violent rule violations" and that "[a]dults in custody experience a number of collateral consequences from a sanction to DSU. . . includ[ing] incentive-level reduction, program failures and/or loss of eligibility for certain programs, loss of employment, loss of housing, and loss of recreation yard time."[32] These collateral consequences can cause AICs to experience feelings of "despair" and hopelessness, leading them to "question whether they should strive to accomplish anything in prison when their accomplishments can so easily be stripped away."[33] This impact on AICs' morale and loss of privileges, programs, and work opportunities can diminish their ability to succeed after their re-entry.

---

[30] Rick Raemisch, ACLU, *Why I Ended the Horror of Long-Term Solitary in Colorado's Prisons*, (Dec. 15, 2018) https://www.aclu.org/blog/prisoners-rights/solitary-confinement/why-i-ended-horror-long-term-solitary-colorados-prisons.
[31] Alison Hastings et al., s*upra* note 10, at 25.
[32] Alison Hastings et al., s*upra* note 10, at 23..
[33] *Id*.

The ODOC's use of disciplinary segregation is inhumane and is nowhere near to living up to the philosophy of the Oregon Way: to treat AICs "in the most humane way possible."[34]

The sanction ordered for Mr. Wilson of 120 days in DSU and loss of privileges, in addition to being inhumane, is beyond the bounds of the laws and regulations governing ODOC. ORS 421.105(1) provides,

> The superintendent may enforce obedience to the rules for the government of the adults in custody in the institution under the supervision of the superintendent by *appropriate* punishment but neither the superintendent nor any other prison official or employee may strike or inflict physical violence except in self-defense, or inflict any cruel or unusual punishment.

(Emphasis added).

This sanction is woefully inappropriate and is therefore contrary to this state law and to regulations governing ODOC's disciplinary process.

First, Mr. Wilson should never have been put in formal proceedings that could result in such a severe sanction. The rules regarding the "Procedures for Handling Misconduct by AICs" state,

> Employees shall be expected to use less formal procedures if the act or acts of misconduct do not constitute an immediate and continued threat to life, health, facility security, employee authority, or serious property damage or destruction, and in a manner that promotes and embraces the Oregon Accountability Model. Less formal corrective action may include: a reprimand, a warning, counseling, a conduct order, or as otherwise authorized by the functional unit manager, Officer-in-Charge, or designee.

OAR 291-105-0021(1).

The record is void of any indication that the alleged actions of Mr. Wilson constituted "an immediate and continued threat to life, health, facility security, employee authority, or serious property damage or destruction." At worst, the record suggests that Mr. Wilson had a child's toy phone in his work area in the library. All other allegations made were of longstanding authorized conduct within the OSCI library: email communications by the library coordinator with attorneys, outside organizations, and court and Board of Parole personnel; the printing of documents under the supervision of the library coordinator; the scheduling of legal calls by the library coordinator; and the use of thumb drives to store legal materials. The absence of any threat or harm explains why Mr. Wilson remained in general population, living on the incentive

---

[34] Testimony of Colette Peters, *supra* note 2; *see also, e.g.*, Oregon Department of Corrections, 2021-23 Agency Budget Request, at 316, *available at* https://www.oregon.gov/doc/Documents/2021-23-agency-request-budget.pdf

unit, throughout the seven-month investigation. Concerns of misconduct by Mr. Wilson should have been handled using "less formal" proceedings and a sanction of solitary confinement should never have been available.

Second, Mr. Wilson should never have been sanctioned to *any time* in disciplinary segregation. The ODOC rules provide:

> Placement on Disciplinary Segregation Status: An AIC charged with committing a rule violation may be placed on disciplinary segregation status pending resolution of the charge through a formal hearing. This action will be taken when the functional unit manager or designee or the Officer-in-Charge determines that the **alleged rule violation or violations are of such seriousness that the security of a facility is at risk and requires immediate removal of the AIC from the general population, or determines that the AIC is a threat to the community,** or determines that the AIC is likely to escape or abscond.

OAR 291-105-0021(3) (emphasis added).

Again, the record is void of any indication that Mr. Wilson's actions placed the security of OSCI at risk or threatened the community, requiring his immediate removal from general population. Any suggestion that the child's toy phone (pictured above) confiscated from the library by investigators posed a security risk or threat to the community is absurd. Any suggestion that Ms. McKinney downloading materials for AICs, in furtherance of a more humane and "normal" work environment, is an indication that Mr. Wilson poses a security risk to the community is likewise absurd. Furthermore, the only discernable results of the alleged violations consisted of: Ms. McKinney sending and receiving emails and printing out emails and attachments for Mr. Wilson related to legal matters, as is done for all AICs who seek legal help from the OSCI legal assistants; Ms. McKinney sending and receiving emails and printing out email attachments for Mr. Wilson related to his work to create pro-social programs in the prison as authorized by the ODOC administration; and Ms. McKinney scheduling legal calls for Mr. Wilson, as is done for all AICs by the library coordinator. It is impossible to reasonably conclude that these results rise to the level of removing Mr. Wilson from general population and placing him in solitary confinement. Again, while the seven-month investigation was pending, Mr. Wilson remained in general population, living on the incentive unit, with no issues.

ODOC also failed to comply with its rule that sanctions ordered for rule violations are to be "individualized" to the circumstances and the incarcerated person. The rule states, "adults in custody found in violation of the rules of prohibited conduct are issued individualized sanctions based upon the totality of circumstances (including . . . the adult in custody's behavior, strengths, and needs . . . ." OAR 291-105-0005(3)(c). In this case, a gratuitously punitive sanction was imposed despite the absence of any harm or threat, and without consideration of Mr. Wilson's exemplary record during his incarceration. Mr. Wilson not only has been misconduct-free for 30 years, he has been a model for all AICs in his commitment to serving others in his community, demonstrating that he is a compassionate individual of strong moral character. Under these circumstances, a sanction of even one day in solitary confinement is inconceivable.

Sanctioning Mr. Wilson to any time in solitary confinement is completely inappropriate, unjustified, and a clear injustice. Sanctioning Mr. Wilson to 120 days of solitary confinement, the maximum available sanction for a violation, is unconscionable – serving no purpose other than grotesque punishment for punishment's sake.

> *"Even though I have interviewed the Dalai Lama, Maya Angelou and other prominent and inspiring figures, one of the most profound experiences for me personally has been to interview Mark [Wilson] and other spiritually-oriented men at OSCI. I believe Mark's story of transformation demonstrates the positive change, redemption and personal insights that we are all capable of...."*
>
> –Khashyar Darvich, Producer-Director, Wakan Films, who filmed and interviewed Mark Wilson over a ten-year period for a documentary film about men who commit crimes as youth and have experienced transformation through a decades-long process of accepting and facing their crimes and dedicating themselves to a personal and spiritual practice of yoga and meditation.

## Conclusion

At every stage, this disciplinary proceeding has inflicted a series of harms upon Mr. Wilson that are wholly unwarranted and unjust, culminating in the grievous 120-day sanction of solitary confinement that he is now serving. ODOC removed Mr. Wilson from a longstanding, well-earned work assignment and launched an investigation based on information from a dubious source, a confidential informant reputed to have fabricated allegations against other AICs. At his hearing, Mr. Wilson was shackled and prevented from accessing the written materials he had prepared to defend himself. Then, ODOC issued guilty findings against Mr. Wilson without providing any factual basis to support them. Finally, despite lacking any evidence that Mr. Wilson represents a security threat, ODOC imposed the maximum possible sanction of 120 days in solitary confinement, showing a complete disregard for Mr. Wilson's exceptional record of ethical and pro-social behavior over the last 30 years. In doing so, ODOC failed to follow state law and agency rules designed to protect AICs from inappropriate punishments, and defied its pledge to treat AICs humanely through "the Oregon Way."

In the interest of justice, we request that the final disciplinary order issued against Mark J. Wilson on August 31, 2021 be vacated pursuant to OAR 291-105-0100, and that Mr. Wilson's

status as OSCI be restored to its previous status, including his housing in the incentive unit in OSCI and his position as a legal assistant in the OSCI library.

Sincerely,

*Julia Yoshimoto*

Julia Yoshimoto
Attorney

 /s/ *Juan Chavez*

Juan Chavez
Attorney

Encl:   Summary of Mark Wilson's Record in ODOC

cc:    Colette Peters, Director, Oregon Department of Corrections
       Michael Dembrow, Oregon State Senator
       Mark Wilson

## Summary of Mark Wilson's Record in ODOC
1988 to Present

### Treatment and Self-Improvement Programs

Completed hundreds of hours of counseling in more than 100 programs, from 1988 to the present, including:

| | |
|---|---|
| 1988 Nov – 2010 Oct | Mental health treatment/counseling, 152+ months |
| 1989 Mar – 1992 Oct | Substance abuse treatment, 42 months |
| 1992 – 1993 | Anger management counseling 12 months |
| 1995 Feb – 2004 Sept | Victim Awareness & Empathy Development Group, 108 months |
| 2008 Mar – 2013 | Insight Development Group, 60 months |
| 2008 – present | Empathy Development & Victim Awareness Group, 108+ months |
| 2010 Jun – 2014 Apr | Violent Offender Group, 48 months |
| 2012 Jan – 2012 Apr | Presence Process Addiction Recovery Class, 3 months |
| 2015 Oct – present | Impaired Driver Impact Panels, 16+ months |

### Activities in Service to Others

Extensive commitment to serving others including but not limited to:

| | |
|---|---|
| 1988 – present | Legal assistant for other prisoners |
| 1994 – 1998 | Volunteer visiting room photographer |
| 1995 Feb – 2004 Sept | Co-founder and co-facilitator of a victim awareness and empathy development group |
| 1995 May – 2004 Sept | Facilitator for crime prevention group of at-risk youth |
| 1999 Feb – 2004 Sept | Hospice volunteer for 23 terminally ill prisoners |
| 2000 | Co-creator of a 90-day pilot victim awareness and empathy development group for Josephine County Parole and Probation |
| 2000 | Creator and facilitator of three-day forgiveness seminar |
| 2000 – 2002 | Co-facilitator of victim awareness panels |

Summary of Mark Wilson's Record in ODOC  1

| | |
|---|---|
| 2003 – 2009 | Member of the Western Prison Project (nka Partnership for Safety and Justice) Prisoner Advisory Committee and Legal Advisory Committee |
| 2005 Jul – 2008 Jan | GED/ABE Tutor |
| 2008 Mar – 2013 | Co-founder and co-facilitator of Insight Development Group |
| 2008 – present | Co-creator and co-facilitator of an empathy development and awareness group |
| 2014 – present | Assist with University of Oregon's Prison Education Program to advance and promote the program's credit and non-credit classes and workshops in OSCI and ODOC |
| 2015 Feb – present | Co-founder of weekly Buddhist study group |
| 2015 Aug – present | Volunteer yoga and mindfulness instructor for prisoners with developmental disabilities and severe mental illness |
| 2015 Oct – present | Co-creator and co-facilitator of impaired driver impact panels |
| 2016 Jun – 2016 Sept | Volunteer gardener in the OSCI garden |
| 2018 Sept – present | Co-coordinated stakeholder and community outreach meetings with the Oregon Justice Resource Center; hosted over 40 state leaders, on multiple days, at OSCI to educate them on the experiences of juvenile lifers |
| 2018 Sept – present | Special Advisor to the Oregon Justice Resource Center |
| 2019 Jun | Wrote *A Guide to Preparing for Your Murder Review Hearing* published by the Oregon Justice Resource Center and distributed by ODOC to prisons state-wide |
| 2019 – present | Co-creator and co-coordinator with the Oregon Justice Resource Center of the Peer Support Program, a peer support mentorship program for OYA youth transferring to ODOC custody |
| 2019 Jun – present | Member of the Oregon State Legislature's Prison Education Workgroup, led by Senator Michael Dembrow |

Charitable Giving

Commitment to charitable giving and coordinating fundraising efforts, which have raised more than $11,000 for crime victims, children, and others in need, including:

| | |
|---|---|
| 1993 – 2004 Sept | Participated in six annual charitable races and donations for Make-A-Wish Foundation |
| 2004 Jun | $2,030 for burial expenses for former prisoner |
| 2004 Sept & 2009 Oct | $1,372 for The Dougy Center for Grieving Children, Portland |
| 2007 Aug – 2009 Dec | $400, personal contribution, for the Sexual Assault Victims' Emergency Medical Response (SAVE) Fund administered by the Oregon Department of Justice Crime Victims' Assistance Section |
| 2008 – present | Participation in annual walkathon and donations for Gales Creek Children's Diabetes Camp, American Foundation for Suicide Prevention, Angel Tree |
| 2009 Apr – 2009 Oct | $7,505.13 for counseling from three children who witnessed their father murder their mother on March 16, 2009 |
| 2017 Oct | Participated in American Red Cross Eagle Creek Fire Relief Fund, total funds raised: $1,000 |

Education and Vocational Training

Commitment to continuously furthering his education by participating in opportunities including:

- Vocational Training

| | |
|---|---|
| 1989 Mar – 1989 Jul | Print Shop Operations, Vocational Training Program |
| 1999 Apr – 1999 Feb | End of Life Hospice Care Training, 36 hours |
| 1999 Feb – 2004 Sept | Monthly In Service Hospice Training |
| 2000 Mar | Basic Meditation Training, 30 hours |
| 2001 Feb | Advanced Family Mediation Training, 12 hours |
| 2005 Jun | TELT – GED/ABE Education Tutor Training |
| 2010 Nov – 2011 Apr | Business Technology, Computer Aided Design (AutoCAD) certification program |

Summary of Mark Wilson's Record in ODOC  3

| 2015 Mar | Protecting Human Research Participants web-based training course from the National Institute of Health |
| 2015 Aug – 2016 Mar | Certified Yoga Instructor Training, 200 hours |

- **Higher Education**

| 1988 | Completed half credit of high school and earned high school diploma |
| 1988 Fall | Began taking college-level course through Chemeketa Community College |
| 1995 Mar 17 | Associates of Arts Degree, Chemeketa Community College, 3.52 GPA |
| 2002–2003 | Completed three law classes offered by Ohio University |
| 2017 Winter | Teaching Assistant, University of Oregon class Autobiography as Political Agency II |
| 2017 Spring | Teaching Assistant, University of Oregon class Prison Narratives and Social Change |
| 2018 Winter | Teaching Assistant, University of Oregon class Autobiography as Political Agency |
| 2019 Jun 6 | Bachelor of Arts Degree, Majoring in General Social Sciences with a focus on Crime, Law and Society, University of Oregon, GPA 4.08 |
| 2020 Winter | Teaching Assistant, University of Oregon class Autobiography as Political Agency; earned master's-level credit |

## Institutional Employment History

Held nine jobs during over thirty years of incarceration, including:

| Corridor Orderly | 1988 Jul – 1988 Sept |
| Legal Assistant | 1989 Oct – 1990 Jun; 1991 Nov – 2004 Sept; 2012 Jul – 2021 Jan. Mark Wilson has worked as a legal assistant throughout most of his incarceration. He finds this position the most rewarding because it is challenging and allows him to be of service to others in very meaningful ways. |

Summary of Mark Wilson's Record in ODOC  4

| | |
|---|---|
| Legal Clerk | 1989 Aug – Dec 1989; 2012 Feb – 2012 Jul |
| UNIBASE Telephone Operator/Data Entry | 1990 Aug – 1991 Sept |
| Clothing Room Worker | 2004 Oct – 2005 Jun |
| Education Clerk | 2005 Jun – 2006 Jan |
| GED/ABE Education Tutor | 2005 Jul – 2008 Jan |
| Engineering Support Unit GIS Technician | 2008 Feb – 2010 Apr |
| Print Shop – Pre-press Assembly | 2011 Apr – 2012 Jan |

<u>Publications</u>

Published a vast number of articles over the past 30+ years of incarceration, educating the public on criminal justice news and the experiences of incarcerated people.

*Catholic Sentinel*, Portland, OR

| | |
|---|---|
| Catholic Community Flourishes in Salem Prison | 1989 Apr 28 |
| Hoping the Padre Serves a Stiff Sentence | 1989 May 26 |
| Prisons Need Long-Term Planning | 1989 Jul 7 |
| Parable Brings Out the Rich Man in All of Us | 1989 Oct 6 |
| Murder is Murder No Matter Who Commits It | 1991 Feb 1 |
| Inmate Has Fond Memories; Best Wishes to Prison Chaplain | 1999 Nov 5 |

*The Printer's Northwest Trader*, Portland, OR

| | |
|---|---|
| Rehabilitation Training, You Can Help | 1989 Aug 8 |

*Legal Assistant Today*, Costa Mesa, CA

| | |
|---|---|
| Not Always Frivolous (Part 1) | 1996 Jan/Feb |
| Civil on the Side (Part 2) | 1996 Mar/Apr |

*Prison Legal News*, Lake Worth, FL

| | |
|---|---|
| ★ Regular Contributing Writer | 1998 – Present |

For a list of articles, visit www.prisonlegalnews.org and search for "Mark Wilson"

Summary of Mark Wilson's Record in ODOC  5

*The Oregon Defense Attorney*, OCDLA, Eugene, OR
    Post-Conviction Relief: The Last Hope            2002 Mar

*Hope Magazine*, Brooklin, ME
    Finding the Heart            2002 Nov/Dec

*The Mindfulness Bell* (Issue No. 32)
    Practicing the Mindfulness Trainings in Prison     2002/2003
           Winter

*Criminal Legal News*, Lake Worth, FL
    ★ Regular Contributing Writer     2018 Dec –
    For a list of articles, visit www.criminallegalnews.org and search for  Present
    "Mark Wilson"

*The Appeal*, https://theappeal.org            2020 Sep 14
    Far From Beyond Saving, Prison Youth Deserve Every
    Opportunity for Meaningful Rehabilitation

<u>Additional Evidence of Rehabilitation</u>

Highest possible incentive level and eligible for incentive/honor housing and other privileges since 1993.

Discipline Record: Prior to the Final Order at issue here, in August 2021, Mark has only incurred a single, low-level prison rule violation for being in an unauthorized area on August 22, 1991.

No drug or alcohol use since 1990, 30 years ago.

No participation or affiliation with prison security threat groups or gangs.

No acts of violence, criminal or abusive behavior against any other person during his 32 years of incarceration.

Summary of Mark Wilson's Record in ODOC  6

 **Oregon**

Kate Brown, Governor

**Oregon Department of Corrections**
Office of the Inspector General
2575 Center Street NE
Salem, OR 97301-4667
Voice: 503-945-0988
Fax: 503-373-7092



October 28, 2021

Mark Wilson SID# 7449142
Oregon State Correctional Institution
3405 Deer Park Dr SE
Salem, OR 97310-9385

Dear Mark Wilson,

This will acknowledge receipt of a written request to vacate case number 2103 OSCI 0056 OSCI 35 in the interest of justice. This request was submitted by Julia Yoshimoto and Juan Chavez of the Oregon Justice Resource Center on your behalf. Our office received this request on September 29, 2021.

The above mentioned case, as well as your overall misconduct and institution history, have been thoroughly reviewed. Your case was handled in accordance with the provisions outlined in the Department of Corrections rules governing Prohibited Conduct and Processing Disciplinary Actions (OAR 291-105). Our findings show there was substantial compliance with the rule, the findings were based on a preponderance of the evidence, and the sanctions recommended were appropriate given the circumstances of this case and your history.

At this time I find no compelling reason to vacate, modify, or re-open this case.

Sincerely,

*Craig Prins*

Craig Prins
Inspector General

/mds
cc: Rob Persson, Assistant Director
     File

Declaration of Nofziger, Exhibit 4, Page 1 of 1

**CERTIFICATE OF SERVICE**

I certify that on November  29 , 2021, I served the foregoing JEREMY NOFZIGER'S

DECLARATION IN SUPPORT OF DEFENDANT JERRY PLANTE'S RESPONSE IN

OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

upon the parties hereto by the method indicated below, and addressed to the following:

| | |
|---|---|
| Juan C. Chavez | ___ HAND DELIVERY |
| Franz H. Bruggemeier | ___ MAIL DELIVERY |
| Oregon Justice Resource Center | ___ OVERNIGHT MAIL |
| PO Box 5248 | ___ TELECOPY (FAX) |
| Portland, OR 97208 | _X_ E-MAIL |
| *Attorneys for Plaintiff* | _X_ E-SERVE |

_s/ Shannon M. Vincent_
SHANNON M. VINCENT #054700
Senior Assistant Attorney General
KENNETH C. CROWLEY #883554
Senior Assistant Attorney General
Trial Attorney
Tel (503) 947-4700
Fax (503) 947-4791
Shannon.M.Vincent@doj.state.or.us
Kenneth.C.Crowley@doj.state.or.us
Of Attorneys for Defendant

Page 1 -   CERTIFICATE OF SERVICE
SMV/jm8/151894191.docx