**Juan C. Chavez**, OSB #136428
**Franz H. Bruggemeier**, OSB #163533
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

    Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| MARK WILSON<br><br>Plaintiffs,<br>    v.<br><br>JERRY PLANTE, and JOHN DOES 1-10.<br><br>Defendants. | Case No. 6:21-cv-01606-SI<br><br>DECLARATION OF<br>JAMES WANTZ |

I, James Wantz, hereby declare and state as follows:

1.  I am 18 years of age or older and am otherwise competent to make this declaration. I make this declaration on personal knowledge of the matters stated in this declaration or from sources deemed reliable.

2.  I worked in the OSCI Library from approx. 2004 until my release in 2012. I worked in the General Library side for most of my time. I was a General Clerk for 1 year, Lead Library Clerk for 5 years, and Legal Clerk for 2 years. During that time, I worked under several different Library Coordinators:

   1. Mr. Hunter
   2. Ms. Hopkins
   3. Mr. Sprenger
   4. Mr. Miller
   5. And staff that filled in for the Library Coordinator for as long as 2 weeks:
      1. Ms. Taylor
      2. Mr. Taylor
      3. Ms. Mondragon
      4. Ms. Ellison
      5. Ms. Hatfield

3. During my 12.5 year sentence I never received a Disciplinary Report (DR).

4. The culture in the library was accepting and mellow. We prided ourselves that our library was the only library in the Oregon Department of Corrections that inmates (we were called inmates at that time – A.I.C.s now) could enter and browse the shelves in search of books. The library was known as a chill place to work – no drama.

5. Clerks organized small parties – staff approved – for holidays and special events. Staff sometimes brought in outside food & decorations for these special events: my first taste of shrimp scampi was when a staff member brought it in for a party. We were told not to let other inmates or staff know about these special events, not because they were against the rules, but because they would want to be involved and would eat our food. Other outside food we had included: pizza, candy bars, brownies, trail mixes, chips, and coffee. Even staff who didn't bring in food would get cinnamon rolls from the kitchen sent over as a sign of worker appreciation.

6. Staff members brought seasonal decorations to lighten up the atmosphere in the library. We had little Christmas trees, tinsel, and ornaments for Christmas; ghosts, witches, and candy corn for Halloween; and hearts, chocolate, and candies for Valentine's Day.

7. The first time I was introduced to Angry Birds was when the Library Coordinator's supervisor showed me on a personal cell phone. We were discussing "apps" and I asked

the Library Coordinator how they could be so addictive. The supervisor was in on the conversation and that's when she showed me Angry Birds, and said she was addicted to it. The supervisor said she knew she wasn't supposed to have her personal cell phone inside the institution, but the implication was that it happened often. Several Library Coordinators forgot to leave their cell phones outside. We, the clerks, only knew this when the phones would ring from inside a lunch box or jacket pocket. I was never allowed to touch or use a cell phone.

8. During all the years I worked in the library, I had access to a computer with a printer attached. As a Library Clerk, the dot matrix printer was used to print book labels, inventory sheets, and shelf labels. As a Legal Clerk, I used the sheet fed hp deskjet printer to respond to inmate communications (Kytes) regarding scheduled appointments in the Legal Library, to send information to inmates in Segregation, and to print call-out sheets for the Library Coordinator. The printer was on my desk attached to my computer. Several times over the years the IT department would comment that inmates weren't supposed to have access to printers and would take them away, saying we had to print everything on the Library Coordinator's printer. The Library Coordinator would get all print requests for a couple days, get overwhelmed at all that needed to be printed (legal filings, labels, call-outs, case law) and would talk to their supervisor. We got our printers back every single time the IT department took them away.

9. During my time as Legal Clerk, the institution started to assign flash drives to inmates to store their legal work. The flash drives were for legal work only, however, I had permission to use the drive for college or institutional club work. During the time I was a member of the institution Toastmasters Club, I created a club newsletter by using the

Microsoft Publisher software on my Legal Clerk computer. I asked for permission to take my flash drive to the Transitions Department to download photos and graphics for the club that I would use to create the newsletter. Permission to do the newsletter was given by the Library Coordinator, their supervisor at the time, and the Transitions Coordinator (who oversaw the Toastmasters club). Copies of these newsletters were made on the library copier and provided to all the staff members and club members who were interested - free of charge.

10. When I started taking college classes through Chemeketa Community College, a Library Coordinator authorized me to work on homework and college papers on the Legal Clerk computer. I also received authorization to work on personal writing projects. I was authorized to print out my college research papers and stories I'd written for a writing class. I was not the exception. Library Coordinators agreed to the clerks' use of computers for club business, college classes, and proposals for the prison. Their primary concern was that nothing we did should ever make the Library Coordinator look bad. Before I was paroled, a Library Coordinator transferred all my personal writings from the authorized inmate flash drive to a CD-R so I could take them home with me.

11. One of the Library Coordinators authorized us to create a music compact disc lending library for the institution. Music cds were donated by inmates who were done listening to them and wanted to buy more (inmates were only allowed to keep 25 cds in their property). These discs were property of the library for other inmates to check out. We had a library of several hundred cds. The Coordinator at the time took home inmate-owned compact discs to copy so we could add them to the lending library.

12. I did receive special treatment from several Library Coordinators over the years: time off, permission to go to yard instead of coming to work on time, permission to take more books back to my cell than was allowed. One memorable occurrence was when the institution was looking for a new Coordinator because a previous Coordinator left. At the time Mr. Hunter filled in temporarily. From my journal:

*4-1-06*
*Hunter said I was the only one he would recommend the new librarian deal with in regards to the general library. And that I am doing a good job. More than both was his refusal to let me pay for the copies of my book. He just said to copy them. And he's Mr. By-the-Book. Wow. Big surprise.*

13. The mood in the library was usually calm and professional, however there were times when the Library Coordinators acted unprofessional and hurtful. The below example is directly from my journal, written at the time of the incident. Italicized below is copied directly from my journal - errors and all.

*March 28, 2011*
*The butt of a very bad joke in the library. Hunter called me to the desk to listen to laughing on the telephone. Then he tells me that he's just had a phone call from Washington County about setting up a telephone hearing for inmate James Wantz for new charges. I couldn't understand the connection between the laughing and the new charges. My heart started to race and I felt the very familiar pit of fear and tightness in my chest. That feeling that something bad is going to happen and I am the one it is going to happen to.*

*Even after he explained that it was a joke from upfront, I still didn't understand what that had to do with the new charges. He told me about the pranks that they were all playing on each other: transferred calls, false messages, etc. I shrugged it off and smirked but I still don't know why he thought he needed to tell me. Maybe he wanted to let me in on the joke, but it was no joke: I fear hearing about new charges being brought against me right before I get out.*

*I used to think that I feared getting out much more, but this showed me that I don't want to stay here. I don't want to be hit with more time.*
*But I really wish he wouldn't have involved me in their 'fun'. I don't think it's funny.*

> *Later on he got a call from an attorney and thought it was a joke as well. He kept asking the guy if he'd been put up to it. Jokes gone bad, and unprofessional by far.*
>
> *March 30, 2011*
> *Ms. Ellison apologized for the joke that Hunter involved me in. she made sure that I know that she was messes with him and not me. It was nice to hear from her, and I told her that I wish that I wouldn't have been involved. It was nice to hear her tell me that.*

14. Many inmate workers came and went over the years. Occasionally, the Library Coordinator would let us know how someone was doing. The Coordinator would say they had looked them up on the Chronos (not sure about spelling) and tell us how they were doing. Once or twice I recall a Library Coordinator saying they'd heard specifically from a former inmate because they called and spoke with the Coordinator. When I was getting ready to parole, I was encouraged to call the Coordinator to let them know how I was doing once I got out - but not to call repeatedly because that would be against the rules.

15. I knew Mark Wilson before he began to work in the legal library. I would schedule him for regular legal sessions and memorized his SID# because I was entering it so often. We were also in a therapy group together. It was based in the chapel. In the group was the first time I heard Mark tell of his offenses - and the first time he heard me talk about my offenses. We were in the group for well over a year together. During this time, I returned to work at the Engineering Support Unit (where Mark worked) on a part time basis. Mark and I spent time talking about the group when we took breaks from cadastral tax-mapping. I was especially excited when Mark shared his writing with me - I was an avid writer and looked forward to reading his work.

16. Over the time we worked together, were in group together, and in the library together, I grew to consider Mark a friend. It didn't start that way. At first, I was very intimidated by

him - his legal acumen is astounding and he hardly talked about anything besides the law. I developed great respect for him when I heard about his hospice work, read his writing (not the legal stuff), and listened to him in group. He was insightful, knowledgeable, and eager to help guys with their legal work. He has always been honest and trustworthy to me. I paroled in 2012, and I've stayed in touch with him intermittently over the last 10 years.

**I declare under penalty of perjury and under the laws of the United States, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, memory, and belief.**

EXECUTED on this 30th day of November

*s/ James Wantz*
James Wantz
Declarant