**Juan C. Chavez**, OSB #136428
**Franz H. Bruggemeier**, OSB #163533
**Benjamin W. Haile**, OSB #040660
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

        Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| MARK WILSON | Case No. 6:21-cv-01606-SI |
|     Plaintiffs, | SECOND AMENDED COMPLAINT AND SUPPLEMENTAL COMPLAINT |
|     v. | |
| JERRY PLANTE, RONNIE FOSS, CRAIG PRINS, JOSH HIGHBERGER, MELISSA NOFZIGER, COLLETTE PETERS, MARIA D. GARCIA, and JOHN DOES 1-10. | Civil Rights Action (42 U.S.C. § 1983) |
|     Defendants. | |

1.      This is a civil rights action brought by Plaintiff, Mark J. Wilson, a state prisoner pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Defendants have retaliated against Plaintiff for his protected conduct as an inmate legal assistant, prison advocate, and for his efforts to access the courts in his own case. Plaintiff also alleges Defendants have violated his right to due process in his disciplinary hearing. Plaintiff seeks damages for actions by Defendants which violate his protected constitutional rights pursuant to the First and Fourteenth Amendments to the Constitution. Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages and reasonable costs and attorney's fees, pursuant to 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

2.      This court has jurisdiction over Plaintiff's claims for violation of federal constitutional

rights, pursuant to 28 U.S.C. §§ 1331(a) and 1343 because the cause of action arises under 42

U.S.C. § 1983.

3.      Most actions alleged herein occurred in Marion County, Oregon. Venue is properly

before this District of Oregon pursuant to 28 U.S.C. § 1391(b) where all of the events giving rise

to these claims occurred in this judicial district and because Defendants are subject to personal

jurisdiction in the District Court of Oregon.

## PARTIES

4.      Plaintiff MARK J. WILSON is, and was at all times relevant, a prisoner of the Oregon

Department of Corrections (ODOC). At all relevant times, he was and is currently confined

within the Oregon State Correctional Institution (OSCI) in Salem, Marion County Oregon. At all

relevant times, Plaintiff was employed at OSCI as an inmate legal assistant (ILA), as defined by

OAR 291-139-0130(2) and OAR 291-139-0160.

5.      Defendant JERRY K. PLANTE is, and was at all times relevant, an employee of the

ODOC, assigned as an inspector in the Special Investigation Unit (SIU). He has been personally

involved in the violations alleged herein. He is sued in his official and individual capacities.

6.      Defendant RONNIE FOSS is, and was at all times relevant, an employee of the ODOC,

assigned as a disciplinary hearings officer. She has been personally involved in the violations

alleged herein. She is sued in her official and individual capacities.

7.      Defendant CRAIG PRINS is, and was at all times relevant, an employee of the ODOC,

assigned as the Inspector General for the Oregon Department of Corrections. He has been

personally involved in the violations alleged herein. He is sued in his official and individual capacities.

8.      Defendant JOSH HIGHBERGER is, and was at all times relevant, an employee of the ODOC, assigned as the Superintendent and functional unit manager of OSCI. He has been personally involved in the violations alleged herein. He is sued in his official and individual capacities.

9.      Defendant MELISSA NOFZIGER is, and was at all times relevant, an employee of the ODOC, assigned as an Assistant Inspector General of ODOC. She has been personally involved in the violations alleged herein. She is sued in her official and individual capacities.

10.     Defendant JOHN and JANE DOES 1-20 are and were at all times relevant, employees of the ODOC whose identities are currently unknown to Plaintiff. All Doe Defendants have been personally involved in the violations alleged herein. Plaintiff will amend this complaint to formally name all DOE Defendants once their identifies are revealed to Plaintiff in discovery. All Doe Defendants are sued in their official and individual capacities.

11.     Defendant COLLETTE PETERS is, and was at all times relevant, the Director of the ODOC. She has been personally involved in the violations alleged herein. She is sued in her official and individual capacities.

12.     Defendant MARIA D. GARCIA is, and was at all times relevant, an employee of the ODOC, assigned as the legislative and government relations manager. She has been personally involved in the violations alleged herein. She is sued in her official and individual capacities.

13.     All Defendants have acted, and continue to act, at all times relevant under color of state law.

## FACTUAL ALLEGATIONS

**Relevant Polices, Practices, and Rules of the ODOC**

14.     The "Oregon Way" is a philosophical approach to corrections created by the ODOC based on best practices in security and the belief that humanizing and normalizing the prison environment is beneficial for employees and prisoners. This innovative approach to incarceration stems from an investigation and immersion in the Norwegian correction system. The Norwegian system is driven by the idea that incarcerated people are "human beings in prisons."

15.     ODOC Director Collette Peters, who developed and promotes the "Oregon Way," explained that Oregon prisons should be places where punishment is the absence of freedom and community, but where "everything else models life on the outside to every degree possible" and prisoners are treated with dignity.

16.     ODOC Director Peters has stated the "Oregon Way" policy in testimony before the Oregon Legislature, stating that "we now know that in order to protect society, help our Adults in Custody (AICs) take personal responsibility, be accountable for their actions, and engage in reformation we must treat them in a normalized environment and in the most humane way possible."

17.     The adoption of the "Oregon Way" and ODOC Director Peters's public statements create a reasonable expectation by ODOC employees, prisoners, and the public that prisoners in ODOC custody will be treated "in a normalized environment and in the most humane way possible."

18.     Prison officials have a constitutional obligation to provide prisoners with law libraries or adequate assistance from persons trained in the law to assist in the preparation and filing of meaningful legal papers. ODOC has fulfilled that duty by providing both law libraries and legal assistance to prisoners at the Oregon State Correctional Institution (OSCI).

19.     ODOC rules under Chapter 291, Division 139 describe the responsibilities of library coordinators and legal assistants in the following ways. Library coordinators are responsible for supervising facility legal libraries and the provision of law library services to inmates, including the activities of the assigned legal assistants. The library coordinator may instruct inmates on how and where to access requested law library services and other resources, but may not offer advice or directly assist an inmate with their legal issues, case or matter.

20.     OAR 291-139-0160(11) prohibits the library coordinator from assigning or removing an inmate legal assistant based on retaliation for legitimate legal activities done in accordance with ODOC rules.

21.     Based on OAR 291-139-0160(11), inmate legal assistants have a reasonable expectation that they will not be retaliated against by any ODOC employee for their authorized legal activities.

22.     Inmate legal assistants are authorized and expected in ODOC to do legal activities that would otherwise constitute the unauthorized practice of law under Oregon law.

23.     Prisoners must obey ODOC employees or be in violation of ODOC rules.

24.     ODOC employees are permitted to make day-to-day decisions and authorize prisoner activity within the scope of the employee's duties, including deciding whether a prisoner's action is a violation of ODOC rules.

25.     Prisoners have a reasonable expectation to not be punished for violating ODOC rules when their actions have been authorized by an ODOC employee.

**Plaintiff, His Position as Legal Assistant at OSCI, and the Library Coordinator**

26.     Plaintiff has been incarcerated for over 30 years within the ODOC for a crime he committed at 18 years of age.

27.     During his time within the ODOC, Plaintiff is well known as an advocate for prisoner's rights, working in as a legal assistant in ODOC, contributing as a writer for Prison Legal News, and participating in legislative matters.

28.     Plaintiff has shown himself to be an honest and trustworthy person to both correctional staff, other prisoners, and members of the public during his many years of incarceration.

29.     Plaintiff's only rule violation in the last 34 years of his incarceration occurred in August 1991 when he was disciplined for seven days for protesting prison labor wages.

30.     Plaintiff has been targeted by ODOC staff and prisoners alike over the years due to his work as legal assistant and as a prisoner advocate. For example, ODOC has previously retaliated against Plaintiff for his assistance in a civil suit requiring ODOC to provide adequate medical treatment to prisoners. See Wilson v. Van Valkenburg, cv-06-1391-SU.

31.     From February 2012, until earlier this year, Plaintiff was assigned as an inmate legal assistant at OSCI. During that time, he worked under at least five library coordinators at OSCI, including, until most recently, under the supervision of library coordinator Pam McKinney (hereafter "McKinney").

32.     Plaintiff's duties as an inmate legal assistant included but were not limited to, drafting motions, affidavits, legal memoranda, petitions, complaints, letters, appellate briefs, administrative review requests and prison grievances.

33.     As an inmate legal assistant Plaintiff has received requests that legal coordinators direct him to provide assistance on, including by not limited to: appeals of convictions and sentences, conditions of confinement challenges, Board of Parole issues, child support/custody/visitation issues, dissolution proceedings, wills and estates issues, defense of civil actions.

34.     Throughout his entire time as an inmate legal assistant, he was allowed discretion with respect to legal matters, to do those things he deemed necessary to properly and effectively perform his duties as an inmate legal assistant.

35.     Throughout the many years Plaintiff served as an inmate legal assistant he developed working relationships with numerous attorneys, prisoner and mental health advocacy groups, court personnel and others as necessary to carry out his legal assistant duties.

36.     Until on or about April 15, 2021, McKinney had worked for over 22 years as a veteran employee with the ODOC. She had been through countless hours of training during her career.

37.     McKinney authorized Plaintiff and other legal assistants to print documents and provide other services without charging prisoners for the initial printing costs.

38.     McKinney authorized and facilitated legal assistants, including Plaintiff, and prisoners to have emails and phone calls sent and received to outside individuals.

39.     McKinney oversaw the operation of the law library during the catastrophic events of the Covid-19 pandemic and wildfires in Oregon last year, in which prisoners were evacuated from OSCI under threat of fire and OSCI was on numerous modified lockdowns.

40.     At all relevant times, McKinney authorized Plaintiff to assist other OSCI prisoners and present his own legal issues with (a) lawsuits related to Covid-19, including Maney v. Brown, 6:20-cv00570-SB, (b) clemency applications; (c) legal matters related to an ODOC's employee losing protected information that was taken home on a work computer; (d) legislative matters, (e) and the development of a mentorship program at OSCI with the support of ODOC administrative employees.

41.     McKinney's conduct and relationship with all prisoners at OSCI is consistent with the "Oregon Way," that is, by humanizing and normalizing the prison environment and treating prisoners with dignity and by modeling life on the outside "to every degree possible."

42.     Plaintiff has always maintained a professional and respectful working relationship with ODOC employees, including McKinney, which is also consistent with the Oregon Way.

43.     As example of the environment McKinney created at OSCI law library, ODOC posted on Twitter (ODOC Twitter) on December 30, 2020, pictures of McKinney at work within the OSCI library as shown below:



**Plaintiff's Removal from Legal Assistant Position and Defendant Plante's Investigation**

44.     On January 21, 2021, Plaintiff was removed from his job as inmate legal assistant and placed on work restriction by Defendant Plante, an investigator for the ODOC's Special Investigative Unit (SIU).

45.    On January 21, 2021, Defendant Plante met with Plaintiff and ordered him to cease assisting other inmates with their legal affairs.

46.    On January 21, 2021, Defendant Plante told Plaintiff that the investigation had been initiated upon receipt of an anonymous inmate communication, but he did not inform Plaintiff of any of the allegations contained in that communication.

47.    On or about January 21, 2021, McKinney was removed from her supervision over the OSCI library and stationed at a desk in another ODOC facility.

48.    On or about March 4, 2021, Plaintiff inadvertently crossed paths with Defendant Plante in the OSCI Education Department. Plaintiff asked Defendant Plante if there was any update in the investigation and offered to take a polygraph examination at his expense. Defendant Plante assured Plaintiff that a polygraph examination would not be necessary, as he patted Plaintiff's arm and said: "I know you. I trust you. I know you're not going to lie to me. Just relax." Defendant Plante then assured Plaintiff that they would talk soon and suggested that the investigation was "no big deal," and it wouldn't take long.

49.    On information and belief, on March 12, 2021, Defendant Plante entered the OSCI Law Library and informed three OSCI library clerks that his investigation was complete, except for interviewing Plaintiff and "a couple tangentially involved people," and making his recommendations to some unidentified ODOC officials. Defendant Plante apparently told Plaintiff's former co-workers to tell Plaintiff: "Relax. Stop listening to rumors. We'll talk soon."

50.    At approximately 9:00 a.m. on March 23, 2021, Defendant Plante called Plaintiff to a private office in the OSCI Security Administrative Room to interview him. The interview lasted from approximately 9:00 a.m. to 10:30 a.m. Defendant Plante informed Plaintiff that he was going to record the interview on his personal cellphone.

51.    During the March 23, 2021, interview of Plaintiff, Defendant Plante asked questions from a typed list of questions/topics, which he marked off with a pen.

52.    At the March 23, 2021, interview of Plaintiff, Defendant Plante told Plaintiff that the only allegation that involved him was the claim that OSCI Library Coordinator McKinney was helping him sue ODOC.

53.    During the March 23, 2021, interview, Defendant Plante informed Plaintiff that, as he had told ILA Wayne Houff, it was McKinney, not Plaintiff or Wayne, who had done something wrong when it came to her sending and receiving emails on our behalf. He then gave Plaintiff the example: "If I tell you to go down to unit 13 then something happens, that's on me, not you." Defendant Plante stated to Plaintiff that he believed that McKinney "is a compromised staff member who has no boundaries" and that "McKinney has much bigger problems than you. I know for a fact that she allowed another inmate to use her personal cellphone."

54.    On or about April 15, 2021, McKinney, following what she described as a four-hour grilling by ODOC employees that was "brutal," resigned from her ODOC job because she was forced to "[e]ither resign or lose the [retirement] money match."

55.    Subsequent to Plaintiff's termination from his position as legal assistant, ODOC removed hundreds of law books and research materials that were used by the legal assistants and inmates at OSCI over the last two decades.

**Plaintiff's Misconduct Report and Disciplinary Hearing Process**

56.    On August 4, 2021, Plaintiff received a misconduct report that was signed by Defendants Plante and by Melissa Nofziger that same day.

57.    The misconduct report identifies that the violation occurred on March 23, 2021. Contrary to OAR 291-105-0021(2)(a), which requires a misconduct report shall be filed "no later than 24

hours after sufficient evidence or information is gathered, discovered, or observed to support a rule violation" and must include any reasons for delay after 24 hours. The misconduct report was filed 134 days after Plaintiff's alleged rule violations and 197 days after he was removed from his position as an ILA in the law library and no explanation was provided for the delay in filing.

58.     The misconduct report alleged Plaintiff had violated four ODOC rules: Compromising an Employee (4.15); Contraband II (1.11); Unauthorized Use of Information Systems I (1.25); and Disobedience of an Order I (4.01).

59.     Defendant Plante offered only conclusory allegations, without supporting facts of Plaintiff's actions which constituted the alleged violations, for each of the charged rule violations, which is in violation of OAR 291-105-0021(2)(d)(A), which states that the report "shall be as specific and comprehensive as possible."

60.     In the misconduct report, Defendant Plante explained that upon receiving an "anonymous" communication about McKinney, Plaintiff, and "other unauthorized things in the OSCI library," he conducted an investigation.

61.     Defendant Plante later declared under oath in this action on November 23, 2021, that the "anonymous AIC communication" did not assert any allegations related to *any* of the charges that Defendant Plante ultimately brought against Plaintiff in the misconduct report.

62.     In the misconduct report, Defendant Plante explained that he had searched Plaintiff's assigned work area in the legal library and found a "white plastic child's toy phone" that McKinney told Plante she had purchased with her own money and, according to Plante, she gave to Plaintiff without supervisor approval. For this, Defendant Plante charged Plaintiff with Contraband II (1.11) and that he engaged in an unauthorized relationship with an employee.

63.     An accurate image of the toy phone is show below:



64.     McKinney placed the child's toy phone on Plaintiff's work desk as a joke, not as a gift, which Defendant Plante knew but intentionally omitted from his disciplinary report.

65.     Defendant Plante intentionally omitted from the misconduct report that McKinney placed the toy phone on Plaintiff's work desk, where it remained in plain view and mostly in the same spot, for nearly one year prior to it being confiscated.

66.     In the misconduct report, Defendant Plante explained that he "reviewed hundreds of emails, from January 2020 through January 2021," that McKinney had sent and received from "individuals at an outside justice resource firm, or attorneys and other professionals," all of whom were associated with Plaintiff in some manner. "Upon [Defendant Plante's] closer review of the emails," Plante explained, he discovered that the emails contained "messages and attached legal documents[.]" Defendant Plante reported that the sending of these emails with attached legal documents saved Plaintiff "at least $387.40" in copy costs – which constituted, in his view, a violation of ODOC rule "Disobedience of an Order I."

67.     Defendant Plante stated in his disciplinary report that he had "reviewed a number of legal calls AIC Wilson had been allowed through the legal library phones," and that "between January 2020 through January 2021, AIC Wilson had been given 146 calls to individuals at the outside justice resource firm, and he and received an additional 15 calls to five other individuals."

68.     The emails and phone calls that Defendant Plante admits to reviewing and forming the basis for Plaintiff's rule violation were, among other things, protected attorney client communications and legal materials sent and received by and through, and with permission from, McKinney.

69.     Defendant Plante omitted from his misconduct report that many of the emails McKinney sent and received related to Plaintiff's assistance of other inmates and his work with ODOC administrators

70.     Defendant Plante omitted from his misconduct report the fact that prisoners, including legal assistants, do not have access to telephones or email. Phone calls with legal professionals are scheduled by McKinny and, when calls are received, she transfers the call to a secure phone. Similarly, McKinney's work emails are sent and received by her alone.

71.     With respect to rule violation "Unauthorized Use of Information Systems I," Defendant Plante alleged in the misconduct report that Plaintiff knowingly chose to disregard and violate ODOC rules by printing a single copy of AIC's legal document from his printer after assisting in the preparation of the document without charging the AIC for the copy.

72.     Defendant Plante failed to note in his misconduct report that Plaintiff told him that McKinney had authorized him and other OSCI ILAs to provide clients with a "first-print" of their legal work free of charge pursuant to a longstanding OSCI Law Library policy and practice.

73.     Subsequent to Plaintiff having been removed from the OSCI Law Library, OSCI continued and still maintains the "first-print" policy and practice as of the filing of this Second Amended Complaint.

74.     With respect to rule violation "Compromising an Employee," Defendant Plante alleged that Plaintiff "engaged in an unauthorized personal relationship" with McKinney because: (a) she

gave a toy phone to Plaintiff; (b) she directly assisted Plaintiff with his "legal issues, case, and matters"; (c) she saved him money (at least $387.40) by sending and emailing "legal documents" to attorneys and other professionals rather than charge him through regular mail; and (d) because she "admitted to giving [Plaintiff] special privileges which not all AICs were afforded."

75.    Defendant Plante represented in the misconduct report that he had interviewed McKinney and "she admitted that her relationships with several individuals at the outside justice resource firm became more of a personal friendship than a professional relationship." McKinney has declared that Defendant Plante had used intimidation and bullying tactics—all while threatening her ability to ever be employed again—to coerce statements out of her. She does not in fact believe that she was compromised by Plaintiff, nor that he broke any rules. She further declares that her and Plaintiff's actions were condoned and encouraged by the facility.

76.    Defendant Plante represented in the misconduct report that Plaintiff said "I mean from my perspective, McKinney's biggest sin is being overly helpful. Right? I mean seriously I mean she says, yeah, fine, no problem, you know[.]" Defendant Plante knew that the context of this statement was in reference to McKinney's emails with Katie Dwyer, an ODOC contractor who is the Director of the University of Oregon's Prison Education Program, and who was then making University of Oregon classes available to OSCI inmates. Defendant Plante knew that the emails McKinney exchanged with "Katie" on Plaintiff's behalf were to help facilitate inmate access to college classes being offered at OSCI at the time. Yet he omitted this exculpatory information from his August 4, 2021, misconduct report with the intention to mislead and to fabricate evidence.

77.    Defendant Plante failed to include any fact as to how Plaintiff purportedly "*knowingly engage[d] an employee, . . . in a personal relationship[,]*" as required under the rule violation OAR 291-105-0015(4)(h) (Compromising an Employee).

78.    Defendant Plante did not include any fact in his misconduct report to support his conclusory allegation that Plaintiff violated OAR 291-105-0015(4)(a) (Disobedience of an Order I) or explaining how his conduct created a threat to the safety, security, or orderly operation of a facility.

79.    Defendant Plante stated in the misconduct report that Plaintiff's "actions were conducted in the legal library, while he was in his role as a legal assistant."

80.    Each and every alleged rule violation in Defendant Plante's misconduct report occurred under the supervision, authorization, or direction of McKinney in her role as OSCI legal coordinator.

81.    In all the many years and under the five different legal coordinators, Plaintiff has never been told that his actions and conduct as a legal assistant violated ODOC rules. Indeed, Plaintiff has received letters of commendation from library coordinators, including McKinney, for his work.

82.    Defendant Nofziger approved and signed Defendant Plante's misconduct report without "ensur[ing] the report is accurate, appropriate, and supported by sufficient information" as required by OAR 291-105-0021(2)(b). Specifically, she approved Defendant Plante's misconduct report despite the deficiencies discussed in the preceding paragraphs.

83.    On or about August 5, 2021, Plaintiff prepared and submitted a "MOTION TO RECUSE HEARINGS OFFICER NOFZIGER".  This was a motion to recuse longtime OSCI Hearings

Officer Jeremy Nofziger as the hearings officer, because his wife, Defendant Melissa Nofziger, was the reviewing supervisor who approved Defendant Plante's misconduct report.

84.    On or about August 10, 2021, Defendant Foss conducted a disciplinary hearing for Plaintiff in case number 2103 OSCI 0056 OSCI 35.

85.    On or about August 5, 2021, Plaintiff submitted to Defendant Foss (Hearings Section), a motion for disclosure of confidential report, a motion for investigation and witness testimony, and a witness list with proposed questions pursuant to ODOC rules and the Fourteenth Amendment to the United States Constitution. The motion for witnesses was 47 pages, included 20 witnesses, with proposed questions for each witness. A true copy of that document is attached to this Complaint.

86.    On August 6, 2021, Plaintiff submitted a motion for polygraph examination to Defendant Foss (Hearings Section). Plaintiff made this request based on ODOC previously allowing him to submit a polygraph examination in 1999 to prove his innocence to a disciplinary hearings officer.

87.    On August 10, 2021, Plaintiff was taken to his disciplinary hearing. Defendant Foss, appeared remotely (by video). Plaintiff was handcuffed behind his back and placed into a small locked cage with Plaintiff's paperwork (documentary evidence and legal arguments) placed on a desk outside the cage where Plaintiff was not able to access it.

88.    Defendant Foss started the hearing by reading the entire misconduct report into the record. She further stated that she had received and reviewed a "Confidential Report" that Defendant Plante submitted and she stated that "it supports the misconduct report."

89.    Defendant Foss "granted" Plaintiff's motion to recuse Hearings Officer Nofziger, given that she was conducting the hearing.  However, Nofziger later oversaw the review process.

90.    Defendant Foss denied Plaintiff's motion to disclose the substance of the confidential report and the motion for polygraph examination. Defendant Foss stated that she was denying the polygraph examination because ODOC maintains a "policy" against allowing prisoners to submit polygraph examinations in prison disciplinary proceedings.

91.    There is no ODOC published "policy" barring prisoners from submitting polygraph examinations in prison disciplinary proceedings.

92.    After denying Plaintiff's motions, Defendant Foss told Plaintiff, "Okay. Now go ahead and try to defend yourself!"

93.    In an effort to defend himself, Plaintiff asked the guard outside his cage to find certain documents so Plaintiff could read it into the record. While Plaintiff attempted to read the documents that the guard held up – Plaintiff wears bifocals – Defendant Foss was extremely hostile, combative and confrontational. Defendant Foss frequently interrupted Plaintiff before he could complete his sentences and denied everything he presented in his defense. Her statements and tone indicated that Defendant Foss had already decided that he was guilty, and the hearing was just a sham formality culminating in the predetermined outcome of guilt.

94.    At the hearing, after Plaintiff explained that he could not defend himself without the investigation and witness testimony he had requested, Defendant Foss stated that "I have some questions for the Library Coordinators too after reading" Plaintiff's motions. Defendant Floss then granted Plaintiff's motion and postponed the hearing pursuant to OAR 291-105-0064.

95.    In Defendant Foss's September 3, 2021, preliminary order, she wrote "On August 10, 2021 the Hearings Officer Granted the AICs request for witness(es)."

96.     Between August 10, 2021, and August 31, 2021, none of Plaintiff's twenty (20) requested witnesses had been contacted or questioned in relation to Plaintiff's prison disciplinary proceedings.

97.     Despite saying during the August 10, 2021, disciplinary hearing that she also had questions for Library Coordinators after reading Plaintiff's motions, Defendant Foss did not "Grant[]" investigation or interview former Library Coordinators Adam Pletcher, McKinney, or currently Library Coordinators Renee Cantrell or Shelby Lund between August 10, 2021, and August 31, 2021.

98.     On August 31, 2021, Defendant Foss resumed the hearing. Defendant Foss denied "AIC's request for witness(es)" on the ground that "the proffered testimony would not constitute a defense to the charges nor substantially mitigate the rule violations."

99.     At the disciplinary hearing, Defendant Foss brusquely responded: "I'm not calling any inmates as witnesses. I have plenty of staff I can talk to[,]" expressing her clearly biased belief that inmates, as a class, are lacking in credibility and unworthy of being called as witnesses in prison disciplinary proceedings if their testimony would not corroborate staff testimony.

100.    Defendant Foss then said: "Why would I call Ms. McKinney as a witness? I have her statement right here," revealing for the first time that she had received, considered, and was withholding as "confidential," McKinney's April 14, 2021, statement as part of Defendant Plante's "Confidential Report." This disclosure was also the first time Plaintiff received notice that Defendant Foss was withholding McKinney's statement as "confidential."

101.    Defendant Foss's withholding of McKinney's statement did not meet the requirements for documents to be classified and withheld as confidential under OAR 219-105-0028(10)(d)— such as "undue risk to the safe, secure, or orderly operation of any facility…or that disclosure

would interfere with an ongoing official investigation"—nor did Defendant Foss state on the record the reasons for making the evidence confidential, as required by that rule.

102.    At the disciplinary hearing, Defendant Foss also revealed that she had received and considered Plaintiff's March 23, 2021, statement to Defendant Plante as part of Defendant Plante's "Confidential Report." Defendant Foss's withholding of Plaintiff's statement also did not meet the requirements for documents to be classified and withheld as confidential under OAR 291-105-0028(10)(d).

103.    During the disciplinary hearing, Defendant Foss interjected new theories of Plaintiff's guilt on the Compromising an Employee charge by claiming that Plaintiff had accepted photographs, a video, and two thumb drives from McKinney. This was the first time Plaintiff learned of this theory. Defendant Plante's misconduct report made no reference whatsoever to photographs, a video, or two thumb drives.

104.    By interjecting new theories of Plaintiff's guilt on the Compromising an Employee charge during the disciplinary hearing, Defendant Foss violated her duties under OAR 291-105-0026(4) by not deciding whether Plaintiff had violated the rule(s) "as charged in the misconduct report."

105.    At the disciplinary hearing, Defendant Foss also interjected new theories of Plaintiff's guilt on the Contraband II charge, by claiming that he had possessed unauthorized items including photographs, a video, and music on a thumb drive. None of this material was referenced in Defendant Plante's misconduct report. Again, by interjecting new theories of Plaintiff's guilt, Defendant Foss violated her duties under OAR 291-105-0026(4).

106.    At the disciplinary hearing, Defendant Foss also interjected new theories of Plaintiff's guilt on the Unauthorized Use of Information Systems charge. Rather than find such violation as

alleged by Defendant Plante due to Plaintiff's purported misuse of his assigned *printer* by giving clients the first print of their legal document for free, Defendant Foss decided that he had instead misused his assigned *computer* by viewing photographs and video on the computer and using the computer to show the photographs and video to other prisoners. Defendant Plante made no reference whatsoever to misusing Plaintiff's assigned computer in that manner in his misconduct report. As such, Defendant Foss violated her duties under OAR 291-105-0026(4).

107.    By interjecting these new theories of guilt, Defendant Foss also violated Plaintiff's due process right to notice and an opportunity to defend against charges of misconduct.

108.    On August 31, 2021, Plaintiff was found guilty of three of the alleged violations—Contraband II, Compromising an Employee, and Unauthorized Use of Information Systems II—and given a sanction of 120 days in segregation, the maximum penalty. Plaintiff was found not guilty of the two other rule violations. Plaintiff was also fined $100 and ordered to serve a 1-year restriction from Vocational Training and Industries assignments.

109.    On September 3, 2021, Defendant Foss prepared her preliminary order from the disciplinary hearing as required under OAR 291-105-0031(1). A genuine and true copy of the preliminary order is attached hereto.

110.    Defendant Foss's preliminary order made conclusory, unsupported, wrong, and inconsistent findings of fact and conclusions of law for the following non-exclusive reasons:

a.    After stating that Plaintiff's witnesses were denied because the proffered testimony would not constitute a defense to the charges nor substantially mitigate the rule violations, Defendant Foss made the finding of fact that "[m]ost of the witnesses" were denied for that reason. The finding that the proffered testimony of the witnesses would not constitute a defense was plain error in light of the

content of the proffered testimony. Foss did not make any findings with respect to witnesses not encompassed within the phrase *most* of the witnesses.

b.      After stating that she considered the confidential information and found it believable, and found it "was provided for the hearing," Defendant Foss failed to explain why the confidential information was believable, failed to conduct the constitutionally-required "totality of the circumstances" independent assessment of the reliability of the confidential information, failed to find pursuant to OAR 291-105-0028(4) that the confidential information was "such evidence as would be considered by a reasonable person in the conduct of their serious affairs," and failed to make any findings supporting her classifying and withholding of the referenced evidence as "Confidential," as required by OAR 291-105-0028(10)(d).

c.      Defendant Foss failed to identify or disclose *any* specific or relevant documentary evidence that was received and "considered by the Hearings Officer,"

d.      Defendant Foss identified and made a finding that an "audio recording of the incident was available and considered by the Hearings Officer," but she does not identify what "incident" was "audio recorded" that she considered, and Plaintiff did not receive any such recording.

e.      Defendant Foss found that Plaintiff had admitted during his interview with Defendant Plante to receiving photographs and a video of a former AIC that was placed on a thumb drive by McKinney, which McKinney had received by email from the former AIC, and that Plaintiff had admitted at the disciplinary hearing that McKinney gave him the photographs and video on a thumb drive. Yet, Defendant Foss failed to identify in her preliminary order that Defendant Plante

did not charge Plaintiff with any disciplinary rule violations related to "receiving photographs and a video of a former AIC that was placed on a thumb drive by Ms. McKinney" and that Defendant Plante did not make a single reference to Plaintiff receiving photographs and a video on a thumb drive from McKinney. Furthermore, the evidence in the record does not support this finding: the evidence in the record shows the photographs and video – of less than 30 seconds in length – are of the infant child of the former AIC, that were received by McKinney from the mother of the infant child, who sent the photos and video to McKinney at McKinney's request, and *for* McKinney, *not* for Plaintiff.

f.      Defendant Foss found that Plaintiff admitted to receiving two black thumb drives from McKinney that he was storing his legal work on and planning to take home once released. However, Defendant Foss failed to recognize in the preliminary order that Plante did not charge Plaintiff with violating any disciplinary rule for having or receiving these thumb drives, nor did she make any finding that it is the longstanding OSCI library policy and practice that all inmates who have electronic legal materials are given thumb drives to take or send home. Defendant Foss also failed to note that Plaintiff was not treated differently from any other inmate in receiving two black thumb drives to store and send home his legal materials.

g.      Defendant Foss made a finding of fact that Plaintiff admitted to having personal photos, music and videos stored on the thumb drives Plaintiff used for work as an ILA. However, Defendant Foss failed to recognize anywhere within her preliminary order that Defendant Plante did not charge Plaintiff with any

disciplinary rule violations related to those facts, and Defendant Plante did not make any single reference to Plaintiff having those items in his misconduct report. Furthermore, Defendant Foss failed to acknowledge McKinney has personally authorized Plaintiff and other ILAs and library clerks to have personal photos, music and videos stored on the thumb drives assigned to them. OSCI Legal Coordinators, in fact, continue to allow these materials on ILAs' and library clerks' thumb drives.

h.      Defendant Foss found that Plaintiff's comment to Defendant Plante during his interview with Plante that "McKinney's biggest sin is being overly helpful," referenced Katie Dwyer, as described in paragraph 76 above. Defendant Foss also failed to acknowledge that she had read, and questioned Plaintiff about, emails between McKinney and "Katie" during the August 10, 2021, and August 31, 2021, disciplinary hearing.

i.      In her preliminary order, Defendant Foss made findings of fact that "Emails were provided for the hearing." Yet, Defendant Foss did not include any further information about the "emails" in her order and did not disclose the substance or content of *any* emails to Plaintiff during the disciplinary proceedings and failed to make any findings that the emails were classified and withheld as confidential under OAR 291-105-0028(10)(d).

j.       Defendant Foss failed to identify the exculpatory evidence that Plaintiff presented during the disciplinary hearing showing that McKinney sent messages and documents through email for *many* AICs, attorneys, courts, parole officials, DHS officials, DOJ officials and others, and not just for Plaintiff.

k.    Defendant Foss failed to make findings that McKinney told Defendant Plante that she placed the toy phone on Plaintiff's desk as a joke and that it belonged to her. This evidence was available to her through Plaintiff's testimony at the hearing as well as the Plaintiff's motion to allow witnesses with proposed questions on this topic for each witness.

l.    Defendant Foss improperly added to and changed the rule violations in Defendant Plante's misconduct report in violation of OAR 291-105-0026(4) by finding that Plaintiff "knowingly engage[d] an employee . . . in a personal relationship" "by . . . having Ms. McKinney send and receive numerous emails on AIC Wilson's behalf." Defendant Plante does not make that allegation anywhere within his misconduct report. Rather, Defendant Plante falsely alleged that Plaintiff purportedly used some pre-existing personal relationship with McKinney – that Plaintiff knowingly engaged in some unspecified manner – to manipulate McKinney into sending and receiving emails.

m.    There is no findings or evidence to support that Plaintiff ever engaged in a "personal relationship" with McKinney.

111.    Defendant Foss's preliminary order is completely devoid of any evidence to support finding Plaintiff guilty of any rule violation.

112.    The term "personal relationship" that is the basis for a charge of Compromising an Employee under OAR 291-105-015(h) is so vague that it fails to give prisoners adequate notice of the scope of prohibited conduct.  Therefore conviction for violation of this rule was a due process violation.  "Personal relationship" is undefined by any rule or policy.  The meaning of this term is particularly vague in light of ODOC's endorsement of the Oregon Way and Oregon

Accountability Model which encourage recovery and rehabilitation oriented interaction between prisoners and staff and normalization of the prison environment, and McKinney's practice of these objectives of the ODOC, and ODOC's endorsement of her doing so.

113.    Any reasonable and rational public official charged with administering ODOC disciplinary hearing rules would not conclude that Plaintiff was guilty of violating ODOC rules.

114.    On September 7, 2021, Plaintiff filed a grievance, numbered OSCI_2021_09_049, against Defendant and other ODOC officials for retaliatory conduct.

115.    On September 14, 2021, OSCI grievance coordinator rejected Plaintiff's grievance on the grounds that "An AIC may not submit a grievance, regarding misconduct reports, investigations, lending to or arising from misconduct reports, disciplinary hearings, findings, sanctions."

116.    On September 15, 2021, OSCI Superintendent Josh Highberger approved and signed the preliminary order, making it a Final Order in Hearing Case Number 2103 OSCI 0056 OSCI 35.

117.    In reviewing and approving Defendant Foss's preliminary order, Defendant Highberger violated OAR 291-105-0031 by, among other things, failing to meaningfully review whether the procedures afforded Plaintiff and the record created in Plaintiff's disciplinary hearing was insufficient to support the violations found and order the dismissal of the misconduct report.

118.    On September 27, 2021, Plaintiff submitted a Petition for Administrative Review pursuant to OAR 291-105-0085 of the Final Order in Hearing Case Number 2103 OSCI 0056 OSCI 35. Plaintiff submitted a hand-written Petition for Administrative Review by mailing it in a sealed envelope to the ODOC Inspector General Craig Prins. At the same time, Plaintiff mailed an identical hand-written copy Petition for Administrative Review to his counsel Julia Yoshimoto, including a cover letter stating that "[e]nclosed you will find a copy of the administrative review request that I sent to the Inspector General today" A true copy of

Plaintiff's letter (redacted) and Petition for Administrative Review is in this court's record at

Docket No. 19, pages 4-13.

119.    On or about November 27, 2021, Plaintiff had not received a response to his Petition for

Administrative Review, described in the preceding paragraph, within 60 days as required under

OAR 291-105-0085(10).

120.    On or about November 29, 2021, Plaintiff's counsel informed him that the ODOC was

arguing in Defendant Jerry Plante's Response in Opposition to Plaintiff's Motion for Temporary

Restraining Order that "Plaintiff never submitted a petition for administrative review" based on

the sworn statement of Jeremy Nofziger, an Assistant Inspector General in the Office of

Inspector General.

121.    To the extent the Inspector General's Office did not receive Plaintiff's timely filed

Petition for Administrative Review, described in the preceding paragraph, it was by

circumstances not in Plaintiff's control, including ODOC officials deliberately destroying his

mail or by other mistake in handing and processing his mail.

122.    ODOC's failure to timely respond to Plaintiff's Petition for Administrative Review of

Final Order in Hearing Case Number 2103 OSCI 0056 OSCI 35, or deliberate or mistaken

actions, described in the previous paragraph, thwarted his ability to take advantage of the

administrative remedy rendering it unavailable.

123.    Defendant Prins rendered an opinion on Plaintiff's petition for relief on or about October

28, 2021. Defendant Prins addressed the relief sought in both Plaintiff's petition and counsel for

Plaintiff's petition, but did not identify which document he was referring to. Defendant Prins has

the authority and duty under OAR 291-105-0085 to rescind both the misconduct report and the

disciplinary findings made against Plaintiff. Despite having ample evidence that Defendants

Plante and Foss has issued improper misconduct reports and made improper disciplinary

findings, Defendant Prins denied Plaintiff relief and appeared to not conduct any consideration of

Plaintiff's Administrative Review as was his duty under OAR 291-105-0085.

**The Nature and Plaintiff's Personal Experience of Punishment in OSCI Disciplinary**

**Segregation**

124.    As a result of Defendant Foss's disciplinary sanction and Defendant Highberger

affirming that decision, Plaintiff was confined within OSCI disciplinary segregation for 120-

days, from August 31, 2021 to December 28, 2021.

125.    Plaintiff's sanction resulted in him being dropped from Incentive Level 3 to Incentive

Level 1, pursuant to OAR 291-077-0035(2)(k). Incentive Level 3 prisoners are afforded the most

"freedoms," movement, comforts, services, and privileges while Level 1 prisoners receive the

least possible "freedoms," movement, comforts, services, and privileges.  As a Level 1 prisoner,

Plaintiff was denied rehabilitative opportunities, including the opportunity to continue his college

education, subjected to harsher living conditions, and lived among a more violent population

made up of other prisoners on Level 1.

126.    The difference in living conditions in incentive housing—where Plaintiff resided for 13

years between January 2008 and August 31, 2021—and disciplinary segregation (also known as

"the hole") are stark.

127.    Plaintiff was removed from the very best possible living conditions and confined in the

very worst on August 31, 2021.

128.    Within the "Incentive Housing Unit," Plaintiff was allowed out of his cell to spend time

in the "Day Room," using the telephones, video visit kiosk, and/or microwave, simply walking

around and socializing with other prisoners, studying, and engaging in other social activities up

to approximately seven hours a day, or 49 hours a week. While in disciplinary segregation, Plaintiff was denied each of these freedoms.

129.    While in disciplinary segregation, Plaintiff was confined within an 8' x 8' segregation cell 23-24 hours a day.

130.    This setting is typical of "the hole"—which "feels like being locked in a dungeon and forgotten," as Plaintiff explained to the Court in his declaration. Dkt. 5. This cell contained a concrete slab bed and an open toilet approximately 6" from the head of the bed. *Id.* No natural light entered the cell, and plexiglass-covered bars prevented air circulation. *Id.*

131.    During the four months Plaintiff was confined in disciplinary segregation, he was allowed out of his cell for only 10-minute showers three days per week, 30 minutes of exercise five days per week, legal calls, and a December 6, 2021 video court appearance in this action.

132.    Any of the minimal and brief times Plaintiff was allowed out of his cell, he was handcuffed behind the back and escorted by two guards. As a Level 3 prisoner, Plaintiff had not been forced to submit to behind the back restraints for *many* years.

133.    While residing in the "Incentive Housing Unit," Plaintiff had very liberal telephone access, allowing Plaintiff to frequently communicate with his family and friends in the community. Plaintiff was authorized to use the telephone anytime he wanted (if a phone was available) during a period of approximately eight hours of the day, or 56 hours a week. Incentive Housing unit prisoners are allowed to place 30-minute telephone calls and may call back, and/or place multiple phone calls, if nobody is waiting to use the phone.

134.    During the 13 years that Plaintiff resided in OSCI's "Incentive Housing Unit," Plaintiff placed 30-minute telephone calls to his parents (who are now 73 years old) and his grandmother

(who is now 92 years old) at least once a week and on important family holidays including birthdays, Mother's Day, Father's Day, Thanksgiving, and Christmas.

135.    Throughout his entire 4-month disciplinary segregation sanction, he was denied the opportunity to use the telephone to call his parents, grandmother or anyone else, including on the important family holidays of both Thanksgiving and Christmas. This caused his mother and grandmother to suffer as much as it caused him to suffer, as they worried about him and had no way of knowing or hearing for themselves that Plaintiff was okay.

136.    As a Level 1 prisoner between Plaintiff's December 28, 2021, release from disciplinary segregation and February 20, 2022, Plaintiff resided on units in which the telephones were available much less often than in the Incentive Housing Unit, only by sign-up, and limited to single 10-minute calls. This *greatly* reduced Plaintiff's ability to communicate with his family by telephone.

137.    At least once a week while residing in the "Incentive Housing Unit," Plaintiff participated in 28-minute video visits with his parents and other people in the community. Throughout his entire 4-month disciplinary segregation sanction, Plaintiff was denied the opportunity to participate in video visits with his parents or other family and friends in the community, including during the important family holidays of Thanksgiving and Christmas. As a Level 1 prisoner, between Plaintiff's December 28, 2021, release from disciplinary segregation and February 20, 2022, Plaintiff resided on housing units in which video visits were available less frequently than they are on the incentive housing unit, making it more difficult to schedule video visits than when he was confined in the incentive housing unit.

138.    While residing in the "Incentive Housing Unit," like other  general population prisoners, Plaintiff was permitted to retain and wear the following items of state-issued clothing: denim

jeans (3 pair), t-shirts (7), sweat shirts (3), briefs (7), socks (3 pair), thermal (long john) top and

bottom (1 set), shorts (1 pair), shoes (1 pair), coat (1), and stocking cap (1). Plaintiff was also

permitted to purchase and wear his own: shorts, shoes, socks, underwear, and gloves.

139.    When Plaintiff was admitted to disciplinary segregation on August 31, 2021, he was

locked in a cage and strip searched. All of his state-issued clothing and his personal shoes, socks,

and underwear were taken from him.

140.    Plaintiff was issued one t-shirt, one pair of underwear, a thermal top and bottom, one pair

of shorts, one pair of socks, and one pair of shower thongs as his authorized clothing during his

4-month disciplinary segregation sanction. The underwear, t-shirts, and socks that he was issued

had been worn by many others before him and were often stained with bodily fluids or other

substances and/or torn. Plaintiff was permitted to exchange his t-shirt, underwear, and socks for

"clean" clothes only during his shower time, three days a week. Plaintiff was also issued an

orange canvas jumpsuit that he was required to wear anytime that he was escorted outside of

disciplinary segregation. Plaintiff wore the orange jumpsuit only once, during his December 6,

2021, video court appearance in this action.

141.    As a general population inmate, Plaintiff was regularly allowed to purchase, retain, and

use basic hygiene products including, but not limited to toothpaste, toothbrush, dental floss,

mouthwash, bar and liquid soap, shampoo, conditioner, moisturizing lotion, deodorant, soap

dish, washcloth, razor and disposable blades, shaving cream, aftershave skin conditioner, and an

electric razor. Plaintiff was also permitted to shower once a day and to put on clean clothes

whenever he wanted.

142.    When Plaintiff was locked in disciplinary segregation on August 31, 2021, guards packed

up all of his personal property, including all of his personal hygiene products, and stored them in

the prison's Property Room. During Plaintiff's 4-month disciplinary segregation sanction, Plaintiff was not allowed to access any of his property including, but not limited to, his personal hygiene products.

143.    Upon entering disciplinary segregation, prisoners are issued only the following personal hygiene products: a two-inch toothbrush, a comb, a 10-cc cap full of industrial liquid soap and a 10-cc cap full of baking soda. Each of these items may be replaced on a one-for-one exchange basis once a day. No other personal hygiene products are issued to prisoners in OSCI's disciplinary segregation.

144.    Prisoners confined in OSCI's disciplinary segregation are allowed a 10 minute shower three days a week. Confined in Section 4, Plaintiff was permitted to shower and exchange his clothing on Monday, Wednesday, and Friday mornings. For much of the time Plaintiff was confined in disciplinary segregation, the showers were not being properly cleaned between use.

145.    OSCI maintains a policy and practice of refusing to allow prisoners to purchase basic hygiene products until they have served 30 days in disciplinary segregation.

146.    The prisoner is required to turn in his commissary order on Thursday and he receives the purchased products the following Thursday.

147.    The first moment that Plaintiff was allowed, after serving 30 days in disciplinary segregation, on September 30, 2021, he turned in an order to purchase the limited basic hygiene products that disciplinary segregation prisoners are authorized to purchase.

148.    On October 1, 2021, prison officials processed Plaintiff's order to purchase one of each of the following hygiene items: white washcloth, eye drops, clear bar soap (3 oz), tube of toothpaste (2.75 oz), dental floss loops, deodorant (3 oz), and shampoo (4 oz), at a price of $9.03

even though he had previously-purchased hygiene products stored in his personal property that he was not allowed to access.

149.    Plaintiff did not receive the hygiene products that he was charged for on October 1, 2021, until October 7, 2021, his 38th day in disciplinary segregation. As such, during his first 37 days in disciplinary segregation, Plaintiff was not permitted to brush his teeth with toothpaste, wash his hair with shampoo, use a washcloth while showering, or use dental floss or deodorant. Plaintiff was permitted to use only a 10-cc cap full of industrial liquid soap to wash his body and hair with while showering, three days a week.

150.    Had Plaintiff remained in general population, he would have been allowed to brush his teeth with toothpaste, shower with soap and shampoo, use dental floss, deodorant, moisturizing lotion, and other basic hygiene products during and after showering every day.

151.    On October 7, 2021, Plaintiff grieved the OSCI disciplinary hygiene policy and practice, but was denied on the grounds that he could not grieve a ODOC policy, only an unconstitutional action taken under the policy.

152.    Prisoners in OSCI's disciplinary segregation are not allowed to possess or use disposable razors to shave. Upon request, guards make an electric razor available for use during the 10-minutes available for showering.

153.    Due to fear of potentially being exposed to hepatitis C or other communicable diseases from an improperly sanitized "community razor," Plaintiff was unwilling and unable to shave during the 4-months he was confined in disciplinary segregation.

154.    OSCI prisoners, including prisoners in disciplinary segregation, are permitted to request a haircut once a month. After Plaintiff's disciplinary segregation admission, Plaintiff received his first haircut on November 13, 2021. At that time, he asked the barber to shave off his beard that

had been growing for the first 75 days of his disciplinary segregation confinement. He requested

and received a second haircut on December 18, 2021, at which time he had the barber again

shave off his beard that had been growing for the 35 days since his previous haircut. Plaintiff

dislikes beards and never grew one when confined in general population. Had Plaintiff not been

confined in segregation, he would have been able to shave regularly throughout the four months

he was segregated, as he had for years prior to his disciplinary segregation confinement.

155.    While confined in general population, Plaintiff was allowed to access the OSCI

recreation yard for outdoor exercise approximately three hours a day, for 21 hours a week. While

there, Plaintiff was free to lift weights, walk or run the track, play handball, basketball, softball,

soccer, flag football or horseshoes, hit the heavy bag, jump rope, use the Ab-Wheel, do pull ups,

throw a Frisbee, purchase and drink soda, play cards, socialize, use the telephone for 30-minute

telephone calls, and participate in other activities.

156.    OSCI maintains a policy and practice of denying outdoor exercise to prisoners for the

first 30 days of their disciplinary segregation confinement.

157.    While Plaintiff was confined in disciplinary segregation, eligible prisoners could sign up

for outdoor "yard" instead of the indoor "dog run" on Monday, Wednesday, and Thursday.

Disciplinary segregation yard was not permitted on the weekends or on general population

laundry exchange days (*i.e.*, Tuesdays & Fridays).

158.    Disciplinary segregation yard consists of being placed in a cage smaller than the

prisoner's 8' x 8' cell, with nothing but a pull-up bar for a period of 30 minutes.

159.    Yard was often unavailable.  Throughout Plaintiff's entire 120-day disciplinary

segregation sanction, prisoners were allowed to attend the outdoor "yard" no more than five

times.

160.    When outdoor recreation is canceled for some reason for OSCI's general population, prisoners are allowed to access the gymnasium (also known as "Multi-Purpose") for approximately one hour a day, for seven hours a week. While there, prisoners may: lift weights; play basketball or pickleball; hit the heavy bag; ride exercise bikes; use treadmills or stair steppers; participate in cardio workouts; purchase and drink soda pop; socialize; play cards; use the telephone for 30-minute telephone calls; watch a large screen television (usually featuring some sporting event); and other activities.

161.    Indoor exercise for prisoners in OSCI's disciplinary segregation consists only of being locked in a 30-40 foot "dog run" that allows the prisoner to pace back and forth and use a pull-up bar, for up to 40 minutes, five days a week.

162.    Residing in the Incentive Housing Unit for 13 years, Plaintiff was able to live in what is likely one of the quietest units in the prison. This is because the Level 3 prisoners who reside there are typically older, more mature, and respectful than the Level 1 & 2 prisoners living on other units. Most of the prisoners spend the day working or attending school and are quieter because they either just want to relax in their cell after a hard day at work or they spend their time studying. Another reason some of them are quieter is that being loud and disrespectful may result in them being moved out of the incentive housing unit, back to the noisy units with the Level 1 & 2 prisoners. Typically, by 9 p.m. each night, the incentive housing unit is completely quiet, and it remains that way until everyone gets up to go to breakfast and work at 6:00 a.m., the next morning.

163.    The noise Plaintiff was subjected to during his 4-month disciplinary segregation sanction was *much* worse than anything he had experienced in the previous 13 years that he was housed in the incentive housing unit. At all hours of the day the people being held in DSU were yelling and

cussing derogatory statements at anything and everything—potentially because some of the individuals were mentally decompensating or to get attention from the correctional officers. It was also worse than the noise Plaintiff had experienced in any general population housing since entering prison.

164.    The exhaust fan in DSU would run during the hours of 9:00 pm to 10:00 am when Plaintiff would try to sleep. The noise kept him awake. Between all of these disruptions, Plaintiffs only managed a couple of hours of sleep during his time in DSU.

165.    For several weeks during Plaintiff's time in disciplinary segregation—in November and December—it became extremely cold on the tier that he was confined on. It felt as though the temperature was in the 30s or 40s. It was so cold, in fact, that some guards gave prisoners extra pairs of long johns and socks and an extra blanket. Plaintiff obtained a third blanket and a second pair of long johns and socks that he always wore.

166.    It was so cold that prisoners could only hide every inch of exposed skin underneath the blankets 24 hours a day to stay warm. All guards who came on the tier were wearing their coats. Some told complaining prisoners: "If you wanted heat, you shouldn't have come to segregation."

167.    Had Plaintiff experienced this type of extreme cold while confined in general population he would have been allowed to wear his stocking cap, gloves, sweatshirts, coat, and other clothing items that he was not permitted to possess in disciplinary segregation.

168.    This harsh austerity, lacking in meaning and purpose within disciplinary segregation stands in stark contrast to life in general population, generally, and the incentive housing unit, specifically.

169.    Before Plaintiff's 120-day disciplinary segregation sanction, Plaintiff was able to spend his days taking graduate-level college classes. He was not permitted to participate in such college

courses—or educational programming of any kind—while confined in disciplinary segregation. Now, as a Level 1 prisoner, Plaintiff has not been eligible to participate in college classes since his December 28, 2021, release from disciplinary segregation.

170.    Before being removed from his position as a legal assistant on January 19, 2021, Plaintiff was able to spend his days helping other prisoners by researching and litigating complex legal problems and issues. He spent 7 hours a day and 35 hours a week at work in the prison law library and countless hours continuing that work in his cell each evening and during the weekends.

171.    Plaintiff loved his job as an Inmate Legal Assistant. It allowed him to learn something new and to help others every day. It offered a very rare opportunity in prison to feel like he was living a life of meaning, purpose, and real benefit to others. It was intellectually stimulating, emotionally gratifying, and gave him a real sense of accomplishment and pride that is rarely felt in prison. He lost all of that when he was removed from his position and ordered to stop assisting other prisoners on January 21, 2021.

172.    Plaintiff was not allowed to assist other prisoners or to hold a job of any kind between January 19, 2021 and being locked in disciplinary segregation on August 31, 2021. During Plaintiff's 4-month disciplinary segregation sanction, he was not allowed to hold a job of any kind.

173.    Between Plaintiff's December 28, 2021, release from disciplinary segregation and February 20, 2022, he was not allowed to obtain a job. The Behavioral Health Services (BHS) Manager offered to hire him to work as a BHS orderly working with mentally ill prisoners, but she was not allowed to hire him for that position because he was a Level 1 prisoner.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

174.    Even though Plaintiff remains a Level 1 prisoner, he was hired on or about February 22, 2022, to work as a medical orderly, helping elderly, infirm, and handicapped prisoners in Unit 13, the OSCI medical dormitory. This is a trust position within OSCI. Trust positions are the traditional term for positions that are only offered to the most trusted inmates since they require trust relationship between the officer and the prisoner or the prisoner over another prisoner.

175.    Before being locked in disciplinary segregation on August 31, 2021, Plaintiff was able to learn new things by watching TED Talks, and University of Oregon and other educational programming shown on the OSCI institutional educational channel. He was not permitted to watch or access any educational programming during the 4 months he was confined in disciplinary segregation.

176.    Before being locked in disciplinary segregation on August 31, 2021, Plaintiff was authorized to possess and play stimulating and challenging video games on an Xbox video game system in his cell. He was not allowed to possess or use any such video game system while confined in disciplinary segregation for 4 months. Nor has he been eligible to do so since his December 28, 2021, release from disciplinary segregation because he is now a Level 1 prisoner.

177.    Before being locked in disciplinary segregation on August 31, 2021, Plaintiff was able to go to the prison dining room to eat meals and socialize with his friends and members of his support network. During the 4-month disciplinary segregation sanction, guards delivered meal trays to Plaintiff in his disciplinary segregation cell, where he ate alone.

178.    Plaintiff felt increased feelings of despair, grief, fear, anxiety, loss, anger, chronic headaches, sleeplessness, blurry vision, cold sores (which Plaintiff gets when stressed), digestive issues, back and joint pain, and hopelessness given the lack of social interaction, an inability to practice coping strategies, and the unavailability of Behavior Health Services (BHS) in DSU.

## SUPPLEMENTAL FACTUAL ALLEGATIONS

179.    On November 4, 2021, Plaintiff filed this § 1983 action against ODOC officials.

180.    On December 6, 2021, this Court held a hearing on Plaintiff's Motion for Temporary Restraining Order, which was covered in *The Oregonian*, among other publications.

181.    On December 29, 2021, following the filing of this § 1983 civil rights suit against various ODOC employees for violations of his constitutional rights, the Chair of the House Judiciary Committee (Committee), Representative Janelle Bynum, invited the Oregon Justice Resource Center (OJRC) to testify before the Committee at an official inquiry into the "jailhouse lawyer incident."

182.    The "jailhouse lawyer incident" that the Committee sought information about pertained to ODOC's actions against Plaintiff described in this case, as an alleged victim of state abuse.

183.    The Committee hearing was scheduled for January 11, 2022, and testimony before the Committee was by invitation only; the Committee was not open to public testimony.

184.    OJRC attorneys, the undersigned counsel, represent Plaintiff in this case.

185.    On January 5, 2022, OJRC policy and outreach director Zach Winston emailed Defendant Marie D. Garcia, ODOC's Legislative and Government Relations Manager stating that, in coordination with the Committee's counsel, Plaintiff was invited and would be presenting to the Committee at the January 11, 2022, meeting. Mr. Winston requested Defendant Garcia to assist in coordinating Plaintiff's access to be present by telephone.

186.    On January 5, 2022, Defendant Garcia emailed Mr. Winston and informed him that ODOC "will not be able to have Mr. Wilson participate in the Judiciary Hearing" and "believe[d] he has the option to submit written testimony if needed."

187.    On January 6, 2022, Mr. Winston emailed Defendant Garcia and sought clarification on ODOC's reasons for not allowing Plaintiff to speak directly by telephone to the Committee on January 11, 2022, specifically requesting the legal authority ODOC relied upon to prevent Plaintiff from presenting in that manner.

188.    Defendant Garcia did not and refused to provide Mr. Winston a written reason as to why ODOC was refusing to allow Plaintiff to present to the Committee by telephone.

189.    On January 6, 2022, Amie Fender-Sosa, counsel at the Oregon Legislative Policy and Research Office, emailed Mr. Winston and Defendant Garcia, to explain that ODOC had informed her that (a) ODOC will generally allow an Adult in Custody (IAC) to appear in a procedure (admin, court) where the person is a party to the case and (b) that ODOC will allow AICs to appear virtually for Legislative work groups, however, (c) "[i]t is not [ODOC's] practice to produce AICs for public hearings, but they do allow written testimony to be submitted."

190.    At no time prior to, during, or after the January 11, 2022, legislative meeting did any ODOC official, including Defendants Peters or Garcia, inform Plaintiff that he could submit written testimony as an alternative means of participating in the meeting.

191.    Plaintiff anticipated that he would testify by telephone at the January 11, 2022, legislative meeting. Had ODOC officials informed him that he could submit written testimony, he would have done so and spoken about ODOC's unlawful conduct against him.

192.    On information and belief, prior to the January 11, 2022, legislative meeting, counsel for the Committee had conversations with Defendant Garcia or other ODOC officials about Plaintiff providing testimony by telephone.

193.    On January 10, 2022, the Committee posted the agenda for the January 11, 2022, informational meeting. The agenda specified that the meeting allowed "invited testimony only"

and identified Plaintiff and his counsel, Juan Chavez, as individuals invited to testify. Generally, the agenda reflects the intent of the Committee's expectations of the hearing and can be changed at any time prior to the start to the hearing and even at the start of the hearing by the Chair. The agenda was never revised or adjusted to indicate that Plaintiff would not be available for the hearing.

194.    The agenda did not reflect that Defendant Peters would be presenting at the hearing; Defendant Peters was not identified as an invited participant. On information and belief, prior to the hearing on January 11, 2022, Chair Bynum confirmed Director Peters' participation.

195.    Prior to the January 11, 2022, hearing, Plaintiff's attorneys were never told that Plaintiff would not be available for the hearing.

196.    At the start of the scheduled time of the hearing, Plaintiff's attorney asked the Committee about whether Plaintiff was present by phone because there had been no indication to Plaintiff's attorney nor changes to the agenda to indicate Plaintiff would not be present.

197.    When asked by Plaintiff's attorney whether Plaintiff was present at the hearing during the scheduled time, Chair Bynum affirmed that the Committee did request Plaintiff to be present and that ODOC had mentioned that "challenges" with "staffing" would prevent Plaintiff from participating in the hearing. Chair Bynum then stated, "At this time I don't believe your client is present for the hearing."

198.    On January 11, 2022, Defendant Peters testified at the Committee meeting about the "jailhouse lawyer incident." In her opening statement to the Committee, Defendant Peters referred to it as the "Mark Wilson Case" and stated that while "it is under litigation, and I cannot comment on it specifically" she wanted to "speak to the issue generally." Defendant Peters

explained to the Committee that "while a bringing in a phone may seem like child's play, it is something that is very serious and the AIC and employee must be held accountable."

199.    At the January 11, 2022, House Judiciary meeting, Defendant Peters "clarified Mr. Wilson's ability to testify before the Committee." Defendant Peters stated that allowing an AIC to testify "is not something we have ever done in the past" and "it is not in line with our policy in the Department of Corrections." Defendant Peters further stated that ODOC has allowed AICs to participate in legislative workgroups on a "case by case basis" but "not in an open public hearing."

200.    At the January 11, 2022, House Judiciary meeting, Defendant Peters described an instance in which an AIC testified by telephone before the legislature. Defendant Peters explained this instance as a lawyer having "circumvented their attorney client privilege phone call to bring an adult in custody before a legislative committee" Defendant Peters informed the Committee that "as soon as we learned that happened, that lawyer's behavior was addressed by the agency."

201.    On January 11, 2022 (updated January 12) The Oregonian reported in response to Defendant Peters's misleading statement re addressing lawyer's behavior that "Attorney Tara Herivel, who had patched in her client from custody by phone from Coffee Creek to testify previously before lawmakers in a separate hearing, said she was surprised by Peters's remarks. She said the corrections department 'never communicated any problem' to her about helping her client testify, and that her client afterwards told her 'being heard by lawmakers was hugely empowering' after her suffering in custody for untreated medical conditions."

202.    In closing her testimony at the January 11, 2022, House Judiciary meeting, Defendant

Peters, who was not at the time a Defendant in this lawsuit, stated that "we look forward to

litigating this in court."

203.    Defendant Peters's testimony to the Committee is available on the Oregon Legislative

webpage at

https://olis.oregonlegislature.gov/liz/mediaplayer/?clientID=4879615486&eventID=2022011020

(last viewed March 21, 2022).

204.    Defendant Peters intentionally made two false statements to the Committee on January

11, 2022, which mislead the Committee members for the purpose of depriving Plaintiff the

ability to participate at the meeting and speak about ODOC's actions against him, which the

Committee had invited him specifically to do. First, Defendant Peters misled the Committee

about ODOC having a "policy" that restricted AICs from testifying live at an "open hearing"

before the Oregon Legislature. Second, on information and belief, Defendant Peters misled the

Committee about ODOC having "addressed" the behavior of the lawyer who facilitated her

client's participation by telephone before the legislature.

205.    On January 12, 2022, Representative Marty Wilde emailed Defendant Peters expressing

his disappointment that Plaintiff was not allowed to testify at the January 11, 2022, House

Judiciary meeting. Representative Wilde requested Defendant Peters provide information about

why Plaintiff was not allowed to testify.

206.    On January 19, 2022, Defendant Peters emailed Representative Wilde a response to his

January 12, 2022, email. Defendant Peters again stated that "DOC has never allowed an adult in

custody to testify in an open hearing as a matter of policy."

207.    In her January 19, 2022, email to Representative Wilde, Defendant Peters also stated that "I will not allow AICs an open forum where they can say anything during a livestreamed event."

208.    Defendant Peters, as ODOC's Director, and ODOC's authority to create policies governing individuals within the custody of the ODOC is governed by Oregon Administrative Procedures Act (APA) and other state laws. Neither Defendant Peters, as ODOC's Director, nor ODOC have promulgated or officially published a policy pursuant to the APA restricting AIC's from providing testimony during a livestreamed event.

209.    As of January 19, 2022, there was no ODOC policy restricting AIC live testimony to the Oregon legislature under its published and online policies on its webpage at https://www.oregon.gov/doc/rules-and-policies/Pages/policies.aspx (last viewed March 21, 2022).

210.    Plaintiff has testified by telephone in the OSCI library on at least 6 separate occasions between August 2019 to March 2000 in legislative workgroups on prison education. Defendant Garcia and other ODOC officials, including former legal librarian Pam McKinney, coordinated Plaintiff's participation by telephone in these workgroups.

211.    Legislative workgroups, generally, are comprised of legislators, subject matter experts, and interested stakeholders. Participation in the workgroup is by invitation only.

212.    The legislative workgroups on prison education are open to the public and recorded. Defendants allowed Plaintiff and other AICs to participate by telephone or video. These recordings can be listened to on the Oregon State Legislature's webpage.

213.    On November 22, 2019, Plaintiff facilitated in-person attendance and presentation of numerous AICs in a meeting of the prison education workgroup at the OSCI visiting room. Defendant Garcia and other ODOC officials were in the room and authorized that activity.

214.     On information and belief, Defendant Peters has during her tenure as Director of ODOC

been alleged on multiple occasions to have retaliated against ODOC employees in response to

their protected conduct.

215.     On information and belief, Defendant Peters has created a culture within ODOC in which

employees and AICs are fearful of speaking out against wrongful practices within the ODOC

that involve Defendant Peters.

///

## FIRST CLAIM FOR RELIEF

### (First and Fourteenth Amendment – Retaliation)

216.     Plaintiff realleges paragraphs 1 through 178.

217.     From January 2021 to the present, Defendants personally engaged in and continue to

engage in retaliatory actions against Plaintiff in violation of his First and Fourteenth Amendment

rights.

218.     Defendant Plante has taken adverse actions against Plaintiff, including but not limited to:

(1) reading Plaintiff's confidential legal material; (2) restricting, removing and punishing him for

his work as a legal assistant and for his prisoner advocacy; (3) placing him on work restriction

from January 2021 until August 10, 2021; and (4) fabricating evidence and writing a false

misconduct report to charge Plaintiff with disciplinary rule violations.

219.     The adverse acts of Defendant Plante, alleged in the previous paragraphs, were

intentionally taken because of Plaintiff's work as a legal assistant helping other prisoners on

legal matters, his accessing the court, communication with legal professionals and his counsel by

email and telephone, and his association and communication with the legal and legislative

community as a prison advocate – all of which are protected conduct involving litigation, advocacy, and political speech.

220.    Defendant Plante's adverse actions have had a chilling effect on Plaintiff's exercise of his First Amendment rights.

221.    Defendant Plante charged Plaintiff for rule violations for conduct authorized, facilitated, or done by McKinney in her role as OSCI legal coordinator.

222.    Defendant Plante charged Plaintiff but not any other other legal assistants and prisoners at OSCI, even though he knew those individuals were granted similar privileges by McKinney and had taken similar actions.

223.    Defendant Plante punished Plaintiff because McKinney was friendly and helpful in carrying out her job as OSCI legal coordinator, and specifically for providing Plaintiff access to the courts.

224.    Defendant Plante's adverse actions are inconsistent with the Oregon Way in that he has punished Plaintiff because McKinney normalized the prison environment and treated Plaintiff and other prisoners humanely.

225.    Defendant Plante used the investigative and misconduct system as subterfuge to obscure his intention to retaliate against Plaintiff for his protected conduct.

226.    Defendant Plante's actions against Plaintiff did not reasonably advance a legitimate correctional goal nor were Defendants' actions narrowly tailored to achieve such goals, to the extent they exist.

227.    Defendant Foss'120-day sanction imposed on Plaintiff was a gross deviation from the sanction typically imposed by ODOC for similar findings of misconduct by prisoners. Moreover, it was a far longer than sanctions typically imposed by ODOC when there are

extensive findings that misconduct created a threat to the safety, security, or orderly operation of a facility.

228.    The 120-day sanction was far in excess of national and international standards for the humane use of disciplinary solitary confinement.  In 2015, the United Nations General assembly unanimously adopted a resolution tiled "Standard Minimum Rules for the Treatment of Prisoners", which it also called the Nelson Mandela Rules, where it stated that "Solitary confinement shall be used only in exceptional cases as a last resort, for as short a time as possible", and that solitary confinement in excess of 15 consecutive days should never be used. The only state bordering Oregon that allows disciplinary solitary confinement longer than 15 days is Nevada.  Even Nevada limits DSC more than Oregon. Only two offenses can be sanctioned with more than 60 days, Assault and Battery on Staff (180 days), and Murder (one year).  The American Bar Association and the National Commission on Corrections Healthcare have unequivocally denounced the use of disciplinary solitary confinement longer than 15 consecutive days.

## SECOND CLAIM FOR RELIEF

### (Fourteenth Amendment – Due Process)

229.    Plaintiff realleges paragraphs 1 through 178.

230.    The Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property without due process of law.

231.    It is well settled that prisoners are entitled to certain due process protections when subject to disciplinary sanctions that contemplate restraint imposing atypical and significant hardship on the prisoner in relation to the ordinary incidents of prison life.

232.    As explained above, the conditions in OSCI disciplinary segregation do not mirror the conditions of administrative segregation.

233.    The duration and degree of restraint imposed by Plaintiff's 120-day disciplinary sanction and a comparison of the drastic differences in his conditions within disciplinary segregation and the incentive housing unit of general population at OSCI establishes that Plaintiff has suffered a "major disruption in his environment" that imposes an atypical and significant hardship on him in relation to the ordinary incidents of prison life.

234.    The punishment imposed on Plaintiff for purportedly violating ODOC rules was atypical and significant, as applied to him.

235.    Plaintiff's disciplinary charge is completely unsupported by evidence.

236.     Plaintiff's condition, that is, his restraint, is atypical and significant because, as a result of the misconduct proceedings and Final Order finding him guilty of serious misconduct, the duration of his confinement will invariably be affected by depriving him of a full reduction in is prison term and by postponing his scheduled release date of January 9, 2025, when that date arrives.

237.    Because Plaintiff has a liberty right at stake, he had the right, among other rights arising from *Wolff v. McDonnell*, 418 US 539 (1974), to call witnesses at a disciplinary hearing unless doing so would be inconsistent with institutional safety and correctional goals and the right to marshal the facts and present a defense to the misconduct violations.

238.    Defendant Foss's refusal to call Plaintiff's witnesses at his disciplinary hearing violated his due process rights.

239.    Contrary to Defendant Foss's reason for not calling Plaintiff's witnesses, those witnesses – and specifically McKinney – would have provided evidence refuting Defendant Plante's false

statements in the misconduct report and showing that Plaintiff was not guilty of the misconduct violations.

240.    Defendant Foss's refusal to call Plaintiff's witnesses deprived him of the ability to marshal the facts and present a defense to the alleged misconduct violations.

241.    As one example of the favorable evidence that Plaintiff would have been able to present had witnesses been allowed by Defendant Foss is the declaration of Pam McKinney. *See* Dkt. No. 7. That evidence shows the falsity of Defendant Plante's statements in the misconduct report and provides Plaintiff a defense to the alleged misconduct violations.

242.    Plaintiff was deprived of the ability to prepare and present a defense to the allegations against him, a meaningful opportunity to be heard, and a fundamentally fair misconduct hearing.

243.    Defendant Foss's Final Order finding Plaintiff guilty of serious misconduct lacked "some evidence", in violation of Plaintiff's right to due process.

244.    Defendant Nofziger had a duty to review the misconduct report to determine if it was accurate, appropriate, and supported by sufficient information. She failed to do that.

245.    Defendant Highberger had a duty upon receiving the preliminary order to evaluate whether one or more the reasons specified in OAR 291-105-0031(5) warranted dismissal or changing the disciplinary sanction(s) or approve and sign the preliminary order.

246.    Defendant Highberger's failure to dismiss the misconduct report or change the sanction in light of the findings and conclusions, in accordance with his duty under ODOC rules, given the lack of evidence to support those violations, violated Plaintiff's right to due process.

247.    Defendant Prins has a duty upon receiving a Petition for Administrative Review under OAR 291-105-0085 to review the Final Order to determine whether (1) there was substantial compliance with OAR 291-105; (2) the findings were based upon preponderance of the

evidence; and (3) the sanction was imposed in accordance with the provisions set forth in OAR 291-105.

248.    Defendant Prins has the authority to dismiss or vacate the Final Order or reopen the case made against Plaintiff under OAR 291-105. *See* OAR 291-105-0085(7)

249.    Despite being provided ample evidence of the deficiencies with Defendant Plante's misconduct report and Defendant Foss's Final Order, Defendant Prins did not dismiss or vacate the Final Order or reopen the case.

250.    Defendant Prins' failure to dismiss or vacate the Final Order or reopen the case against Plaintiff, in light of the evidence presented to him, violated Plaintiff's right to due process.

### THIRD CLAIM FOR RELIEF

### (First and Fourteenth Amendment – Retaliation)

251.     Plaintiff realleges paragraphs 1 through 215.

252.    Defendants personally engaged in and continue to engage in retaliatory actions against Plaintiff in violation of his First and Fourteenth Amendment rights.

253.    Defendants Peters and Garcia have taken adverse actions against Plaintiff by (1) depriving him of the ability to present live testimony at the January 11, 2022, Committee inquiry into the "jailhouse lawyer incident"; (2) depriving him of the ability to speak in an open forum where he can say anything during a livestreamed event; and (3) depriving him of the opportunity to present written testimony.

254.    The adverse acts of Defendants Peters and Garcia, alleged in the previous paragraphs, were intentionally taken because of Plaintiff's litigation in this case and his prior communications and associations with members of the Oregon legislature, and specifically

because of the content and viewpoints Plaintiff has expressed in this litigation and in communications with members of the Oregon legislature.

255.    Defendants Peters and Garcia's adverse action have had a chilling effect on Plaintiff's exercise of his First Amendment rights.

256.    Defendants Peters and Garcia's decision to deny Plaintiff the ability to participate by telephone in the January 11, 2022, Committee meeting was ad hoc and entirely inconsistent with their decisions prior to Plaintiff filing this § 1983 suit.

257.    Defendant Peters's reasons for denying Plaintiff the ability to participate by telephone Committee meeting were pretextual and in no other instance has Defendant Peters relied upon the impact on victims or the availability of staff to deny an AIC participation in a legislative meeting in which members of the legislature have specifically invited testimony from the incarcerated individual.

258.    Defendant Peters misled the Committee about an existing ODOC policy barring AICs from participating in a legislative proceeding that is livestreamed.

259.    Defendant Peters demeanor and statement to the Committee at the January 11, 2022, House Judiciary meeting that "we look forward to litigating this in court" – a matter in which she was not a party – showed a personal animus toward Plaintiff for seeking to redress violations of his constitutional rights in the court and the legislature. In using the term "we" in a matter not involving her at the time, Defendant Peters exhibited a degree of antagonism and bias contrary the ordinary and appropriate conduct of public officials in exercising their statutory and constitutional duties.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

260.     Defendants Peters and Garcia's actions against Plaintiff did not reasonably advance a legitimate correctional goal nor were Defendants' actions narrowly tailored to achieve such goals, to the extent they exist.

### FOURTH CLAIM FOR RELIEF

### (First and Fourteenth Amendments – Freedom of Expression)

261.     Plaintiff realleges paragraphs 1 through 215.

262.     The First Amendment forbids laws "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances."

263.     Although restricted, prisoners retain their First Amendment rights.

264.     When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.

265.     Plaintiff's effort to speak directly to the House Judiciary Committee on January 11, 2022, about the wrongs committed against him by ODOC Defendants, as alleged in this case, amounted to an effort to redress grievances to the legislature.

266.     Prohibiting Plaintiff from speaking to the House Judiciary Committee violated his right to speech.

267.     Prohibiting Plaintiff from speaking to the House Judiciary Committee was content-based and viewpoint-based ban on his speech in a public forum.

268.     The unwritten and ad hoc policy, articulated by Defendant Peters, imposing a blanket ban on adults in custody from testifying in an open hearing before the legislature or in a livestreamed event, irrespective of the nature or substance of the hearing, serves no legitimate governmental interest.

269.    To the extent that Peters was not even following an unwritten or ad hoc policy, but specifically singled out the Plaintiff to impose a ban on his speech on this occasion, she served no legitimate governmental interest.

270.    Although Defendant Peters identified that the reasons that Plaintiff was not allowed to provide live testimony included that it may impact his victims and that there were staff shortages, the use of those reasons by Defendant Peters, who is, as she noted in her statements to the Committee, a victim's advocate , was simply pretext to silence Plaintiff from speaking directly to the legislature about being a victim of state abuse.

271.    Defendant Peters exceeded the statutory authority granted to her as the Director of ODOC.  The Oregon Legislature has never authorized the Director of ODOC to prevent individuals in its custody from presenting live testimony to the legislature, nor to silence individuals in its custody from speaking directly to the government about the abuses those individuals have suffered at the hands of the state or the ODOC.

272.    Defendants Peters and Garcia have arbitrarily denied Plaintiff his right to speak to the legislature about his treatment by ODOC.

273.    Defendants Peters and Garcia's actions violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

WEREFORE Plaintiff prays for judgment as follows:

   A. Issue a Declaratory Judgment stating that Defendant Plante retaliated against Plaintiff in violation of the First and Fourteenth Amendments to the United States Constitution.

   B. Issue a Declaratory Judgment stating that Defendants Foss, Highberger, and Nofziger's denial of due process at Plaintiff's misconduct proceedings

violated the Fourteenth Amendment to the United States Constitution.

C.  Issue a Declaratory Judgment stating that Defendant Prins' denial of due
    process at Plaintiff's Administrative Review violated the Fourteenth
    Amendment to the United States Constitution.

D.  Issue a Declaratory Judgment stating that Defendants Peters and Garcia
    retaliated against Plaintiff in violation of the First and Fourteenth
    Amendments to the United States Constitution.

E.  Issue a Declaratory Judgment stating that Defendants Peters and Garcia's
    refusal to allow Plaintiff to testify before the Oregon legislature violated
    Plaintiff's First Amendment Rights.

F.  Issue a Declaratory Judgment stating that ODOC's unwritten policy and
    practice of precluding AIC's from providing live testimony to the Oregon
    Legislature is a violation of the First and Fourteenth Amendments to the United
    States Constitution.

G.  Issue and Injunction ordering Defendants and their agents to immediately:

    1.  Cease engaging in any and all ongoing acts of retaliation against Plaintiff.

    2.  Cease engaging in any and all ongoing chilling of Plaintiff's First and
        Fourteenth Amendment rights for the exercise of his protected conduct.

    3.  Credit Plaintiff's inmate trust account with the difference in the monetary
        award he would have earned as an Inmate Legal Assistant and the amount
        of monetary awards he actually received for each month from January 2021
        to the present.

    4.  Enjoin Defendants from requiring Plaintiff to pay $100 as a fine from the

disciplinary proceeding.

5.  Order Plaintiff's assignment to the OSCI law library as a legal assistant.

6.  Assign Plaintiff to incentive housing, where he was housed prior to January 20, 2021, in OSCI.

7.  Vacate or withdraw Defendant Plante's Misconduct Report.

8.  Vacate and dismiss the August 31, 2021, Final Order.

9.  Order the destruction of any and all false information created by Defendant Plante, described herein, that is in Plaintiff's institutional record or maintained in ODOC's computer systems.

10. Order Plaintiff to be fully restored to his institutional status and privileges prior to the violations of Plaintiff's constitutional rights.

H.  Award compensatory damages against Defendants named in their individual capacity.

I.  Award punitive damages against Defendants for an amount to be determined at trial.

J.  Award reasonable costs and attorney fees.

DATEED and SIGNED: April 6, 2022.

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Attorney for Plaintiff

*LEAD ATTORNEY*

/s/ *Benjamin Haile*
Benjamin Haile, OSB #040660
Attorney for Plaintiff

/s/ *Franz H. Bruggemeier*
Franz H. Bruggemeier, OSB #163533
Attorney for Plaintiff